UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

FORT LAUDERDALE DIVISION

CASE NO. 17-60301-CR-WPD


```
UNITED STATES OF AMERICA,      .
                               .
             Plaintiff,        . Fort Lauderdale, Florida
                               . June 26, 2018
             v.                . 8:58 a.m.
                               .
ANDRES MENCIA,                 .
                               .
             Defendant.        .
. . . . . . . . . . . . . . . .
```

- - - - -

Transcript of Trial Proceedings had

before the Honorable William P. Dimitrouleas,

United States District Judge, and a Jury.

- - - - -

VOLUME 7

- - - - -

Proceedings recorded by mechanical stenography, transcript produced by computer.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

**APPEARANCES:**

For the Government:   Michael E. Gilfarb, Esq.
                          Assistant U.S. Attorney
                          United States Attorney's Office
                          99 N.E. 4th Street
                          Suite 300
                          Miami, Florida  33132
                                and
                          Adam G. Yoffie
                          U.S. Department of Justice
                          Criminal Division
                          Bond Building, 8th Floor
                          1400 New York Avenue, N.W.
                          Washington, DC  20005

For the Defendant:    Marcos Beaton, Jr., Esq.
                          Cristina Prieto, Paralegal
                          Sinclair, Louis & Zavertnik, P.A.
                          40 Northwest 3rd Street
                          Suite 200
                          Miami, FL 33128
                                and
                          Bradley E. Horenstein, Esq.
                          The Horenstein Firm
                          40 NW 3rd Street
                          Penthouse 1
                          Miami, Florida  33128

Court Reporter:       Francine C. Salopek, RMR, CRR
                          Official Court Reporter
                          United States District Court
                          299 E. Broward Blvd., Room 203
                          Fort Lauderdale, Florida 33301
                          (954)769-5686

                      -  -  -  -  -

```
 1              TUESDAY, JUNE 26, 2018, 8:58 A.M.

 2              (The Judge entered the courtroom)

 3              THE COURT:  Please be seated.

 4              All right.  We're back on the record.

 5              Counsel are present.  Dr. Mencia is present.

 6              Anything to come before the Court before we bring the

 7    jury in?

 8              MR. YOFFIE:  Not for the government, your Honor.

 9              MR. BEATON:  Not from the defense, your Honor,

10    although, the marshal said I think we're missing two.

11              THE COURT:  Okay.

12              Mr. Mensah, if you want to come on back up and take

13    the stand.

14              COURTROOM SECURITY OFFICER:  Missing two.

15              THE COURT:  Okay.

16              And, Mr. Mensah, you understand you're still under

17    oath?

18              THE WITNESS:  Yes, your Honor.

19              (Pause)

20              THE COURT:  All right.  Let's bring in the jury.

21              COURTROOM SECURITY OFFICER:  All rise.

22              (The jury entered the courtroom)

23              THE COURT:  Counsel concede the presence of the jury

24    and waive its polling?

25              MR. YOFFIE:  Yes, your Honor.
```

MENSAH - DIRECT/YOFFIE

1    MR. BEATON:  Yes, sir.

2    THE COURT:  And did everyone follow my admonition not

3  to discuss the case or allow it to be discussed in your

4  presence?

5    THE JURORS:  Yes, your Honor.

6    THE COURT:  All right.  Mr. Yoffie, I think we're

7  ready to resume.

8    MR. YOFFIE:  Thank you, your Honor.

9           **DIRECT EXAMINATION (CONTINUED)**

10  BY MR. YOFFIE::

11  Q.  Good morning, Mr. Mensah.

12  A.  Good morning, sir.

13  Q.  Thank you for coming back this morning.

14    We were reviewing some prescriptions stemming from the

15  visits with Mr. Morales-Gomez.  Do you recall that?

16  A.  Yes, sir.

17  Q.  I'm gonna start by showing you a prescription from

18  August 24th, 2017.  This is not one of the recordings we've

19  seen, but it is a recording in evidence that I believe you have

20  seen and which you are in.

21    Do you recognize this prescription?

22  A.  Yes, sir.

23  Q.  What is the name of the practice up top?

24  A.  AGI Medical & Dental Center.

25  Q.  And what doctor's name is checked on the prescription?

1284

MENSAH - DIRECT/YOFFIE

1   A.  Dr. Andres Mencia.

2   Q.  And who is the recipient of the prescription?

3   A.  Lebrak Morales-Gomez.

4   Q.  And just to remind the jury, is that the individual we saw

5   in the recordings yesterday?

6   A.  Yes, sir.

7   Q.  Okay.  What is the date listed on the prescription?

8   A.  August 24th, 2017.

9   Q.  What is the prescription for?  What drug, dosage, and

10  quantity?

11  A.  Oxycodone, 30 milligrams.  Quantity number, 80.

12  Q.  Okay.  So, 80 pills.  Is that the same that Mr. Lebrak

13  Morales-Gomez received in July on his last visit?

14  A.  Yes, sir.

15  Q.  Whose signature is that at the bottom?

16  A.  Dr. Mencia.

17  Q.  Mr. Mensah, what is a "red flag"?

18  A.  As regard to medication quantity?

19  Q.  As your understanding of it.

20  A.  Dr. Mencia -- I heard him use --

21          MR. BEATON:  Judge, I object.

22          MR. YOFFIE:  It's a statement by the doctor, the

23  defendant himself.

24          THE COURT:  I don't know what he's going to say.  So,

25  let's hear what he has to say, and then you can object.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

MENSAH - DIRECT/YOFFIE

1        Go ahead.

2    A.   I heard him on numerous occasion that he would prefer to

3    give quantity of medications and 90 pills so as not to raise

4    red flags.

5    Q.   Okay.  I'm gonna show you another prescription.  Without

6    going through each detail, is this substantially similiar to

7    the prescription we just reviewed?

8    A.   Yes, sir.

9    Q.   Okay.  What is the difference on this prescription?

10   A.   The medication.

11   Q.   And what is the medication here?

12   A.   Oxycontin, extended release, number 60.

13   Q.   Does Oxycontin include oxycodone?

14   A.   Yes, sir.

15   Q.   How do the two drugs compare?

16   A.   Oxycodone is an immediate release.  And Oxycontin is an

17   extended release.

18   Q.   So, these two prescriptions were received on the same day?

19   A.   Yes, sir.

20   Q.   I want to do a quick calculation with you.  Eighty pills at

21   30 milligrams of oxycodone.  What is that number?

22   A.   2400?

23   Q.   Now, for Oxycontin, we have 60 pills at 20 milligrams.

24   What does that equal?

25   A.   1200?

1286

MENSAH - DIRECT/YOFFIE

1   Q.  So, in one sitting, Mr. Morales-Gomez gets how many

2   milligrams of oxy?

3   A.  3600?

4   Q.  Gonna show you a prescription from September of 2017,

5   subsequent visit.

6           Do you recognize this prescription?

7   A.  Yes, sir.

8   Q.  And who wrote the drug listed in the prescription?

9   A.  I did.

10  Q.  Who signed this prescription?

11  A.  Dr. Mencia.

12  Q.  Now, as compared to the prescription for oxycodone we just

13  looked at, what is the difference in this oxycodone

14  prescription?

15  A.  The previous was for 80 pills, and this one is 90 pills.

16  Q.  So, it's gone up another ten pills in a month.

17  A.  Yes, sir.

18  Q.  Is that the limit you referenced as the red flag?

19  A.  Yes, according to the doctor.

20  Q.  Do you recognize this prescription?

21  A.  Yes, sir.

22  Q.  And how does this compare to the Oxycontin prescription we

23  just reviewed?

24  A.  It *(sic)* basically the same thing.

25  Q.  And who wrote this prescription for the Oxycontin?  Whose

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

MENSAH - DIRECT/YOFFIE

1  handwriting is that?

2  A.  It's mine.

3  Q.  Who signed the prescription?

4  A.  Dr. Mencia.

5  Q.  I'm showing you now Exhibit 22F.  And this was already

6  admitted under exhibit -- as a subpart of Exhibit 22.

7      Do you recognize this document?

8  A.  Yes, sir.

9  Q.  Can you describe to the jury what this is?

10  A.  This is the superbill.

11  Q.  Okay.  Well, let me show you something.

12      Is this what you would see in Practice Fusion?

13  A.  Yes.  This is not -- sorry -- it's not a superbill.  This

14  is part of the patient record.

15  Q.  Can you describe what Practice Fusion is again for the

16  jury?

17  A.  Practice Fusion is the -- the patient records.  It's -- and

18  tells the patient's name, date of birth, the physical

19  examinations, the diagnosis, the plan of care.

20  Q.  Is this also known as an "electronic medical record"?

21  A.  Yes, sir.

22  Q.  I'm gonna direct your attention to page 13.  In the upper

23  right-hand corner, who is the individual listed by "seen by"?

24  A.  Dr. Andres Mencia.

25  Q.  And what is the date listed?

MENSAH - DIRECT/YOFFIE

1   A.  September 22nd, 2017.

2   Q.  What is the date listed for electronically signed?

3   A.  November 1st, 2017.

4   Q.  So, roughly how many weeks later is this electronically

5   signed?

6   A.  September, October....

7   Q.  From September to November.

8   A.  About 11 weeks?

9   Q.  Well, September 22nd, 2017, to November 1st, 2017.

10  A.  September, October, that's four weeks -- that's about eight

11  weeks, I think.

12  Q.  Okay.

13  A.  Approximately.

14  Q.  Give or take.

15        I'm gonna turn your attention to the next page on

16  page 14.  Under "plan," can you read the bolded language into

17  the record?

18  A.      "Patient advised and warning about overdosing

19        controlled med's.  Patient educated about red flag.

20        Patient advised on the risk abused the controlled

21        med's (sic)."

22  Q.  Do you recall if Dr. Mencia ever provided this warning to

23  Mr. Morales-Gomez?

24  A.  I don't recall.

25  Q.  Do you recall if you ever provided this warning to

MENSAH - DIRECT/YOFFIE

1   Morales-Gomez?

2   A.  I don't.

3   Q.  Do you know how it ended up in this patient file?

4   A.  This is preinstalled in the system.  And when I was hired,

5   as part of the training, the -- my trainers told me that

6   patients who get controlled substances, as part of the plan of

7   care that has to be clicked on and automatically shows up.

8   That's how I was told it was done at the office.

9   Q.  Even if the patient doesn't actually receive the warning.

10  A.  Yes.

11  Q.  Mr. Mensah, I want to turn briefly to Medicare patients.

12          As a medical assistant, did you see patients who were

13  paying for their visits with Medicare?

14  A.  Yes, sir.

15  Q.  Okay.  And unlike Mr. Morales-Gomez, who paid approximately

16  $200 in cash, roughly how much would a Medicare patient usually

17  pay, do you know?

18  A.  I don't know.

19  Q.  Okay.  Are you familiar with copays?

20  A.  Yes, sir.

21  Q.  All right.  And can you briefly describe what a "copay" is?

22  A.  A "copay" is for those who have insurance.  An insurance

23  may cover certain amount of the visit, and the rest is covered

24  by the patient.

25  Q.  In the recordings we saw yesterday, in the approximately

MENSAH - DIRECT/YOFFIE

1  six minute and 22 seconds examination, how would that compare

2  to the examination performed for Medicare patients?

3  A.  It's basically the same, with the exception of first-time

4  patients.

5  Q.  Okay.  How is it different for first-time patients?

6  A.  First-time patient, the visit -- the visit or the attention

7  is a little bit longer.

8  Q.  But how long would it be for repeat patients, such as the

9  second video with Mr. Morales-Gomez?

10  A.  About five minutes.

11  Q.  So, is it fair to say, although Mr. Morales-Gomez wasn't a

12  Medicare patient, that that is representative of repeat visits

13  for Medicare patients?

14  A.  Yes, sir.

15  Q.  Mr. Mensah, I want to talk briefly about your involvement

16  in this case.

17          Were you charged criminally?

18  A.  Yes, sir.

19  Q.  What were you charged with?

20  A.  For conspiracy to dispense and distribute controlled

21  substances, Schedule II medications.

22  Q.  What is the maximum amount of time you can serve in prison?

23  A.  Five years.

24  Q.  How did you plead to these charges?

25  A.  Guilty.

MENSAH - DIRECT/YOFFIE

1  Q.  As a result of this guilty plea, did you sign a plea

2  agreement?

3  A.  Yes, sir.

4  Q.  And what is your primary obligation under this plea

5  agreement?

6  A.  Is to cooperate with the government and tell the truth.

7  Q.  So, as part of this plea agreement, are you currently

8  cooperating with the government?

9  A.  Yes, sir.

10  Q.  Have you already been sentenced?

11  A.  No, sir.

12  Q.  When is your sentencing scheduled for?

13  A.  August 24th.

14  Q.  Has the government made you any promises?

15  A.  No, sir.

16  Q.  Who ultimately decides your sentence?

17  A.  The judge.

18  Q.  Are you hoping for a reduction based on your cooperation

19  here today?

20  A.  Yes, sir.

21  Q.  Who ultimately makes the determination as to whether you

22  are awarded a reduction?

23  A.  The judge.

24  Q.  But can the government file a motion for a reduction?

25  A.  Yes, sir.

MENSAH - DIRECT/YOFFIE

1    Q.   What happens if you don't tell the truth here today?

2    A.   Then I don't have the privilege of the government filing a

3    motion on my behalf.

4    Q.   Have you spoken with agents and prosecutors about this

5    case?

6    A.   Yes, sir.

7    Q.   Approximately how many times?

8    A.   On three occasions.

9    Q.   Was it possible to tell your entire involvement in one

10   sitting?

11   A.   No, sir.

12   Q.   Did you speak to federal law enforcement agents on the day

13   of your arrest?

14   A.   Yes, sir.

15   Q.   Did you mention a February 2018 meeting with Dr. Mencia?

16   A.   Yes, sir.

17          MR. YOFFIE:  Before we address that meeting, the

18   government would like to read stipulation 46 into the record.

19          "On or about January 31st, 2018, Dr. Andres

20      Mencia was served with records reflecting the Florida

21      Department of Health's investigation into patient

22      Ronald Erickson."

23    BY MR. YOFFIE::

24   Q.   Approximately when did this meeting take place in 2018?

25   A.   Second February, 2018.

MENSAH - DIRECT/YOFFIE

1   Q.   And who was in this meeting?

2   A.   Initially had the meeting which only by myself and him.

3   Q.   I'm sorry, for the record, who is "him"?

4   A.   Dr. Mencia.  Sorry.

5   Q.   Okay.  What did Dr. Mencia say to you in this meeting?

6   A.   On that date of February of 2018, after we have finished

7   seeing a patient, he asked me to accompany him to his office.

8   When we go to the office, he told me to have a seat, so I had a

9   seat.  And he said that, John, you have been here for about a

10  year now.  Uhm, I know your work.  I admire your work.  And I

11  appreciate what you do.  But I know that God placed you here to

12  help me, and I'm gonna need your help.

13           So, I asked him what does he need me for.

14           And he said that he had instructed the head of medical

15  assistants to make sure that every patient who is on pain

16  medications, including G-code -- or Code-G patients or the

17  gypsies and regular patients, that the person in charge is

18  supposed to make sure that when anybody come for their

19  medications, the person's supposed to make sure that they are

20  setting documentations, like they are sign -- there's a signed

21  consent form for them.

22           And the consent form entails that they will only come

23  to him for their medications, and they will only take the

24  medications that was prescribed to them, and that they will not

25  take the medication to get other street drugs, and they should

1294

MENSAH - DIRECT/YOFFIE

1  provide all the previous MRIs or x-rays, CAT scans that should

2  be on file.  And, also, the urine toxicology should also be on

3  file.

4        But to him, he believed that that person has not been

5  doing it.  So, he had meeting with the management, and they

6  decided that he should ask me to take that part of the work,

7  and he will inform the other medical assistants later on in the

8  day.  And he said that he knows that if he begin to enforce

9  those rules, he knows he will lose patients, and he's gonna

10 lose money, but he doesn't really care.

11 Q.  So, this is being said for the first time to you in 2018?

12 A.  Yes, on February, 2018.

13 Q.  And you've been there for over a year at this point.

14 A.  Yes.  I've been there for -- yeah, a year and one month.

15 Q.  And you previously heard Dr. Mencia refer to "gypsies" or

16 "G-codes"?

17 A.  Yes, sir.

18 Q.  What happened at the meeting later that day?

19 A.  Later that day, after -- after the work of the day, he

20 called all the other medical assistant *(sic)* back to his

21 office, and he told them what I just -- I've just said, the

22 same thing.

23 Q.  Did you receive any presigned prescriptions from

24 Dr. Mencia?

25 A.  Yes, once, on Monday, the 5th.

MENSAH - CROSS/BEATON

1   Q.   And what did he tell you to do with those prescriptions?

2   A.   He said I should -- if Oscar or Nadira, if they need it,

3   they can ask me for it.

4   Q.   That was February 5th.

5        To the best of your recollection, when were the

6   arrests carried out at AGI?

7   A.   February the 6th.

8        MR. YOFFIE:  One moment.

9        *(Discussion had off the record between counsel)*

10       MR. YOFFIE:  No further questions, your Honor.  The

11  government passes the witness.

12       THE COURT:  Cross-examination.

13       MR. BEATON:  Yes, sir.  Thank you.

14       Good morning, ladies and gentlemen.

15                       **CROSS-EXAMINATION**

16   BY MR. BEATON::

17  Q.   Good morning, Mr. Mensah.

18       How are you?

19  A.   Good morning, sir.  How are you?

20  Q.   Good.

21       So, I want to begin by playing the parts of the video

22  that the government didn't play.

23       MR. BEATON:  Brad, can we go to the first visit and

24  start where the government stopped, which is at approximately

25  seven minutes and 40 seconds?

MENSAH - CROSS/BEATON

1    MR. HORENSTEIN:  Yes.

2    *(Videotape playing)*

3    MR. BEATON:  Can we move on to the next video, the

4  remainder of the meeting, please?  Beginning at about 6:20.

5    *(Videotape playing at 6:20)*

6    MR. BEATON:  Stop there.

7   BY MR. BEATON::

8  Q.  So, Mr. Mensah, that's you that we hear on the recording,

9  correct?

10  A.  Yes, sir.

11  Q.  The second part, this is a different video.  It is the

12  second part of that first meeting with this patient, correct?

13  A.  Yes, sir.

14  Q.  Okay.  So, all that we saw yesterday where the government

15  stopped it happened before where we are now, correct?

16  A.  Yes, sir.

17  Q.  And do you remember telling the jury that Dr. Mencia

18  doesn't come back into the room?

19  A.  Yes, sir.

20    MR. BEATON:  Brad, can you finish playing it?

21    *(Videotape playing)*

22   BY MR. BEATON::

23  Q.  Can you tell where --

24    MR. BEATON:  Stop it there, Brad.

25

1297

MENSAH - CROSS/BEATON

1    BY MR. BEATON::

2    Q.  Can you tell where this video is being taken now?

3    A.  At the checkout counter.

4    Q.  Okay.  And are you there with this person posing as a

5    patient?

6    A.  You mean at the checkout counter?

7    Q.  Yes.

8    A.  I don't remember.

9    Q.  Okay.  This person's at the checkout counter on his own,

10   correct?

11   A.  I heard him talking to the checkout lady.

12   Q.  Okay.  And the payment is being processed by the checkout

13   lady, correct?

14   A.  Yes, sir.

15   Q.  This patient didn't hand cash to you inside of the waiting

16   room, correct?

17   A.  No, sir.

18   Q.  And this patient was finished with his visit and was sent

19   to pay at the front on his own, correct?

20   A.  Yes, sir.

21   Q.  Okay.

22        MR. BEATON:  Keep playing it, Brad.

23        (Videotape playing at 7:56)

24        MR. BEATON:  Let's fast forward to 10:45.

25        (Videotape playing at 10:45)

MENSAH - CROSS/BEATON

1    MR. BEATON:  Can you stop it there, Brad, and

2    highlight the part of the transcript that we just heard?

3    MR. HORENSTEIN:  *(Complied)*

4    MR. BEATON:  Right there.

5    BY MR. BEATON::

6    Q.  Mr. Mensah, do you hear where the person posing as a

7    patient is at the front desk, and they are making another

8    appointment for him?

9    A.  Yes, sir.

10   Q.  And it's hard to hear, which is why I have the transcript

11   up, but do you hear that the patient is making an appointment

12   and being told by someone at the front desk to fast, which

13   means not to eat or drink anything, right?

14   A.  Yes, sir.

15   Q.  And that's because at the next visit, he was gonna be

16   subjected to a blood test, correct?

17   A.  Yes, sir.

18   Q.  And that blood test was being done on Dr. Mencia's orders,

19   correct?

20   A.  Yes, sir.

21   Q.  And we don't hear -- you said Dr. Mencia didn't come back

22   into the room.  Did you hear anything inside the room where

23   Dr. Mencia says, I'm going to ask you to take a blood test next

24   time?  In the first part of the video?

25   A.  I don't recall.

1299

MENSAH - CROSS/BEATON

1  Q.  But certainly Dr. Mencia at some point ordered that blood

2  work -- blood be drawn from this patient, correct?

3  A.  Yes, sir.

4      MR. BEATON:  Brad, keep going, please.

5      *(Videotape playing at 11:21)*

6      MR. BEATON:  Can you stop it there, Brad, please.  And

7  go down to the portion halfway down the page where Patricia

8  talks.  A little bit higher.  A little bit higher.  There you

9  go, right there.  A little bit lower.  A little bit lower.

10  Right.

11  BY MR. BEATON::

12  Q.  And do you hear, and now see on the transcript, where the

13  front desk says, "You'll come back after your blood work, and

14  you'll see Dr. Mencia," correct?

15  A.  Yes, sir.

16  Q.  It doesn't say, You're gonna see John Mensah, Oscar

17  Rodriguez, Nadira Sampath.  The lady says, You're gonna see

18  Dr. Mencia.  Correct?

19  A.  Yes, sir.

20      MR. BEATON:  Brad, let's go to the May 24th visit,

21  please.

22      *(Discussion had off the record between counsel)*

23      MR. BEATON:  Let's go to July 25th, the video that we

24  saw yesterday and play the portions -- some of the portions

25  that we didn't see.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

1300

MENSAH - CROSS/BEATON

1      Let's start at minute 11:30.

2          MR. HORENSTEIN:  What time?

3          MR. BEATON:  11:30.

4          *(Videotape playing at 11:32)*

5          MR. BEATON:  Okay.

6          *(Videotape playing)*

7          MR. BEATON:  Brad, can you stop it there?

8    BY MR. BEATON::

9    Q.  Do you hear where, in that visit, Dr. Mencia says that 75

10   is his ceiling?

11   A.  Yes, I did.

12   Q.  And Dr. Mencia then leaves the room.

13         MR. BEATON:  Actually, Brad, just keep playing the

14   video.

15         *(Videotape playing)*

16         MR. BEATON:  Stop it there, please.

17   BY MR. BEATON:

18   Q.  Now Dr. Mencia is out of the room, right?

19   A.  Yes, sir.

20   Q.  And you and the patient start joking around and laughing.

21   A.  Yes, sir.

22   Q.  And he says, Come on, give me 80, I won't tell him.

23         Who did you understand "him" to be?

24   A.  Dr. Mencia.

25   Q.  Okay.  And at some point, you tell the patient, Okay, let

1301
MENSAH - CROSS/BEATON

1    me see what I can do.  Correct?

2    A.  Yes, sir.

3    Q.  And who wrote the "80" in that prescription?

4    A.  I did.

5    Q.  And when the person posing as a patient says, I won't say

6    nothing, I won't tell, your response is:

7                "Let -- but let me see what you're taking first.

8         Let me see where you are, all right?"

9    A.  Yes, sir.

10   Q.  That's your response.

11   A.  Yes, sir.

12   Q.  You don't say, Let me go talk to Dr. Mencia and see if I

13   can talk him into it.  Let me go confer with Dr. Mencia.

14               You say, Let me see what you're on, and let me see

15   where you are, correct?

16   A.  Yes.  Just that -- that was after I just -- just witnessed

17   the negotiation that he had with Dr. Mencia.  To be honest with

18   you, I guess that was a silly mistake on my part.  That -- I

19   shouldn't have done it.

20   Q.  I didn't ask you -- and I appreciate the fact that you're

21   ashamed of it and -- but those are the words that you used

22   then, was, Let me see where you're at, and let me see where you

23   are.  Right?

24   A.  Yes, sir.

25               MR. BEATON:  Let's go to July 25th, the second video,

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

MENSAH - CROSS/BEATON

1   and begin at 45 seconds.

2          (Videotape playing at :42)

3          MR. BEATON:  Stop right there.

4    BY MR. BEATON::

5   Q.  Did you hear that conversation --

6   A.  Yes, sir.

7   Q.  -- Mr. Mensah?

8   A.  Yes, sir.

9   Q.  You didn't go outside and say, Hey, Dr. Mencia, can I give

10  him five more pills?  He's asking for five more pills.

11  Correct?

12  A.  No, I didn't.

13  Q.  You didn't walk outside and have any discussion with the

14  doctor whatsoever, correct?

15  A.  Yes, sir.

16  Q.  You said, The most I can do is I can add five more pills,

17  correct?

18  A.  Yes.

19  Q.  And you added those five pills, did you not?

20  A.  Yes, I did.

21  Q.  Because you wanted to get that tip.

22  A.  I did not discuss no tip with him.

23  Q.  Did you hear several times before where he said, I'm gonna

24  hook you up, bro, I'll take care of you, bro?

25          Did you hear that?

1303

MENSAH - CROSS/BEATON

1   A.   Yes.

2   Q.   What did you think that meant?

3   A.   That could mean anything, but I did not discuss no -- any

4   issue of gotten tip with him *(sic)*.

5           MR. BEATON:  Brad, keep playing it, please.

6           *(Videotape playing)*

7           MR. BEATON:  Stop there.

8   BY MR. BEATON:

9   Q.       "I keep looking at you, and you're not saying

10       anything *(sic)*, man."

11           Do you hear that?

12   A.   Yes, sir.

13   Q.   Isn't that sort of a polite way of saying, I'm looking at

14   you, I just gave you five more pills, where's my hookup?

15   A.   I don't think so.

16   Q.   You don't think so?

17   A.   No, sir.

18   Q.   You were there, I wasn't.  You tell me.

19   A.   *(No response)*

20   Q.   What did you want him to say?

21   A.   Nothing, actually.

22   Q.   That's your testimony?  That that line -- when you say,

23   "That's why I... I'm keep looking at, and you're not saying

24   nothing," your testimony is that you didn't want him to say

25   anything?  Is that what you're telling this jury?

1304

MENSAH - CROSS/BEATON

1   A.  All right.  Since he was saying that he is gonna hook me

2   up, so I just wanted to hear exactly what he had.

3   Q.  Okay.  Where's that hookup, right?

4   A.  Yeah, that's what -- that's what that refers to.

5           MR. BEATON:  Let's keep going.

6           (Videotape playing at 2:19)

7           MR. BEATON:  Actually, Brad, let's just go to 4:09 so

8   we can....

9           (Videotape playing at 4:09)

10          MR. BEATON:  Stop it right there, please.

11   BY MR. BEATON::

12   Q.  Do you hear you laughing, Mr. Mensah?

13   A.  Yes.  Yes, sir.

14   Q.  And you hear the person posing as a patient say, You're

15   saying next month, I could boost it up?

16          And your answer is:  "If only I deal with you."

17          Do you see that?

18   A.  Yes, sir.

19   Q.  You don't say, If Dr. Mencia thinks it's appropriate,

20   correct?

21   A.  Yes, sir.

22   Q.  You don't say, We'll see what Dr. Mencia says, correct?

23   A.  Yes, sir.

24   Q.  You basically say, If we can keep Dr. Mencia out of the

25   loop, and you deal only with me, I can boost you up.

MENSAH - CROSS/BEATON

1         That's what you're saying.

2    A.   But those prescriptions are given to him, he look at it and

3    sign them, so....  I don't sign those prescriptions.

4    Q.   Maybe my question wasn't clear.

5         When you say, "If only I deal with you," you are

6    telling this person, We can boost you up next month, but if

7    you're only seeing me.  Correct?  You used the word "only."

8    A.   Yes, sir.

9    Q.   And that excludes Dr. Mencia, doesn't it?

10   A.   It does not exclude him, because the prescription has to go

11   to him.  He reads it, and he sign (sic) them.

12   Q.   Okay.  And Dr. Mencia -- and we've now learned it was a bad

13   habit -- from time to time would have prescriptions signed --

14   presigned and give them to you, would he not?

15   A.   No.

16   Q.   Would someone in the office give you prescriptions that

17   were signed?

18   A.   No.

19   Q.   So, you're saying that in your case, Dr. Mencia signed

20   every prescription after you presented it to him?

21   A.   Yes.

22   Q.   Okay.  So, you consulted with the doctor?

23   A.   I write a prescription, and I give it to him.  And if need

24   be, I consult with him.

25         THE COURT REPORTER:  I'm sorry?

MENSAH - CROSS/BEATON

1    A.  If it's necessary, I consult with him.

2          MR. BEATON:  I didn't understand.  I'm sorry.  Forgive

3    me.

4          THE COURT REPORTER:  "If necessary, I consult with

5    him."

6          MR. BEATON:  Oh, okay.

7     BY MR. BEATON::

8    Q.  So, that phrase, "If only I deal with you," where you both

9    laugh, includes Dr. Mencia is what your testimony is.

10   A.  *(No response)*

11   Q.  I just want to understand.

12         MR. YOFFIE:  Objection.  Asked and answered.

13         THE COURT:  Overruled.

14   A.  It does not mean that he will come and see only me.  He had

15   to be seen by Dr. Mencia.

16   Q.  Okay.

17   A.  And I witness him negotiate pills increment with

18   Dr. Mencia, so I thought it was okay.  But as I said, it was a

19   silly mistake on my part.  I should not have done that.

20   Q.  I'm only talking right now about what you said.  And we'll

21   move on, but what you're saying is, when you say, "If only I

22   deal with you," doesn't mean "if only I deal with you."

23   A.  Yes, that's what it means.

24   Q.  Okay.

25         MR. BEATON:  Can we go to 7:33, please?

1307

MENSAH - CROSS/BEATON

```
1              (Videotape playing at 7:31)
2              MR. BEATON:  Stop it there.
3    BY MR. BEATON::
4    Q.       "Hey, here you go, bro.  Don't say I did this."
5         And you laugh, and you say, "Thank you, man."
6         Did you hear that?
7    A.  Yes, sir.
8    Q.  And what the person posing as a patient is doing is handing
9    you a hundred dollar bill, isn't he?
10   A.  He did not hand it to me.  He came in, and he put something
11   in my pocket.  I did not really initially know what it was.
12   Q.  Okay.  You took a hundred dollars from this guy.
13   A.  Yes.  Later I found out it was a hundred dollars that he
14   put in my pocket.
15   Q.  And he tells you, "Hey, don't say I did this," right?
16   A.  Yes.
17   Q.  And he repeats, "Don't say I did this," right?
18   A.  Yes.
19   Q.  And you say, "Yeah," correct?
20   A.  Yes, sir.
21   Q.  You don't tell him, Don't even worry about it, doctor
22   knows.  Did you?
23   A.  Your question again, please?
24   Q.  You didn't say anything to the effect of, Don't worry about
25   it, it's not a secret here, or the doctor already knows.
```

1308

MENSAH - CROSS/BEATON

1    That wasn't your response, was it?

2    A.  No, sir.

3    Q.  And then you say, "The next time, if we -- if we're linked

4    together, I'll see what we do, okay?"

5    Do you see that?

6    A.  Yes, sir.

7    Q.  You don't say, Next time you come in, we'll see what

8    Dr. Mencia says, correct?

9    A.  No, sir.

10   Q.  You don't say, Next time we (sic) come in, we'll talk to

11   the doctor and see what the doctor thinks we should do,

12   correct?

13   A.  No, sir.

14   Q.  You say, The next time you come in, if we're linked

15   together, I'll see what we can do."  Correct?

16   A.  Yes, sir.

17   Q.  And do you remember yesterday your testimony to this jury

18   that it was the confidential informant that asked for your

19   number?

20   A.  Yes, sir.

21   Q.  And that you did not ask for the confidential informant's

22   number?

23   A.  I don't recall that part.

24   Q.  Will you agree with me that your testimony about exchanging

25   numbers was simply that the confidential informant asked for

MENSAH - CROSS/BEATON

```
1    your number?

2    A.  Yes, sir.

3            MR. BEATON:  Brad, play it starting at 8:20.

4            (Videotape playing at 8:18)

5     BY MR. BEATON::

6    Q.  Do you see where you tell him first -- after he tells you:

7            "I hooked you up good, bro" -- "Listen, call me,

8        when you're coming, call me"?

9            Do you see that?

10   A.  Yes, sir.

11   Q.  Prior to that, he had not asked for your number, correct?

12   A.  No, sir.

13   Q.  The idea about communicating directly with this

14   confidential informant was yours.

15   A.  (No response)

16   Q.  Mr. Mensah?

17   A.  Yes, sir.

18   Q.  And what you ask him is to call you ahead of time when he's

19   coming in so that you know he's coming in.

20   A.  (No response)

21   Q.  Right?

22   A.  Yes, sir.

23            MR. BEATON:  Keep playing it, Brad.

24            (Videotape playing)

25            MR. BEATON:  Stop it there.
```

1310

MENSAH - CROSS/BEATON

1    BY MR. BEATON::

2    Q.  Do you see where, again, the confidential informant goes to

3    the front desk?

4    A.  Yes, sir.

5    Q.  Or the checkout -- forgive me -- that's actually not

6    correct.  It's in the front area, but it's actually the

7    checkout desk.

8    A.  Yes, sir.

9    Q.  And do you see what that first line says that you can read

10   on the screen?

11   A.  The first line?

12   Q.  Hum-hum.

13   A.  That's the "Okay, 185" or --

14   Q.  Yes.  It says:  "Okay, 185."

15   A.  Yes.

16   Q.  This confidential informant goes to the checkout and pays

17   $185, does he not?

18   A.  Yes.  Yes, sir.

19   Q.  Not 300, correct?

20   A.  No, sir.

21   Q.  Not 350, correct?

22   A.  Yes, sir.

23   Q.  $185, correct?

24   A.  Yes, sir.

25   Q.  And, by the way, at that checkout desk, there are many,

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

1311
MENSAH - CROSS/BEATON

1  many people working in that little area, are there not?

2  A.  Yes, sir.

3  Q.  So, this is in front of everybody, correct?

4  A.  Yes, sir.

5  Q.  He didn't pay you inside of the room, did he?

6  A.  That was -- he wasn't paying me 185.  That was for his

7  visit.

8  Q.  That was for his visit.

9  A.  Yes.

10  Q.  But my question is:  He didn't pay you inside the room.  We

11  can see that he pays outside in front of everybody, and it's

12  185.

13  A.  Yes, sir.

14         MR. BEATON:  Brad, can we go to the September 22nd

15  visit, please.

16         (Discussion had off the record between counsel)

17         (Videotape playing)

18         MR. HORENSTEIN:  One moment.

19         (Videotape playing at :01)

20         MR. BEATON:  Can you stop it there, please?

21   BY MR. BEATON::

22  Q.  So that we don't waste any time, this is the September 22nd

23  visit, Mr. Mensah, and you'll see -- you'll recall that

24  Dr. Mencia was in this visit, correct?

25  A.  Yes, sir.

1312

MENSAH - CROSS/BEATON

1   Q.   And that person in the white coat, do you see that?

2   A.   Yes, sir.

3   Q.   That is a physician training with Dr. Mencia, is it not?

4   A.   Yes, sir.

5   Q.   So, now Dr. Mencia's bringing additional people into the

6   room with him, is he not?

7   A.   Yes, sir.

8   Q.   Dr. Mencia brought that gentleman into the room, right?

9   A.   Yes, sir.

10   Q.   So, now, it's not only you in this room, correct?

11   A.   Yes, sir.

12   Q.   Dr. Mencia comes into the room, right?

13   A.   Yes, sir.

14   Q.   And Dr. Mencia brings with him another physician, correct?

15   A.   Yes, sir.

16        MR. BEATON:  Keep going, Brad.

17        (Videotape playing at 0:01)

18        MR. BEATON:  Stop it there, please.

19   BY MR. BEATON:

20   Q.   I don't want to go back in the video if I don't have to,

21   but the confidential informant, posing as a patient, had asked

22   you if you could give him Adderall, correct?

23   A.   Yes, sir.

24   Q.   And you don't say, Sure, I can, correct?

25   A.   Yes.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

MENSAH - CROSS/BEATON

1  Q.  What you tell the patient is that the patient needs to ask

2  Dr. Mencia, correct?

3  A.  Yes, sir.

4  Q.  And then you coach the patient on what to tell Dr. Mencia

5  to medically support a prescription for Adderall.

6  A.  *(No response)*

7  Q.  Mr. Mensah?

8  A.  Yes, that's -- sorry about that.  I thought you had

9  something else to say.

10         But as I said, I should not have done that.  Those are

11 all part of silly mistakes I made, and I'll have to live with

12 it for the rest of my life.

13 Q.  I understand that.

14         Forgive me for interrupting.  Keep going.  I didn't

15 mean to interrupt you.

16 A.  Pardon me?

17 Q.  I didn't mean to interrupt you, I'm sorry.  If you have

18 something else to say, go ahead.

19 A.  No, that's all I have to say.  As I said, I should not have

20 done it.  That's a silly mistake.  It's bad judgment on my

21 part.  And it's something that I shouldn't have done.

22 Q.  So, my question wasn't whether it was, as you characterize

23 it, a silly mistake.  My question was:  What you are doing --

24 strike that.

25         Let -- what you say on that video to this patient is:

MENSAH - CROSS/BEATON

```
 1            "What you -- what you do is that you tell -- tell
 2        the doctor how you feel, that's, you guess, you --
 3        you cannot concentrate, you cannot finish your work
 4        and all."  Correct?
 5   A.   Yes, sir.
 6   Q.   Now, you're trained as a medical doctor, correct?
 7   A.   Yes, sir.
 8   Q.   You practiced as a medical doctor, correct?
 9   A.   Yes, sir.
10   Q.   You know that Adderall is an attention deficit drug,
11   correct?
12   A.   Yes, sir.
13   Q.   And it's indicated for people who can't concentrate,
14   correct?
15   A.   Yes, sir.
16   Q.   And it's indicated for people who can't finish their work,
17   correct?
18   A.   Yes, sir.
19   Q.   And that's how people are diagnosed, in part, with
20   attention deficit disorder, correct?
21   A.   Yes, sir.
22   Q.   And so, you tell this patient what to say, what words to
23   use to support a diagnosis of attention deficit disorder,
24   correct?
25   A.   Yes.  But in part, when he asked me for Adderall and -- I
```

MENSAH - CROSS/BEATON

 1   told Dr. Mencia about it, and I guess my -- my medical

 2   background just -- nothing came out by the whole thing, just --

 3          THE COURT REPORTER:  I'm sorry.  "Just"....

 4   A.  My medical background, I'm not thinking deeply about it.  I

 5   just told him what to say.  And I shouldn't have done it

 6   anyway, as I said.

 7   Q.  But -- I get the whole thing about the medical background,

 8   but you didn't ask this person if he had trouble concentrating,

 9   correct?

10   A.  No, I didn't.

11   Q.  It's not posed as a question, is it?

12   A.  No, sir.

13   Q.  You don't ask this person if this person has trouble

14   finishing his work, do you?  It's not a question, correct?

15   A.  No.

16   Q.  You preface your entire statement by saying, What you do,

17   what you tell the doctor is -- and then proceed to give the

18   patient the words that will support a diagnosis for attention

19   deficit disorder, correct?

20   A.  Yes, sir.

21          MR. BEATON:  Keep playing it, Brad.

22          (Videotape playing)

23          MR. BEATON:  Can you stop it there?

24    BY MR. BEATON::

25   Q.  You hear where the -- after you coach this witness on -- I

MENSAH - CROSS/BEATON

1  mean this patient on what to say, the patient expresses a fear

2  to you that Dr. Mencia might cut the patient's medication down.

3  Do you see that?

4  A.  Yes, sir.

5  Q.  And you don't say, Look, he's not gonna cut it down, do

6  you?

7  A.  No.

8  Q.  You don't say, Look, Dr. Mencia knows about all of this, so

9  don't even worry about it, correct?

10 A.  No.

11         MR. BEATON:  Brad, go to 59 seconds, please.

12         (Videotape playing)

13         MR. BEATON:  Stop it right there.

14  BY MR. BEATON::

15 Q.  You tell the patient not to tell Dr. Mencia that you are,

16 quote/unquote, buddies, correct?

17 A.  Yes.

18 Q.  You tell this confidential informant, posing as a patient,

19 that, If you tell Mencia about us, he's not gonna do it.

20 Correct?

21 A.  Yes, sir.

22 Q.  You're asking this patient to help keep your relationship

23 with the patient a secret from the doctor, correct?

24 A.  I was not -- not thinking of keeping it a secret.

25 Q.  I'm sorry?

1317
MENSAH - CROSS/BEATON

1  A.  Like I said, that's -- I said that, but I was not thinking

2  of telling him to keep anything a secret.

3       Because at the end of the day, Dr. Mencia had to sign

4  the prescription.  He had to read it and sign it.  So, there

5  will not be no secret there.

6  Q.  But you tell this person:  If you tell -- quote:  "If you

7  tell him we're buddies, he's not gonna do it," correct?

8  A.  Yes, I did.

9  Q.  And the "he" that you're referring to, when "he's not gonna

10  do it," is Dr. Mencia, correct?

11  A.  Yes, sir.

12  Q.  And what Dr. Mencia is not gonna do if he finds out that

13  you're, quote/unquote, buddies is give the patient a

14  prescription for Adderall, correct?

15  A.  Your question again, please?

16  Q.  What you are telling this confidential informant, who was

17  posing as a patient, is that if this patient tells Dr. Mencia

18  that you are, quote/unquote, buddies, that Mencia will not

19  prescribe the Adderall.

20  A.  The judgment lies on Dr. Mencia.  I think being,

21  quote/unquote, buddies, that's not -- it has no weight on that.

22  He has the final say.

23  Q.  Forgive me if my question is unclear.

24       When you tell this confidential informant that if he

25  tells Dr. Mencia that you two are, quote/unquote, buddies, that

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

MENSAH - CROSS/BEATON

1   Dr. Mencia is not gonna do it, correct?

2   A.  Yes, sir.

3   Q.  And the "it" refers -- what Dr. Mencia will not do is

4   prescribe the Adderall, correct?

5   A.  Yes, sir.

6   Q.  Because you knew that if there was no medical necessity for

7   the Adderall, Dr. Mencia was not going to prescribe it.

8   A.  *(No response)*

9   Q.  Correct?

10  A.  That's -- that's -- that's right.  But if we are talking

11  about medical necessity, I believe that if -- the first time

12  the patient came in, if due diligence had been done on the part

13  of the doctor in terms of physical examination, I don't think

14  I'll be sitting down here.

15  Q.  No, I get that you're blaming Dr. Mencia for all of this.

16  A.  No, I'm not blaming him.  I'm just saying -- telling what I

17  saw.

18  Q.  But my question is far more simple than that.  What you

19  understood Dr. Mencia wouldn't do if he found out that you

20  guys -- meaning you and the patient -- were trying to trick

21  Dr. Mencia, that the patient was giving you tips, is that

22  Dr. Mencia was not gonna prescribe the Adderall, correct?

23  That's what you're saying there.

24  A.  Yeah, that's correct.  But as I said, being -- him being my

25  buddy has -- has no weight on that.  Everything is Dr. Mencia.

1319

MENSAH - CROSS/BEATON

```
 1   He look at the prescription.  And if he decide to sign or not,
 2   that's up to him.  Being my buddy with him would not have
 3   nothing to do with him getting the prescription or not.
 4           MR. BEATON:  Brad, go back to 1:35, please.
 5           (Videotape playing at 1:35)
 6           MR. BEATON:  Can you stop again, please?
 7   BY MR. BEATON:
 8   Q.  The confidential informant again asks you, If I tell him,
 9   he's not gonna do it?
10           And you again say, "Yeah, he won't do it."
11           Do you see that?
12   A.  Yes.
13   Q.  And what you understood is that Dr. Mencia would not
14   prescribe the Adderall.
15   A.  Yes.
16   Q.  And then you coach the patient some more on what not to
17   say, correct?
18   A.  Yes, sir.
19   Q.  And that is, Do not tell Dr. Mencia that you are sleepy,
20   correct?
21   A.  Yes, sir.
22   Q.  You have medical training.  What would a patient telling a
23   doctor that he is sleepy -- how would that calculate into the
24   decision to prescribe Adderall?
25   A.  If you -- if you need something to keep you awake, and you
```

MENSAH - CROSS/BEATON

1  need to at least get your concentration, and in some instances,

2  if you are sleepy, most of the time, what happen is that

3  Adderall will help you to stay awake.

4  Q.  Okay.  But you say there, "Don't tell him that you are

5  sleepy."  Do you see that?

6  A.  Yes.

7  Q.  Why did you say that?

8  A.  That was an error on my part.  That does not really make

9  sense.

10  Q.  So, not only were you giving him medical advice, you were

11  giving him bad medical advice, because Adderall does, in fact,

12  make you more alert, correct?

13  A.  Yes, sir.

14          MR. BEATON:  Brad, let's go to 2:40, please.

15          (Videotape playing at 2:40)

16          MR. BEATON:  Stop there.

17   BY MR. BEATON::

18  Q.  I'm not gonna beat a dead horse.

19          You're coaching him again for the third time, correct?

20  A.  Yes.

21          MR. BEATON:  Brad, can we start at five minutes,

22  please?

23          (Videotape playing)

24          MR. BEATON:  Stop it, please.

25

MENSAH - CROSS/BEATON

1  BY MR. BEATON:

2  Q.  So, you keep -- your testimony has been both yesterday and

3  today that, Nope, I went in to Dr. Mencia and showed him

4  everything and signed it.  Do you see there where you're

5  negotiating with the patient between 85 and 90 pills?

6  A.  That's -- that's -- is based on what I saw him did -- did

7  with Dr. Mencia.  And as I said, it's bad judgment on my part,

8  and I shouldn't have done it.  That's -- that's it.  I should

9  not have done it.  But because I saw him negotiate the pills

10  with Dr. Mencia, Dr. Mencia agreed to increase his pills, that

11  made me do it.  But it's bad judgment.  I should not have done

12  it.

13  Q.  My question was:  Do you see there where you negotiate the

14  quantity of pills with the person posing as a patient?

15  A.  Yes.

16  Q.  That's the question.

17  A.  Yes.

18  Q.  And that's what you did, right?

19  A.  Yes, that's what I did.  But as I said, I shouldn't have

20  done that.  That is -- that is a bad judgment on my part.

21  Q.  And your testimony, you'll agree with me, has consistently

22  been that when you did all of this stuff, what you characterize

23  as either silly mistakes or bad judgments, that you consulted

24  with Dr. Mencia and showed him the prescription.  Correct?

25  That's been your testimony.

1322
MENSAH - CROSS/BEATON

1    A.  Yes, I gave the prescription to him.  He read it, and he

2    signs it.

3    Q.  Okay.

4         MR. BEATON:  Brad, back up to four maybe 48.  I'm

5    sorry, I mean 5:48.  Forgive me, forgive me.

6         *(Videotape playing)*

7         MR. BEATON:  Stop.

8     BY MR. BEATON::

9    Q.  Here what you say:

10        "But I'm not going to say -- I'm not gonna say

11         nothing to him, I'm gonna deal with it, I will take

12         care of that."

13        Do you see that?

14   A.  Yes, sir.

15   Q.  And what you are saying is that you aren't going to tell

16   Dr. Mencia of the increase in pills, correct?

17   A.  Yes.

18        MR. BEATON:  Do we need to take a break, Judge?

19        THE COURT:  Yeah.

20        All right, members of the jury, we're going to take a

21   ten-minute recess.  Remember my admonition not to discuss the

22   case or allow it to be discussed in your presence.  We'll see

23   you back in the jury room in about ten minutes.

24        COURTROOM SECURITY OFFICER:  All rise.

25        *(The jury exited the courtroom)*

1323

MENSAH - CROSS/BEATON

1    THE COURT:  And, again, Mr. Mensah, during the break

2  in your testimony, you're not allowed to discuss your testimony

3  with anyone.  And we'll see you back in about ten minutes.

4    And if there's nothing else to come before the Court,

5  we'll be in recess for ten minutes.

6    MR. GILFARB:  Thank you, your Honor.

7    MR. BEATON:  Thank you, Judge.

8    *(The Judge exited the courtroom)*

9    *(Recess taken at 10:18 a.m. until 10:35 a.m.)*

10    *(The Judge entered the courtroom)*

11    THE COURT:  All right.  We're back on the record.

12    Counsel are present.  Dr. Mencia's present.

13    Mr. Mensah, do you understand you're still under oath?

14    THE WITNESS:  Yes, sir.

15    THE COURT:  Anything to come before the Court before

16  we bring the jury in?

17    MR. YOFFIE:  Not from the government, your Honor.

18    MR. BEATON:  Not from the defense, your Honor.

19    THE COURT:  All right.  If we have all the jurors,

20  let's bring them in.

21    *(Laughter)*

22    MR. BEATON:  Glad somebody's having fun.

23    COURTROOM SECURITY OFFICER:  All rise.

24    *(The jury entered the courtroom)*

25    THE COURT:  Counsel concede the presence of the jury

MENSAH - CROSS/BEATON

```
1   and waive its polling?

2            MR. YOFFIE:  Yes, your Honor.

3            MR. BEATON:  Yes, your Honor.

4            THE COURT:  And did everyone follow my admonition not

5   to discuss the case or allow it to be discussed in your

6   presence?

7            THE JURORS:  Yes, Judge.

8            THE COURT:  All right.  Mr. Beaton, you may continue.

9            MR. BEATON:  Thank you, your Honor.

10           Brad, can we go back to five minutes and 50 seconds,

11  just to put us back where we were?

12           (Videotape playing at 5:51)

13           MR. BEATON:  Stop there, Brad.

14   BY MR. BEATON::

15  Q.  So, before the break, Mr. Mensah, you'll recall that we

16  were talking about this portion of the video?

17  A.  Yes, sir.

18  Q.  And where the confidential informant, posing as a patient,

19  asks if you're still gonna give him 90.  Do you see that?

20  A.  Yes, sir.

21  Q.  And your response is, quote:

22           "But I'm not gonna say nothing to him, I'm gonna

23        deal with it, I will take care of that."

24           Do you see that?

25  A.  Yes, sir.
```

MENSAH - CROSS/BEATON

1  Q.  And do you see -- when you say, "I'm not going to say

2  nothing to him," what you mean by that is that you're not gonna

3  say anything about the increase to Dr. Mencia, correct?

4  A.  Yes, sir.

5  Q.  And what you say to him is that you are going to deal with

6  it on your own, without Dr. Mencia, correct?

7  A.  Yes.  But he has to sign the prescription, so he saw what

8  was there.

9  Q.  My question was:  When you say, "I'm gonna deal with it, I

10  will take care of that," what you were saying is that you were

11  going to, on your own, increase the number of pills without

12  speaking with, consulting with, or running it by Dr. Mencia,

13  correct?

14  A.  Yes.

15         MR. BEATON:  Brad, go to 11 minutes, please.

16         Actually, you know what, go to 10:50.  Forgive me.

17         (Videotape playing at 10:50)

18         MR. BEATON:  Stop it there, please.

19   BY MR. BEATON::

20  Q.  So, you see that Dr. Mencia is now in the room, correct?

21  A.  Yes, sir.

22  Q.  And this is after the conversations that you have just had

23  with this confidential informant posing as a patient, correct?

24  A.  Yes, sir.

25  Q.  When you were having those conversations with this patient

MENSAH - CROSS/BEATON

1  about what he needed to say and about increasing the pills,

2  Dr. Mencia was not in the room, correct?

3  A.  Yes, sir.

4  Q.  And you see that now, later in the visit, Dr. Mencia is in

5  the room?

6  A.  Yes.

7  Q.  And there is also the doctor that is training with

8  Dr. Mencia, correct?

9  A.  Yes, sir.

10 Q.  Okay.  So, now there's four people in the room, correct?

11 A.  Yes, sir.

12 Q.  You, Dr. Mencia, the training doctor, and the confidential

13 informant posing as a patient, correct?

14 A.  Yes, sir.

15 Q.  Okay.  And --

16         MR. BEATON:  Brad, you can keep playing it.

17         (Videotape playing at 10:56)

18         MR. BEATON:  Stop there, please.

19  BY MR. BEATON::

20 Q.  Do you see where the confidential informant tells

21 Dr. Mencia exactly what you told the confidential informant to

22 tell Dr. Mencia?

23 A.  Yes, sir.

24 Q.  And do you see where Dr. Mencia says, "Don't take

25 Adderall," correct?

MENSAH - CROSS/BEATON

1   A.  Yes, sir.

2   Q.  Dr. Mencia refuses to prescribe Adderall.  Correct?

3   A.  Yes, sir.

4           MR. BEATON:  Brad, go to 15:40, please.

5           *(Videotape playing at 15:39)*

6           MR. BEATON:  Stop it there.

7    BY MR. BEATON::

8   Q.  Do you see there at the end where you say to the

9   confidential informant, posing as a patient, that you gave him

10  the 90?

11  A.  Yes, sir.

12  Q.  Now, Mr. Mensah, the video that we just saw from

13  September 22nd, you didn't discuss that video yesterday with

14  the prosecution team in front of this jury, did you?

15  A.  No.

16  Q.  This is the first time that you've discussed it in front of

17  this jury, right?

18  A.  Yes, sir.

19  Q.  When -- you were arrested on February 6th, correct?

20  A.  Yes, sir.

21  Q.  When the practice -- when the federal agents came into the

22  practice, correct?

23  A.  Yes, sir.

24  Q.  And you were put in a room in handcuffs?

25  A.  Yes, sir.

MENSAH - CROSS/BEATON

1   Q.   And you were asked questions about your behavior and what

2   you observed at the practice, correct?

3   A.   Yes, sir.

4           (Discussion had off the record between counsel)

5           MR. BEATON:   Judge, at this time, we would, with

6   agreement from the government, ask to admit what is I believe

7   Defendant's Exhibit Number 16, which is the audio recording of

8   Mr. Mensah's statement with law enforcement.

9           (Defendant's Exhibit 16 marked for identification)

10          THE COURT:   Okay.   Sixteen will be received.

11          (Defendant's Exhibit 16 admitted into evidence)

12          MR. BEATON:   Brad, can you just go straight to 14:58,

13  please?

14          MR. HORENSTEIN:   Yeah.   One second.   14:58?

15          MR. BEATON:   Yes, please.

16          (Videotape playing at 14:56)

17          MR. BEATON:   Can you stop there?

18   BY MR. BEATON::

19  Q.   Do you see there where you tell the agents asking you that

20  sometimes, based on your own medical training -- because the

21  agents were confused about whether you were a doctor or not --

22  that it's difficult to tell whether somebody's in pain,

23  correct?

24  A.   Yes.

25  Q.   And that if somebody tells you they're in pain, it may be

1329

MENSAH - CROSS/BEATON

1   legitimate, it may not be legitimate, correct?

2   A.  Yes, sir.

3   Q.  And you can't tell, because you're not in their body,

4   correct?

5   A.  Yes.

6        MR. BEATON:  So, I want to move on to minute 20, Brad,

7   please.

8        *(Videotape playing)*

9        MR. BEATON:  Stop it there, Brad.  Stop it.

10   BY MR. BEATON::

11   Q.  Do you see there where the agents say that you've lied to

12   them about ten times?

13   A.  *(No response)*

14   Q.  Did you hear that?

15   A.  Yes, sir.

16   Q.  And you're aware, are you not, that lying to a federal

17   agent is a crime, is it not?

18   A.  Yes, sir.

19   Q.  And it's a crime that carries a maximum punishment of five

20   years, right?

21   A.  I did not know -- I didn't know about the punishment side,

22   the punishment part of it.

23   Q.  At that time.  But do you now know --

24   A.  Yes.

25   Q.  -- that it's up to five years in jail for lying to a

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

1330

MENSAH - CROSS/BEATON

1   federal agent?

2   A.  Yes.  What they actually were referring to, because of

3   the -- the arrest and the pressure and attention, and to be

4   honest with you, the issue with the undercover agent did not

5   actually come to my mind.  Because if they have showed me, Hey,

6   this person, this is what transpired before you and him *(sic)*,

7   I would have just agreed to it.  But that was the first time I

8   been in a situation like that.  It was a lot of pressure, and I

9   wasn't thinking.  And I did not actually remember.  There was

10  not an ounce of recollection that I had any contact with this

11  gentleman.

12  Q.  Okay.  My question was a little bit more simple.  So, you

13  see there where the agent tells you the agent believes that

14  you've lied to him ten times, correct?

15  A.  That's what -- that's what he said.  But I'm not sure where

16  I lied to him ten times.  I don't -- I cannot count the ten

17  lies.

18  Q.  Okay.  And you now know that each one of those lies carries

19  a punishment of up to five years, right?

20  A.  Yes, sir.

21  Q.  And you showed us earlier with Mr. Yoffie that you were

22  very good at math.  What is five times ten?

23  A.  Fifty.

24  Q.  It's 50 years, right?

25  A.  Yes, sir.

1331

MENSAH - CROSS/BEATON

1    Q.  You ever been charged with lying in this case to those

2    agents those ten times?

3    A.  No, sir.

4           MR. BEATON:  So, Brad, go to 23:20.  Okay?

5           *(Videotape playing at 23:20)*

6           MR. BEATON:  Can you stop it there, please?  Stop it

7    there, please?

8     BY MR. BEATON::

9    Q.  Mr. Mensah, do you hear there where the agent says, "Look,

10   you're not a lawyer, you don't have to back everything up with

11   facts"?

12   A.  Yes, sir.

13          MR. BEATON:  Brad, can you play that portion of the

14   video, please?

15          *(Discussion had off the record between counsel)*

16          *(Videotape playing at 41:55)*

17    BY MR. BEATON::

18   Q.  Do you hear that discussion, Mr. Mensah, where you're

19   explaining to the agents the difference between the long-acting

20   and short-acting opioid?

21   A.  Yes, sir.

22   Q.  And the long-acting is which one of the two -- Oxycontin or

23   oxycodone?

24   A.  Oxycontin.

25   Q.  Okay.  And the short-acting is?

1   A.  The oxycodone.

2   Q.  And I saw when the prosecutor made -- did all this math

3   about the milligrams that this person posing as a patient was

4   getting, and that you did the math with him, the agent -- I

5   mean, what the prosecutor was referring to was the fact that

6   this patient was being prescribed Oxycontin and oxycodone,

7   correct?

8   A.  Yes, sir.

9   Q.  And the reason that you prescribed the long-acting, as you

10  explained to the agents here, with the short-acting is in an

11  attempt to start reducing the short-acting, correct?

12  A.  Yes, sir.

13  Q.  And that's what Dr. Mencia would do.  He would give the

14  long-acting in an attempt to reduce the short-acting.

15  A.  Yes, sir.

16  Q.  And the reason that you use the short-acting along with the

17  long-acting is in case there is what's called breakthrough

18  pain, correct?

19  A.  Yes, sir.

20  Q.  So, when you did all that math about the 3400 milligrams,

21  or whatever it was, that -- that's not an accurate way to

22  portray how these two medications work together, correct?

23  A.  Yes.

24  Q.  Because one is actually designed to help reduce the other.

25  A.  Yes.

MENSAH - CROSS/BEATON

1          MR. BEATON:  Brad, can we go to 19:24, please.

2          *(Videotape playing at 19:24)*

3   BY MR. BEATON::

4   Q.  Do you hear there where the agent says, "I'm going to give

5   you one last opportunity to understand where we are coming

6   from," correct?

7   A.  Yes, sir.

8   Q.  And you ultimately understood where they were coming from,

9   right?

10  A.  Yes, sir.

11  Q.  And you're a smart guy.  You understood pretty quickly,

12  right, where they were coming from?

13  A.  Yes, sir.

14         MR. BEATON:  Can you keep playing it, Brad?

15         *(Videotape playing at 19:35)*

16         MR. BEATON:  Stop.

17  BY MR. BEATON::

18  Q.  You understood where they were coming from, because you ask

19  them, "What do you need me to tell you?"

20  A.  Yes, sir.

21  Q.  And to the agent's credit, the next line he says is, "I

22  need you to tell me the truth."

23         But, at this point, you understood that you needed to

24  tell these agents what they needed to hear and understand where

25  they were coming from, and that included blaming Dr. Mencia,

MENSAH - CROSS/BEATON

1    correct?

2    A.  I was not -- I was not made to blame Dr. Mencia.  I was

3    just -- they wanted to know exactly what was transpiring at the

4    facility, and they never advised me to blame him.

5    Q.  My question was a little bit different, and forgive me if

6    it was unclear.

7    A.  All right.

8    Q.  When you say, "What do you need me to tell you," you wanted

9    to understand what you needed to say to try to get yourself out

10   of this mess, correct?

11   A.  Yes.  That is an issue of being specific, so at least if

12   they need a specific answer, I'll give that one to them.

13   Q.  Mr. Mensah, you were originally charged in an indictment in

14   this case back in February, along with Dr. Mencia, Nadira, and

15   Oscar, correct?

16   A.  Yes, sir.

17   Q.  And you were facing -- adding all of those charges up, and

18   I hope not to have to go through it with you -- a hundred years

19   in prison as a maximum, correct?

20   A.  Yes, sir.

21   Q.  And now the deal that you have made with the government by

22   pleading guilty and agreeing to cooperate against Dr. Mencia is

23   that you can receive no more than five.

24   A.  Yes, sir.

25   Q.  That is a very good deal, is it not?

MENSAH - CROSS/BEATON

1   A.  Yes, sir.

2   Q.  And --

3   A.  Excuse me one second.

4   Q.  Sure.  Finish your answer.

5   A.  Yes, I was just thinking about your combined hundred years,

6   I did not -- if you can explain that one further.

7   Q.  Was it not your understanding --

8   A.  No, I did not really understand, because nobody told me

9   combined a hundred years.  Nobody mentioned that to me.

10  Q.  Nobody did.

11  A.  Nobody did.

12  Q.  Judge Dimitrouleas didn't mention it to you when you --

13  A.  I don't recall.

14  Q.  Okay.  What did you understand was the maximum that you

15  would be facing under that original indictment?

16  A.  Twenty years.

17  Q.  Okay.  You didn't understand that you would be facing a

18  combined 100 years in jail?

19  A.  No.

20  Q.  You thought the most you could ever get was 20 years?

21  A.  That's what I understood.

22          MR. BEATON:  Fran, can I have the ELMO, please?

23          MR. YOFFIE:  Your Honor, objection on relevance.  The

24  witness has already answered what he thought the sentence would

25  be.

MENSAH - CROSS/BEATON

1    THE COURT:  Overruled.

2    BY MR. BEATON::

3  Q.  Mr. Mensah, you see that this is the original indictment

4  that was entered in this case?

5  A.  Yes, sir.

6  Q.  And do you see your name there?

7  A.  Yes, sir.

8  Q.  And do you see that in Count 1, you're charged with

9  conspiracy to commit healthcare fraud and wire fraud?

10  A.  Yes, sir.

11  Q.  And you see your name there?

12  A.  Yes, sir.

13  Q.  And wasn't it -- isn't it a fact that it was your

14  understanding that you could receive 20 years as to Count 1?

15  A.  I can't see the 20 years over here.

16  Q.  Wasn't it your understanding, is what I'm asking, that as

17  to Count 1, you could receive 20 years?

18  A.  It wasn't my understanding.

19  Q.  It was not.

20  A.  No.

21  Q.  Okay.  As to which charge was it your understanding that

22  you could receive 20 years?

23  A.  Uhm, my understanding was all the combined charges.

24  Q.  Okay.  Would be no more than 20 years.

25  A.  Yes, sir.

1337

MENSAH - CROSS/BEATON

1  Q.  Okay.  Well, let's just accept that for the moment --

2  20 years.  A maximum of 20 years and a maximum of five years,

3  the five years is a whole lot better, is it not?

4  A.  Yes, sir.

5  Q.  It's a very good deal, is it not?

6  A.  Yes, sir.

7  Q.  And you signed a plea agreement with the prosecution team,

8  right?

9  A.  Yes, sir.

10  Q.  And those five years can even be reduced further, can they

11  not?

12  A.  Yes, sir.

13  Q.  And in that plea agreement, it says, number one, that you

14  need to be truthful, right?

15  A.  Of course, yes, sir.

16  Q.  But it also says -- and if I need to show it to you, I

17  will -- that a motion to reduce your sentence can only be made

18  by the prosecution team, correct?

19  A.  Yes, sir.

20  Q.  And it isn't until the prosecution team makes that motion

21  that Judge Dimitrouleas can, as a matter of law, consider

22  reducing your sentence, correct?

23  A.  Yes.

24          MR. YOFFIE:  Objection, your Honor.  He has not been

25  sentenced here yet.

MENSAH - CROSS/BEATON

1    THE COURT:  Sustain.

2    BY MR. BEATON::

3    Q.  And unless the government files that motion, the judge

4    cannot reduce your sentence for the quality of your

5    cooperation, correct?

6    MR. YOFFIE:  Objection, your Honor.  It's not legally

7    true.

8    THE COURT:  For the quality of his cooperation, that's

9    true.  I can reduce it for other reasons.

10   MR. BEATON:  Correct.

11   BY MR. BEATON::

12   Q.  Is that correct, Mr. Mensah?  Is that your understanding?

13   A.  Yes, sir.

14   Q.  And you hope the government files that motion, right?

15   A.  Yes, sir.

16   Q.  And you understand that the government is prosecuting

17   Dr. Mencia, correct?

18   A.  Yes, sir.

19   Q.  And you understand that the government wants to win,

20   correct?

21   A.  I guess so.

22   Q.  And so, you certainly want the government to view your

23   testimony here today favorably, correct?

24   A.  Yes, sir.

25   Q.  And so, between the judge, the jury, and the prosecutors

MENSAH - CROSS/BEATON

1  sitting at the table, who can file that motion, to you

2  personally, who are the most people in this courtroom?

3  A.  The judge.

4  Q.  Good answer.

5      Mr. Mensah, you said that you made mistakes in those

6  videos, and that you shouldn't have done what you did, and you

7  ultimately pled guilty to it, right?

8  A.  Yes, sir.

9  Q.  And they weren't just silly mistakes.  They were a crime,

10  correct?

11  A.  Yes, sir.

12  Q.  And you did what you did for money, right?

13  A.  I did not discuss money issues with him.

14  Q.  I know, but the reason that you ultimately made what you

15  call silly mistakes or bad decisions was for money.  I mean you

16  wanted those tips.

17  A.  Yes, you can say that.

18  Q.  And you understood that you were increasing prescriptions

19  for a controlled substance, correct?

20  A.  Yes.  After I saw what transpired with the -- the doctor

21  and him, then after I saw, I thought it was okay to do it --

22      THE COURT REPORTER:  I'm sorry.

23  A.  After I saw what transpired, the negotiation between the

24  doctor and the patient, so I thought it was okay for me to do

25  it.

1340

MENSAH - CROSS/BEATON

1    But as I said, it was a silly mistake that I shouldn't
2    have done it.
3    Q.  Okay.  But at the time, you knew that it was wrong to take
4    tips of hundred dollars from these patients, right?
5    A.  I did not actually discuss tips with him.  And as I said, I
6    did not actually -- I didn't see what he put in my pocket until
7    a later time.  And at the office, there's no document or
8    there's no sign that says that nobody can take tips.
9    Q.  So, you thought that was okay?
10   A.  Yes, I thought so.
11   Q.  What sentence are you hoping for?
12   A.  I don't know.
13   Q.  You want to do all five years?
14   A.  No.
15   Q.  You want to do as little as possible, right?
16   A.  I don't decide that.  The honorable judge decide that.
17   Q.  But I'm asking you, how much time do you want to do?
18   A.  I don't -- I don't know.
19   Q.  Would it be fair to say you want to do as little as
20   possible?
21   A.  The judge has that call.  I don't -- I don't know.
22   Q.  Okay.  But that wasn't quite my question.  My question is:
23   John Mensah, inside, thinking, wouldn't anybody just want to do
24   as little time as possible?
25   A.  Yeah, that's it -- that's it, but it's punishment.  The

MENSAH - REDIRECT/YOFFIE

1  ultimate rests on the judge.

2          MR. BEATON:  Judge, I have no further questions.

3          THE COURT:  Redirect?

4                    **REDIRECT EXAMINATION**

5   BY MR. YOFFIE::

6  Q.  Mr. Mensah, after you serve your sentence of whatever

7  duration, where will you go when you're deported?

8  A.  To my country.

9  Q.  Where's that?

10 A.  Ghana.

11 Q.  During the video in which -- or the audio in which you're

12 discussing with the agents on the day of your arrest, were you

13 nervous?

14 A.  Very.

15 Q.  Why were you nervous?

16 A.  First time in my life that I experienced anything like

17 that.

18 Q.  And you mentioned "pain."  You said that pain is difficult

19 to detect.  Do you recall that?

20 A.  Yes.

21 Q.  Is that why doctors should conduct physical examinations

22 when diagnosing pain?

23 A.  Yes, sir.

24 Q.  Let me ask you about the final visit that defense counsel

25 showed you on a recording.  That's the visit with the Adderall.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

MENSAH – REDIRECT/YOFFIE

1   Do you remember that?

2   A.   Yes, sir.

3   Q.   And Dr. Mencia doesn't prescribe the Adderall, correct?

4   A.   No, he didn't.

5   Q.   But he did prescribe two prescriptions.  Do you remember

6   that?

7   A.   Yes, sir.

8   Q.   And since Mr. Beaton liked my math, we're gonna do a little

9   bit more.

10          This is from August, so this is the previous visit.

11   The top line, do you recall which drug that is for?

12   A.   That's the oxycodone.

13   Q.   And is oxycodone short-acting or long-acting?

14   A.   That's a short-acting.

15   Q.   Okay.  The second line, what is that drug?

16   A.   That's Oxycontin.

17   Q.   And is that short-acting or long-acting?

18   A.   That's a long-acting.

19   Q.   Now, Mr. Beaton asked you about reducing the short-acting

20   while you're prescribing long-acting.  Do you recall that?

21   A.   Yes, sir.

22   Q.   At the very next visit, do you recall the same long-acting

23   prescription for Oxycontin?

24   A.   Yes, sir.

25   Q.   Do you recall how many pills Dr. Mencia signed for of the

1343
MENSAH - REDIRECT/YOFFIE

1  short-acting?

2  A.  Ninety.

3  Q.  Well, I'm a little confused.  Is 2700 less than 2400?

4  A.  No.

5  Q.  So, did Dr. Mencia reduce the short-acting oxycodone?

6  A.  No, sir.

7  Q.  So, what was the total oxy that Mr. Morales-Gomez got?  How

8  many milligrams?

9  A.  3900.

10  Q.  Did Dr. Mencia do a physical examination before increasing

11  the oxy?

12  A.  No, sir.

13  Q.  Prior to February of 2018, which is that last meeting you

14  had, did you ever receive presigned prescriptions from

15  Dr. Mencia?

16  A.  Prior to February 2018, no.

17  Q.  So, were those saved for the G-codes or gypsies?

18        MR. BEATON:  I object.  That question is misleading.

19  It's in the factual proffer that the government prepared and

20  John -- and Mr. Mensah signed.  So, if we can approach sidebar.

21        THE COURT:  Are you objecting that it's beyond the

22  scope of cross?

23        MR. BEATON:  No, I'm objecting that it's a

24  misstatement.

25        THE COURT:  Okay.  What the lawyers say isn't

MENSAH - REDIRECT/YOFFIE

```
1    evidence; the answers are evidence.
2              You may continue.
3     BY MR. YOFFIE::
4    Q.  Prior to February 2018, to the best of your knowledge, did
5    you personally receive presigned prescriptions from Dr. Mencia?
6    A.  No, sir.
7              MR. BEATON:  Objection.
8    A.  No, sir.
9              THE COURT:  On those grounds, overrule.
10   BY MR. YOFFIE:
11   Q.  Do you recall the visit of July 2017, that is the
12   negotiation video?
13   A.  Yes, sir.
14   Q.  And in the video with Dr. Mencia, how many pills of
15   oxycodone did he agree to?
16   A.  Seventy-five.
17   Q.  But how many pills did Mr. Morales-Gomez actually receive?
18   A.  Eighty.
19   Q.  Who wrote that "80"?
20   A.  I did.
21              MR. YOFFIE:  Can you please play the video?
22              Can we go to the --
23    BY MR. YOFFIE::
24   Q.  This is after you've written "80" on the prescription.
25              (Videotape playing at 6:25)
```

1345

MENSAH - RECROSS/BEATON

1   BY MR. YOFFIE::

2   Q.  Mr. Mensah, where did you go during that approximately 55,

3   60 seconds?

4   A.  I took the prescription to Dr. Mencia to sign.

5   Q.  Did Dr. Mencia just forget that he had prescribed 75?

6   A.  I don't know.  I just gave it to him, he look (*sic*) at it,

7   read it, and sign it.

8         MR. YOFFIE:  No further questions, your Honor.

9         THE COURT:  All right.  Thank you, sir.  You may step

10  down.  You're excused.

11        MR. BEATON:  Your Honor, I would make a motion to ask

12  three questions to correct the government's misleading question

13  about the presigned prescriptions.

14        THE COURT:  Three questions.  Go ahead.

15                    **RECROSS-EXAMINATION**

16  BY MR. BEATON::

17  Q.  Mr. Mensah, you signed a factual proffer prepared by the

18  government that was ultimately filed in this court, correct?

19  A.  Yes, sir.

20        MR. BEATON:  Can I have the ELMO, Fran?

21        MR. YOFFIE:  Your Honor, the government will note this

22  document is not in evidence, although it has no objection to

23  introducing it.

24        THE COURT:  Sustain.

25        MR. BEATON:  Then I'll introduce it into evidence,

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

1346

MENSAH - RE-REDIRECT/YOFFIE

1    Judge, as 16.

2              MR. HORENSTEIN:  Seventeen.

3              *(Defendant's Exhibit 17 marked for identification)*

4              THE COURT:  Seventeen will be received.

5              *(Defendant's Exhibit 17 admitted into evidence)*

6              THE COURT REPORTER:  Mr. Yoffie, can you use the

7    microphone, please?

8              MR. YOFFIE:  Yes.

9              MR. BEATON:  Do you have a highlighter?

10             MR. GILFARB:  You cannot mark that.  You cannot mark

11   that.  That's in evidence.

12    BY MR. BEATON::

13   Q.  Is that your signature, Mr. Mensah?

14   A.  Yes, sir.

15   Q.  You agreed with your signature that, "Dr. Mencia also

16   passed out presigned prescriptions to the defendant" -- meaning

17   you -- "and other medical assistants," correct?

18   A.  He passed the presigned prescriptions to other medical

19   assistant *(sic)*, but the first time I got any presigned

20   prescription was February of 2018.

21             MR. BEATON:  I have nothing further, your Honor.

22             THE COURT:  Anything further, Mr. Yoffie?

23                  **RE-REDIRECT EXAMINATION**

24    BY MR. YOFFIE::

25   Q.  So, prior to February 2018, you did not receive any

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

1347

```
1    presigned prescriptions?

2    A.  No, sir.

3    Q.  No, sir, you did not receive them?

4    A.  No, I didn't.

5              MR. YOFFIE:  No further questions, your Honor.

6              THE COURT:  Thank you, sir.  You may step down.

7    You're excused.

8              (Witness excused)

9              the Government May Call Its Next Witness.

10             MR. YOFFIE:  the united states Calls stephen quindoza

11   To The Stand.

12             MR. BEATON:  your honor, This Is The Expert That The

13   court Had taken under advisement before trial.  If you want me

14   to approach sidebar, I can refresh the Court's recollection

15   about the discussion we had on Mr. Quindoza?

16             THE COURT:  Just object when you think something

17   objectionable is going on.

18             MR. BEATON:  Well, we renew our previous objections,

19   and object to the testimony that Medicare won't pay bills for

20   services that aren't provided.  I think we can all agree on

21   that.  It's just gonna be a waste of time.

22             THE COURT:  We don't want to waste time, so you

23   object, and I'll rule on it.

24             THE COURT REPORTER:  Please raise your right hand.

25             (STEPHEN QUINDOZA, GOVERNMENT'S WITNESS, WAS SWORN)
```

QUINDOZA - DIRECT/YOFFIE

```
 1            THE COURT REPORTER:  Please sit down.

 2            Please state your full name for the record, spelling

 3   your last name.

 4            THE WITNESS:  Stephen Quindoza, Q-U-I-N-D-O-Z-A.

 5                       DIRECT EXAMINATION

 6    BY MR. YOFFIE::

 7   Q.  Good morning, Mr. Quindoza.

 8   A.  Good morning, sir.

 9   Q.  How are you employed?

10   A.  I work for HMS Federal Solutions.

11   Q.  And what is HMS Federal Solutions?

12   A.  It's a private company that holds several contracts with

13   the federal government to ensure the integrity of claims and

14   medical services.  We also hold contracts as a subcontractor to

15   other companies like ours for the same purposes.

16   Q.  In general, what role do contractors like your company play

17   in regards to Medicare?

18   A.  Our job is specifically to identify, prevent, and

19   investigate allegations of healthcare fraud in Medicare and

20   Medicaid.

21   Q.  How long have you been with HMS Federal Solutions?

22   A.  Since spring 2005.

23   Q.  So, approximately 13 years?

24   A.  Yes, sir.

25   Q.  What is your title?
```

QUINDOZA - DIRECT/YOFFIE

1  A.  Communications and coordination manager.

2  Q.  And what does that actually mean?

3  A.  There's several aspects to my job.  One is about education.

4  I provide education and training to our staff, such as our

5  investigators and our clinicians, regarding healthcare fraud

6  investigations, the rules and regulations and policies of the

7  Medicare and Medicaid program.

8        I also provide outreach and education to healthcare

9  providers on preventing healthcare fraud.

10        I also provide education to the Medicare recipients,

11  the insured people, on how to identify and avoid becoming

12  victims of fraud.

13        And then I play a significant role as a point of

14  contact for several law enforcement agencies who have oversight

15  of healthcare fraud matters, like the Office of the Inspector

16  General, the U.S. Attorney's office, the FBI, Department of

17  Justice.  And in that role, again, it's also education on the

18  rules and regulation of the Medicare program.  I also act as a

19  resource for them with regard to those matters, including

20  reviewing and analyzing claims for their purposes.

21  Q.  Before HMS Federal, where did you work?

22  A.  Several other Medicare contractors in various capacities,

23  mainly education.  I've worked for a company just like the one

24  I'm at right now called TriCenturion.  I also worked for First

25  Coast Service Options, which is another type of Medicare

1350
QUINDOZA - DIRECT/YOFFIE

1  contractor.  And then years ago, for Blue Cross/Blue Shield of

2  Florida.

3  Q.  Did your work include work as a claims processor?

4  A.  Yes, sir.

5  Q.  What is a "claims processor" in layman's terms?

6  A.  Simply put, when a healthcare provider submits a claim to

7  Medicare, it was my job to process the claim and make a

8  decision on coverage, whether to pay it or deny it.

9  Q.  What is "claims data"?

10  A.  It's a collection of claims that are submitted to the

11  Medicare program and all the contents of the information in

12  that claim -- the identity of the patient, the identity of the

13  healthcare provider, and then the details of the services that

14  they're asking payment for, such as the dates of services,

15  codes which represent the description of the services, how much

16  they're billing for, the condition or the diagnosis of the

17  patient.

18  Q.  So, when you are processing claims, you determined

19  essentially whether or not a claim would be paid?

20  A.  Back then, yes.

21  Q.  Do you have any training regarding Medicare billing

22  requirements?

23  A.  Yes, sir.

24  Q.  Can you explain that training?

25  A.  When I first started working for the first contractor, I

QUINDOZA - DIRECT/YOFFIE

1   received, I don't know, I guess about three months of training

2   on the rules of the Medicare program, as well as how to process

3   a claim.  And then throughout the course of the years of

4   working with these contractors, I've also received other

5   training, as well as a lot of self-paced courses on the

6   Medicare program.

7   Q.  Have you trained others on Medicare billing requirements?

8   A.  Yes, sir.

9   Q.  Who have you trained?

10  A.  Let's see... claims processors at the Medicare contractors;

11  customer service staff at the Medicare contractors; the staff

12  at the companies that I represent, such as our investigators

13  and our nurses; law enforcement; and then for several years, I

14  worked in a public relations position where I trained the

15  healthcare community in the state of Florida.  So, I provided

16  education and information to doctors, hospitals, and other

17  types of healthcare providers on the Medicare program.

18  Q.  So, approximately how many years did you conduct such

19  training?

20  A.  Since 1989, so about 27 or 28 years.

21  Q.  What about audits and investigations, does Medicare use

22  contractors to conduct audits and investigations?

23  A.  Yes, sir.

24  Q.  Have you conducted audits and investigations?

25  A.  Yes, sir.

1352

QUINDOZA - DIRECT/YOFFIE

1   Q.   Approximately how many?

2   A.   I couldn't count.  In my current capacity, for the last

3   20 years, I don't know, over a hundred.

4   Q.   What about Medicare reviews, have you conducted reviews?

5   A.   Yes, sir.

6   Q.   Can you describe briefly what a review is?

7   A.   There are different types of review.  The first one I'll

8   speak of is a claim review.  That involves a person looking at

9   the information submitted on a claim, comparing it to the rules

10  that apply to that claim, and then make a decision to pay it or

11  not pay it.

12          Another type of review involves looking at the claim,

13  and then also looking at the medical records that are

14  associated with that claim, comparing it to the rules and

15  regulations, and then making a decision to pay it or deny it.

16  Q.   And for approximately how many years you've done reviews?

17  A.   About six to eight years.

18  Q.   So, in total, for claims processing, reviews, training, how

19  many decades have you been working in the Medicare program?

20  A.   A little over 36 years.

21  Q.   Have you testified in federal court as an expert before?

22  A.   Yes, sir.

23  Q.   And an expert in the area of Medicare rules and

24  regulations?

25  A.   Yes, sir.

1353

QUINDOZA - DIRECT/YOFFIE

1    Q.  What about in the -- here in the Southern District of

2    Florida?

3    A.  Yes, sir.

4    Q.  And based on your experience, you're primarily a witness

5    for the government?

6    A.  Yes, sir.

7    Q.  In reaching your conclusions here today, what materials did

8    you review?

9    A.  I reviewed the claims data that were supposedly submitted

10   by the defendant.  I also reviewed a handful of videos that

11   were recorded supposedly at the defendant's place of business.

12          MR. YOFFIE:  Your Honor, at this point in time, the

13   government would tender Mr. Quindoza as an expert under federal

14   evidence *(sic)* 702 in the areas of Medicare coverage,

15   reimbursement, and claims filing.

16          MR. BEATON:  Same objection and same request for a

17   *Daubert* hearing.

18          THE COURT:  Overruled.

19          You may proceed.

20    BY MR. YOFFIE::

21   Q.  Mr. Quindoza, what is "Medicare"?

22   A.  Medicare's health insurance.  It's health insurance

23   primarily for people age 65 or older.  It also provides

24   coverage for people who have a disability, regardless of their

25   age.  It is an insurance program that is overseen and

1354

QUINDOZA - DIRECT/YOFFIE

1  administered by the federal government.

2  Q.  How is Medicare funded?

3  A.  Through taxes and small monthly premiums that are paid by

4  the Medicare beneficiaries or recipients.

5  Q.  Where does the Medicare money go?

6  A.  It goes to what is called the Medicare trust fund, which is

7  an account, which holds all that money to pay Medicare -- the

8  Medicare pro -- the claims for Medicare.

9  Q.  Is that trust fund limited or unlimited?

10  A.  Limited.

11  Q.  Does Medicare cover all health expenses?

12  A.  No, sir.

13  Q.  Can you describe the different parts of Medicare?

14  A.  Yes, sir.

15        There's four -- A, B, C, and D.

16        Part A pays for when a patient goes to a facility,

17  like a hospital, skilled nursing facility, or home health

18  agency, or they receive hospice care.

19        Part B pays for what is done to a patient by a

20  healthcare professional, like a doctor, a nurse practitioner,

21  lab tests, x-rays, medical equipment, ambulance transportation.

22        Part C is a combination of both A and B, but that

23  represents Medicare's managed care network, or HMO.

24        And then Part D pays for prescription drugs.

25  Q.  So, Part B, as in "boy," would commonly pay for an

QUINDOZA - DIRECT/YOFFIE

1    individual's office visit to a doctor's office.

2    A.   Yes, sir.

3    Q.   What is a Medicare claim?  How does it compare to a bill?

4    A.   It is essentially a bill.  But it's a bill requesting

5    payment for medical services and items provided to a patient.

6    Q.   And what is a "Medicare beneficiary"?

7    A.   It is the insured person under Medicare.

8    Q.   Let's talk briefly about the submission of those claims.

9         What are the steps for submitting a claim or bill to

10   Medicare?

11   A.   Okay.  There's essentially five components to a claim

12   for -- to be submitted.  First, there has to be a patient who

13   is insured by Medicare, so a Medicare beneficiary.

14        You must have a healthcare provider who has received

15   billing privileges into the Medicare program, so they're also

16   enrolled as a healthcare provider.

17        They must have provided a service that would be

18   considered as covered.

19        Whatever they provided, that it meets federal and

20   state regulations in relation to that service, as well as any

21   policies or coverage criteria outlined by the Medicare program

22   itself.

23        And then, lastly, it must be submitted on a claim

24   properly, and it must be documented in terms of medical and

25   financial records.

1356

QUINDOZA - DIRECT/YOFFIE

1  Q.  As part of that, the service billed for must be the service

2  provided, is that correct?

3  A.  Yes, sir.

4  Q.  How does a beneficiary enroll in Medicare?

5  A.  Once a person reaches the age of 65 or right -- a few

6  months prior to reaching that age, they are notified by the

7  Social Security Administration that they are entitled to such

8  benefits.  That's when they're allowed to enroll into the

9  Medicare program.

10        If it's a person who has a disability, they can enroll

11 at any point regardless of their age.

12        Once they're enrolled, they'll receive an

13 identification number specific to them, which shows that they

14 have coverage under Medicare.

15 Q.  Would you say it's easy or difficult to enroll in Medicare?

16 A.  Easy.

17 Q.  Now, let's talk about enrolling as a Medicare provider.

18        What is a "Medicare provider"?

19 A.  It's any healthcare provider who's authorized to bill the

20 Medicare program, such as a doctor, a hospital, a laboratory.

21 Q.  Okay.  Before I show you some documents, I want to ask you

22 very briefly about Medicaid.

23        How is Medicaid funded and run?

24 A.  Funded by both federal and state taxes.  It's overseen by

25 the federal government, but each state has its own agency that

QUINDOZA - DIRECT/YOFFIE

1  administers the Medicaid program per state.

2  Q.  And what does it mean that Medicaid is a "payer of last

3  result"?

4  A.  There are some individuals who may be entitled to both

5  Medicare and Medicaid.  If that is the case, then Medicare

6  always pays first, Medicaid pays second, if needed.

7           MR. YOFFIE:  Your Honor, pursuant to stipulation 14,

8  the government seeks to move into evidence Government

9  Exhibit 14, which is Medicaid data from 2012 to 2017.

10           *(Government's Exhibit 14 marked for identification)*

11           MR. BEATON:  That's correct, your Honor, we have no

12  objection to that.

13           THE COURT:  Fourteen will be received.

14           *(Government's Exhibit 14 admitted into evidence)*

15           MR. YOFFIE:  And in addition to that, pursuant to that

16  pursuant to stipulation 15, the government seeks to move into

17  evidence Government Exhibit 15, CMS or SGS documents.

18           *(Government's Exhibit 15 marked for identification)*

19           MR. BEATON:  Same thing, Judge, no objection.

20           THE COURT:  Fifteen will be received.

21           *(Government's Exhibit 15 admitted into evidence)*

22   BY MR. YOFFIE::

23  Q.  Mr. Quindoza, what is "CMS"?

24  A.  That stands for the "Center for Medicare and Medicaid

25  Services."  They are the government agency who has oversight of

QUINDOZA - DIRECT/YOFFIE

1  both the Medicare and Medicaid programs.

2  Q.  And is "SGS"?

3  A.  That stands for "SafeGuard Services."  That is one of a

4  handful of private contractors who have contracts with the

5  government to identify and investigate healthcare fraud in

6  Medicare and Medicaid.

7  Q.  And what does it mean to receive Medicare documentation

8  from SGS?

9  A.  I'm sorry, say that again?

10  Q.  What does it mean to receive Medicare documentation from

11  SGS?

12  A.  In what context?  I'm sorry.

13  Q.  So, what are -- when you talk about SGS providing Medicare

14  documentation to the government, what does that refer to?

15  A.  Oh.  Typically, that's any information related to the

16  Medicare program about a patient, about a healthcare provider,

17  such as claims data, the enrollment documents that are

18  submitted by the healthcare providers themselves.

19  Q.  What is a "provider enrollment application"?

20  A.  That is a request from a healthcare provider seeking

21  authorization to bill the Medicare program.

22  Q.  When a doctor, such as Dr. Mencia, or a clinic, such as

23  AGI, applies to become a provider, do they promise to abide by

24  the rules and regulations of Medicare?

25  A.  Yes, sir.

1    MR. YOFFIE:  Can we go to the ELMO?

2  BY MR. YOFFIE:

3  Q.  I'm showing you Government Exhibit 15A.

4        What is this document?

5  A.  This is a section out of that enrollment application for a

6  healthcare provider.  It's -- the section's called the

7  certification statement.

8  Q.  Can you read the highlighted portion into the record?

9  A.  Yes, sir.

10        "By his or her signatures, an authorized official

11      binds the supplier to all of the requirements listed

12      in the certification statement and acknowledges that

13      the supplier may be denied entry to or revoked from

14      the Medicare program if any requirements are not met.

15      All signatures must be original and in ink.  Faxed,

16      photocopied, or stamped signatures will not be

17      accepted."

18  Q.  And in layman's terms, what does that mean?

19  A.  That means they agree to the terms outlined in this

20  particular section, and if they don't, then their billing

21  privileges will be taken away.

22  Q.  Okay.  We're gonna move to the next page.

23        Is this a continuation of the certification statement?

24  A.  Yes, sir.

25  Q.  And are these additional requirements that must be met and

QUINDOZA - DIRECT/YOFFIE

1    maintained by the individual filling out this certification

2    statement?

3    A.   Yes, sir.

4    Q.   Can you read paragraphs 2 and 3 into the record?

5    A.   Yes, sir.

6            "I have read and understand the penalties for

7         falsifying information, as printed in this

8         application.  I understand that any deliberate

9         omission, misrepresentation, or falsification of any

10        information contained in this application or

11        contained in any communication supplying information

12        to Medicare, or any deliberate alteration of any text

13        on this application form may be punished by criminal,

14        civil, or administrative penalties, including, but

15        not limited to, the denial or revocation of Medicare

16        billing privileges and/or the imposition of fines,

17        civil damages, and/or imprisonment."

18   Q.   And the next one.

19   A.       "I agree to abide by the Medicare laws,

20        regulations, and program instructions that apply to

21        this supplier.  The Medicare laws, regulations, and

22        program instructions are available through the

23        Medicare contractor.  I understand that payment of a

24        claim by Medicare is conditioned upon the claim and

25        the underlying transaction complying with such laws,

QUINDOZA - DIRECT/YOFFIE

1   regulations, and program instructions (including, but

2   not limited to, the federal antikickback statute and

3   the Stark law), and on the supplier's compliance with

4   all applicable conditions and participation in

5   Medicare."

6   Q.  Can you briefly describe in layman's terms what this means?

7   A.  Okay.  For the second paragraph, they're attesting to the

8   fact that they understand if they falsify the application or

9   any other information submitted to Medicare, such as a claim or

10  medical record, if there's falsification in it in any form,

11  that they're subject to any kind of penalty.

12      The third paragraph they're agreeing to follow the

13  rules of the Medicare program as it applies to their claims.

14  Q.  And one more, paragraph 6, what does that say?

15  A.      "I will not knowingly present or cause to be

16      presented a false or fraudulent claim for payment by

17      Medicare, and I will not submit claims with

18      deliberate ignorance or reckless disregard of their

19      truth or falsity."

20  Q.  I think that's self-explanatory.

21      Let me turn to the next page.

22      Can you please just read the first highlighted portion

23  of this paragraph?

24  A.  Yes, sir.

25      "I have read the contents of this application.

1362

QUINDOZA - DIRECT/YOFFIE

1    My signature legal *(sic)* and financially binds the

2    supplier to the laws, regulations, and program

3    instructions of the Medicare program.  By my

4    signature, I certify that the information contained

5    herein is true, correct, and complete, and I

6    authorize the Medicare fee-for-service contractor to

7    verify this information."

8  Q.  Whose name is listed below?

9  A.  Andres Mencia.

10  Q.  Do you understand that to be the defendant here today?

11  A.  Yes, sir.

12  Q.  Have you ever met Andres Mencia?

13  A.  No, sir.

14  Q.  And what is the title or position?

15  A.  President and CEO.

16  Q.  And is that his -- to your -- the best of your knowledge,

17  his full signature?

18  A.  I would assume that.

19  Q.  What is the date signed?

20  A.  August 25th, 2015.

21  Q.  Mr. Quindoza, I'm gonna show you Government's Exhibit 15A2,

22  which is a subpart of Government Exhibit 15.

23      Do you recognize this document?

24  A.  Yes, sir.

25  Q.  Is it fair to say that this is an excerpt of the

QUINDOZA - DIRECT/YOFFIE

1  certification statement we just reviewed?

2  A.  Yes, sir.

3  Q.  Okay.  But what is the date listed on this certification

4  statement?

5  A.  August 15, 2007.

6  Q.  So would this have been the prior certification for

7  Dr. Andres Mencia to bill Medicare?

8  A.  Yes, sir.

9  Q.  And are these ongoing, in general, certifications valid

10  until there's a new certification?

11  A.  Yes, sir.

12  Q.  Government Exhibit 15A3, can you briefly describe what this

13  document is?

14  A.  This is another form that is submitted by a healthcare

15  provider.  It's called a "participation agreement."

16  Essentially what it is saying is that that particular

17  healthcare provider agrees to submit claims directly to

18  Medicare on behalf of their patients.  And, in turn, they will

19  pay -- get paid directly by Medicare for those claims.

20  Q.  So, they're accepting payment under Medicare Part B.

21  A.  Yes, sir.

22  Q.  And is that the same signature we just saw on the 2007

23  certification document?

24  A.  I believe so.

25  Q.  And what is the title listed?

1364

QUINDOZA - DIRECT/YOFFIE

```
 1   A.   President.
 2   Q.   And what is the date?
 3   A.   August 15, 2007.
 4   Q.   And just directing you to the top, what is the name of the
 5   entity listed?
 6   A.   Adult & Geriatric Institute of Florida.
 7   Q.   And do you understand that to be AGI?
 8   A.   Yes, sir.
 9   Q.   Mr. Quindoza, once a claim is submitted, who actually pays
10   it?
11   A.   It is paid for by one of the Medicare contractors who
12   processes the claims.
13   Q.   Okay.  In Florida, is one of those Part B contractors First
14   Coast Service Options?
15   A.   Yes, sir.
16   Q.   Approximately how many claims are submitted per year in the
17   state of Florida?
18   A.   Florida alone?
19   Q.   Yes.
20   A.   For Medicare?  Over a hundred million.
21   Q.   Does Medicare or the Medicare contractor review every claim
22   before it's submitted?
23   A.   No, sir.
24   Q.   Why not?
25   A.   It's a physical impossibility to do so.
```

1365

QUINDOZA - DIRECT/YOFFIE

1    Q.   So, approximately what percentage of Medicare claims are

2    reviewed before payment?

3    A.   Less than one to two percent of all claims.

4    Q.   And, again, why is that the case?

5    A.   When you think about the volume, a hundred thousand -- a

6    hundred million claims a year, to validate a claim means you

7    got to verify the patient, their identity.  You got to verify

8    the healthcare provider and their identity, and their

9    licensure, and their certification, and their enrollment.  Then

10   you have to verify that a service was actually provided and

11   it's the service that they're claiming payment for.  Then you

12   have to review the medical records that are associated with

13   that claim to see if it's properly documented and medically

14   necessary.  Then you have to make sure that whatever they're

15   billing for complies with all the rules that apply to that

16   particular claim.

17            There's no way to do that for one hundred million

18   claims a year.

19            Specifically for Medicare Part B, there's a regulation

20   that specifies that a Medicare contractor has to process that

21   claim within 14 days of submission.  So, you can't take all

22   those steps in a 14-day time frame for a hundred million

23   claims.

24   Q.   So, just because Medicare paid for the actual claim, it

25   doesn't necessarily mean it's valid.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

QUINDOZA - DIRECT/YOFFIE

1  A.  Correct.

2  Q.  What does it mean when we say Medicare is a "trust-based

3  system"?

4  A.  That means that there's an assumption that the claims that

5  are submitted on behalf of the patients, that they're accurate,

6  truthful, and whatever they're claiming payment for meets all

7  the rules and regulations of the Medicare program.

8  Q.  Mr. Quindoza, let's turn specifically to Medicare Part B.

9        Once again, what is Medicare Part B, as in "boy"?

10 A.  It's the part of the program that provides coverage for

11 professional services by people like doctors and other

12 clinicians.

13 Q.  Prior to your testimony here today, did you review

14 Dr. Mencia's Medicare Part B billing?

15 A.  Yes, sir.

16 Q.  What years did that billing cover?

17 A.  2012 through 2017.

18        MR. YOFFIE:  Your Honor, pursuant to stipulation 13,

19 the government seeks to move into evidence Government

20 Exhibit 13, which is Medicare Part B, as in "boy," data for the

21 years 2012 to 2017.

22        *(Government's Exhibit 13 marked for identification)*

23        MR. BEATON:  No objection.

24        THE COURT:  Thirteen will be received.

25        *(Government's Exhibit 13 admitted into evidence)*

1367

QUINDOZA - DIRECT/YOFFIE

1    *(Discussion had off the record between counsel)*

2           MR. BEATON:  Judge --

3           MR. YOFFIE:  Your Honor, at this point, we'll just

4    note that the government will be introducing Exhibits 45 and

5    46, which are summary charts, pursuant to Federal Rule of

6    Evidence 1006, based on data and information reviewed by

7    Mr. Quindoza.

8           *(Government's Exhibits 45 and 46 marked for*

9    *identification)*

10          MR. BEATON:  And I would just -- the only objection I

11   have would be a renewed objection regarding methodology.

12          THE COURT:  Overruled.

13    BY MR. YOFFIE::

14   Q.  Mr. Quindoza, before you address the data, can you explain,

15   what is an "evaluation in management or EM service guideline"?

16   A.  It's the rules that provide guidance to practitioners, like

17   a doctor, on how to appropriately bill for visits of patients.

18   Q.  I'm gonna show you Government Exhibit 45.

19          Do you recognize this document?

20   A.  Yes, sir.

21   Q.  Did you create this document?

22   A.  Yes.

23          THE COURT:  Let me interrupt for a second.  Are we

24   introducing 45 and 46?

25          MR. YOFFIE:  Yes.  Those are the summary charts.

QUINDOZA - DIRECT/YOFFIE

1      MR. BEATON:  Those are the ones that I have the

2  objection to, Judge.

3      THE COURT:  Well, I don't know anything about how the

4  charts were made.

5      THE WITNESS:  I'm sorry, sir?

6      MR. YOFFIE:  I'll address that first.

7  BY MR. YOFFIE::

8  Q.  Did you review a list of EM service guidelines?

9  A.  Yes, sir.

10 Q.  Okay.  And, again, briefly, what are "EM service

11 guidelines"?

12 A.  It's a set of guides for a doctor on how to appropriately

13 select the right code to bill on a claim.

14 Q.  Okay.  Approximately how many codes are there for

15 established patient visits?

16 A.  For office?

17 Q.  Yes.

18 A.  Five.

19 Q.  And what about for new patient visits?

20 A.  Four.

21 Q.  Based on your review of those codes, did you create a

22 summary chart outlining those options?

23 A.  Yes, sir.

24 Q.  And did you describe the different categories available

25 under each code?

1369

QUINDOZA - DIRECT/YOFFIE

1   A.  Yes, sir.

2   Q.  And does that include what is required for Medicare to pay

3   for each code that would be submitted by a doctor?

4   A.  Yes, sir.

5         MR. YOFFIE:  Your Honor, at this point, we would move

6   Federal Rule of Evidence 1006, a summary chart, based on his

7   review of those EM guidelines *(sic)*.

8         THE COURT:  Mr. Beaton?

9         MR. BEATON:  Same objection.

10        THE COURT:  And these charts are based on records from

11  2012 to 2017?

12        MR. YOFFIE:  Just to clarify, there are two separate

13  charts.  One, which is 46, that is based on the data strictly

14  from 2014 to 2017 for the time in the charged conspiracy.

15  Mr. Quindoza was provided and reviewed data dating back earlier

16  based on a comprehensive pull by the agents.  But the chart for

17  46 is exclusively focused on 2014 to 2017.

18        THE COURT:  So, I'll sustain the objection to 45.

19        MR. YOFFIE:  Okay.  But permitted to move with 46?

20        THE COURT:  At this point, you are.

21        MR. YOFFIE:  Okay.

22   BY MR. YOFFIE::

23  Q.  Mr. Quindoza, let me ask you, then, about the EM codes.

24        For established in office -- for established patients

25  on an in-office visit, what are the options available to a

QUINDOZA - DIRECT/YOFFIE

1  doctor?

2  A.   Okay.   There are five levels of codes for an established

3  patient visit, ranging from low to high.  So, within the

4  structure of those five codes, there are three components -- or

5  three main components to every visit:  The extent of the

6  patient's medical history, that is of -- that the -- that is

7  gleaned by the healthcare provider or the doctor; the level of

8  the examination conducted by the doctor, and that level of

9  examination is based on the patient's complaints or chief

10  complaints or what they're there for.  The third component of

11  any visit is the level of decision-making that the doctor makes

12  in regards to the patient's diagnosis, treatment options, or

13  what they're doing in that particular encounter.

14       So, those five codes, again, represent five different

15  levels.  You can look at it this way.  The more the effort, the

16  higher the code.  So, if there's an extensive history, medical

17  history, it could be a higher code.

18       Same thing with the level of examination.  Is it just

19  one problem and a quick look, or is it a multisystem problem,

20  or multiple body systems contributing to one problem?

21       Think about someone with diabetes.  You have diabetes,

22  what happens to that patient?  It's not just their blood, their

23  endocrine system that's affected.  It could affect their

24  eyesight.  It could affect their circulatory problem -- their

25  circulatory system.  It could mean high blood pressure as well.

QUINDOZA - DIRECT/YOFFIE

1   So, there you have an extended look in the examination.

2           And then, lastly, the level of decision-making -- how

3   much time or how much effort did the doctor need to make to

4   come to a decision with regard to the diagnosis, and what

5   treatment is to be provided?

6           So, again, you have high to low.

7           With the five codes, again, representing high to low,

8   of course the reimbursement's gonna be different for each code,

9   ranging anywhere from $20 at the lowest to 155 to *(sic)* the

10  highest.

11  Q.  What are those five codes?  What are the actual numbers?

12  A.  99211, 99212, 99213, 99214, 99215.

13  Q.  So, beginning with 99211, what is the associated time that

14  is representative of that billing code?

15  A.  About five minutes.

16  Q.  So, does that mean that if a doctor spends roughly five

17  minutes with an individual, he or she can bill for that code?

18  A.  Yes, sir.

19  Q.  99212, how much time is associated with that billing code?

20  A.  If I'm not mistaken, about 15 minutes.

21  Q.  Okay.  99214.

22  A.  I believe 25 minutes.

23  Q.  And 99215.

24  A.  Forty-five minutes or longer.

25  Q.  So, does that mean that a doctor billing Medicare has an

QUINDOZA - DIRECT/YOFFIE

1   option to choose any of those levels following a visit by a

2   patient?

3   A.   It's not an option.   They must meet the requirements for

4   each of those codes to select one of those codes.

5   Q.   If a doctor meets with a patient for five minutes, can a

6   doctor bill 99214 for 25 minutes?

7   A.   That's highly unlikely.

8   Q.   Why is that unlikely?

9   A.   Again, when you think about the amount of effort or work

10  that it takes to do that, those time increments are based on an

11  average of what it would take everybody else to provide that

12  level of service.

13  Q.   Mr. Quindoza, did you review the video recordings from this

14  investigation?

15  A.   Yes, sir.

16  Q.   And did you review the examinations by Dr. Mencia?

17  A.   Yes, sir.

18  Q.   If Dr. Mencia billed 99214, does a 25-minute visit for any

19  of the examinations you reviewed, would Medicare have paid for

20  that claim?

21  A.   No, sir.

22  Q.   Why not?

23  A.   Two reasons.   Number one, the patient's complaint was back

24  pain.   Never examined the back.

25          Secondly, he spent very little time with the patient,

1373

QUINDOZA - DIRECT/YOFFIE

1  not even five to ten minutes.

2  Q.  Mr. Quindoza, you reviewed the data -- the Medicare Part B

3  data for 2014 from Mr. -- excuse me -- from Dr. Mencia?

4  A.  Yes, sir.

5  Q.  For Part B visits, approximately what percentage were

6  billed under 99214?

7          MR. BEATON:  Objection, your Honor.  I would refer the

8  Court to Docket Entry 97, page 8, which sets forth the

9  allegations that the government has made as to what constitutes

10  the Medicare fraud, and this is so far beyond that, that I move

11  to strike.

12          THE COURT:  All right, members of the jury, we're

13  going to go ahead and recess for lunch.  Remember my admonition

14  not to discuss the case or allow it to be discussed in your

15  presence.  I'm gonna ask you to come back at 1:30.

16          So have a nice lunch.  We'll see you back at 1:30.

17          COURTROOM SECURITY OFFICER:  All rise.

18          *(The jury exited the courtroom)*

19          THE COURT:  Mr. Quindoza, during the break in your

20  testimony, you're not allowed to discuss your testimony with

21  anyone.  Do you understand?

22          THE WITNESS:  Yes, your Honor.

23          THE COURT:  And we'll see you back at 1:30.

24          THE WITNESS:  Yes, your Honor.  Thank you.

25          *(The witness exited the courtroom)*

```
 1          THE COURT:  Let me ask, what testimony have we had or
 2   are we gonna have that a particular person submitted Medicare
 3   or Medicaid claims in this case?
 4          MR. YOFFIE:  I'm sorry, what testimony?
 5          THE COURT:  Yeah, I mean did Erickson submit a
 6   Medicaid claim?
 7          MR. YOFFIE:  Oh, no.  The -- it's our understanding
 8   the patients here did not necessarily submit Medicare claims --
 9          THE COURT REPORTER:  Excuse me.
10          MR. YOFFIE:  That the Medicare patients -- the
11   patients highlighted did not submit Medicare claims, but
12   obviously that Medicare claims were submitted by Dr. Mencia.
13          THE COURT:  Well, how do we know that those claims
14   were fraudulent?  How can you have Mr. Quindoza look at
15   evaluations of some patients and then postulate that Medicare
16   patients must have also had similarly fraudulent claims
17   submitted --
18          MR. YOFFIE:  Mr. Mensah testified that the Medicare
19   patients were treated in substantially the same manner as the
20   individual on the recording.  That would be Mr. Lebrak
21   Morales-Gomez.  Mr. Quindoza is simply saying that if that were
22   the case, Medicare would not pay the 25-minute 99214 claim that
23   was submitted for over 90 percent of Ms. -- of Dr. Mencia's
24   patients over a four-year period.  So, every year, from 2014 to
25   2017, with those five code options, Dr. Mencia chose 99214.
```

1375

1    And it's simply the government's position that based on the

2    testimony of Mr. Mensah, that Medicare patients were treated

3    substantially the same, and based on Mr. Quindoza's review of

4    those recordings, it is not difficult to make the

5    extrapolation -- in fact, it is supported -- that Medicare

6    would have not reimbursed for those claims.

7            THE COURT:  I thought that there was testimony from

8    Mr. Rodriguez that Medicare patients were treated differently

9    than the gypsy patients, that Dr. Mencia wanted to treat them,

10   and he spent more time with them, and he was concerned about

11   their experience in the waiting room, that they not be

12   disturbed by the Code-G misbehaving patients.  I thought there

13   was testimony in this case that there was a difference in the

14   practice between the geriatrics' treatments and the controlled

15   substance-seeking people.

16           MR. YOFFIE:  Absolutely, your Honor.  The gypsies or

17   G-code patients were not seen by Dr. Mencia at all.  So, what

18   Mr. Ventura-Rodriguez is simply saying is that Dr. Mencia

19   actually saw the Medicare patients, as we saw with Lebrak

20   Morales-Gomez, where Dr. Mencia for six minutes and 22 seconds

21   conducts a physical examination.  It is simply our position

22   that based on a 25-minute billing claim, which, again, is

23   submitted for over 90 percent of Medicare patients, that

24   Medicare would not reimburse for those claims.

25           THE COURT:  So, what you're saying is, because Mensah

1  says in an offhand remark that the Medicare patients were

2  treated the same as the Code-G patients, that that means that

3  this expert should testify that all the Medicare patients were

4  inappropriately billed, because by looking at how the Code-G

5  people were treated, if Mensah's to believe that the Medicare

6  patients were treated the same, that would be inappropriate.

7         MR. GILFARB:  May I consult with my --

8         THE COURT:  Sure.

9         *(Discussion had off the record between counsel)*

10        MR. YOFFIE:  Just note that Mr. Ventura-Rodriguez, or

11 Oscar, as well as Sylvia Hernandez both noted that individuals,

12 including those with Medicare, did come to obtain controlled

13 substances.  And so, therefore, if those individuals were

14 billed for 99214 for a 25-minute visit, when they were simply

15 coming to seek controlled substance prescriptions, then that

16 would fit with the indictment as to Count 1 for conspiracy to

17 commit healthcare fraud.

18        THE COURT:  I think if you had a Medicare patient or

19 Medicaid patient that was on tape, and Mr. Quindoza had looked

20 at that tape, and it was within the three years charged in the

21 indictment, that you'd have a better argument.

22        So, at this point, I'm going to sustain the objection

23 to Exhibit 46.

24        We'll be in recess until 1:30.

25        COURTROOM SECURITY OFFICER:  All rise.

1377

1        *(The Judge exited the courtroom)*

2        *(Luncheon recess taken at 12:03 p.m.)*

3                          -   -   -   -   -

1378

```
 1              TUESDAY, JUNE 26, 2018, 1:31 P.M.

 2          (The Judge entered the courtroom)

 3          THE COURT:  Please be seated.

 4          All right.  We're back on the record.

 5          Counsel are present.  Dr. Mencia's present.

 6          Mr. Quindoza, you understand you're still under oath?

 7          THE WITNESS:  Yes, sir.

 8          THE COURT:  Anything to come before the Court before

 9   we bring the jury in?

10          MR. BEATON:  Yes, your Honor.  I'd like to finish

11   arguments on Mr. Quindoza's testimony.  I know you excluded the

12   first two exhibits.  But -- and I don't know what the

13   government anticipates on presenting as further exhibits, so

14   they may be able to short circuit my presentation.  But --

15          THE COURT:  Do we have all the jurors?

16          COURTROOM SECURITY OFFICER:  Yes.

17          THE COURT:  Just make your objections when they ask

18   questions.

19          MR. BEATON:  Every single exhibit they have is the

20   same type of statistical analysis that you just excluded, every

21   single one.

22          THE COURT:  Then I may exclude all of them.

23          MR. BEATON:  Well, I'm moving to strike this witness.

24          MR. YOFFIE:  We have no intention to utilize those

25   exhibits, your Honor.
```

1379

```
 1              THE COURT:  Okay.  So, are you done with your direct?

 2              MR. YOFFIE:  Just two, three questions left.

 3              THE COURT:  Okay.

 4         So, anything further before we bring the jury in?

 5              MR. YOFFIE:  No, your Honor.

 6              MR. BEATON:  No, sir.

 7              THE COURT:  Okay.  Let's bring in the jury.

 8              MR. BEATON:  I'm gonna be asking for a curative

 9    instruction, though, after his testimony.

10              THE COURT:  What's the curative instruction?

11              MR. BEATON:  That the testimony improperly and

12    inaccurately suggested that 90 percent of Dr. Mencia's --

13              THE COURT:  Well, you can cross-examine on that.

14              COURTROOM SECURITY OFFICER:  All rise.

15              (The jury entered the courtroom)

16              THE COURT:  Counsel concede the presence of the jury

17    and waive its polling?

18              MR. YOFFIE:  Yes, your Honor.

19              MR. BEATON:  Yes, sir.

20              THE COURT:  And did everyone follow my admonition not

21    to discuss the case or allow it to be discussed in your

22    presence?

23              THE JURORS:  Yes, your Honor.

24              THE COURT:  And tomorrow we'll start at 9:15.

25              Mr. Yoffie, you may proceed.
```

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

QUINDOZA - DIRECT/YOFFIE

| | |
|---|---|
| 1 | **DIRECT EXAMINATION (CONTINUED)** |
| 2 | BY MR. YOFFIE:: |
| 3 | Q.  Good afternoon, Mr. Quindoza. |
| 4 | A.  Good afternoon, sir. |
| 5 | Q.  Just have very few remaining questions. |
| 6 | Based on your experience with the rules and |
| 7 | regulations of Medicare, what would you expect a doctor who |
| 8 | billed for a 25-minute 99214 session to have done? |
| 9 | A.  Several things.  Again -- |
| 10 | MR. BEATON:  Objection.  Relevance. |
| 11 | THE COURT:  Overrule. |
| 12 | A.  Can you state the question again? |
| 13 | Q.  Yes. |
| 14 | What would you expect a doctor who billed 99214, the |
| 15 | 25-minute EM code, to have done? |
| 16 | A.  Okay.  Again, there are three main components to every |
| 17 | visit or every evaluation and management service:  Level of |
| 18 | history of the patient, level of examination of the patient's |
| 19 | condition that they complained about, and the level of |
| 20 | decision-making by the doctor with regard to the patient's |
| 21 | diagnosis and the appropriate treatment decisions after the |
| 22 | examination. |
| 23 | With the 25-minute, the rules say it requires extended |
| 24 | time, examination of the -- extended examination of the |
| 25 | complaint of the patient and of other body systems that are |

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

QUINDOZA - DIRECT/YOFFIE

1    related to that complaint.

2         The level of the decision-making is also higher.

3    Again, there are five levels of office visits.  With the 99214,

4    that's the fourth highest.  So, again, the level of

5    decision-making by the doctor has to be higher than the other

6    three.

7         Patient history has to be extended as well.  Is it

8    just the complaint or is he gonna look at other things?  How

9    long has it been going on?  Is there any relationship with that

10   complaint to any family histories?  Say, for example, a cancer

11   patient, does anyone in their family have cancer or had cancer,

12   things of that nature.

13        Again, that 25 minutes represents the average time it

14   would take to complete that particular examination.  So, those

15   components must be met in order for that doctor to bill that

16   level of care.

17   Q.  And based on your review of Dr. Mencia's Medicare Part B

18   data, what percentage of instances were billed for 99214?

19        MR. BEATON:  Objection, Judge.  Same grounds that you

20   ruled on earlier.

21        MR. YOFFIE:  This is just an expert witness based on

22   his review of the data.

23        THE COURT:  You're talking about the data from 2014 to

24   2017?

25        MR. YOFFIE:  Yes.  Let me clarify, strictly from 2014

1382
QUINDOZA - CROSS/BEATON

1  to 2017.

2          THE COURT:  I'll allow it subject to a motion to

3  strike if it's not tied up.

4   BY MR. YOFFIE::

5  Q.  You may answer.

6  A.  Uhm, for all of those years, it's always 90 percent or

7  greater.

8          MR. YOFFIE:  Thank you.

9          No further questions.

10          THE COURT:  Cross-examination.

11          MR. BEATON:  Move to strike that last answer, Judge.

12          THE COURT:  Well, I don't know for all those years.

13  Are you're talking about 2014 to 2017?

14          THE WITNESS:  Yes, your Honor.

15          THE COURT:  All right.  Motion to strike denied.

16                    **CROSS-EXAMINATION**

17   BY MR. BEATON::

18  Q.  Mr. Quindoza, good afternoon.

19          My name is Marcos Beaton.  I represent Dr. Mencia.

20          You and I have never met before?

21  A.  I don't believe so, sir.  Good afternoon.

22  Q.  So, when you testified earlier on the government's

23  questioning that 90 percent of Dr. Mencia's patient visits were

24  for a code consistent with a 25-minute visit, didn't you

25  inaccurately suggest that those 25-minute patient visits did

QUINDOZA - CROSS/BEATON

1    not happen?

2    A.   Did I inaccurately say that?

3    Q.   Did you inaccurately suggest that?

4    A.   I did not inaccurately suggest that.

5    Q.   Okay.  Did you suggest that at all?

6    A.   What I said was, in order to bill a visit, the doctor must

7    examine the patient's complaint.  I did not see that in the

8    video.

9    Q.   Okay.

10             MR. BEATON:  I move to strike that answer, your Honor.

11             THE COURT:  You asked the question.  So, denied.

12    BY MR. BEATON::

13    Q.   Did you review one video involving a Medicare patient?

14    A.   I don't know.

15    Q.   The government didn't tell you whether those patients on

16    video were Medicare patients?

17    A.   Okay, in that case, no, I did not.  But I didn't know that

18    for sure.

19    Q.   Okay.  Will you accept my representation that they aren't?

20    A.   Yes.

21    Q.   And so, you based your opinion on videos that had nothing

22    to do with Medicare.

23    A.   For those patients, no, they did not.

24    Q.   That wasn't my question.  You just referred to the video.

25    A.   Yes, sir.  But I thought that's what you were asking about,

QUINDOZA - CROSS/BEATON

1   was the video.

2   Q.  You said, I did not see what I just talked about regarding

3   Medicare in the videos for patients who had nothing to do with

4   Medicare.

5   A.  Let me make sure I understand your question.

6           THE COURT REPORTER:  Excuse me.  Speak into the

7   microphone.

8           THE WITNESS:  I'm sorry.

9   A.  Let me make sure I understand your question.  I thought you

10  asked me if those patients in the video were Medicare patients

11  or not.  My understanding is no.

12  Q.  Okay.  And what I'm asking you is, and what you testified

13  to earlier -- and we can have a readback if you want -- that

14  the testimony regarding 25-minute visits and your opinion was

15  in part based on those videos.

16  A.  Yes, sir.

17  Q.  And so, the question again is:  Are you suggesting that for

18  all of the visits, or for most of the visits, or for any of the

19  visits that you didn't see, Dr. Mencia did not perform a

20  25-minute examination?

21  A.  I cannot say that either way.

22  Q.  And are you aware that Dr. Mencia ran a geriatric practice?

23  A.  Yes, sir.

24  Q.  Where approximately 90 percent of his patients were

25  geriatric patients?

1385

QUINDOZA - CROSS/BEATON

1   A.   I could only assume that, but I don't know.  I don't know

2   who else he billed.

3   Q.   And will you agree with me that geriatric patients often

4   present with far more complicated histories and far more

5   complicated medical conditions than perhaps younger people?

6   A.   At times, yes.

7   Q.   You work for a company called SafeGuard Services.

8   A.   I'm a subcontractor to SafeGuard Services.

9   Q.   Okay.

10  A.   But I -- essentially, yes, I do work for them.

11  Q.   You've made presentations on behalf of SafeGuard Services

12  or using the SafeGuard Services logo?

13  A.   Yes, sir.

14  Q.   And how many clients does SafeGuard Services have?

15  A.   I don't know who all their customers are.  I know of two

16  that I have (sic) directly involved with, or one for two

17  contracts.

18  Q.   Isn't the only client of SafeGuard Services the United

19  States government?

20  A.   That's one of them, I believe.  I don't know if they have

21  any others.

22  Q.   Well, you've testified, by my count, at least 100 times.

23  A.   Somewhere around there.

24  Q.   So, let's just use 100, because it's a nice round number.

25  A.   Yes, sir.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

1386

QUINDOZA - CROSS/BEATON

1    Q.   Assuming that it's been a hundred times, how many times

2    have you testified for the government?

3    A.   All of them.

4    Q.   There is a distinction between "fraud" and "abuse," is

5    there not?

6    A.   Yes, sir.

7    Q.   In the Medicare billing context.

8    A.   Yes, sir.

9    Q.   And so, "fraud" is doing something knowingly and willfully,

10   correct?

11   A.   That is one of the definitions.

12   Q.   And "abuse" is something that may result, directly or

13   indirectly, in unnecessary costs to the Medicare system.  And

14   just one example is for, for example, failing to meet

15   professionally recognized standards of care or performing

16   procedures that are medically unnecessary.  That is something

17   that falls under the "abuse" definition, not "fraud."

18   A.   It can fall under both.

19   Q.   Okay.

20            *(Discussion had off the record between counsel)*

21            MR. BEATON:  So, your Honor, I'm gonna mark this as an

22   exhibit, but I'm only gonna use it as a demonstrative.  I'm not

23   gonna seek to admit it into evidence, just to focus the

24   questioning of the witness?

25            THE COURT:  Any objection?

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

QUINDOZA - CROSS/BEATON

1    MR. YOFFIE:  No objection, your Honor.

2    THE COURT:  Okay.  You may proceed.

3    MR. BEATON:  Okay.  So, I'm gonna mark this as

4    defendant's --

5    MR. HORENSTEIN:  Eighteen.

6    MR. BEATON:  -- Demonstrative 18.

7    *(Defendant's Exhibit 18 marked for identification)*

8    BY MR. BEATON::

9    Q.  Mr. Quindoza, do you recognize this first slide?

10   A.  Yes, sir.

11   Q.  And it is part of a presentation that you have given,

12   actually on numerous occasions, is it not?

13   A.  Yes, sir.

14   Q.  And to whom do you give these presentations?

15   A.  A number of different types of people, healthcare

16   providers, our staff, Medicare recipients.

17   Q.  Do you give it to law enforcement?

18   A.  Yes, sir.

19   Q.  I mean, in other words, you help educate a wide variety of

20   folks.

21   A.  Yes, sir.

22   Q.  And educate them accurately.

23   A.  Hopefully so, yes.

24   Q.  And so, do you see the slide on definitions of "fraud" and

25   "abuse"?

1388

QUINDOZA - CROSS/BEATON

1   A.  Yes, sir.

2   Q.  And you typed that out, right?

3   A.  Yes, sir.

4   Q.  And so, do you see the definition of "fraud," and we were

5   talking about the definition of "abuse," and will you agree

6   with me that I was correctly reading your typed definition of

7   "abuse," right?

8   A.  Correctly reading it?  Yes, sir.

9   Q.  Yes.

10       And one of the -- the definition of "abuse," according

11  to you, that may result in unnecessary costs is in part failing

12  to meet professionally recognized standards of care, or failing

13  to do something that is medically unnecessary *(sic)*.

14  A.  Yes, sir.

15  Q.  And so that is not necessarily fraud.

16  A.  No, sir, I'm not saying that.

17  Q.  Right.

18  A.  If someone intentionally provides a service that is not

19  medically necessary, and they know it, that's fraud.

20       If they intentionally know that they're not meeting

21  accepted standards of care, that's also fraud.

22  Q.  So, if somebody, for example, bills for a dead patient

23  services that they claim they rendered, which is it closer to?

24  A.  That's closer to fraud.

25  Q.  And I think the reason why you have to sort of qualify your

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

QUINDOZA - CROSS/BEATON

1   answers is precisely because of this, the claims continuum,

2   right?  There's sort of a lot of overlapping things that go on.

3   A.  Yes, sir.

4   Q.  And so, abuse is here, and technical errors are here, and

5   proper claims are here at the beginning, right *(indicating)*?

6   A.  Yes, sir.

7   Q.  But the knowledge of wrongdoing -- no knowledge of

8   wrongdoing and knowledge of wrongdoing is where you

9   differentiate between fraud or perhaps some other type of

10  error.  Fair enough?

11  A.  Yes, sir.

12  Q.  And you put that right in the middle, right?

13  A.  Yes, sir.

14  Q.  And that's because there are certain types of mistakes and

15  errors -- and I'll even call them misstatements -- in Medicare

16  billing which are done without intention, that if there was, a

17  determination of intention would fall differently on either

18  side.

19  A.  Yes, sir.

20  Q.  And an example of fraud is falsifying medical records?

21  A.  Yes, sir.

22  Q.  And so, you can't say, because you didn't see, that

23  Dr. Mencia billed for services that were not rendered, correct?

24  A.  I cannot say that.

25  Q.  You cannot say, because you didn't see, that Dr. Mencia

QUINDOZA - CROSS/BEATON

1   falsified records.

2   A.  No, sir.

3   Q.  And you cannot say that Dr. Mencia improperly billed for

4   either services -- for services, because you didn't see those

5   services provided.

6   A.  What I can say is this.  The patient complained of back

7   pain.  Not in any of those videos did I see Dr. Mencia examine

8   the patient for the back pain.  And, again, the coding

9   guidelines say "examination of the patient's complaint."  I

10  never saw that.  That's what makes the billing incorrect.

11  Q.  Who did he bill in that video that you're referring to?

12  A.  I don't know.

13  Q.  So, why does it matter?

14  A.  It was posed to me in that regard.  If they did not -- if

15  that's all he did, would Medicare have paid it?  The answer is

16  no.

17  Q.  Did he bill Medicare for that?

18  A.  I don't know.  I don't think so, if it's not a Medicare

19  patient.

20  Q.  You make a lot of money saying the same thing in all these

21  trials, don't you?

22  A.  I don't know if you want to call it a lot of money.  I

23  don't get paid to testify.

24  Q.  Well, the only party that's ever paid you to testify and

25  hired you is the government, right?

1391

QUINDOZA - REDIRECT/YOFFIE

1  A.  I don't get paid to testify.  I get paid a salary to do my

2  job, which is education.  I get subpoenaed by the government to

3  testify, which I do not get reimbursement for.

4  Q.  Okay.  Well, the government hired your company.  Is that

5  the distinction that you're trying to make?

6  A.  What I'm saying is I'm not paid as a witness.

7  Q.  Okay.  In any of the videos that you saw, regarding those

8  patients, what corresponding Medicare data did you review?

9  A.  None.

10  Q.  Now, I know you want to keep referring to these videos.

11  Regarding the patients on the video, what corresponding billing

12  data did you review?

13  A.  None.

14  Q.  Regarding the patients on the video, what medical records

15  did you review?

16  A.  None.

17          MR. BEATON:  I have no further questions, Judge.

18          THE COURT:  Redirect?

19                    **REDIRECT EXAMINATION**

20   BY MR. YOFFIE:

21  Q.  Mr. Quindoza, is Medicare a government program?

22  A.  Yes, sir.

23  Q.  And you are an expert on Medicare?

24  A.  Yes, sir.

25  Q.  And so, your company's hired by the government?

1392

1  A.  Yes, sir.

2  Q.  99214 is a code we've been discussing.  Is there an

3  additional code that provides for a longer time period?

4  A.  Yes, sir.

5  Q.  Do you know roughly how long that time period is?

6  A.  Forty-five minutes or longer.

7  Q.  So, if there was a complicated geriatric patient,

8  Dr. Mencia could have billed for 99215 if it would have taken

9  45 minutes.

10  A.  Possibly.

11  Q.  But your review of his data showed that 90 percent of those

12  sessions were 99214.

13  A.  Yes, sir.

14          MR. YOFFIE:  No further questions, your Honor.

15          THE COURT:  Thank you, sir.  You may step down.

16  You're excused.

17          THE WITNESS:  Thank you, your Honor.

18          *(Witness excused)*

19          THE COURT:  The government may call its next witness.

20          MR. GILFARB:  The United States calls Jodi Sullivan to

21  the stand.

22          MR. BEATON:  Judge, before the witness enters, just as

23  we're waiting for her to come in, same objection, same request

24  for a *Daubert* hearing.

25          THE COURT:  You object as the witness testifies.

1393

SULLIVAN - DIRECT/YOFFIE

1   ROOM CLERK:  Please raise your right hand.

2   *(JOHANNA SULLIVAN, GOVERNMENT'S WITNESS, WAS SWORN)*

3   ROOM CLERK:  Thank you.  You may be seated.

4   THE WITNESS:  Thank you.

5   THE COURT:  Please state your name.  Please spell your

6   name for the record.

7   THE WITNESS:  Johanna Sullivan.  It's J-O-H-A-N-N-A,

8   S-U-L-L-I-V-A-N.

9   THE COURT REPORTER:  Ma'am, I need you closer to the

10  microphone.  Speak right into the tip.

11  THE COURT:  You can scoot the microphone closer if you

12  want.

13  THE WITNESS:  Is that good?  Okay.  Thank you.

14  **DIRECT EXAMINATION**

15  BY MR. YOFFIE:

16  Q.  Good afternoon, Dr. Sullivan.

17  A.  Good afternoon.

18  Q.  Where do you live?

19  A.  Tampa, florida.

20  Q.  i Want To Talk Briefly About Your Educational Background.

21  where Did You Attend College?

22  A.  university Of florida.

23  Q.  and What Did You Study There?

24  A.  uhm, i Did my undergraduate studies, and I also received a

25  Doctor of Pharmacy degree.

1394

SULLIVAN - DIRECT/YOFFIE

1   Q.   Okay.  What Did You Study As An Undergraduate?

2   A.   primarily Science, Chemistry Classes, Biology.

3   Q.   if You Don't Mind Me Asking, What Year Did You Graduate

4   From College?

5   A.   1995.

6   Q.   and, Again, So What School Did You Attend After?

7   A.   i Went To the University of Texas Health Science Center at

8   San Antonio.  It's part of the UT Austin campus, and I did a

9   post-graduate residency.*****************

10  Q.   Moving back to the graduate school of pharmacy, what did

11  you study?

12  A.   Uhm, particularly it was the study for pharmacist.  I did

13  three years of classes and one year of clerkships.

14  Q.   Generally speaking, what did you study during those

15  three years of courses?

16  A.   You study drug chemistry, how the drugs affect the body,

17  how drugs are used in therapeutics for different disease

18  states, how to work with patients about side effects of

19  medications, uhm, and how to best streamline and maximize value

20  for drug therapy for patients, the best drug for the patient to

21  treat their condition.

22  Q.   And what degree did you receive from graduate school?

23  A.   Doctor of Pharmacy.

24  Q.   But to clarify, you're not a medical doctor?

25  A.   No, I'm not.

SULLIVAN - DIRECT/YOFFIE

1  Q.  And so, what is the degree commonly referred to?

2  A.  PharmD.

3  Q.  So, again, after you received your PharmD, where did you go

4  next?

5  A.  That's when I went to the University of Texas and did my

6  post-graduate residency there.

7  Q.  And what was the post-graduate residency in?

8  A.  Is in drug information and pharmacoeconomics.

9  Q.  Can you spell the last one?

10  A.  Oh, sure.

11       MR. YOFFIE:  You good?  Okay.

12  BY MR. YOFFIE:

13  Q.  Can you briefly describe what that means?

14  A.  I basically worked in studying drug sets, studying drug

15  literature to evaluate decision-making, so large health

16  systems, large health plans.  You might have 20 drugs in a

17  category.  How do you decide which ones are the best to cover?

18  It may not be the cheapest one.  It may be the one that's most

19  effective.  It may be the one that causes the least side

20  effects.  It may be a combination of those kind of things.  So,

21  that was really what I worked with, is evaluating statistical

22  studies, data sets, literature to formulate decisions about

23  drugs.

24  Q.  Are you a member of any professional organizations?

25  A.  I'm currently a member of the Florida Health System

SULLIVAN - DIRECT/YOFFIE

1  pharmacist group.

2  Q.  Do you have any licenses?

3  A.  Yes.  I'm licensed in the State of Florida with a

4  registered pharmacist and also a consultant pharmacist.  I'm

5  also registered in the State of Texas.

6  Q.  And briefly, what is the difference between a "registered

7  pharmacist" and a "consultant pharmacist"?

8  A.  A "consultant pharmacist" is a license that's required by

9  the State of Florida for certain pharmacy practice settings.

10  It's required for a hospital pharmacy.  It's required for

11  nursing home pharmacy.  Pretty much any setting except a

12  community retail pharmacy, which is what most people associate

13  with pharmacy, like a Publix, or a Walgreens, or something.

14  But anything outside of that, you have to have a consultant

15  pharmacist license.

16  Q.  But you're also licensed as a --

17  A.  Registered pharmacist.

18  Q.  -- registered pharmacist.

19  A.  So, I have both.

20  Q.  When did you receive your licenses from the State of

21  Florida?

22  A.  Well, I went to Texas immediately after graduating, so I

23  took my licensure there first, because I was physically in

24  Texas, and then I flew back and took mine at the next

25  opportunity.  This was before everything was computerized.  I'm

1397

SULLIVAN - DIRECT/YOFFIE

1  dating myself.  But it was, I believe, the December or January

2  exam, so it was right there in that '95-'96 time frame.

3  Q.  And have your licenses been continually active since then?

4  A.  Yes.

5  Q.  Okay.  So, you are currently licensed pharmacist in the

6  State of Florida.

7  A.  Yes.

8  Q.  Okay.  After your residency in Texas, where did you head

9  next?

10  A.  I went to the University of Pittsburgh.  I was a faculty

11  member there and also worked at their health system, University

12  of Pittsburgh Medical Center.

13  Q.  And approximately how many years were you there for?

14  A.  I was there a little bit over two years.

15  Q.  And can you briefly describe what your responsibilities

16  were?

17  A.  I worked in the drug information center, so I did the

18  things that I had been trained for with my residency.

19        I worked with their formulary committee to help make

20  decisions about drugs; I worked with their adverse drug

21  recreation committee to assess side effects of drugs; and also

22  presented data about new drugs that were coming out to the

23  medical staff and to the pharmacy staff, and assessed that data

24  and summarized it for everyone, as well, so....

25  Q.  Can you briefly explain -- you mentioned "adverse

SULLIVAN - DIRECT/YOFFIE

1  reactions."  Can you briefly describe what you mean?

2  A.  Yes.  That's the scientific term for a side effect from a

3  drug.  So, something that you didn't intend for the drug to do.

4  Drugs have medical effects that we do all the time, like

5  lowering blood pressure, lowering blood sugar, helping you to

6  breathe better.  But sometimes they also have side effects or

7  adverse drug reactions that you don't intend, like having a

8  stroke, or, uhm, passing out, or something like that.

9  Q.  And after the University of -- excuse me -- strike that.

10      After this first opportunity, what did you do next?

11  A.  I took a job in the pharmaceutical industry.  I worked

12  for -- at the time, it was Pharmacia and Upjohn, went through a

13  couple company mergers.  It eventually became Pfizer, which

14  most people are familiar with.  And I did research, field

15  research, stage 3 and 4 trials for their drugs.

16  Q.  And approximately how long were you working there?

17  A.  I worked for them for three years.

18  Q.  Okay.  I promise we won't go through your whole resume, but

19  what did you do next?

20  A.  After that, I took a job as a health system pharmacy

21  director.  So, it was a small hospital in Tampa, Florida, and I

22  was both the clinical and the pharmacy director.  So, I did all

23  the administrative things of running the pharmacy, but I was

24  also the clinical director and did all the things with

25  antibiotics, IVs, IV nutrition, did all the dosing and

SULLIVAN - DIRECT/YOFFIE

1 monitoring of patients.  And I worked with the committee of

2 physicians, our medical committee, to determine drugs that we

3 were using, how we would use those drugs, protocols that the

4 hospital would implement regarding those drugs, and what we

5 would do with those drugs.

6 Q.  And where did -- how long, roughly, were you in that

7 position?

8 A.  Two years, I believe.

9 Q.  And where did you head next?

10 A.  Then I worked at Merck-Medco, which is a large PBM.  It's

11 now called Medco Health.  Actually, it was bought by Express

12 Scripts, if people have heard of that.  And it's what's called

13 a pharmacy benefit manager, or PBM.  And this was a group that

14 manages drug benefits.  So, when you run your card at a

15 pharmacy, this is the people that handle that card in terms of

16 paying the drug, how it will pay, what tier it's on, how much

17 your copay will be, if it has any kind of limits.

18        And I was a customer service pharmacist for them, so I

19 answered calls from patients that were having problems with

20 their medication, and I talked to them about their medication.

21 I might have called physicians to intervene, if there was

22 issues with the medication, if something needed to be changed,

23 and had those type of discussions.

24 Q.  What do you mean by "issues with the medication"?

25 A.  Again, usually adverse drug events or side effects.

1400

SULLIVAN - DIRECT/YOFFIE

1   Sometimes people were on duplicative medications where they

2   were getting two drugs from two different physicians that were

3   doing the same thing.  And then the patient was elderly.  They

4   were maybe having problems like falls.  And I would intervene

5   to try to change their therapy so they did not have those

6   problems anymore.

7   Q.  And what is the issue with sometimes receiving duplicative

8   medication?

9   A.  Well, as I said, any drug has therapeutic effects or

10  effects you want.  And then they all also have side effects or

11  adverse drug effects.  So, when you take two drugs in the same

12  category that do the same thing, you maybe magnify those side

13  effects.  So, the potential for those negative effects are even

14  greater than they would be if you just had one of those drugs.

15  Q.  Dr. Sullivan, during the previously lengthy resume, did you

16  work with controlled substances?

17  A.  Yes.

18  Q.  And did those controlled substances include opioids?

19  A.  Yes.

20  Q.  What about benzodiazepines?

21  A.  Yes.

22  Q.  What about muscle relaxants?

23  A.  Yes.

24  Q.  Can you just briefly describe what each category those

25  drugs is and common examples?

1401
SULLIVAN - DIRECT/YOFFIE

1   A.   Sure.

2            Opioids is a class of drugs.  They work on opioid

3   receptors in your body, which we all naturally have.

4            MR. BEATON:  Judge, I object.  The witness has not

5   been tendered as an expert witness yet.

6            THE COURT:  Sustain.

7   BY MR. YOFFIE:

8   Q.   What was your -- how long did you work with controlled

9   substances?

10  A.   I've worked with controlled substances since I've been a

11  pharmacist.  And before that, actually, because I was a

12  pharmacy student and a technician prior to being a licensed

13  pharmacist.

14  Q.   We'll return to those drugs in a minute.  Let me just ask

15  you, what is the "Prescription Drug Monitoring Program"?

16  A.   "Prescription Drug Monitoring Program" here in Florida is a

17  program that monitors all dispensing of controlled substances,

18  regardless of form of payment and regardless of pharmacy or

19  prescriber.  There is one in every state except one.  And they

20  all have a slightly different name, but they're all basically

21  the same product.

22  Q.   So, is a common name in Florida E-FORCSE?

23  A.   Yes.

24  Q.   So, E-FORCSE and PDMP, Prescription Drug Monitoring

25  Program, are the same thing?

SULLIVAN - DIRECT/YOFFIE

1    A.  Yes, in Florida.

2    Q.  In Florida, who runs the PDMP program?

3    A.  The Department of Health.

4    Q.  Okay.  And have you worked with PDMP data?

5    A.  Yes, extensively.

6    Q.  Roughly how many years?

7    A.  Probably ten years.

8    Q.  Okay.  And can you briefly describe what capacity you've

9    worked with PDMP data?

10   A.  Well, there's limits on what you can do in terms of working

11   with PDMP data.  It has to be patient-specific.  So, when I've

12   had jobs where I was involved in patient-specific things, I did

13   review patient profiles to determine how patients were using

14   controlled substances.

15         I ran an opioid lock-in program for one of the

16   Medicaid plans in the State of Florida.  So, I would review

17   patients and determine how they were using controlled

18   substances, if they were getting them from multiple prescribers

19   or multiple pharmacies, which is called doctor or pharmacy

20   shopping.  And I would look at those kind of things to

21   determine if the patient appeared to be abusing products and if

22   we needed to narrow them down to one prescriber or one

23   pharmacy.

24         In my current position, I work with law enforcement,

25   and I get data sets of the PDMP in addition to our Medicare

SULLIVAN - DIRECT/YOFFIE

1   data, and I evaluate those and look primarily at what people

2   are getting in addition to what Medicare is paying for.  But I

3   also can look at other aspects of the PDMP in relation to law

4   enforcement cases per request.

5   Q.   Okay.  And so, where do you currently work?

6   A.   I work for Qlarant, which is a nonprofit, which administers

7   the NBI medic for CMS.

8   Q.   That's a lot of initials, so let's take them one at a time.

9        What is "CMS"?

10  A.   Centers for Medicaid and Medicare Services.

11  Q.   And what does "NBI Medic" refer to?

12  A.   It's the National Benefit Integrity Part D program.  So,

13  it's the fraud contractor for Medicare Part D, the outpatient

14  drug benefit.

15  Q.   Okay.  Outpatient drug benefit.  But briefly, what is

16  Medicare Part D?  Can you describe that?

17  A.   Yeah.  Medicare Part D is the main avenue of coverage for

18  drugs for Medicare patients.  So, when you go to a community

19  retail pharmacy, if you're in a nursing home, that is who would

20  cover your drugs.  The exceptions would be a hospital, which is

21  under a different division of Medicare, but -- or an

22  institution.  But it's typically all outpatient prescriptions.

23  Q.   So, generally speaking, if you walk -- if an individual

24  walks into a CVS or Publix who's a Medicare beneficiary and

25  fills a prescription, what part will pay for that?

1404

SULLIVAN - DIRECT/YOFFIE

1   A.   Part D.

2   Q.   Okay.  Have you worked with Part D data before?

3   A.   Yes.  That's my job.

4   Q.   Okay.  And can you just -- when you say "Part D data," can

5   you just briefly describe what that means?

6   A.   We have what we call an "IDR," which is an integrated data

7   repository.  The way Medicare Part D works is that CMS or

8   Medicare pays private plans like United, Aetna, WellCare to

9   administer the Medicare Part D benefit.

10          So, they then provide those prescriptions to the

11  patients.  They do the payments.  But then they provide the

12  data back into this data repository for CMS.  So, we have

13  access to all this data.  And then we work with the plans to

14  analyze that data and also CMS, so....

15  Q.   Okay.  So, we've thrown out a lot of initials, but very

16  basically, how does PDMP data compare to Part D data?

17  A.   Okay.  So, our Part D data is just for Medicare patients.

18  So, if you're not enrolled in Medicare Part D, you would not be

19  in our data set.

20          PDMP is everybody.  So, it would be people that are in

21  Medicaid, people that are in Medicare, people that are

22  commercial insurance, so under 65, but, you know, private

23  insurance, and also people who are providing cash for drugs.

24  So, it would cover all of those sets.

25  Q.   So, if an individual walks into a pharmacy and pays cash

SULLIVAN - DIRECT/YOFFIE

1   for a controlled substance, would that show up on the PDMP

2   data?

3   A.   Yes.

4   Q.   But it wouldn't show up on the Medicare data.

5   A.   Correct.

6   Q.   Dr. Sullivan, what data did you review -- or what materials

7   did you review before coming here to testify today?

8   A.   I reviewed the Medicare Part D records for Dr. Mencia; the

9   Medicare Part B, which is medical data, for Dr. Mencia; a

10  date-of-death analysis that our analysts ran; and then also the

11  Florida PDMP data for Dr. Mencia and 54 patients that had been

12  seen by Dr. Mencia and possibly other prescribers.

13  Q.   And who provided you with the PDMP data?

14  A.   The legal team for the case.

15  Q.   And do you know if they received it from the Florida

16  Department of Health?

17  A.   Yes.

18  Q.   And how did you obtain the Part D, as in "David," data?

19  A.   It was run by one of our analysts off of the IDR data

20  repository and then was provided directly to the pharmacy team

21  for review and analysis.

22  Q.   Okay.  Was a report authored based on that Part D data?

23  A.   Yes.

24  Q.   Did you author that report?

25  A.   I did not -- I was not the primary author of the report.  I

1406

SULLIVAN - DIRECT/YOFFIE

1  was the secondary pharmacist on the report.  We always have one

2  pharmacist write the report, and then we have a second

3  pharmacist review all of the data and the report and agree with

4  all of the conclusions that are made in that.  So, I was the

5  secondary pharmacist that did that.

6  Q.  So, you reviewed the underlying data and reviewed the

7  conclusions reached in it.

8  A.  And agreed with the conclusions, yes.

9       MR. YOFFIE:  At this point in time, your Honor, the

10  government tenders Dr. Sullivan as an expert under Rule 702 in

11  the areas of Medicare Part D, the Prescription Drug Monitoring

12  Program, and the prescribing practices for controlled

13  substances.

14       MR. BEATON:  Objection, Judge.  Same methodology

15  objection we had earlier.  The government is gonna run into the

16  same problem they ran into with Mr. Quindoza for the same

17  reasons.

18       THE COURT:  And if they do, I'll sustain the

19  objection, but she's a qualified expert.

20       You may proceed.

21  BY MR. YOFFIE:

22  Q.  Dr. Sullivan, returning to the drugs we discussed earlier,

23  as a licensed pharmacist, can you describe some common opioids?

24  A.  Yes.  Opioids, some of the most common ones would be

25  oxycodone acetaminophen, sometimes called Percocets under brand

SULLIVAN - DIRECT/YOFFIE

1  name; oxycodone extended release, or Oxycontin; Dilaudid;

2  hydromorphone; hydrocodone acetaminophen, or Vicodin.  It's

3  often known by Norco or Vicodin.

4  Q.  What is the difference between oxycodone and Oxycontin?

5  A.  Well, Oxycontin is made of oxycodone, so it is the same

6  drug, but Oxycontin is a long-acting or extended release

7  formulation of oxycodone.

8  Q.  And have you worked with benzodiazepines?

9  A.  Yes.

10 Q.  Can you briefly provide an example of a benzodiazepine?

11 A.  Alprazolam or Xanax is one that most people know.  That's

12 used for anxiety.  There's Temazepam or Restoril is often used

13 for sleep.  Diazepam or Valium is often used for muscle spasms

14 or seizures.

15 Q.  And muscle relaxants, what are some common examples of

16 muscle relaxants?

17 A.  Cyclobenzaprine is a real common one.  Its trade name,

18 brand name is Flexeril, it's usually known by.  And

19 carisoprodol, or Soma is the brand name, is another common one.

20 Q.  Okay.

21      MR. YOFFIE:  Your Honor, pursuant to stipulation 16,

22 the government seeks to move into evidence Exhibit 16, which is

23 Part D data for the time frame of July 24th, 2012, to

24 July 28th, 2017.

25      (Government's Exhibit Number 16 marked for

1408

SULLIVAN - DIRECT/YOFFIE

1  *identification)*

2          MR. BEATON:  So, we've stipulated that the records are

3  authentic.  But we, again, have the same problem where it's

4  from 2012 to 2017.  So, I object.

5          THE COURT:  You stipulated to them, so 16 will be

6  received.

7  BY MR. YOFFIE:

8  Q.  Dr. Sullivan, did you review -- maybe you mentioned this

9  before, but Medicare Part D data in this case?

10          MR. BEATON:  I'm sorry to interrupt, Mr. Yoffie.

11          The stipulations -- and Mr. Gilfarb will confirm this

12  representation -- the stipulations were as to authenticity,

13  reserving the right to object as to relevance, which is what

14  I'm doing now.  And Mr. Gilfarb is free to chime in on that.

15          THE COURT:  Okay.  I change my ruling.  So, I sustain

16  the objection to 16.

17          MR. YOFFIE:  Your Honor, may Dr. Sullivan opine as to

18  her review of the data as it pertains to trends she reviewed

19  regarding 2014 to 2017?

20          THE COURT:  She can testify to whatever you ask her

21  that isn't objected to, or if it's objected to, then I overrule

22  the objection.

23          MR. YOFFIE:  Okay.

24          At this point, pursuant to stipulation 11, the

25  government seeks to move into evidence Exhibit 11, which is

1409

SULLIVAN - DIRECT/YOFFIE

1   PDMP data for the time frame of January 1, 2014, to May 31st,

2   2018.

3          MR. BEATON:  No objection as to that, Judge.

4          THE COURT:  Eleven's already in evidence.

5          MR. YOFFIE:  Okay.

6   BY MR. YOFFIE:

7   Q.  Dr. Sullivan, let's just discuss the PDMP data.

8          Did you review that data?

9   A.  Yes.

10  Q.  Okay.  And based on your review of that -- well, first of

11  all, who is the prescriber in that data that you reviewed?

12  A.  As I said, I got two different sets.  I got one set that

13  was Dr. Mencia's PDMP data for 2014 through May 2018, and that

14  was all of Dr. Mencia's prescribing of controlled substances in

15  the state of Florida through that PDMP.

16         I also had 54 patients that were treated by Dr. Mencia

17  with controlled substances, but also may have had prescriptions

18  from other people.  So, it was their individual history that

19  had everything, not just Dr. Mencia's data.  It might have --

20  it would show if you had anything from anybody else.  So, I had

21  both of those sets.

22  Q.  Based on your review of the data as pertaining to

23  Dr. Mencia --

24  A.  Um-hum.

25  Q.  -- what trends, if any, did you notice?

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

SULLIVAN - DIRECT/YOFFIE

1  A.   There were several trends that I noticed.  Uhm, there was a

2  consistency in prescribing certain regimens.  One was oxycodone

3  acetaminophen, also goes by Percocet as a brand name;

4  alprazolam, also known by Xanax; and then also carisoprodol, or

5  Soma.  This is a combination that is known as "trio" or

6  "trinity."  It's often sought by drug-seeking beneficiaries.

7  So, it's a muscle relaxant, an opioid, and a benzo prescribed

8  together.

9       I also noticed several trends, besides the consistency

10  of those regimens, that in the patient sets, the patients

11  appeared not to be on those drugs prior to being treated by

12  Dr. Mencia, and then they did not continue those drugs after

13  they were no longer seen by Dr. Mencia, as well.  So, they seem

14  to start and stop with treatment by Dr. Mencia.

15       And the regimens were very, very similar.  They did

16  not appear to be individualized to unique patients, except

17  where commercial insurance was involved.  About a third of the

18  patients -- there was about 45,000 records in that data set for

19  Dr. Mencia.  About one-third of them were cash.  But the ones

20  that had commercial insurance or Medicare insurance -- Medicare

21  accounted for about a third of the prescriptions as well --

22  they had -- they had greater utilization for the people who had

23  commercial insurance.  So, they got additional drugs.  Other

24  than just oxycodone acetaminophen, the alprazolam, and the

25  carisoprodol, they got Dilaudid, they got Oxycontin, they got

SULLIVAN - DIRECT/YOFFIE

1  sometimes amphetamines, other things, but they got other drugs

2  additionally on top of those drugs.  But the cash payment

3  patients looked pretty similar, and then the commercial

4  patients had some additional drugs in that.

5          There were also duplication prescribing, again

6  primarily in the commercial, where they would have multiple

7  short-acting or long-acting opioids duplicative.  They would

8  also have duplicative benzodiazepines.  So more than one

9  benzodiazepine being prescribed by Dr. Mencia at the same time

10  to the same patient, sometimes as many as three, in addition to

11  other controlled substances, such as insomnia agents, muscle

12  relaxants, and other things that were potentially harmful in

13  terms of drug combinations.

14  Q.  And so, based on your training and experience, what

15  problems, if any, did you see with this -- these duplicative

16  drugs being prescribed?

17  A.  Uhm, one of the things --

18          MR. BEATON:  Judge, I think the question is vague, so

19  I object.  Based on which data?

20  BY MR. YOFFIE:

21  Q.  This is on the PDMP data that you've reviewed.

22  A.  On the PDMP data, a number of things.  One, when you see

23  the same routine, prescriptions being prescribed over and over

24  again, both in quantity and the types of drugs, it has -- it's

25  consistent with what we call "pill mill prescribing," where you

SULLIVAN - DIRECT/YOFFIE

1   are -- someone is prescribing not because of a patient

2   medically needs those drugs --

3            MR. BEATON:  Objection, Judge.  How can someone

4   testify as to medical necessity?

5            MR. YOFFIE:  This is based on her review of the data

6   as a licensed pharmacist.  She's not purporting to be a medical

7   doctor.

8            MR. BEATON:  I question the methodology.

9            THE COURT:  You can cross-examine on it.

10           Overrule.  This is based on her training and

11  experience.

12  BY MR. YOFFIE:

13  Q.  What, if anything, did you notice about the dosage

14  strengths of the drugs prescribed?

15  A.  The doses of the applicable drugs were consistently the

16  highest doses of the available drug and dosage form.  So, for

17  example, oxycodone acetaminophen, the highest strength you can

18  have is ten milligrams of oxycodone.  The Tylenol part of it,

19  the acetaminophen, can vary, but ten milligrams is the highest

20  strength.  So, that was the highest strength out of all the

21  oxycodone acetaminophen that was prescribed.

22           Alprazolam, or Xanax, as the brand name is called, was

23  two milligram, which is the highest immediate-release dose

24  strength that was available.  And that was the most common one

25  was prescribed *(sic)*.

SULLIVAN - DIRECT/YOFFIE

1          Oxycodone or -- immediate release, it was

2    30 milligrams, which is the highest dose strength available as

3    well.

4          Those are also patterns that we find consistent with

5    pill mill prescribing, where the highest dose strength is

6    continually and repeatedly prescribed to multiple patients over

7    periods of time.

8    Q.  So, oxycodone 30 milligrams, that's the highest available

9    dosage for oxycodone?

10   A.  For immediate release, not extended release, yes.

11   Q.  And to the best of your recollection, approximately what

12   percentage of the oxycodone prescribed in the PDMP data was of

13   the highest strength available?

14   A.  I think it was over 80 percent, if I remember correctly.

15   Q.  And what about the highest dosage for oxycodone

16   acetaminophen as it pertains to the oxycodone?

17   A.  That was also over 80 percent.

18   Q.  Showing you now Government's Exhibit 12B.  This was

19   admitted under Government's Exhibit 12.  Do you recognize this

20   document?

21   A.  Yes.  This is one of the 54 patients that I received to

22   review.

23   Q.  And so, who is the individual?

24   A.  Amy Garcia.

25   Q.  And what is "E-FORCSE" in the upper left-hand corner?

1414

SULLIVAN - DIRECT/YOFFIE

1   A.   This is the PDMP data for the State of Florida.

2   Q.   So, is it fair to say that this is a record of the

3   prescriptions that she filled for controlled substances in the

4   state of Florida?

5   A.   Correct.

6            MR. YOFFIE:  Flip to the next page.

7            A little hard to see that.

8            MR. BEATON:  You can zoom it in.

9   BY MR. YOFFIE:

10  Q.   On May 20th, 2017, what three drugs did Ms. Garcia fill

11  for?

12  A.   She received Lorazepam, two milligrams; carisoprodol,

13  350 milligrams; and oxycodone acetaminophen 10/325.

14  Q.   Before we address that, right here, BM4911904.  What does

15  that refer to?

16  A.   That refers to Dr. Mencia.  That is his identifier.

17  Q.   Is it fair to say that Dr. Mencia -- that these

18  prescriptions were issued under Dr. Mencia's name?

19  A.   Correct.

20  Q.   Okay.  What type of drug is Lorazepam?

21  A.   Lorazepam is a benzodiazepine.

22  Q.   What about carisoprodol?

23  A.   It is a muscle relaxant.

24  Q.   What about oxycodone acetaminophen?

25  A.   It is opioid analgesic or pain reliever.

SULLIVAN - DIRECT/YOFFIE

1    The combination of those three drugs is what I spoke

2  about, which is trio or trinity prescribing, which is the

3  combination of a benzodiazepine, carisoprodol, and an opioid

4  analgesic.

5  Q.  And what is, based on your training and experience, the

6  trinity prescribing indicative of?

7  A.  It's indicative of drug-seeking behavior and pill mill

8  prescribing.

9  Q.  What do these numbers 60, 30, 120 -- what do they

10  represent?

11  A.  Sixty, 30, and 120 indicate the quantity that was dispensed

12  for each of those drugs.

13  Q.  Let me move up one line.

14    May 26, 2017, what does Ms. Garcia receive?

15  A.  She received Oxycontin, 20-milligram tablets.

16  Q.  What kind of drug is Oxycontin?

17  A.  It is also oxycodone but without any of the acetaminophen,

18  and it's in an extended release form.

19  Q.  But six days earlier didn't she just get oxycodone?

20  A.  She got oxycodone acetaminophen, correct.

21  Q.  And based on your training and experience and review of the

22  PDMP data, what is that indicative of to you?

23  A.  She was receiving a short-acting and a long-acting opioid.

24  That can occur in an individual patient, but it's not typical

25  to see it with a benzodiazepine and a muscle relaxant as well.

1416

SULLIVAN - DIRECT/YOFFIE

1   Q.  And based on your review of the data, did you see a trend

2   of duplicative prescribing of short-acting and long-acting

3   oxycodone?

4   A.  Yes.  And also short-acting or long-acting of different

5   types, not just oxycodone, but multiple agents that did the

6   same thing at the same time in each patient, yeah.

7   Q.  Let's move up.

8        Let me try to zoom in.

9        June 18th, 2017, what drugs does Ms. Garcia receive?

10  A.  She, again, received Lorazepam, carisoprodol, and oxycodone

11  acetaminophen.

12  Q.  And what are those three drugs indicative of?

13  A.  The trio or trinity prescribing.

14  Q.  Is it the same prescriber number belonging to Dr. Mencia?

15  A.  Yes.

16  Q.  Six days later, what does Ms. Garcia get?

17  A.  She got the Oxycontin again.

18  Q.  Okay.  And what kind of drug is Oxycontin?

19  A.  Extended release oxycodone.

20  Q.  Was the oxycodone or the short-lasting drug reduced based

21  on her receipt of the long-acting drug?

22  A.  It did not appear to be, no.

23  Q.  Won't go through the whole chart.

24       July 15th, 2017, what does Ms. Garcia receive?

25  A.  Lorazepam, carisoprodol, and oxycodone acetaminophen.

1417

SULLIVAN - DIRECT/YOFFIE

1    Q.   And there is some reduction here of the oxycodone, correct?

2    A.   Yes.  It went down one tablet per day.

3    Q.   Okay.  But she's still receiving short-acting and

4    long-acting oxycodone?

5    A.   Well, in those -- those three you showed me, it was just

6    the short-acting.  But she would have had long-acting from the

7    previous prescription you showed me.

8    Q.   Okay.  August 12th, 2017, what three drugs does she

9    receive?

10   A.   Carisoprodol, oxycodone acetaminophen, and Lorazepam.

11   Q.   And for the last time, what are those three drugs combined

12   known as?

13   A.   Trio or trinity prescribing.

14   Q.   Let's jump ahead.

15        January 31st, 2018, what drugs does Ms. Garcia

16   receive?

17   A.   She received oxycodone acetaminophen, carisoprodol,

18   Oxycontin in a higher dose than she was receiving before, the

19   30 milligrams, and Lorazepam, two milligrams.

20   Q.   So, roughly six months later, she's still receiving

21   short-acting and long-acting oxycodone?

22   A.   Correct.

23   Q.   Dr. Sullivan, when, do you know, to the best of your

24   recollection or understanding, was the arrest of Dr. Mencia?

25   A.   It was in February 2018.

SULLIVAN - CROSS/BEATON

1  Q.  And what happens in February and March of 2018?

2  A.  Amy Garcia did not receive any prescriptions for any

3  controlled substances.

4  Q.  And to clarify, the PDMP data is not restricted to

5  Dr. Mencia, correct?

6  A.  Correct.

7  Q.  So, if she were receiving -- if she were filling a

8  prescription from another provider, it would appear here.

9  A.  Correct.

10  Q.  And, in fact, what happens in April of 2018?

11  A.  She received Lorazepam two milligrams from a different

12  prescriber.

13  Q.  What happened to the oxycodone?

14  A.  She did not receive it.

15  Q.  What happened to the Oxycontin?

16  A.  She did not receive it.

17  Q.  What happened to the muscle relaxant?

18  A.  She did not receive it.

19         MR. YOFFIE:  No further questions, your Honor.

20         THE COURT:  Cross-examination.

21         *(Discussion had off the record between counsel)*

22              **CROSS-EXAMINATION**

23  BY MR. BEATON:

24  Q.  Good afternoon, Ms. Sullivan.

25  A.  Good afternoon.

SULLIVAN - CROSS/BEATON

1   Q.  My name is Marcos Beaton.  I represent Dr. Mencia.

2           You and I have never met before, correct?

3   A.  Correct.

4   Q.  So, I want to begin where the government left off.

5           You recall the government just showing you this PDMP

6   data for a woman named Amy Garcia?

7   A.  Yes.

8   Q.  And that's data that you reviewed, correct?

9   A.  Correct.

10  Q.  And did you review Army Garcia's medical records?

11  A.  No, I did not.

12  Q.  Did you review any reports -- investigative reports

13  regarding visits by Ms. Garcia to the practice?

14  A.  No, I did not.

15  Q.  And so, the testimony that you just gave is based on your

16  review of this chart.

17  A.  On hers, yes, um-hum.

18  Q.  And so, what you can tell is that the medications that we

19  see here were under the prescriber number associated with

20  Dr. Mencia, correct?

21  A.  Correct.

22  Q.  Did you see the physical prescriptions?

23  A.  No, I did not.

24  Q.  And can you say whether a medical assistant, for example,

25  might have issued any or all of these prescriptions behind

SULLIVAN - CROSS/BEATON

1  Dr. Mencia's back?

2  A.  I did not review the physical prescriptions, so I could not

3  speak to that.

4  Q.  And so, the government asked you whether after

5  January 31st, you saw the same type of prescription pattern

6  that you testified about.  Do you remember that question?

7  A.  Yes.

8  Q.  And, obviously -- and we can all see it -- the answer's no.

9  And you're aware that Dr. Mencia was arrested on February, I

10  believe, 6th?

11  A.  Um-hum.

12  Q.  Do you know who Oscar Ventura-Rodriguez is?

13  A.  No, I do not.

14  Q.  Are you aware that he was also arrested on February 6th in

15  association with this case?

16  A.  I know there were some associates of Dr. Mencia that were

17  arrested.  But I -- again, I'm focused on my part of this.

18  Q.  And your part of this was reviewing this data.  I mean

19  basically what you're -- it's a data review and sort of an

20  extrapolation from the data, right?

21  A.  Correct.

22  Q.  And data, to use a term that the government used earlier,

23  is only as good as the information that goes in -- garbage in,

24  garbage out, right?

25  A.  Correct.

SULLIVAN - CROSS/BEATON

1    Q.  And so, do you know who Nadira Sampath-Grant is?

2    A.  No.

3    Q.  Are you aware that she was also arrested on February 6th?

4    A.  Similar to the other question, I'm aware there were some

5    associates that were arrested.

6    Q.  Okay.  And I'm gonna ask you the same question.  I assume

7    it's gonna be the same answer.  But there was another gentleman

8    named John Mensah, same --

9    A.  Same answer.

10   Q.  Same answer.  Okay.

11        And forgive me for calling you "Ms. Sullivan."  It's

12   actually "Dr. Sullivan," right?

13   A.  Yes.

14   Q.  Okay.  Sorry.

15   A.  That's okay.

16   Q.  Dr. Sullivan, you also talked about pill mills, right?

17   A.  Um-hum.  Yes.

18   Q.  You got to answer out loud.  Otherwise --

19   A.  Sorry, sorry.

20   Q.  -- we get in trouble with the court reporter.

21   A.  Okay.

22   Q.  And you've been involved in pill mill cases before?

23   A.  Yes.

24   Q.  The firm that you work for actually does some work in that

25   regard as well?

SULLIVAN - CROSS/BEATON

1    A.   Yes.

2    Q.   So, you've gotten to see not just what statistical patterns

3    of pill mills look like, but you -- I assume, in part of your

4    due diligence, that you have also done some research or

5    background work on what pill mills look like, right?

6    A.   Correct.

7    Q.   I mean one sign of a pill mill is that they're located, for

8    example, in a strip mall, correct?

9    A.   They can be anywhere, but sometimes they're in strip malls,

10   yes.

11   Q.   But that's one of those red flags, right?  The doctor's

12   office is in a strip mall, right?

13   A.   It can be one of the red flags, yes.

14   Q.   Another red flag is, for example, just bulletproof glass at

15   the front, you know, where the receptionists hide behind,

16   right?

17   A.   Those are less common nowadays, but, yes, those are one of

18   the hallmarks as well.

19   Q.   One of the other hallmarks of pill mills is, as you were

20   testifying to from the data, is that, for example, there are

21   long lines outside before the practice opens in the morning,

22   right?

23   A.   That is another red flag that people see.

24   Q.   And another hallmark of pill mills -- well, strike that.

25        You work for a company called Qlarant?

1423

SULLIVAN - CROSS/BEATON

1    A.   Correct.

2    Q.   And you said that it was a nonprofit?

3    A.   It's a nonprofit organization, yes.

4         THE COURT REPORTER:  Could you spell that?

5         THE WITNESS:  Q-L-A-R-A-N-T.

6    BY MR. BEATON:

7    Q.   And -- but that doesn't mean that Qlarant doesn't make

8    money, right?

9    A.   No.  They -- a nonprofit just doesn't -- they put the money

10   back into the organization.  It's not -- they don't pay money

11   to shareholders or something.

12   Q.   And -- I mean, so it can go back into the business in the

13   form of salaries, too.

14   A.   Correct.

15   Q.   Okay.  So, just because it's a not-for-profit doesn't mean

16   that people aren't well paid or increasing their own salaries

17   as the success of the not-for-profit increases, right?

18   A.   I don't think you've worked for a nonprofit before.

19   *(Laughter)*

20        Uhm, nonprofits tend to be a little lower paid, I

21   think, than general, but....

22   Q.   But I mean, Qlarant has marketing, does it not?

23   A.   There is a marketing department.  We work to try to gain

24   contracts with government agencies and things like that.

25   Q.   So, you want government agencies to hire you, right?

SULLIVAN - CROSS/BEATON

1  A.  Correct.

2  Q.  And do you like working for Qlarant?

3  A.  Yes.

4  Q.  Would you like to keep your job there?

5  A.  Yes.

6  Q.  Okay.  So, you would like for Dr. Mencia to be convicted.

7  A.  I don't see how that follows the line of questioning.

8  Q.  Let me show you.

9       *(Discussion had off the record between counsel)*

10       MR. BEATON:  Judge, I'm gonna mark as Defense

11  demonstrative Number 19 the Qlarant website and only seek to

12  introduce into evidence page 2 of the website.

13       *(Defendant's Exhibit Number 19 marked for*

14  *identification)*

15       MR. YOFFIE:  Okay.  No objection, your Honor, if she

16  recognizes it.

17       THE COURT:  Okay.

18       *(Defendant's Exhibit Number 19 admitted into evidence)*

19  BY MR. BEATON:

20  Q.  So, Dr. Sullivan, do you recognize this as the Qlarant

21  website?

22  A.  Uhm, that's the logo in the left-hand top corner, but I

23  really don't go on the website, so I'm not familiar with what's

24  on there.

25  Q.  Okay.  That's the correct logo, though, right?

1425

SULLIVAN - CROSS/BEATON

1   A.   That is the logo, yes.

2   Q.   Okay.

3   A.   I can't vouch for anything else that's on it.

4   Q.   And that is the way that Qlarant -- it's spelled -- it's

5   kind of a funny spelling, but that Q-L-A-R-A-N-T is how the

6   company that you work for spells its name.

7   A.   Yes, correct.  They went through a name change recently.

8   Q.   Okay.  But this is how they spell it now.

9   A.   Yes.

10  Q.   Okay.  Do you have any reason to dispute that this is the

11  web page?

12  A.   Again, I can't -- I can't vouch for it.  I just -- I know

13  that is the, you know, that is the logo, so....

14  Q.   Or part of the web page.  Let me take that back.

15  A.   Um-hum.

16  Q.   So, I'm gonna show you what is page 2 of -- part of the

17  Qlarant web page.  Do you see that little logo there?

18  A.   Yes.

19  Q.   Can you read it?  What's inside that --

20  A.   The text in the picture?

21  Q.   Yep.

22  A.        "We have a hundred percent conviction rate in

23        over 100 trials when our expert witnesses testify."

24  Q.   Do you want this to be the trial that makes Qlarant take

25  that down?

1426

SULLIVAN - REDIRECT/YOFFIE

1    A.  If it was the right thing, then I would be happy to lose my

2    job, if that was the right thing.

3    Q.  In other words, if this jury found Dr. Mencia not guilty,

4    finding that to be the right thing, you --

5    A.  Then I will take that hit.

6    Q.  But you understand that that's how the company holds itself

7    out.

8    A.  If that's on our website, then I will speak to someone

9    about that, so....

10         MR. BEATON:  I have no further questions, Judge.

11         THE COURT:  Redirect?

12                    **REDIRECT EXAMINATION**

13   BY MR. YOFFIE:

14   Q.  Dr. Sullivan -- I apologize if I was saying "Silverman"

15   before -- Dr. Sullivan, you work for the nonprofit Qlarant?

16   A.  Correct.

17   Q.  And part of Qlarant's job is to maintain the integrity of

18   the Medicare program?

19   A.  Correct.

20   Q.  How is the Medicare program funded?

21   A.  The Medicare program is funded through taxpayer dollars.

22   Q.  So, you're seeking to ensure the integrity of taxpayer

23   dollars.

24   A.  Correct.

25   Q.  Dr. Sullivan, when you reviewed Amy Garcia's data, to be

1427

SULLIVAN - REDIRECT/YOFFIE

1    clear, was the trio or trinity a trend that you observed in

2    your review of all of the PDMP data?

3    A.  Not every single patient had trio, but a significant number

4    of them did.

5    Q.  So, not just Army Garcia.

6    A.  It was not limited to Army Garcia.

7    Q.  And the PDMP data, again, covers all controlled substances

8    prescriptions under Dr. Mencia's name for the time period of

9    2014 to 2017.

10   A.  Correct.

11   Q.  Did you also see, outside of Amy Garcia, a trend of

12   duplicative prescribing?

13   A.  Yes.

14   Q.  And can you explain one more time what "duplicative

15   prescribing" is?

16   A.  It means two agents that are in the same category of drugs

17   and do the same thing.  So, such as benzodiazepines,

18   alprazolam, and Lorazepam being prescribed in the same patient

19   at the same time.

20   Q.  And would that include oxycodone and Oxycontin?

21   A.  Uhm, it -- it could.  It depends on the formulations.  But

22   two short-acting or two long-acting being prescribed at the

23   same time would be considered duplication.

24   Q.  And, finally, the high strength or dosage strength that you

25   mention earlier, was that restricted to Army Garcia?

GEGA - DIRECT/GILFARB

1    A.   No, it was not.  It was a trend overall in the data.

2              MR. YOFFIE:  No further questions, your Honor.

3              THE COURT:  Thank you, Doctor.  You may step down.

4    You're excused.

5              THE WITNESS:  Thank you.

6              *(Witness excused)*

7              THE COURT:  The government may call its next witness.

8              MR. GILFARB:  The government calls Klaudia Gega to the

9    stand.

10             ROOM CLERK:  Please raise your right hand.

11             *(KLAUDIA GEGA, GOVERNMENT'S WITNESS, WAS SWORN)*

12             ROOM CLERK:  Thank you.  You may be seated.

13             Please state your name.  Please spell your name for

14   the record.

15             THE WITNESS:  K-L-A-U-D-I-A, G-E-G-A.

16             MR. GILFARB:  May it please the Court.

17                      **DIRECT EXAMINATION**

18    BY MR. GILFARB::

19   Q.   Ms. Gega, can you please introduce yourself to the members

20   of the jury.  Tell them your name again, what area of town

21   you're from, your age, please.

22   A.   Yes.  My name is Klaudia Gega.  I'm originally from

23   Albania, and I'm 30 year *(sic)* old.

24   Q.   And how long have you lived in the United States?

25   A.   I've lived in the United States for three years.

1429

GEGA - DIRECT/GILFARB

1  Q.  You said you came from Albania.  Did you come straight from

2  Albania to Florida?

3  A.  I did.

4  Q.  When you came here, did you come here legally?

5  A.  Yes.

6  Q.  Did you eventually get employed by Adult & Geriatric

7  Institute or AGI?

8  A.  I did, a week after I came United States *(sic)*.

9  Q.  And how was it that you were able to land that job a week

10  after coming to the United States?

11  A.  Uhm, my aunt was Dr. Mencia's realtor, and she introduced

12  us.

13  Q.  When you interviewed for the job -- well, strike that.  Did

14  you interview for a job?

15  A.  I did.

16  Q.  Who did you interview with?

17  A.  With Dr. Mencia and Dr. Rosemary.

18  Q.  Dr. Rosemary?

19  A.  Mencia.

20  Q.  And who is that?

21  A.  It was his wife.

22  Q.  All right.  Do you see Dr. Mencia here in court today?

23          MR. BEATON:  Stipulate to identity, Judge.

24          THE COURT:  The record will so reflect.

25

GEGA - DIRECT/GILFARB

1    BY MR. GILFARB::

2    Q.  When you were hired -- when you went to go interview at

3    Dr. Mencia's office, AGI, what position were you trying out

4    for?  Or was it a general interview?

5    A.  It was a general interview.  They needed someone to help

6    with the finances.

7    Q.  Did you end up getting -- you said you ended up getting a

8    job.  What job did you get?

9    A.  I was helping the finance manager at that time.  I was

10   doing invoices.  I was taking care of the invoices mostly.

11   Q.  You were an assistant to somebody else, basically?

12   A.  Yes.  I was helping him.

13   Q.  Okay.  This person that you were helping, what is that

14   person's name?

15   A.  Is Dharma Khanal.

16   Q.  Can you spell the last name?

17   A.  K-H-A-N-A-L.

18   Q.  So, were you learning on the job or -- how did that work?

19   Did you already know how to do the job?

20   A.  I already had finance experience back home, but here I

21   start learning from the beginning with the system and the

22   terminology.

23   Q.  So, what were your duties and responsibilities when you

24   were helping Dharma?

25   A.  I was mostly taking care of the invoicing.  I was

1431

GEGA - DIRECT/GILFARB

1   registering everything in the system and checking the due dates

2   when they were due to be paid.  And I was helping with the bank

3   deposit into the QuickBooks.

4   Q.  What is QuickBooks?

5   A.  It's a financial system, when you register the data, the

6   financial data.

7   Q.  Would it be fair to say that QuickBooks is like an

8   electronic checkbook?

9   A.  It is.

10  Q.  Did there come a time at AGI when you took over for Dharma?

11  A.  I did.  When Dharma resign *(sic)*.

12  Q.  And about how long into your job did you take over?

13  A.  After one year.

14  Q.  You indicated that as part of your job, you worked with

15  QuickBooks paying bills and invoices.  Was that just for AGI?

16  A.  It was personal invoices and business invoices.

17  Q.  Whose personal invoices would you pay?

18  A.  Both the owners.

19  Q.  And who are they?

20  A.  Dr. Mencia and Dr. Rosemary.

21  Q.  So, in addition to AGI, personal bills as well.

22  A.  Yes.

23  Q.  When you inherited full responsibility for QuickBooks, did

24  it also require you or was it part of your job to make payments

25  for taxes?

1432

GEGA - DIRECT/GILFARB

1   A.  Yes.  Yes.

2   Q.  At the time that you inherited these responsibilities, what

3   did you see in the way of what was going and coming with

4   regards to paying for taxes?

5   A.  The first year that I took over, we didn't have any due

6   taxes, but towards the end of 2017, I was --

7          MR. BEATON:  Objection, Judge, with regards to

8   relevance.

9          THE COURT:  Overruled.

10  BY MR. GILFARB:

11  Q.  That means you can answer.

12  A.  Okay.  After -- in 2017, we receive a tax bill for the

13  personal taxes of 2015 that was unpaid.

14  Q.  For how much?

15  A.  About 80,000.

16  Q.  Okay.  And prior to that, was there -- were there personal

17  taxes or other taxes that were a higher amount?

18  A.  Years ago, there have been about 500,000 that they were not

19  paid, payroll taxes.

20  Q.  And during your time with AGI, were you making payments

21  toward the taxes?

22  A.  I did, in the end of 2017.

23  Q.  Was part of your duties and responsibilities to keep

24  records of the way that patients were paying for their services

25  at AGI?  Did you have any part in that?

GEGA - DIRECT/GILFARB

1    A.   Uhm, it was the checkout person who had the -- who had a

2    spreadsheet in the computer that it was separated all the kind

3    of payments that they were receiving from the patients.

4    Q.   And who created that spreadsheet?

5    A.   I created that spreadsheet.

6    Q.   And after the checkout person would make notations in the

7    spreadsheet, did you ever get a copy of that spreadsheet or the

8    dailies?

9    A.   Yes.  The spreadsheet was sent daily to the billing

10   department, to the medical manager, to me, and to Dr. Mencia's

11   email.

12   Q.   All right.  I want to jump now to a different topic.  We'll

13   return to the spreadsheets in a moment.

14        While you were working there, did you ever hear the

15   term for a patient -- the term "Code-G"?

16   A.   It was one time when Dr. Mencia sent me a text message

17   stating that I had to ask Patricia, who was the checkout

18   person, and Inna, the manager, to put the Code-G and the log

19   under his door.

20   Q.   Okay.  So, where was Dr. Mencia when you got that text?

21   A.   He was in Orlando.

22   Q.   And when you got the text to talk to Inna or Patricia about

23   the Code-G envelope, what did you do?

24   A.   I went to Patricia, and I show her the text message

25   Dr. Mencia send me, and I said, Dr. Mencia send me this text

GEGA - DIRECT/GILFARB

1    message, do you know what it is?

2          She said, Yeah, don't worry, I'll take care of it.

3    Q.   Now, you indicated that Dr. Mencia was out of town.

4    A.   Yes.

5    Q.   When was G-code (sic) money collected, do you know?

6    A.   I do not know.

7    Q.   When did you get Code-G money?

8    A.   I start getting the money in the summer, 2017.

9    Q.   I mean what time of the day?

10   A.   At the end of the day.

11   Q.   So, you would get it at the end of the day, but Dr. Mencia

12   was out of town?

13   A.   Yes.  At that time, I was not receiving any money for the

14   Code-G.

15   Q.   You were not getting the money.

16   A.   No.

17   Q.   All right.  We'll talk more specifically about that.

18          So, at the time that you get this message about the

19   envelope, did you know what Dr. Mencia was talking about?

20   A.   No, I did not.

21   Q.   Prior to that time, did you ever get an envelope of money?

22   A.   No.  I did receive money, but not envelope with money.

23   Q.   Who is Patricia?

24   A.   Is the checkout person in medical department.

25   Q.   When you -- did you approach Inna and Patricia or just one

GEGA - DIRECT/GILFARB

1  of them?  Do you remember?

2  A.  Just Patricia.

3  Q.  When you approached Patricia and asked about -- or said, I

4  got this text, or what's Code-G, can you please describe for

5  the members of the jury how she reacted to that?

6  A.  She -- she was surprised how I knew about that, or why the

7  other doctor send me that text message.  And then she was

8  rushing, telling me, I'll take care of it, don't worry.

9           MR. BEATON:  Objection.  Hearsay.

10           THE COURT:  Sustain.

11   BY MR. GILFARB::

12  Q.  I want to talk to you -- you told us about when you first

13  heard the term.  Did you ever find out from Dr. Mencia what

14  that term meant, Code-G?

15  A.  No.

16  Q.  Okay.  Did you attend a meeting in the summer of 2017?

17  A.  Yes, I did.

18  Q.  In the summer of 2017, who was at this meeting?

19  A.  It was the entire medical department, the billing

20  department, and Dr. Mencia, and myself.

21  Q.  Was there a discussion at this meeting where Dr. Mencia

22  discussed cash-paying patients?

23  A.  Yes.

24  Q.  And what did Dr. Mencia say he wanted done, if anything,

25  with regards to these cash-paying patients?

GEGA - DIRECT/GILFARB

1   A.   He wanted to open a separate column into the spreadsheet in

2   order for him to keep track of this patient *(sic)*.

3   Q.   How were -- from the time that you took over with the

4   bills, until the time of this meeting, how were patient

5   payments being tracked in the office?

6   A.   With the spreadsheet.

7   Q.   Okay.

8   A.   We had the spreadsheet, and the spreadsheet would specify

9   the patient name, the doctor that the patient saw, the cash

10  payment or credit card, debit card payment.

11  Q.   You indicated before that you had not -- at the time that

12  you got that text message from Dr. Mencia about the Code-G

13  envelope, that you had not been receiving envelopes of money.

14  Do you remember that?

15  A.   No, I have not.

16  Q.   Okay.  Was there a time that you were receiving envelopes

17  of money from Dr. Mencia or no?

18  A.   From Dr. Mencia, I have received money to deposit in the

19  bank, but not envelopes.

20  Q.   Okay.  Did you get envelopes from anybody else in the

21  office?  Of cash?

22  A.   It was when it started in summer, 2017.

23  Q.   All right.  In the summer of 2017, you indicated that there

24  was a column that was going to be added to the spreadsheet?

25  A.   Yes.

GEGA - DIRECT/GILFARB

1   Q.   Whose idea was that?

2   A.   Dr. Mencia's.

3   Q.   Did Dr. Mencia give any instructions about how that column

4   was to be labeled?

5   A.   Yeah, they labeled it "CS."

6   Q.   Did he tell you why -- or what "CS" stood for?

7   A.   Controlled substance.

8   Q.   Did Dr. Mencia -- after giving you these instructions about

9   adding the column for CS, did he give you any specific

10  instructions about whether to notate CS in QuickBooks?

11  A.   When I ask one time to write -- when I deposit the money in

12  the bank to write it was controlled substance, he said

13  absolutely no.

14  Q.   Prior to the spreadsheet, would Dr. Mencia -- you said

15  would bring you money to deposit in cash?

16  A.   Yes.

17  Q.   After the mid-2017 meeting, were there any instructions

18  given to the checkout person about separating money into two

19  different envelopes?

20  A.   Yes.  The normal cash, like the co-payment patients, they

21  were in a separate envelope, and the CS patient, they were in a

22  separate envelope.

23  Q.   And what happened with the CS envelope?  Where did it go

24  from the front desk?

25  A.   They would start putting it under my door, and then I would

1438

GEGA - DIRECT/GILFARB

1    count the money and give it to Dr. Mencia.

2    Q.  When you say you would give it to Dr. Mencia, would you

3    leave it for him somewhere or would you put it in his hand?

4    A.  In his hand.

5    Q.  This envelope that you would give to him in his hand, did

6    it say anything on the outside of it?

7    A.  "CS."

8    Q.  Showing you what's already been entered into evidence as

9    17B -- you can look on the screen right there in front of you.

10   A.  Okay.

11   Q.  Just gonna ask you to take a look at this.

12   A.  Yes.

13   Q.  Is this an example of the daily spreadsheet that we've been

14   talking about?

15   A.  Yes.

16   Q.  And this column here, with regards to CS, is that the "CS"

17   column that you've been discussing?

18   A.  Yes.

19   Q.  Did you ever have any discussions with Dr. Mencia about

20   what he was doing with the CS cash that you were giving him?

21   A.  What he was doing?

22   Q.  Let me ask -- let me change the question a little bit.

23        During the time that you were the bookkeeper or

24   controller for the business, were there things that you were

25   doing for him and his wife on a personal basis?

GEGA - DIRECT/GILFARB

1   A.   Yes, paying their bills.

2   Q.   Paying their bills.

3        Do you know whether Dr. Mencia was renovating any

4   houses or doing any home work?

5   A.   Yes.  I was helping with the construction, as well.

6   Q.   And so, when you would say that you're "helping with the

7   construction," what does that mean?  You weren't laying tiles.

8   So what were you doing?

9   A.   I was paying the bills to the contractors.  I was going to

10  the city to schedule the inspection, to take the permits,

11  meeting with the inspector.

12  Q.   Were you ever involved in paying any of the contractors?

13  A.   Not personally, but Dr. Mencia would tell me how much it

14  was, I would give the money to him, and he would pay them.

15  Q.   When you say you would "give the money to him," would you

16  write him a check from AGI?

17  A.   Sometimes a check, sometimes he would take the money from

18  the CS.

19  Q.   When was -- when did this construction start and when did

20  it end?

21  A.   It start as soon as Dr. Mencia bought the house, which was

22  in August 2015.  And, uhm, until the last day, we had scheduled

23  an inspection, the day that the DEA came in the office.

24  Q.   So, from 2015 until the arrest, there was ongoing

25  construction?

GEGA - DIRECT/GILFARB

1   A.   Yes.

2   Q.   How many houses were you aware of that you were paying for?

3   A.   The house that Dr. Mencia was staying and the house that

4   Dr. Rosemary was staying, too.

5   Q.   Two different houses.

6   A.   Yes.

7   Q.   Were you a part of any discussions about -- or did you go

8   with him to look at other houses as well?

9   A.   Yes.

10  Q.   This was all in 2015 or after?

11  A.   2015 and after.

12  Q.   Did you ever have a discussion with Dr. Mencia about the CS

13  money and just having that kind of money in your office?

14  A.   I did.  I wasn't feeling comfortable having that money in

15  my office, and I asked Dr. Mencia to deposit the money in the

16  bank.

17          And he said, No, I'm not gonna deposit the money in

18  the bank, I need the money for the construction, and I need

19  cash.

20  Q.   And did you tell him that you felt uncomfortable about it?

21  A.   I did, several times.

22  Q.   And what did he say about that?

23  A.   He said that as soon as I finish my construction, like --

24  I'm not gonna deposit the money in the bank.

25  Q.   I'm sorry, just to be clear, you said that as soon as I

GEGA - DIRECT/GILFARB

1    finish the construction, I won't deposit --

2    A.  As soon as I finish the construction, we'll start

3    depositing the money in the bank, but right now I need cash for

4    the contractor people.

5    Q.  Then did you ever confront him with the fact that he could

6    still deposit it and have access to that?

7    A.  Yes, I did.

8    Q.  And what did he say?

9    A.  Then he got convinced, and we deposited the money in the

10   bank.

11          MR. GILFARB:  Your Honor, at this time, the government

12   would move into evidence Government's Exhibit 40, which is a

13   download of Ms. Gega's data from her telephone.

14          (Government's Exhibit 40 marked for identification)

15          MR. BEATON:  No objection.

16          THE COURT:  Forty will be received.

17          (Government's Exhibit 40 admitted into evidence)

18          MR. GILFARB:  All right.  We would then move into

19   evidence 40B, your Honor, which is an excerpt of 40.

20          (Government's Exhibit 40B marked for identification)

21          THE COURT:  All right.  40B will be received.

22          (Government's Exhibit 40B admitted into evidence)

23   BY MR. GILFARB::

24   Q.  Okay.  Ms. Gega, I'm showing you an excerpt of some text

25   messages.  Do you recall sending these text messages to

GEGA - DIRECT/GILFARB

1    Dr. Mencia?  I guess let's start here at the bottom.

2             "Did you take $2,090 from my CS folder this weekend?"

3             Do you see that there?

4    A.  Yes.

5    Q.  And then it says:  "Yes, I have to pay the roofer, 320 --

6    $3,220."

7             Do you see that?

8    A.  Yes.

9    Q.  Okay.  Why did you ask Dr. Mencia that question?

10   A.  Because there were the CS money that they were staying in a

11   folder in my office, and I would always -- when I go in the

12   office, I would always count the money, because I was scared,

13   it was money.

14   Q.  You indicated -- when you say "folder," is that different

15   from when you were saying about the envelope?

16   A.  Yeah, whenever I was receiving the envelope, I was putting

17   it into a folder, like to hide it in the office.

18   Q.  Did he ever, to the best of your knowledge, take cash for

19   things like this out of the other file or the other envelope

20   that of cash-paying patients?

21   A.  *(No response)*

22   Q.  You said there were two envelopes, one of regular

23   cash-paying patients --

24   A.  The regular cash-paying patients was going every day in the

25   bank, was getting deposited in the bank.

GEGA - DIRECT/GILFARB

1    MR. GILFARB:  Moving into evidence Government's 40C.

2    *(Government's Exhibit 40C marked for identification)*

3    THE COURT:  I guess if it's part of 40, it will be

4    received.

5    *(Government's Exhibit 40C admitted into evidence)*

6   BY MR. GILFARB::

7   Q.  All right.  Now, this one starts from the top.

8    From Dr. Mencia:  "Make sure Patricia and Inna

9    tomorrow leave the Code-G envelope on my desk."

10    Then it says he just boarded.

11    And you say:  "Okay, have a good trip."

12    And he then responds:  "I'm inside the -- or

13    inside the hotel."

14    Do you see that there?

15  A.  Yes.

16  Q.  Do you remember this conversation?

17  A.  Yes.

18  Q.    What -- it says here:  "Make sure Patricia and

19    Inna tomorrow leave the Code-G envelope on my desk."

20    Is that something that would normally happen, or did

21  you stay with the G-Code envelope?

22  A.  No, at that time, I did not know what was happening with

23  that money.

24  Q.  And do you know what hotel he was in?  Do you know where he

25  is at this time, where you're saying, "Have a good trip"?

GEGA - DIRECT/GILFARB

1    A.   That was in Orlando.

2    Q.   Is this the text message you were referring to when you

3    said this is the first that you heard of this?

4    A.   Yes.

5    Q.   Government's Exhibit 40E.

6         All right.  So, it says here:  "FYI:  Gave $5,200

7       today for the air duct system."

8         Do you see that there?

9         *(Government's Exhibit 40E marked for identification)*

10   A.   Yes.

11   Q.   And then you said it was not from the Code-GS.  Is that a

12   new code?  We've heard Code-G, and we've heard CS.  Is this

13   something new?

14   A.   No, that is the same.  I had sent another text correcting

15   it, CS.

16   Q.   Okay.  All right.  So, you're paying out of the CS money.

17   A.   Yes.

18   Q.   All right.  And it also indicates a $900 for the

19   extension's windows and installation.  Do you see that there?

20   A.   Yes.

21   Q.      All right.  Now, the rest of that message, it

22       says:  "Yes."

23       "Expensive weekend."

24       "Wow, beautiful."

25       Do you recall what that's about?

GEGA - DIRECT/GILFARB

1    A.   It's a continuance of the other one?

2    Q.   I believe so.  Do you remember that at all or no?

3    A.   Yeah, the expensive weekend was because of the money.  And

4    the "wow beautiful," he send a picture of the windows or

5    something from the house.  He would always send pictures of

6    whatever renovation he was doing.

7    Q.   40D.  All right.  It starts at the top.

8              (Government's Exhibit 40D marked for identification)

9              MR. BEATON:  Your Honor, I object as to relevance and

10   403.

11             THE COURT:  Overruled.

12    BY MR. GILFARB::

13   Q.        Dr. Mencia here is sending a message:  "How much

14      are we paying for the Benz?"

15           Do you see that?

16   A.   Yes.

17   Q.   And you respond with "$2800.71."

18   A.   Yes.

19   Q.   Is that right?

20   A.   Correct.

21   Q.   All right.  You were paying bills for a Mercedes-Benz?

22   A.   Yes.

23   Q.   He then says:  "Gracias," or thank you.

24           And then it says:  "Prego."  What is that?

25   A.   Prego is, in Italian, you're welcome.

1446

GEGA - DIRECT/GILFARB

1  Q.  Okay.  Now, down here he asks:  "How about the Bentley?"

2         What does he mean -- or what do you think he's

3  referring to when he says "the Bentley"?

4  A.  To the monthly payment of Bentley.

5  Q.  So, you were paying for a Bentley?

6  A.  Yes.

7  Q.  In the amount of $3,090?

8  A.  Correct.

9  Q.  Is that a month?

10  A.  Yes.

11  Q.       And then it says here:  "Buy back on the *(sic)*

12       Bentley is 164,000?"

13         Do you see that question?

14  A.  Yes.

15  Q.  And your answer was you didn't remember exactly, but around

16  that amount.  Do you see that there?

17  A.  Yes, yes.

18  Q.  And then he indicates to you that he's trying to trade the

19  Bentley for lower payments.  Do you see that?

20  A.  Yes.

21  Q.  And then he sends you a picture.

22  A.  Yes.  He was to a Ferrari dealership, if I'm not wrong.

23  Oh, it was -- it was BMW.

24  Q.  Is this the picture that was attached to there?

25  A.  Yes, I believe so.

1447

GEGA - DIRECT/GILFARB

1   Q.      So, it says:  "Trying to trade for the Bentley,

2       lower payments for us."

3           This is the car -- this is the picture that he sent

4   you as an attachment to that text?

5   A.  Yes.

6           MR. GILFARB:  The government would enter 40G.

7           *(Government's Exhibit 40G marked for identification)*

8    BY MR. GILFARB::

9   Q.  All right.  It says here:  "I am a superstar."  That was

10  being sent to you or --

11  A.  No.  It looks like I sent it.

12  Q.  Okay.  And then it says:  "Yes, you are."

13          Do you see that?

14  A.  Yes.

15  Q.  And then there's a screenshot.  I'm gonna ask you if you

16  remember this screenshot.

17  A.  Yes, I do.  It was with a previous contractor Dr. Mencia

18  has in the house -- had in the house.

19  Q.      Dr. Mencia says:  "How much did we pay for the

20      door *(sic)*?  Do you remember *(sic)*?"

21          That's your answer?  Do you remember this

22  conversation?

23  A.  Yes.

24  Q.      "Was cheap, like $300 *(sic)*?"

25  A.  Yes.

GEGA - DIRECT/GILFARB

1    Q.       Then it says:  "KK."  Then it says:  "Are you

2         coming?"

3              And then you say:  "No, I'm not coming *(sic)*."

4              Do you know what that's in reference to?  Do you

5    remember?

6    A.   Hum, maybe it was to go to the house, because it looks like

7    it's lunchtime.  Lunchtime we used to go to see the -- how the

8    construction were *(sic)* going.

9    Q.   And then he sends you a picture, if I'm not mistaken, and

10   it says:  "Happy," question mark.  Do you remember that?

11   A.   Yes, I do.

12   Q.   Do you remember that that's the picture that he sent you?

13   A.   Yes.

14   Q.   Do you know where that picture is taken?

15   A.   Yes.  I believe it was taken inside one of the rooms in his

16   house, in the closet.

17   Q.   So, then you say:  "So now you have 20 now *(sic)*."

18              What did you mean by that?

19   A.   Uhm, at that time, we had a problem with Medicare, so the

20   business wasn't doing that good, and Dr. Mencia said that I

21   have 10,000 at home so I can put in the business.  And then he

22   showed me the other picture, and he said -- the picture, and he

23   said:  "Happy?"

24              And I ask:  "So you have 20 now?"

25   Q.       And then, you say:  "So you have 20 now."

GEGA - DIRECT/GILFARB

1      And he says:  "Yes, babe."

2      Did you have a romantic relationship with Dr. Mencia?

3  A.  Absolutely no.

4  Q.  Okay.  Was this a common --

5  A.  Yes, it was.

6  Q.  -- way that you were being addressed?

7      MR. BEATON:  Objection, Judge.  What's the relevance

8  of this?

9      THE COURT:  Sustain.

10     MR. GILFARB:  Your Honor, I'm just exploring the

11 nature of their relationship.

12     THE COURT:  She said they didn't have a relationship.

13     MR. GILFARB:  All right.

14 BY MR. GILFARB::

15 Q.  Now, did there come a time when Dr. Mencia came to your

16 office and gave you what you perceived to be a lot of money in

17 cash?

18 A.  Yes.  There was, like, after two months, one month or two

19 months after I started working, and he brought me a bag with

20 money.  There were about $50,000.

21 Q.  What kind of bag was it?

22 A.  It was like a Publix bag.

23 Q.  And when he came with this Publix bag, where were you?

24 A.  In the office.

25 Q.  In your office?

GEGA - DIRECT/GILFARB

1   A.   In my office, yes.

2   Q.   Where is your office in the building?

3   A.   It's in the second floor, in the corner close to the

4   stairs.

5   Q.   And when he gave you -- did he give you this money -- this

6   bag in your hand?

7   A.   He left it on my desk, and he said, count it and separate

8   it into 9,000 each.

9   Q.   Okay.  Did you separate it into 9,000 each?

10  A.   I count it first, and then I went to the -- at that time,

11  it was the other financial person.  So -- Dharma.  So, I went

12  to him, and we split it into 9,000 deposits *(sic)*.

13  Q.   Other than telling you to split it that way, did he give

14  you any other instructions?

15  A.   Later on, he called, and he said, Send me a text message,

16  how did you deposit the money?

17  Q.   Okay.  But did he leave it to you to decide how to deposit

18  the money, or did he give instructions on how to deposit the

19  money?

20  A.   He gave instruction how to deposit the money.

21  Q.   Okay.  Well, that's what I want to explore.

22       What instructions did he give you, if you remember?

23  A.   He said to tell Dharma to split the money into $9,000 each

24  deposit and deposit into the different bank accounts.

25  Q.   Did he specify which bank accounts to do that to?

1451

GEGA - DIRECT/GILFARB

1   A.  No, just the business bank accounts, which there were

2   several ones.

3           MR. GILFARB:  Moving into evidence 40F.

4           *(Government's Exhibit 40F marked for identification)*

5    BY MR. GILFARB::

6   Q.  Showing you here a text message exchange that you sent to

7   Dr. Mencia.  It says:  "We deposit all the money today."

8           Who is "we"?

9   A.  Me and Dharma.

10  Q.  "$9,000 Wells Fargo" -- when you say "Wells Fargo," what

11  are you referring to?

12  A.  That was Dr. Mencia's personal bank account.

13  Q.  "$9,000 BBT Tam Holdings."  What is that?

14  A.  That is the BB&T account for the company, Tam Holding.

15  Q.  And what is "Tam Holdings"?

16  A.  It's the company who owned the real estate for Dr. Mencia,

17  the two commercial buildings.

18  Q.  The building where AGI is.

19  A.  Yes.

20  Q.  "7167 AGI."  Do you see that there?

21  A.  Yes.

22  Q.  What does that mean, "7167 AGI"?

23  A.  It's $7,167 into AGI bank account.

24  Q.  And then it says:  "Yesterday $9,000 Wells Fargo."

25          Do you see that?

1452

GEGA - DIRECT/GILFARB

1  A.  Yes.

2  Q.  So, were the deposits made over two days --

3  A.  Correct.

4  Q.  -- or was it all made the same day?

5  A.  Over two days.

6  Q.  And then it says:  "Wells Fargo" -- I guess you deposited

7  the remaining $15,833 into Tam Holdings, is that right?

8  A.  Correct, yes.

9  Q.  And then you almost immediately after that -- well,

10  sometime after that, it says:  "I'm not coming tomorrow,

11  because I don't have anything important to do *(sic)*."

12       Is that at all related to the previous texts or --

13  A.  No, it's not.

14       MR. GILFARB:  One moment, your Honor.

15       Okay, your Honor, I tender the witness.  Thank you.

16       THE COURT:  All right, members of the jury, we're

17  going to take a 15-minute recess.  Remember my admonition not

18  to discuss the case or allow it to be discussed in your

19  presence.  We'll see you back in the jury room in about

20  15 minutes.

21       COURTROOM SECURITY OFFICER:  All rise.

22       *(The jury exited the courtroom)*

23       THE COURT:  Ms. Gega, during the break in your

24  testimony, you're not allowed to discuss your testimony with

25  anyone.  Do you understand?

1453

GEGA - DIRECT/GILFARB

```
1              THE WITNESS:  Yes, yes.

2              THE COURT:  And we'll see you back in 15 minutes.

3              THE WITNESS:  Okay.

4              THE COURT:  And if there's nothing else to come before

5    the Court, we'll be in recess for 15 minutes.

6              MR. BEATON:  No.  Thank you, Judge.

7              ROOM CLERK:  All rise.

8              (The Judge exited the courtroom)

9              (Recess taken at 3:26 p.m. until 3:42 p.m.)

10             (The Judge entered the courtroom)

11             THE COURT:  Please be seated.

12             All right.  We're back on the record.

13             Counsel are present.  Dr. Mencia's present.

14             Anything to come before the Court before we bring the

15   jury in?

16             MR. GILFARB:  No, your Honor.  Well, yes, but I will

17   go get this witness.

18             If you can ask Ms. Gega to come back.

19             Your Honor, I honestly believe that if we just go a

20   little bit longer today, that the government will be able to

21   rest today.

22             THE COURT:  We'll go a little bit longer.

23             MR. GILFARB:  Okay.

24             THE COURT:  Thursday we have to break at 4:30, because

25   one of the jurors has to pick up her cat.
```

1454

GEGA - DIRECT/GILFARB

1        MR. BEATON:  So, Mr. Gilfarb and I were talking.  We

2   anticipate that this case is going to be submitted to the jury

3   tomorrow.

4        THE COURT:  Good.  Good news.

5        Come on back up, Ms. Gega.

6        Ms. Gega, you understand you're still under oath?

7        THE WITNESS:  Yes.

8        THE COURT:  If we have all the jurors, let's bring

9   them in.

10        COURTROOM SECURITY OFFICER:  All rise.

11        *(The jury entered the courtroom)*

12        THE COURT:  Counsel concede the presence of the jury

13   and waive its polling?

14        MR. GILFARB:  Yes, your Honor.

15        MR. BEATON:  Yes, your Honor.

16        THE COURT:  And did everyone follow my admonition not

17   to discuss the case or allow it to be discussed in your

18   presence?

19        THE JURORS:  Yes, your Honor.

20        THE COURT:  And Thursday we're going to break early,

21   at 4:30.

22        Mr. Beaton, you may cross-examine.

23        MR. BEATON:  Thank you, your Honor.

24

25

GEGA - CROSS/BEATON

1                    **CROSS-EXAMINATION**

2    BY MR. BEATON::

3    Q.  Good afternoon, Ms. Gega.

4    A.  Good afternoon.

5    Q.  My name is Marcos Beaton.  I represent Dr. Mencia.

6            You and I have never met before, correct?

7    A.  No, we have not.

8    Q.  Okay.  So, you testified on direct examination that you

9    were hired as an assistant to the comptroller of the company?

10   A.  Yes.

11   Q.  And that person's name was Dharma.

12   A.  Correct.

13   Q.  So, Dharma was your direct supervisor, right?

14   A.  Yes.

15   Q.  And Dharma was the one who was in charge of most of the

16   finances, and your job was to give Dharma a hand, is that a

17   fair characterization?

18   A.  Yes.

19   Q.  Okay.  And I want to talk about a few things.

20           You said that you interviewed with Rosemary Mencia and

21   Dr. Andres Mencia, right?

22   A.  Correct.

23   Q.  And Rosemary Mencia also worked at the practice, correct?

24   A.  Yes.  Yes.

25   Q.  And although they were still technically married,

GEGA - CROSS/BEATON

1  Dr. Mencia and Rosemary Mencia did not live together?

2  A.  As far as I know, no.

3  Q.  And would it be fair to say that the relationship that

4  Dr. Mencia and Rosemary Mencia had was a tense one?

5  A.  No.

6  Q.  Okay.  Let me ask it this way.  Were there times that you

7  would have to pay for bills for -- for example, credit card

8  bills for Rosemary Mencia?

9  A.  Yes, there were.

10  Q.  And they were extremely high bills?

11  A.  When Dharma was in charge, yes, they were very high bills.

12  Q.  So, for example, she -- Rosemary Mencia might come in with

13  a 60,000 or $70,000 credit card bill for you to pay?

14  A.  As far as I know, yes, that had had happened.

15  Q.  Okay.  And so, that was a constant issue that, in the

16  opinion of Dr. Andres Mencia, that Rosemary Mencia spent too

17  much money?

18  A.  She would, yes.

19  Q.  Okay.  And so, you assisted in keeping track of the

20  finances in the office.  And you also paid, really, for all of

21  Dr. Mencia's personal bills, right?

22  A.  Correct.

23  Q.  And let me make this clear.  Dr. Mencia would receive a

24  paycheck from the business, correct?

25  A.  Yes.

1457

GEGA - CROSS/BEATON

1  Q.  And that paycheck would be -- taxes would be taken out of

2  it, correct?

3  A.  Correct.

4  Q.  And all of the accounting was done properly in terms of --

5  A.  Yes.

6  Q.  -- the reporting requirements with all of the money that

7  came in, correct?

8  A.  Paycheck, yes.

9  Q.  Okay.  And it is from there that you would pay his personal

10  expenses.

11  A.  No, from the business.

12  Q.  Okay.  Uhm, but it is from his paycheck that -- well, in

13  other words, his paycheck, in other words, would go back into

14  the business to reimburse the business.

15  A.  Uhm, no.

16  Q.  Okay.  Did he receive the paycheck personally?  Would you

17  give it to him?

18  A.  As far as I know, he was giving it to Dr. Rosemary for the

19  kids.

20  Q.  Okay.  And I think what I'm trying to get at is that his

21  personal finances were accounted for in terms of the

22  compensation that he received.  It was all done properly.

23  A.  I -- I don't know how to answer that question.

24  Q.  Okay.  Did Dharma ultimately do the accounting in terms of

25  the monies that Dr. Mencia was paid and the payments that were

GEGA - CROSS/BEATON

1  made?  Was Dharma ultimately responsible for that?

2  A.  Yes.  And we had an accountant as well, a CPA.

3  Q.  Okay.  So, you had a CPA in the business as well.

4  A.  Correct.  Not in the business, but an outside CPA.

5  Q.  Forgive me.  Assisting the business.  In other words, an

6  outside CPA would review your records every year?

7  A.  Correct.

8  Q.  So, would it be fair to say -- and this is the whole point

9  I was getting to -- you saw some texts that the government

10  showed you where Dr. Mencia is asking you, How much did we pay

11  for this, how much did we pay for that, correct?

12  A.  Yes.

13  Q.  Dr. Mencia was, uhm -- delegated his finances to you almost

14  entirely, right?

15  A.  Yes.

16  Q.  Like Dr. Mencia didn't even pay his own bills.  He just

17  said, you know, Take care of it for me.

18  A.  Yes.

19  Q.  So, Dr. Mencia, for example, didn't know how much he was

20  paying for his cars, right?

21  A.  He knew when he signed the lease, but then --

22  Q.  But I mean in terms of -- who wrote the check?  Who wrote

23  the monthly payment?

24  A.  Yeah, I wrote the check, and Dr. Mencia would sign it.

25  Q.  Okay.  But, you know, you'll agree with me that in that

GEGA - CROSS/BEATON

1    text, he's like, How much are we paying for this?

2    A.   Yeah, he did not remember all the -- all the payments.

3    Q.   Did you pay his water bill, his electricity bill?

4    A.   Yes, yes, everything.

5    Q.   Okay.  Did you pay -- I mean I can think of a million

6    things, but his finances you took care of, right?

7    A.   Yes, correct.

8    Q.   And he didn't have anything, really, to do with writing

9    the -- you know, submitting the checks and reviewing the bills

10   and all that?  I mean --

11   A.   He would review the bills when I would attach it with the

12   checks for him to sign it.

13   Q.   Okay.  And so -- I want to talk about a few other things.

14          You testified that the CS cash was treated -- or

15   separated from all the other cash, right?

16   A.   Yes.

17   Q.   So, were you also involved in, for example, dealing with

18   outside companies that billed the practice for the services of

19   outside companies?

20   A.   Can you give me an example?

21   Q.   Sure.  Let's say, for example, that a cash-paying patient

22   had to do a urinalysis and went to a lab outside of, obviously,

23   your practice.  You would receive a bill for that urinalysis?

24   A.   No, the patient would receive the bill, not the company.

25   Q.   Okay.  And if you had to do any tests in your practice, for

GEGA - CROSS/BEATON

1   example, a urinalysis, would there be costs associated with

2   that?

3   A.  I don't -- I do not understand what --

4   Q.  So, for example, if there were diagnostics that needed to

5   be done in the practice, let's say -- what I'm trying to get is

6   sort of a cost of goods sold baseline.

7   A.  I have never received any bills for urinalysis.

8   Q.  Okay.  You never did.

9   A.  No.

10  Q.  Do you know who at the business might have?

11  A.  Me.

12  Q.  Okay.  Could Dharma have received them?

13  A.  Uhm, maybe the first year that Dharma was in charge, yeah,

14  but when I was in charge, I have not seen any bills like that.

15  Q.  Could there have been Medicare patients that there were

16  bills associated with of that nature?

17  A.  I do not know.

18  Q.  Okay.  So, you talked earlier about a time when Dr. Mencia

19  brought cash from his home because there was an issue making

20  payroll.

21  A.  Yes.

22  Q.  Okay.  And -- so, you said that there was an issue with

23  Medicare.

24  A.  No, that was a year later.

25  Q.  Okay.  At some point, there was an issue with Medicare?

1461

GEGA - CROSS/BEATON

1   A.   Yes.

2   Q.   Okay.   Let's be clear about what that was.   That somebody

3   in the accounting department made a mistake on the billing, and

4   Medicare had temporarily stopped payments, correct?

5   A.   Yes.   It was Dharma, yes.

6   Q.   Okay.   So, Dharma made a mistake, and Medicare stopped

7   paying.

8   A.   Stopped paying for two weeks, yes.

9   Q.   Okay.   And did Dr. Mencia contribute money to the practice

10  for payroll?

11  A.   Yes, he did.

12  Q.   His own personal money?

13  A.   Yes.

14  Q.   So that his employees would get paid?

15  A.   Correct.

16  Q.   Okay.   And from what you observed, Dr. Mencia spent most of

17  the day with patients on the first floor of the business,

18  right?

19  A.   Correct.

20  Q.   And that's what he concentrated on all day, right?

21  A.   Yes, he did.

22  Q.   And it was a busy practice?

23  A.   Very busy.

24  Q.   And there were a lot of people who weren't medical

25  providers working for the practice, right?

1462

GEGA - CROSS/BEATON

1   A.   Yes, the operating people, yes.

2   Q.   And there were a lot of those people too, right?

3   A.   I'm sorry?

4   Q.   There were a lot of people -- what you call operating

5   people, right?

6   A.   Yes.

7   Q.   And Dr. Mencia delegated to these people, including you,

8   paying his bills, billing Medicare, and taking care of what I

9   will call administrative duties to keep the practice running,

10   right?

11   A.   Yes, correct.

12   Q.   And Dr. Mencia really didn't get involved in that kind of

13   administrative work, would that be fair to say?

14   A.   Yes, overall.

15   Q.   Now, in your estimation, about 90 percent of the patients

16   at AGI had some form of insurance, correct?

17   A.   Yes, most -- yes.

18   Q.   Okay.  So, the cash-paying patients were a very, very small

19   part overall of --

20   A.   The co-payment?

21   Q.   No, no, the -- people who paid only in cash, not

22   necessarily the --

23   A.   Yes, it was very little, yes.

24   Q.   Okay.  In other words, just cash-paying patients were a

25   very small portion of the practice.

GEGA - CROSS/BEATON

1   A.   Correct.

2   Q.   And of the 90 percent of patients that had some form of

3   insurance, 60 percent of the insured patients were some sort of

4   Medicare beneficiary, correct?

5   A.   Yes, that's about right.

6   Q.   And the vast majority of Dr. Mencia's patients were older

7   patients, correct?

8   A.   Yeah, he was geriatrician.

9   Q.   Okay.  And so, Dr. Mencia spent most of Dr. Mencia's time

10  with seeing older patients.

11       MR. GILFARB:  Objection.  Speculative, lack of

12  personal knowledge.

13       THE COURT:  If she knows.

14   BY MR. BEATON::

15  Q.   Right?

16  A.   I believe so.

17  Q.   Okay.  Well, let me ask you this.  Let me take it back.

18       The people that you saw in the lobby, the people that

19  you saw walking around in the building consisted largely of

20  older patients, right?

21  A.   I have -- I haven't seen on a daily basis patient, because

22  I was on the second floor, and the lobby was on the first

23  floor.  So, I know that they were olderly -- elderly patient,

24  looking at the demographic, but I haven't seen them, like all

25  of them or every day.

GEGA - CROSS/BEATON

1  Q.  Okay.  That's fair enough.

2       You weren't involved in the billing to insurance

3  companies, right?

4  A.  No, I was not.

5  Q.  Okay.  When agents originally interviewed you in this case,

6  you told the agents that you would deposit approximately $2,000

7  per day in cash for Dr. Mencia, correct?

8  A.  Deposit?

9  Q.  Yes.  Or that Dr. Mencia would receive $2,000 a day.  I

10  don't remember which it was.

11  A.  It's an average, yes.

12  Q.  Okay.  I want to show you Government's Exhibit 40E.

13       Is this a text message that you are receiving or

14  sending?

15  A.  The one that you have your finger is the receiving.

16  Q.  So, you on your phone are receiving or is Dr. Mencia

17  receiving it?

18  A.  Dr. Mencia send it to me.

19  Q.  Okay.  So, this is a text from Dr. Mencia to you.

20  A.  Correct.

21  Q.       And it says:  "FYI:  I *(sic)* gave $5200 today for

22       the air duct system."

23       That's what Dr. Mencia says to you?

24  A.  Yes.

25  Q.  And it says not -- and then the second text, where my

1465

GEGA - CROSS/BEATON

1    finger is, is also from Dr. Mencia.  Correct?

2    A.  Yes, correct.

3    Q.  To you.

4    A.  Yes.

5    Q.      And it says:  "Not from Code-GS," right?

6    A.  Correct.

7    Q.  And then Dr. Mencia sends you another text, correct?

8    A.  Correct.

9    Q.  Correcting that it's "CS," not "GS," right?

10   A.  Yes.

11   Q.  And that the money was not money that was segregated into

12   the CS pile, right?

13   A.  Hum, can you explain?

14   Q.  In other words, it was not CS money, is all he was saying.

15   A.  Yes.

16   Q.  Okay.  So, your testimony is that Dr. Mencia instructed you

17   to deposit cash in deposits of a certain amount?

18   A.  Yes.

19   Q.  Okay.  Your testimony is actually that Dr. Mencia told you

20   to tell Dharma to deposit certain amounts -- to deposit cash in

21   certain amounts, right?

22   A.  Yes.  But he told Dharma as well.

23   Q.  Okay.  So, he told Dharma as well?

24   A.  Yes.

25   Q.  Were you both together when that happened?

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

1466

GEGA - CROSS/BEATON

1   A.   Yes.

2   Q.   Okay.  And I want to show you the text from you to

3   Dr. Mencia.  And I'm referring to Government's Exhibit 40F.

4        In it, you say that you deposited all the money,

5   right?

6   A.   Yes.

7   Q.   And you list the amounts, right?

8   A.   Correct.

9   Q.   And all of the amounts that you list were in cash?

10  A.   Correct.

11  Q.   And your testimony is that Dr. Mencia told you that you had

12  to deposit them in amounts under $10,000.

13  A.   Under -- 9,000 and under, yes.

14  Q.   Okay.  That Wells Fargo deposit, is it for more or less

15  than 10,000?

16  A.   That is not the -- the Wells Fargo is 9,000 --

17  Q.   Oh, I'm sorry.  You're right.

18  A.   -- and the BB&T Tam Holding is 15,833.

19  Q.   Forgive me.  You're right.  In other words, the number goes

20  before the account.

21  A.   Yes, correct.

22  Q.   Sorry about that.

23        So, 15,833 goes into BBT Tam Holdings, right?

24  A.   Yes.

25  Q.   $15,833 in cash?

GEGA - CROSS/BEATON

1  A.  Yes.  And there was documents it was paying rent to the

2  other building.

3  Q.  Okay.  But that deposit --

4  A.  It was every month, the same deposit.

5  Q.  But it was over $10,000.

6  A.  Yes.

7  Q.  And who filled out the currency transaction form for that

8  one?

9  A.  Dharma filled out all the deposit tickets.

10  Q.  Okay.  And so, that one, on the same day, out of the same

11  money was over $10,000.

12  A.  Yes.

13  Q.  Now, Ms. Gega, are you aware of a woman named Teresa Longo?

14  A.  Yes.

15  Q.  And that is someone who Dr. Mencia is seeing?

16  A.  Yes.

17  Q.  And you understand that Ms. Longo has a significant amount

18  of money?

19  A.  Yes.

20  Q.  And that Ms. Longo would very often help Dr. Mencia out

21  financially?

22  A.  Yes, she would.

23  Q.  In significant sums?

24  A.  Yes.

25  Q.  So, the cash that Dr. Mencia shows you in the picture, do

GEGA - CROSS/BEATON

1   you know where that came from?

2   A.  No, I do not know.

3   Q.  Could Teresa have given it to him?

4   A.  I do not remember when he first start seeing Teresa.

5   Q.  Okay.  And so, you certainly can't say with regards to the

6   cash that Dr. Mencia at times had whether or not Teresa Longo

7   gave it to him.

8   A.  The specific picture?

9   Q.  No, just any -- I mean if he had cash, whether it came from

10  her or somewhere else.  You just can't say.

11  A.  No.

12          MR. BEATON:  Just one moment, your Honor.

13          (Discussion had off the record between counsel)

14   BY MR. BEATON::

15  Q.  Ms. Gega, you've been in the country for what, three years?

16  A.  Yes.

17  Q.  Has this been a pretty scary experience?

18  A.  Very scary.

19  Q.  Pretty uncomfortable to be here, pretty uncomfortable to be

20  interviewed by the agents?

21  A.  Yes.

22  Q.  And just uncomfortable in general, right?

23  A.  Correct.

24  Q.  Well, thank you very much for coming.

25          MR. BEATON:  I have nothing further, Judge.

1469

GEGA - REDIRECT/GILFARB

1   A.  You're welcome.

2           THE COURT:  Redirect?

3              **REDIRECT EXAMINATION**

4    BY MR. GILFARB::

5   Q.  Ms. Gega, you were -- thank you -- you were asked some

6   questions about whether Dr. Mencia spent a lot of time seeing

7   patients.  Do you remember being asked that question?

8   A.  Yes.

9   Q.  Your office is upstairs, is that right?

10  A.  Yes.

11  Q.  And where are the patients and patient examination rooms

12  located?

13  A.  On the first floor.

14  Q.  Did you go into those rooms?

15  A.  No, I did not.

16  Q.  Did you see what he was doing down there?

17  A.  No.

18  Q.  Did you -- how close was his office to your office

19  upstairs?

20  A.  It was another office in the middle.

21  Q.  Okay.  With regards to the patient waiting room, do you

22  think you spent more time on a daily basis downstairs or

23  upstairs?

24  A.  Dr. Mencia?

25  Q.  No, you.

GEGA - REDIRECT/GILFARB

1  A.  Me?  Upstairs.

2  Q.  And you were asked some questions about these $9,000

3  deposits that we -- it's actually still up on the screen there.

4  A.  Yes.  Yes.

5  Q.  Were these the only deposits of $9,000 or less that he

6  asked you to make over time?

7  A.  No.  This was the first one I ever had to face with.

8  Q.  And after that, did you --

9  A.  There was --

10  Q.  -- did he ask you to make deposits of less than $9,000?

11  A.  Yeah, there were several other times.

12  Q.  And that deposit for $15,000, you indicated that was to pay

13  the rent for the commercial property?

14  A.  Yes.

15  Q.  And how much is the rent for the commercial property?

16  A.  Uhm, we used to have another doctor in that property.  The

17  doctor was paying the exactly same amount that Dr. Mencia was

18  paying the rent for that property.

19  Q.  So, he deposited the amount he needed to pay.

20  A.  Yes.

21  Q.  And with regards to these $9,000 deposits, did you ever

22  talk to Dr. Mencia and say, Why are we making deposits under

23  $9,000?

24  A.  Yes.  I ask one time, and he said for tax purposes.

25  Q.  All right.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

1471

PARKER - DIRECT/GILFARB

1   MR. GILFARB:  No further questions, your Honor.

2   THE COURT:  Thank you, ma'am.  You may step down.

3   You're excused.

4   THE WITNESS:  Thank you.

5   *(Witness excused)*

6   THE COURT:  The government may call its next witness.

7   MR. GILFARB:  The government calls Agent Amy Parker.

8   THE COURT REPORTER:  Please raise your right hand.

9   *(AMY LYNN PARKER, GOVERNMENT'S WITNESS, WAS SWORN)*

10  THE COURT REPORTER:  Please sit down.

11  Speak right into the microphone and state your full

12  name for the record, spelling your last name.

13  THE WITNESS:  My name is Amy Lynn Parker, P-A-R-K-E-R.

14  **DIRECT EXAMINATION**

15  BY MR. GILFARB:

16  Q.  Ms. Parker, can you please introduce yourself to the

17  members of the jury, telling them how you're currently employed

18  and for how long?

19  A.  I'm employed with Homeland Security Investigations.  I've

20  been employed with the federal government, U.S. Customs and

21  Homeland Security Investigations, for approximately 32 years.

22  I'm currently assigned to the asset forfeiture investigative

23  group in Miami.

24  Q.  Were you asked to examine some financial records in this

25  case?

1472

PARKER - DIRECT/GILFARB

1    A.  Yes, I was.

2    Q.  And in addition to examining financial records, were you

3    also asked to examine some records indirectly tied to

4    financing, like land property deeds, car rentals, things like

5    that?

6    A.  Yes, I was.

7    Q.  Did you examine records from Wells Fargo Bank?

8    A.  Yes, I did.

9    Q.  From BB&T Bank?

10   A.  Yes, I did.

11   Q.  From T&D *(sic)* Bank?

12   A.  TD Bank, yes, I did.

13   Q.  TD Bank.

14        MR. GILFARB:  One moment, your Honor.

15   BY MR. GILFARB:

16   Q.  PNC Bank?

17   A.  Yes, I did.

18   Q.  Did you review financial records from the Florida

19   Department of Revenue?

20   A.  Yes, I did.

21   Q.  From Florida Title and Guarantee Agency Mortgage?

22   A.  Yes, I did.

23   Q.  Titan Funding and Loan?

24   A.  Yes, I did.

25   Q.  Documents with regards to a Delray residence in

PARKER - DIRECT/GILFARB

1   Dr. Mencia's name?

2   A.  Yes, I did.

3   Q.  Documents from SunTrust and/or Mercedes-Benz of Delray?

4   A.  Yes, I did.

5   Q.  And documents related to JM Lexus?

6   A.  Yes, I did.  Actually, the Mercedes-Benz, that was the

7   Bentley, I believe.

8   Q.  Okay.  How would you describe the volume of records that

9   you reviewed in this case?

10  A.  Huge.  Thousands.  Thousands and thousands of records.

11  Q.  All right.  Is there any way for the jury to sit down and

12  look at those records in the manner that you did in a

13  reasonable amount of time?

14  A.  No.

15          MR. GILFARB:  Your Honor, at this time, pursuant to

16  stipulation, the government moves into evidence 1 through 10

17  and all of its subparts.

18          *(Government's Exhibit Numbers 1 through 10 marked for*

19  *identification)*

20          MR. BEATON:  So, Judge, we stipulated as to

21  authenticity.  The only objections would be to 6A through F and

22  9A through D on 403 grounds and 401 grounds.

23          THE COURT:  Okay.  Overruled.

24          One through 10 will be received.

25          *(Government's Exhibit Numbers 1 through 10 admitted*

1474

PARKER - DIRECT/GILFARB

1   *into evidence)*

2   BY MR. GILFARB:

3   Q.  In your review of the -- I want to break down his

4   finance -- Dr. Mencia's finances for a moment.

5          Would it be fair to say that there was one operating

6   account that you were able to find as money that was used by

7   AGI in an operating way?

8   A.  Specifically for an operating way?

9   Q.  Well, are you familiar with BB *(sic)* account ending in

10  '6401?

11  A.  Yes, I am.

12  Q.  All right.  Based upon your review of that data, do you

13  believe that that was used as an operating account?

14  A.  Yes.

15  Q.  Okay.  First of all, how is it labeled?

16  A.  As an operating account for AGI.

17  Q.  And the things that you saw coming and going in and out of

18  that account, based upon what you reviewed, was it being used

19  as an operating account?

20  A.  For the most part, yes.

21  Q.  All right.  There's the BB&T account '6401.

22         Based upon your review of the data that you got from

23  all these banks, were you able to determine whether '6401

24  received Medicare money?

25  A.  Yes, it did.

PARKER - DIRECT/GILFARB

1   Q.  Did it also receive cash?

2   A.  Yes, it did.

3   Q.  Now, you indicated before that you were able to find --

4   well, strike that.

5           You reviewed data related to a Delray Beach residence

6   and a Fort Lauderdale residence?

7   A.  I did.

8   Q.  Was there money that was paid from '6401 to each of those

9   residences?

10  A.  Yes, there was.

11  Q.  With regards to the Delray house, what was the approximate

12  purchase value of that house?

13  A.  Uhm, I think it was 1.4 million.

14  Q.  Showing you Government's Exhibit 8A.  Do you recognize what

15  that is?

16  A.  Yes.

17  Q.  And what is that a picture of?

18  A.  That's the Delray property.

19  Q.  8B, is that another photograph of the Delray property?

20  A.  Yes.

21  Q.  8C, an interior of the Delray property?

22  A.  Yes.

23  Q.  Is that correct?

24          8D, demonstrating for the jury the Delray property?

25          And 8E.

1476

PARKER - DIRECT/GILFARB

1   A.  That --

2   Q.  Yes?

3   A.  I think that's the Fort Lauderdale property.

4   Q.  All right.  That's been misfiled.

5          Now, the Fort Lauderdale house, what was the

6   approximate value of that house?  Do you remember?

7   A.  It was approximately a 1.4 or 1.5 million purchase price.

8   Without having the documents in front of me, I can't be

9   absolutely sure.

10  Q.  All right.  We'll take the low end.

11         With regards to the Fort Lauderdale property, did you

12  see any records in the Fort Lauderdale property documents that

13  reflect what his income is or gross salary or wages?

14  A.  *(No response)*

15         MR. GILFARB:  Your Honor, may I approach the witness?

16         THE COURT:  Okay.

17         *(Discussion had off the record between the witness and*

18  *government counsel)*

19  BY MR. GILFARB:

20  Q.  Showing you what's been entered into evidence as

21  Government's Exhibit 9A.  Can you tell the members of the jury

22  what we're looking at here?

23  A.  It's a purchase agreement for the purchase of a Bentley

24  from Mercedes-Benz.  It's an application.

25  Q.  And in the purchase for the Mercedes-Benz, what does it

PARKER - DIRECT/GILFARB

1  indicate is the doctor's gross salary or wages?

2  A.  500,000.

3  Q.  Now, did you have an opportunity to review records

4  pertaining to the Florida Department of Revenue?

5  A.  Yes, I did.

6  Q.  And how does his claim of $500,000 compare to what he

7  declared to the Florida Department of Revenue?

8  A.  It's more than what he declared.

9  Q.  With regards to the diagram that's crudely drawn here, do

10  you recall whether there were payments from the BB&T account

11  '6401 out to a Wells Fargo account, '2487?

12  A.  Yeah, I believe he transferred funds from that account into

13  '2487.

14  Q.  '2487.

15          And with regards to that '2487, was there a person who

16  owned that account with him?

17  A.  Yes.  If I recall, it's Rene Renate, Rene Latom *(phonetic)*.

18  I can't pronounce her last name.

19  Q.  Did it appear to be of German --

20  A.  German name, yes.

21  Q.  Okay.  And out of the BB&T -- we were just talking about

22  the Bentley -- were payments made from '6401 to the Bentley, or

23  four monthly payments for the Bentley?

24  A.  I believe so, yes.

25  Q.  We were discussing about the Fort Lauderdale home.  Let me

1478

PARKER - DIRECT/GILFARB

1  show you what's been entered into evidence as subsets of 6.  Do

2  you recognize that?

3  A.  Yes.

4  Q.  And is that the Fort Lauderdale home?

5  A.  Yes, it is.

6  Q.  The same with 6C?

7  A.  Yes.

8  Q.  Same with 6D?

9  A.  Yes.

10  Q.  6E --

11  A.  Yes.

12  Q.  -- the same?

13      And 6F?

14  A.  Yes.

15  Q.  With regards to the Bentley that we've been discussing,

16  showing you Government's Exhibit 9B, is that the Bentley we've

17  been discussing?

18  A.  Yes.

19  Q.  And 9C, the interior of that Bentley?

20  A.  Yes.

21  Q.  You indicated, also, that he was making payments on a

22  Mercedes, is that right?

23  A.  Yes.  But I -- I never reviewed any documents related to

24  that.

25  Q.  All right.  Did you have an opportunity to break down

PARKER - DIRECT/GILFARB

1   generally how much Dr. Mencia had to pay out to cover some

2   basic monthly expenses?

3   A.  Yes.  But I don't -- I don't recall offhand what it was.

4   I'd have to --

5   Q.  Well, I'll ask you the questions.

6   A.  Okay.

7   Q.  Do you remember how much he was paying a person by the name

8   of Connie Cole?

9   A.  Yes.  About 10 -- 10,000 a month, I believe, approximate.

10  Q.  $10,000 a month?  What was that for?

11  A.  That was for the west -- or the Delray Beach property.

12  Q.  And how much was he paying for the Fort Lauderdale

13  property?

14  A.  About $10,000 a month, approximate.

15  Q.  How much approximately was he paying for the Bentley?

16  A.  I believe 3500 a month.

17  Q.  We'll make it 3,000.

18          Do you know whether he was paying for any other

19  vehicles?

20  A.  Yeah.  He was paying for a Lexus, and I think --

21  Q.  Do you know approximately how much he was paying for that

22  Lexus, about?

23  A.  Maybe 900, or was it 2,000?  I can't really recall.

24  Q.  We'll call it 900.

25          So, just for these expenses, this is about $24,000 a

1480

PARKER - DIRECT/GILFARB

 1    month.

 2    A.  Yes.

 3    Q.  That doesn't include payroll, is that right, that you saw

 4    coming as expenses?

 5    A.  Yes.

 6    Q.  That doesn't include bills, like electric and water, and

 7    bills that a business has, right?

 8    A.  Correct.

 9    Q.  Was he paying any loans?

10    A.  Yes, he was.

11    Q.  How much -- are you familiar with a Tam Holdings that was

12    holding a commercial property?

13    A.  Yes.

14    Q.  And how much was he paying a month for that?  Do you

15    remember?

16    A.  No, I don't recall offhand.  It was two commercial

17    properties he was operating his business out of.

18    Q.  Okay.

19    A.  One is a warehouse and one is the office.

20    Q.  Do you remember if the Tam Holdings was approximately

21    $3,000, more or less?

22    A.  Approximate, it sounds correct.

23    Q.  Did he have lines of credit that he was paying back?

24    A.  Yes, he did.

25    Q.  In the amount of about how much?

1481

PARKER - DIRECT/GILFARB

1    A.  I think 2,000, if I recall correctly.

2    Q.  So, in addition to payroll, bills, was he paying -- or any

3    tax payments that he might have, this is the nut that he had to

4    crack, monthly.

5    A.  Yes.

6    Q.  And this, of course, this does not include profit, right,

7    pocketing some?

8    A.  Correct.

9    Q.  This is what has to go out.

10   A.  Correct.

11   Q.  So, at this rate, this is over -- it's almost $530,000 a

12   year.  Would you agree with that?

13   A.  Yeah, if it's close to -- what is it -- ten -- yeah.  Yes,

14   I would.

15   Q.  Now, did you have the opportunity to investigate the

16   payments for those houses and which accounts they came out of

17   and for how much?

18   A.  I did.

19        THE COURT:  How do you come to 540?

20        MR. GILFARB:  240 times 12?  No, I'm sorry.  $24,000

21   times 12?

22        THE COURT:  Not 540.

23        MR. GILFARB:  You have to -- maybe I'm not as good as

24   him, Judge.

25

PARKER - DIRECT/GILFARB

1    BY MR. GILFARB:

2    Q.  But $24,000 a month he had to crack, approximately?

3    A.  At least, minimum.

4    Q.  All right.  So, we were last speaking about the payments

5    for the houses.  That's what I want to focus on next.

6            With regards to the payments for the house, I want to

7    talk first about the account '2487.

8            Are you aware of whether there was a transfer on or

9    about July 30th of 2015 in the approximate amount of

10   $437,614.06, via wire transfer, drawn on Wells Fargo '2487,

11   made payable to Watermark Realty?

12   A.  Yes, I was.

13   Q.  And was that for the purchase of which home, do you recall?

14   A.  *(No response)*

15   Q.  Was it the Fort Lauderdale home, 4750 Northeast 23rd

16   Avenue?

17   A.  I believe so.  That was the closing.

18   Q.  Showing you what's been entered into evidence as

19   Government's Exhibit 1A, can you please tell the members of the

20   jury what we're looking at here?

21   A.  It's the wire transfer detail record of the funds that were

22   withdrawn from his Wells Fargo account, transferred.

23   Q.  Is that the amount we were just speaking of?

24   A.  Yes, that's the amount.

25   Q.  And you said it was drawn on Wells Fargo account?

1483

PARKER - DIRECT/GILFARB

1        For the record, it's Government's 6G.

2    A.   Yes.

3    Q.   Is it reflected, then, as -- in this bank statement of

4    Wells Fargo?

5    A.   Yes, it is.

6    Q.   And, again, what was that used for?

7    A.   Those were the closing funds when he closed on that

8    property.  He financed a certain amount with the seller, and

9    that was the closing funds he brought.  Or had wire

10   transferred.

11   Q.   Okay.  I now want to focus on the Delray Beach residence.

12        Were you able to determine -- you indicated that there

13   were payments in the approximate amount of $10,000 being made

14   to the, uhm -- to Connie Cole, is that right?

15   A.   Yes, that's correct.

16   Q.   Were you able to determine who Connie Cole was or is?

17   A.   Connie Cole was the owner of the property.

18   Q.   And what does it mean -- do you know what kind of sale this

19   was?  Did he obtain a loan from somebody, or was this some

20   other kind of sale?

21   A.   It was -- it was seller financed.

22   Q.   And what does "seller financed" mean?

23   A.   Well, it means that as owner, she, Connie Cole, agreed to

24   finance.  In other words, she created a mortgage and filed it

25   with the county.  And he was to make payments monthly to her in

1484

PARKER - DIRECT/GILFARB

1  an amount until it was all paid off.

2  Q.  Showing you what's been entered into evidence as the

3  subparts of 2.

4          MR. GILFARB:  This is, for the members of the jury,

5  2A.

6  BY MR. GILFARB:

7  Q.  What are we looking at here?

8  A.  It's a check issued from the '6401 account, in the name of

9  Adult Geriatric Institute of Florida (sic) and made payable to

10  Connie Cole for $10,952, with the memo for June 2015.

11  Q.  Okay.  Wait.  Hold on.  Is that you touching the screen?

12  A.  Yeah.  I'm sorry.

13  Q.  All right.  So, it's to Connie Cole, drawn on which

14  account?

15  A.  The BB&T '6401 account.

16  Q.  The same account that gets Medicare and cash.

17  A.  Correct.

18  Q.  Were you able to determine where that cash was coming from?

19  A.  No.

20  Q.  For purposes of the record so that the record's clear, can

21  you tell us the date of that payment?

22  A.  Well --

23  Q.  Hold on.  Or the date of the check?

24  A.  The date of the check is June 15, 2015.

25  Q.  In over $10,000, is that right?

1485

PARKER - DIRECT/GILFARB

1   A.   Yes.

2   Q.   What are we looking at here, Government's 2B?

3   A.   Another check out of the same account, BB&T '6401, payable

4   to Connie Cole, in the amount --

5   Q.   And the check date?

6   A.   September 15th, 2015.

7   Q.   Okay.  Check Number 78698?

8   A.   Yes.

9   Q.   In an amount over $10,000.

10  A.   Correct.

11  Q.   I'm showing you Government's Exhibit 2C.  Same question.

12  If you could just read into the record the account -- the check

13  number, the date, and the amount?

14  A.   Okay.  Check Number 78907, drawn from BB&T account '6401,

15  payable to Connie Cole, dated November 16th, 2015, in the

16  amount of $10,952.20.

17  Q.   Same for Government's 2D.

18  A.   Check Number 79287, drawn from BB&T account '6401, made

19  payable to Connie Cole, dated February 19th, 2016, in the

20  amount of $11,359.72.

21  Q.   2E?

22  A.   Check Number 79869, drawn from BB&T account '6401, made

23  payable to Connie Cole, in the amount of $10,952.20, dated

24  August 8th, 2016.

25  Q.   And, lastly, 2F.

PARKER - DIRECT/GILFARB

1    A.   Check Number 80121, drawn from BB&T account '6401, made

2    payable to Connie Cole, in the amount of $10,952.20, and dated

3    November 15th, 2016.

4    Q.   So, those are payments in excess of $10,000.

5         I now want to draw your attention to deposits under

6    $10,000.

7    A.   Okay.

8    Q.   Did you have an opportunity to look at the Wells Fargo

9    '2487 account and the '6401 BB&T and the '6517 BB&T accounts?

10   A.   I did, I did.

11   Q.   So, just so that the record's clear, the '2487 -- strike

12   that -- the '6401 was the main operating account?

13   A.   Yes, it was.

14   Q.   And the '2487, what was that used as, the best that you

15   could determine?

16   A.   Uhm --

17   Q.   If you recall.

18   A.   I don't -- I don't recall.  I would have to --

19   Q.   How many bank accounts -- different bank accounts,

20   regardless of how many banks they were at, approximately how

21   many different bank accounts do you think you looked at?

22   A.   I would -- I would say approximately 15 bank accounts, if

23   not more.

24   Q.   And how was -- from what you could determine, how was he

25   using these bank accounts?

PARKER - DIRECT/GILFARB

1  A.  Well, some of them were labeled -- I mean there was a

2  couple operating accounts, there was a payroll account.  In a

3  lot of these accounts, he was just moving money back and forth

4  between the accounts.  I mean he was doing banking at BB&T, he

5  was doing banking at PNC, he was doing banking at TD Bank,

6  Wells Fargo, and he just moved the money back and forth between

7  these accounts.  He'd move it into one account, then move it

8  back to the same account, then he'd move it to another account.

9  Q.  Showing you what's been entered into evidence as part of 1,

10  this is 1B.  Do you see here that it's the Wells Fargo account?

11  A.  Yes.

12  Q.  Do you see the date of the statement here?  Could you read

13  it into the record?

14  A.  April 1st, 2015, through April 30th, 2015.

15  Q.  Can you please tell the members of the jury what we see as

16  far as deposits on 4-16, that is April 16th and 17th?

17  A.  Two deposits in the amount of $9,000 each.

18  Q.  Consecutively.  There's no intervening deposits?

19  A.  No.

20  Q.  Do you see this account here, the name of the bank?

21  A.  Yes, BB -- BB&T.

22  Q.  Do you see the date of this statement?

23  A.  Yes, April 30th, 2015.

24  Q.  Can you please read into the record what this deposit slip

25  says -- or what it is in reference to, a deposit into what

PARKER - DIRECT/GILFARB

1   account for how much?

2   A.  It's a deposit of $9,000 cash into the BB&T account ending

3   in the last four digits of '6517, in the name of Tam

4   Holdings, LLC.

5   Q.  And what is the date that it says on here this deposit was

6   transacted?

7   A.  April 17, 2015.

8   Q.  The same date as the one in the Wells Fargo.

9   A.  Yes.

10  Q.  Showing you Government's Exhibit 2G.  Is this also a BB&T

11  account?

12  A.  It is.

13  Q.  Do you see this deposit slip here?

14  A.  Yes.

15  Q.  Can you just tell the members of the jury what date this

16  deposit slip is filled out?

17  A.  April 17, 2015.

18  Q.  For how much?

19  A.  $7,167.

20  Q.  Do you recall whether there was any information in the

21  records that you reviewed about turning in a car or trading up

22  or trading in a car in exchange for -- as part of the Bentley

23  transaction?

24  A.  Yes.  I recall there was a trade-in -- I don't recall the

25  type of car -- a trade-in when he -- when he purchased the

1489

PARKER - DIRECT/GILFARB

1   Bentley.

2   Q.   And do you recall if he was, as they say, upside down in

3   that trade-in?

4   A.   Yes.  Well, he still owed money on it, yes.

5   Q.   Okay.  So, what -- can you just explain to the members of

6   the jury what "upside down" means?

7   A.   *(No response)*

8   Q.   When you're -- you were saying that -- did he owe more

9   money on the car?

10  A.   He owed more -- yes.  So, when he traded it in, he got a

11  trade-in allowance for that car, but he still owed money on the

12  balance of the loan for that car.

13  Q.   Okay.  And so, when he owed money on the car he was trading

14  in, how did he pay for the Bentley?

15  A.   He financed it.

16  Q.   Okay.  And what did he do with the money that he owed on

17  the other car?

18  A.   He financed that, too, in the same loan.

19  Q.   So, he rolled it into the loan for the Bentley.

20  A.   Yes.

21  Q.   And approximately how much was that loan, if you recall?

22  A.   I think 180,000?

23          MR. GILFARB:  One moment, your Honor.

24          *(Discussion had off the record between counsel)*

25          MR. GILFARB:  Pass the witness, your Honor.

1490

BLANCO - DIRECT/GILFARB

```
1          THE COURT:  Cross-examination.

2          MR. BEATON:  No, Judge.  No.  No questions.  None.

3          THE COURT:  Thank you, ma'am.  You may step down.

4          THE WITNESS:  Thank you.

5          (Witness excused)

6          THE COURT:  The government may call its next witness.

7          MR. GILFARB:  The government calls Vanessa Blanco.

8          THE COURT REPORTER:  Please raise your right hand.

9      (VANESSA BLANCO, GOVERNMENT'S WITNESS, WAS SWORN)

10         THE COURT REPORTER:  Please sit down.

11         Please state your full name for the record, spelling

12  your last name.

13         THE WITNESS:  Vanessa Blanco, B-L-A-N-C-O.

14                    DIRECT EXAMINATION

15  BY MR. GILFARB:

16  Q.  Ms. Blanco, how are you employed?

17  A.  I work for Homeland Security Investigation (sic).

18  Q.  Did you have the opportunity to participate in a search of

19  a home in Fort Lauderdale belonging to or with an ownership

20  interest by Dr. Andres Mencia?

21  A.  Yes.

22  Q.  And as part of your duties, did you then go into that house

23  and conduct a search?

24  A.  Yes.

25         MR. GILFARB:  Your Honor, pursuant to stipulation, the
```

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

1491

BLANCO - DIRECT/GILFARB

1   government would move into evidence Government's Exhibit 24,

2   which is a signed prescription pad located at Dr. Mencia's

3   office, in his office.

4            *(Government's Exhibit Number 24 marked for*

5   *identification)*

6            MR. GILFARB:  Do you have any objection?

7            MR. BEATON:  No.

8            THE COURT:  Twenty-four will be received.

9            *(Government's Exhibit Number 24 admitted into*

10  *evidence)*

11  BY MR. GILFARB:

12  Q.   Okay.  Now, when you went and you conducted a search of

13  Dr. Mencia's residence, did you go into the master bedroom?

14  A.   Yes.

15  Q.   And when you went to the master bedroom, did you recover an

16  item of evidence -- did you recover something that you thought

17  was evidence?

18  A.   Yes.

19            MR. GILFARB:  Permission to approach, your Honor?

20            THE COURT:  Okay.

21  BY MR. GILFARB:

22  Q.   Showing you what's been marked as Government's Exhibit 23.

23  Do you recognize this?

24            *(Government's Exhibit Number 23 marked for*

25  *identification)*

1492

1   A.  Yes.

2   Q.  And is this something that you recovered from the

3   residence?

4   A.  Yes, it's correct.

5           MR. GILFARB:  Your Honor, at this time, we would move

6   23 into evidence.

7           MR. BEATON:  No objection.

8           THE COURT:  Twenty-three will be received.

9           *(Government's Exhibit Number 23 admitted into*

10  *evidence)*

11  BY MR. GILFARB:

12  Q.  Can you please tell the members of the jury where in the

13  residence you recovered Government's Exhibit 23?

14  A.  Master bedroom, on the dresser.  It was in the master

15  bedroom on the dresser.

16          MR. GILFARB:  Your Honor, at this time, the government

17  has no further questions.

18          THE COURT:  Cross-examination.

19          MR. BEATON:  No, sir.

20          THE COURT:  Thank you, ma'am.  You may step down.

21  You're excused.

22          THE WITNESS:  Thank you.

23          *(Witness excused)*

24          THE COURT:  The government may call its next witness.

25          MR. GILFARB:  Your Honor, before we do that, can we

1493

1    just have a brief recess to discuss that matter amongst counsel

2    and make sure all the items of evidence are in?

3         THE COURT:  All right, members of the jury, we're

4    going to go ahead and recess for the evening.  Remember my

5    admonition not to discuss the case or allow it to be discussed

6    in your presence.  And I'm gonna ask you to come back tomorrow

7    at 9:15.

8         So have a nice evening.  We'll see you back at 9:15.

9         COURTROOM SECURITY OFFICER:  All rise.

10        *(The jury exited the courtroom)*

11        MR. GILFARB:  Your Honor, we do intend to rest.  We

12   don't have any further witnesses.  We'd just like to confirm

13   with the Court two things.  First of all, if we could just kind

14   of go through -- I guess it would be easier to show -- for us

15   to announce which items of evidence are not in and see if this

16   concurs with the Court?

17        THE COURT:  Well, why don't I tell you what I think is

18   not in.

19        MR. GILFARB:  All right.

20        THE COURT:  15A, B, and C, 15C-1 are not in; 19 is not

21   in; 30's not in; 39's not in; 45, 46, and 47 are not in; 49's

22   not in.  And that's all I have.

23        MR. GILFARB:  One moment then, your Honor.

24        *(Discussion had off the record between counsel)*

25        MR. GILFARB:  Your Honor, Government's Exhibit 15 is

1  in, and I believe we showed two --

2       THE COURT:  You're right, 15's in.  I just didn't mark

3  the subparts.  So, you're right, 15 is in.  So, all the

4  subparts, A, B, and C are in.

5       MR. GILFARB:  We concur that 19 is not in.

6       Judge, by stipulation, we would move in all the

7  transcripts, so that would be 30, 33, and 36, if that wasn't

8  done.  They're all together in one binder.

9       *(Government's Exhibit Number 30 marked for*

10 *identification)*

11      THE COURT:  Thirty-three and 36 are in.

12      Mr. Beaton, what's your position on 30?

13      MR. BEATON:  No objection.  No, that's fine, Judge.

14      THE COURT:  Okay.  So 30 is now in.

15      *(Government's Exhibit Number 30 admitted into*

16 *evidence)*

17      MR. GILFARB:  All right, your Honor, I think that's --

18 no -- that's it for the government, your Honor.  We do intend

19 to then rest our case with the admission of those documents.

20      THE COURT:  Well, do you want to rest now, and we'll

21 do the Rule 29?

22      MR. GILFARB:  Sure, your Honor.  At this time, the

23 government rests.

24      THE COURT:  Mr. Beaton.

25      MR. BEATON:  Your Honor, if we could do the Rule 29

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

1  tomorrow morning.  I had expected us to go through the day.

2          THE COURT:  I mean I got the jury coming in at 9:15.

3          MR. BEATON:  And I should have said something.  I

4  probably should have said, you know --

5          THE COURT:  So, let's do the Rule 29 now.

6          *(Pause)*

7          MR. BEATON:  Your Honor, as to Count 1, conspiracy to

8  commit healthcare fraud and wire fraud, the defendant moves for

9  a judgment of acquittal, because taking all the evidence in the

10 light most favorable to the government --

11         MR. GILFARB:  I'm sorry to interrupt, your Honor.  In

12 my haste to sit down -- I apologize -- I did discuss with

13 Mr. Beaton outside also the stipulations, that the stipulations

14 will be admitted into evidence as the government's last

15 exhibit, and we will redact those items that either didn't come

16 into evidence or which are -- weren't spoken about during the

17 government's case in chief.

18         MR. BEATON:  Well, that's got to be done in front of

19 the jury.

20         MR. GILFARB:  Well, we'll do that and rest in front of

21 the jury.

22         THE COURT:  Well, I mean haven't you announced all the

23 stipulations in front of the jury?

24         MR. GILFARB:  We haven't, and the reason why it

25 occurred to me is that, for example, we have agreed -- we

1496

1    stipulated that Medicare claims are submitted to Medicare via

2    interstate wire.  It's little things like that, your Honor,

3    that we've agreed to that we haven't announced in the record.

4          THE COURT:  Let's see whether he can get by the

5    Rule 29.  It may be a moot issue by tomorrow morning.

6          MR. GILFARB:  Well, as part of the Rule 20 *(sic)* --

7    that's what made me think about it.

8          THE COURT:  If he argues that there's no testimony

9    about interstate wires, then I'll let you reopen the case

10   tomorrow morning in front of the jury.

11         MR. GILFARB:  All right, your Honor.

12         MR. BEATON:  So, as to Count 1, taking all the

13   evidence in the light most favorable to the government,

14   there -- Dr. Mencia moves for a judgment of acquittal.  There's

15   been no testimony or evidence that claims that were submitted

16   to Medicare were either for services that weren't rendered,

17   were false or fraudulent in any way.  There has been no

18   testimony.

19         THE COURT:  What's your position on -- who's going to

20   argue for the government?

21         MR. GILFARB:  I will, your Honor.

22         THE COURT:  What's your position on that, Mr. Gilfarb?

23         MR. GILFARB:  Your Honor, first, there was testimony

24   with regards to a Medicare beneficiary by the name of James

25   Hewett being seen in 2014.

```
1              Second, there was testimony from Mr. Ventura --

2         THE COURT:  Hewett was a Medicare beneficiary?

3         MR. GILFARB:  Yes, your Honor.

4         THE COURT:  He got disability early, I guess.

5         MR. GILFARB:  Yes, your Honor.

6         THE COURT:  I forgot about that.  Okay.  Go ahead.

7         MR. GILFARB:  Second, your Honor, there was testimony
```

from Mr. Rodriguez that this was a scheme that was already in

progress when he got there.  And he got there after the death

of Mr. Hewett.

He also testified that the Medicare patients that were

seen, were seen in very much the same way, maybe a little bit

longer than what we see on the videos and what was given to

G-codes *(sic)* as far as medical service and examinations.  We

also heard that from Mensah, and we also heard that from Sylvia

Hernandez.

We heard, your Honor, from Mr. Quindoza that what is

expected of Medicare billing with regards to the services

rendered and what's supposed to comport with services rendered.

And, therefore, your Honor, in light of -- in the

light most favorable to the government, we do believe that we

have established an agreement -- an unlawful agreement between

the conspirators to see patients and deprive Medicare of money

by not providing the services that were being billed.

THE COURT:  Who did Dr. Mencia conspire with regarding

1    Mr. Hewett back in 2014?

2             MR. GILFARB:  If you see the medical records of

3    Mr. Hewett, you not only see charged but also uncharged

4    coconspirators in the form of medical assistants.  In the

5    medical records of Mr. Hewett, you'll see that it was Mr. Homer

6    Parajon, I believe there was -- there were some other initials

7    there.  You heard from Amanda Baldwin, his girlfriend, who

8    indicated that she saw a young guy.  I believe she thought his

9    name was Juan.  It certainly was not Oscar; he wasn't working

10   there at the time.

11            So, those are uncharged coconspirators for whom he was

12   seeing that patient with.

13            THE COURT:  All right.  Mr. Beaton, why isn't that

14   enough to get by a Rule 29 on Count 1?

15            MR. BEATON:  Because there's been no testimony

16   whatsoever that Dr. Mencia or Dr. Mencia's office did not

17   submit bills on his behalf for services that were not rendered,

18   fraudulent, exaggerated, or whatever other iteration of the

19   word the government wants to use.

20            THE COURT:  Well, I think there's circumstantial

21   evidence that Mr. Hewett was treated inappropriately.  And,

22   therefore, if there were bills that were submitted, they were

23   submitted inappropriately and fraudulently.  But is there

24   evidence that Medicare or Medicaid bills were submitted on

25   behalf of Mr. Hewett?

1    MR. BEATON:  I haven't seen any.

2    THE COURT:  Mr. Gilfarb?

3    MR. GILFARB:  Judge, the Medicare data is in evidence

4  as one gigantic disc of evidence of all the Medicare billing

5  data for 2014 through 2017.

6    THE COURT:  So, can you show me something that shows

7  that Medicare paid a claim for Mr. Hewett getting oxycodone in

8  2014?

9    MR. GILFARB:  Well, your Honor, respectfully, I don't

10  think we would have -- I would not be able to find that right

11  now in all that data.  But I would argue alternatively --

12    THE COURT:  Can you find it by tomorrow morning?

13    MR. GILFARB:  We'll look for that.  But I would argue

14  alternatively, your Honor, that payment doesn't have to be

15  made.  It is a conspiracy count, no substantive counts charged.

16    THE COURT:  All right.  Show me that there was a claim

17  made on behalf of Mr. Hewett getting oxycodone.

18    MR. GILFARB:  All right, your Honor, we'll have to

19  find that for you.

20    THE COURT:  Okay.

21    MR. BEATON:  Judge, if you're gonna indulge the

22  government for more time and precision on their arguments, then

23  I'd ask for the same courtesy, because I --

24    THE COURT:  I'm not giving him more time for an

25  argument.  I'm giving him more time to show me evidence, which

1    would take, hopefully, a minute tomorrow morning.

2         You know, we could spend hours on these arguments, and

3    I don't want the jury to sit in the jury room for a long period

4    of time.

5         MR. BEATON:  I agree with you.

6         Uhm, so are you gonna hold -- is what you're saying --

7    and I --

8         THE COURT:  If there's other arguments as to Count 1,

9    I'll listen to them.  Otherwise, I'm going to defer ruling

10   until tomorrow morning and see if the government can show me

11   that there was some effort to get compensated for Mr. Hewett's

12   oxycodone in 2014 before he died.

13        MR. BEATON:  Okay.

14        MR. GILFARB:  Your Honor, I would also say that

15   they -- these were also filled -- we demonstrated his PDMP

16   data, which demonstrated that they were filled at a pharmacy,

17   which would be -- which would have been paid by Medicare.

18        MR. BEATON:  You waiting on me?

19        THE COURT:  No, I'm thinking about that.  I mean,

20   there was testimony from the girlfriend that he had Medicare.

21   If he filled the drugs at a pharmacy, isn't that circumstantial

22   evidence that Medicare would have paid them?  So, maybe that's

23   enough to get by Rule 29 at this point.

24        Does he need to look and find records that show that

25   Mr. Hewett filled the oxycodone at pharmacies in 2014,

1   Mr. Beaton?

2           MR. BEATON:  No.  I mean I think I've seen those

3   records.

4           THE COURT:  As long as they're introduced, then that

5   to me would be enough at this point to deny the Rule 29.

6           MR. BEATON:  Okay.

7           The broader issue -- well, we'll address the broader

8   issue tomorrow, I guess.

9           I'll move straight into Count 3, which is the count

10  that charges Dr. Mencia with dispensing a controlled substance

11  on or about August 29th of 2014 that resulted in the death of

12  James Hewett, and move for a judgment of acquittal, taking all

13  the evidence in the light most favorable to the government, and

14  in light of the holding in *United States vs. Burrage*,

15  B-U-R-R-A-G-E, that the dispensing has to be the proximate

16  cause of the death.

17          THE COURT:  Well, I mean that just would knock out the

18  aggravating circumstance, right?

19          MR. BEATON:  As an initial matter, correct.  In other

20  words, the government cannot exclude the reasonable hypothesis,

21  number one, that Mr. Hewett obtained the drugs either on the

22  street --

23          THE COURT:  I mean excluding the reasonable hypothesis

24  works in state court; it really doesn't work in federal court.

25  Let me see the case you're talking about.  I mean in state

1  court, if they couldn't prove that he bought the drugs off the

2  street that killed him, then they're out of luck.  But that's

3  not the rule in federal court.  But let me see the case you're

4  talking about.

5       MR. BEATON:  Okay.  And the second thing is, the

6  government cannot exclude the likely scenario that it was a

7  suicide, which courts have recognized as a sufficient

8  intervening cause in the medical context to absolve, for

9  example, hospitals, doctors, and in some 1983 cases, police

10  officers, of liability.  It is a sufficient intervening cause

11  to break the chain and no longer provide for the but-for cause

12  of the death being the dispensing of the controlled substance.

13       THE COURT:  I mean, you can argue that to the jury,

14  but I think it's a question of fact for the jury whether or not

15  they have a reasonable doubt as to whether or not he committed

16  suicide or whether he died as a result of an overdose, an

17  unintentional overdose.  So, that part of it, I have no problem

18  denying the Rule 29.  But I'd like to see the case on the

19  proximate cause of his death, and do you have to prove that

20  that the overdose came from the oxycodone he got on

21  August 29th, as opposed to some oxycodone that maybe he got on

22  the street?

23       MR. BEATON:  Okay.  Fair enough.

24       THE COURT:  So, do you want to either give me the case

25  or give me the cite, and I'll look it up?

```
1            MR. BEATON:  It's at the condo that I'm working at.

2    I'm gonna have to email it to the Court, do a notice of filing

3    tonight.

4            THE COURT:  Well, what's the name of the case?  Do you

5    know how to spell it?

6            MR. BEATON:  I wish I did.  I had left that all

7    back --

8            MR. GILFARB:  It's a Supreme Court case.

9            MR. BEATON:  Oh, Burrage?

10           THE COURT:  Right.

11           MR. BEATON:  Sure.  It's B-U-R-R-A-G-E.  I'm sorry.

12   Yeah, and I'm sure I have the cite somewhere.

13           MR. GILFARB:  And, Judge, just so that the record is

14   clear, we agree that the law is that it has to be the but-for

15   cause.  The oxycodone in his system has to be the but-for

16   cause.  And that's why we went through with the medical --

17           THE COURT:  Well, I understand that, that the

18   oxycodone killed him.  But does it have to be the oxycodone

19   that he got from Dr. Mencia as opposed to oxycodone that he

20   could have gotten illegally on the street?

21           MR. GILFARB:  I don't know the answer to that, your

22   Honor.  But we believe that the testimony, taken in the light

23   most favorable to the government, shows that it was from

24   Dr. Mencia.  To the extent that you heard from Amanda Baldwin,

25   who said since he was getting it for free, there was no need to
```

1   get it anywhere else.  The bottles were -- photographs of the

2   bottles were introduced into evidence.  The contents of his

3   blood and urine were --

4         THE COURT:  I have no problem saying circumstantially

5   that the jury could find that.  I have no problem finding under

6   federal law that the circumstantial evidence is a question of

7   fact for the jury.  I just want to read *Burrage* to see if they

8   made an exception that you have to prove that the overdose

9   could have only come from the doctors prescribing that

10  particular batch of oxycodone.

11        If it says that, then I'm gonna have to consider

12  reducing the charge to just a 20-year max.  If it doesn't say

13  that, then I have no problem denying the Rule 29 at this point

14  and continuing on.

15        MR. BEATON:  Okay.  Here's the case, Judge.  It's

16  *U.S. vs. Burrage*, 571 U.S. 204.

17        THE COURT:  All right.  So, I'll read it.

18        MR. BEATON:  And -- okay.

19        MR. GILFARB:  And, your Honor, just to avoid taking

20  the Court's time tomorrow, I'll take -- if I may, just take

21  some today.

22        So, we've made those arguments that we believe

23  demonstrate that it was this oxycodone that caused his

24  overdose.  There was some question raised about whether he had

25  done something in the past or whether he could have gotten this

1505

1    on the street.  But the evidence that came in to trial through

2    Ms. Baldwin and through his father, and through the

3    photographic evidence, was pretty specific about the fact that

4    it was from Dr. Mencia.  And we'll rest on that, your Honor.

5           THE COURT:  Okay.  So, I'll read *Burrage*.

6           Further arguments, Mr. Beaton?

7           MR. BEATON:  Not at this time, your Honor.  Whatever I

8    have, I will file with the Court tonight.  I thought you were

9    asking me earlier about whether I had the name of the case

10   that -- on circumstantial evidence, so forgive me.  But *Burrage*

11   is the case that I was --

12          THE COURT:  No, *Burrage* was the case I was asking

13   about.

14          MR. BEATON:  I'm sorry.  I misunderstood you.

15          THE COURT:  I mean there's a bunch of Eleventh Circuit

16   cases on circumstantial evidence --

17          MR. BEATON:  Right.

18          THE COURT:  -- saying that a reasonable hypothesis of

19   innocence doesn't equate to an acquittal in federal court.

20   It's a question of fact for the jury.

21          MR. BEATON:  Yes.  So, that's it.  Those are my

22   arguments for right now, Judge.

23          THE COURT:  Okay.  So, you're done with your Rule 29

24   motion?

25          MR. BEATON:  Do I have -- am I -- will the Court

1  entertain further arguments tomorrow morning?

2          THE COURT:  Well, I mean I'd like to entertain them

3  now.  You've got money laundering counts, you've got

4  structuring counts.  You got your Count 2 conspiracy to

5  dispense controlled substances.  You got Count 3 that we've

6  already talked about the aggravating aspect of it.

7          I'm trying to avoid the jury sitting in the jury room

8  any longer than they need to.

9          *(Pause)*

10         MR. BEATON:  As to Count 2, conspiracy to dispense a

11  controlled substance, the defendant moves for a judgment of

12  acquittal, because taking the evidence in the light most

13  favorable to the government, there was insufficient evidence

14  that Dr. Mencia entered into an agreement with Oscar

15  Ventura-Rodriguez, Nadira Sampath-Grant, and/or John Mensah to

16  distribute a controlled substance.

17         THE COURT:  I think there's sufficient evidence, if

18  the jury chooses to believe it, at this point to deny the

19  Rule 29 motion as to Count 2.

20         MR. BEATON:  As to Counts 4 through 10, the money

21  laundering count, Dr. Mencia moves for a judgment of acquittal,

22  because taking the evidence in the light most favorable to the

23  government, the government failed to establish --

24         *(Discussion had off the record between counsel)*

25         MR. BEATON:  -- the government failed to establish the

1  proceeds of unlawful activity prong of U.S.C. 1957, and failed

2  to tie those home payments to specific acts that constituted an

3  unlawful activity and would have constituted money laundering.

4       THE COURT:  Mr. Gilfarb, what if some of the money

5  involved in the money laundering came from specified unlawful

6  activity, but not all of it?  In other words, let's say on

7  Count 4, out of the $10,952.20 that was the transfer to the

8  BB&T account, some of it came from Code-G payments, maybe a

9  little bit was left over from Mr. Hewett.  But do you have to

10  prove that all 10,952 came from criminally derived property?

11       MR. GILFARB:  No.

12       THE COURT:  Or do you have to prove that at least

13  $10,000 came from criminally derived property?  Or if $1 came

14  from criminally derived property and the other $9,999 came from

15  legitimate resources from his medical practice, is that money

16  laundering?

17       MR. GILFARB:  It is money laundering if criminal

18  proceeds entered a bank account, which then mingled with

19  legitimate money, for lack of a better term, and then money

20  that's commingled was used to pay those accounts.  So, any

21  portion of those $10,000, if it was derived from Medicare money

22  and/or G-code money or CS money, then that would be a

23  violation.

24       THE COURT:  Do you agree with that, Mr. Beaton?

25       MR. BEATON:  No, Judge.  And not only that, but let me

1508

1  add something to the equation.

2          THE COURT:  So, Mr. Gilfarb, you need to give me a

3  case saying that for money laundering, if any part of the

4  $10,000 came from criminally derived property, then that's

5  enough to result in a conviction, as long as the money being

6  transferred was more than 20 -- was more than 10,000.  Even if

7  all 10,000 of it wasn't money that was being laundered, it was

8  dirty money, just some of it being dirty is enough as long as

9  the total amount is more than 10,000.

10          MR. BEATON:  And I will also add that the record is

11  relatively uncontroverted that 90 percent of the practice

12  involved either legitimate patients or Medicare patients, for

13  lack of a better word.

14          So --

15          THE COURT:  So, I'll wait and hear from Mr. Gilfarb as

16  to their -- what the law is on commingled dirty money.

17          Do you want to argue on your structuring count?

18          MR. BEATON:  So, we're left with Count 11.  Forgive

19  me, your Honor, give me one second to pull up the....

20          THE COURT:  Well, while you're looking at that, why

21  don't we come in at nine o'clock.  I've got two short hearings

22  at nine, so maybe when I finish them, we can do the arguments

23  before 9:15.

24          MR. BEATON:  I appreciate that very much, Judge.

25  Thank you.

 1          THE COURT:  But that didn't --

 2          MR. BEATON:  That didn't absolve me of the --

 3          THE COURT:  That didn't mean we weren't going to talk

 4     about Count 11.  That just meant that I was going to listen to

 5     Mr. Gilfarb tomorrow morning before 9:15 hopefully.

 6          MR. BEATON:  But you'll listen to me too, I hope.

 7          THE COURT:  I've always listened to you.

 8          *(Laughter)*

 9          MR. BEATON:  So, Dr. Mencia moves for a judgment of

10     acquittal as to count -- Counts 11 through -- Count 11.

11          THE COURT:  It's just 11.

12          MR. BEATON:  The government -- taking the evidence in

13     the most favorable to the government, there -- I don't recall

14     testimony that the purpose of the structured transaction -- or

15     the alleged structured transaction was to evade the transaction

16     reporting requirements.

17          THE COURT:  Didn't Ms. Gega say that the doctor told

18     her that it was for tax purposes?

19          MR. BEATON:  I do believe that that was the testimony.

20          THE COURT:  I think that's enough, if the jury wants

21     to believe that he said that and that it was to evade taxes.

22          MR. BEATON:  Well, he didn't say it was to evade

23     taxes.  He said it was for tax purposes.

24          THE COURT:  But the jury could infer that, if they

25     wanted to.

     1          How about -- I mean this normally carries a five-year

     2   maximum, except if the amount of illegal activity involved more

     3   than a hundred thousand dollars in a 12-month period, then I

     4   think it bumps it up to ten years.  What's the evidence of the

     5   aggravation of more than a hundred thousand dollars in a

     6   12-month period?

     7          MR. BEATON:  I'll defer that one to --

     8          MR. GILFARB:  That was my bad math.  Recalculating

     9   that, I think, just to cover the monthly expenses, the business

    10   had to make over $200,000.

    11          So, when you have expenses of $2400 a month just for

    12   those items, the math is what it is.  It has to be over

    13   $200,000 just to make those expenses, your Honor.

    14          THE COURT:  Well, I don't understand what -- the fact

    15   that he has 240 or $360,000 a month in expenses, how is that

    16   illegal activity?

    17          MR. GILFARB:  It's not that it's illegal activity that

    18   he has those expenses, but he paid those expenses from an

    19   account that was the main operating account for the illegal

    20   activity.  So, that company had to make over a hundred thousand

    21   dollars.  He was making those payments.  That's proof of the

    22   fact that there was over a hundred thousand dollars worth of

    23   illegal proceeds -- that the business was making over a hundred

    24   thousand dollars.

    25          THE COURT:  I don't understand the argument.

1511

```
1          MR. GILFARB:  All right.

2          THE COURT:  I mean the fact that he needed to pay

3    $240,000 a year just to cover his expenses doesn't mean that

4    all that $240,000 was coming from illegal activity.

5          I mean, don't you have to show that either he was

6    getting a hundred thousand dollars in 2015 from Medicare fraud,

7    or he was getting a hundred thousand dollars in 2015 from

8    inappropriately dispensing oxycodone?  I mean what's the

9    illegal activity that happened in a one-year period around

10   April of 2015 that equated out to a hundred thousand dollars?

11         MR. GILFARB:  Well, the illegal activity, as we have

12   demonstrated, was the Medicare fraud and the G-code money.

13   That money, this last witness -- excuse me -- second-to-last

14   witness, Ms. Parker, indicated went into BB&T '6401.  That

15   '6401 was used to pay expenses that totalled more than a

16   hundred thousand dollars a year.

17         THE COURT:  So that kind of goes back to your money

18   laundering argument, that if some of the money came from dirty

19   funds, and it went into an account that there was more than a

20   hundred thousand dollars being involved, then you think that's

21   enough to enhance the penalty from five years to ten years.

22         You're going to need to show me a case saying that.

23         MR. GILFARB:  All right, your Honor.

24         THE COURT:  Do we know what the defense is going to do

25   tomorrow?
```

1    MR. BEATON:  Uhm, our case -- and we're gonna talk

2  about it tonight -- if we put one on, is going to be very

3  short.

4    THE COURT:  All right.  And either way, normally I do

5  a colloquy with a defendant to talk about his right to testify

6  and not to testify.  So, we can do that tomorrow, depending on

7  what your decision is.

8    MR. BEATON:  Yes, sir.

9    THE COURT:  And if there's nothing else to come before

10  the Court, we'll be in recess until a little bit after nine

11  tomorrow.

12    MR. BEATON:  Thanks, Judge.

13    MR. GILFARB:  Your Honor, do you also want us to

14  prepare a verdict form?  We submitted instructions on PACER and

15  to your Honor's email, but I don't think it included a verdict

16  form.

17    THE COURT:  A verdict form would be helpful.  But we

18  don't know for sure what the verdict form's gonna say right

19  now.  I mean there's -- I mean, do you know -- if I deny all

20  the Rule 29s, are you going all or nothing, or do you want the

21  lessors on the couple of counts that you could have lessors on?

22  We need to know that for the verdict form.

23    MR. GILFARB:  True.  Very well, your Honor.

24    THE COURT:  All right.  We'll be in recess.

25    COURTROOM SECURITY OFFICER:  All rise.

1      *(The Judge exited the courtroom)*

2         *(Proceedings concluded at 5:26 p.m.)*

3                  -   -   -   -   -

4                  <u>INDEX OF WITNESSES</u>

5   **GOVERNMENT'S WITNESS**                    PAGE

6   **John Mensah**
    Direct by Mr. Yoffie (Continued)        1283
7   Cross by Mr. Beaton                      1295
    Redirect by Mr. Yoffie                  1341
8   Recross by Mr. Beaton                   1345
    Re-Redirect by Mr. Yoffie               1346
9
    **Stephen Quindoza**
10  Direct by Mr. Yoffie                1348, 1380
    Cross by Mr. Beaton                     1382
11  Redirect by Mr. Yoffie                  1391

12  **Johanna Sullivan**
    Direct by Mr. Yoffie                    1393
13  Cross by Mr. Beaton                     1418
    Redirect by Mr. Yoffie                  1426
14
    **Klaudia Gega**
15  Direct by Mr. Gilfarb                   1428
    Cross by Mr. Beaton                     1455
16  Redirect by Mr. Gilfarb                 1469

17  **Amy Lynn Parker**

18  Direct by Mr. Gilfarb                   1471

19  **Vanessa Blanco**
    Direct by Mr. Gilfarb                   1490
20

21                  -   -   -   -   -

22

23

24

25

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

```
 1                      INDEX OF EXHIBITS

 2    GOVERNMENT'S EXHIBITS:          MARKED      RECEIVED

 3    16                              1328         1328
       1 through 10                   1473         1474
 4    24                              1491         1491
      23                              1491         1492
 5    30                              1494         1494
      40                              1441         1441
 6    40B                             1441         1443
      40C                             1443         1443
 7    40E                             1444
      40D                             1445
 8    40G                             1447
      40F                             1451
 9

10    DEFENDANT'S EXHIBITS:           MARKED      RECEIVED
      19                              1424         1424
11    18                              1387
      16                              1407
12    17                              1346         1346
      14                              1357         1357
13    15                              1357         1357
      13                              1366         1366
14    45 and 46                       1267

15

16                        -  -  -  -  -

17

18               C E R T I F I C A T E

19         I hereby certify that pursuant to Section 753,

20    Title 28, United States Code, the foregoing is a true and

21    correct transcript from the record of proceedings in the

22    above-entitled matter.

23
          ____/s/Francine C. Salopek _____    10-17-2019_____
24    Francine C. Salopek, RMR-CRR              Date
      Official Court Reporter
25
```

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

**BY MR. BEATON:: [39]** 1295/15 1296/6 1296/21 1296/24 1298/4 1299/10 1300/7 1302/3 1304/10 1306/6 1307/2 1309/4 1309/25 1311/20 1315/23 1316/13 1320/16 1322/7 1324/13 1325/18 1326/18 1327/6 1328/17 1329/9 1331/7 1331/16 1333/2 1333/16 1336/1 1338/1 1338/10 1345/15 1346/11 1382/16 1383/11 1387/7 1455/1 1463/13 1468/13
**BY MR. GILFARB:: [10]** 1428/17 1429/24 1435/10 1441/22 1443/5 1445/11 1447/7 1449/13 1451/4 1469/3
**BY MR. YOFFIE: [1]** 1391/19
**BY MR. YOFFIE:: [15]** 1283/9 1292/22 1341/4 1344/2 1344/22 1344/25 1346/23 1348/5 1353/19 1357/21 1367/12 1368/6 1369/21 1380/1 1382/3
**COURTROOM SECURITY OFFICER: [12]** 1282/13 1282/20 1322/23 1323/22 1373/16 1376/24 1378/15 1379/13 1452/20 1454/9 1493/8 1512/24
**MR. BEATON: [188]**
**MR. GILFARB: [71]**
**MR. HORENSTEIN: [7]** 1295/25 1298/2 1300/1 1311/17 1328/13 1346/1 1387/4
**MR. YOFFIE: [57]**
**ROOM CLERK: [5]** 1392/25 1393/2 1428/9 1428/11 1453/6
**THE COURT REPORTER: [15]** 1305/24 1306/3 1315/2 1339/21 1346/5 1347/23 1347/25 1374/8 1384/5 1393/8 1423/3 1471/7 1471/9 1490/7 1490/9
**THE COURT: [201]**
**THE JURORS: [4]** 1283/4 1324/6 1379/22 1454/18
**THE WITNESS: [24]** 1282/17 1323/13 1348/3 1368/4 1373/21 1373/23 1378/6 1382/13 1384/7 1392/16 1393/3 1393/6 1393/12 1423/4 1428/4 1428/14 1452/25 1453/2 1454/6 1471/3 1471/12 1490/3 1490/12 1492/21

**$**

**$1 [1]** 1507/13
**$10,000 [13]** 1466/12 1467/5 1467/11 1479/10 1479/14 1483/13 1484/25 1485/9 1486/4 1486/6 1507/13 1507/21 1508/4
**$10,952 [1]** 1484/10
**$10,952.20 [4]** 1485/16 1485/23 1486/2 1507/7
**$11,359.72 [1]** 1485/20
**$15,000 [1]** 1470/12
**$15,833 [2]** 1452/7 1466/25
**$185 [2]** 1310/17 1310/23

**$2,000 [2]** 1464/6 1464/9
**$2,090 [1]** 1442/2
**$20 [1]** 1371/9
**$200 [1]** 1289/16
**$200,000 [2]** 1510/10 1510/13
**$24,000 [3]** 1479/25 1481/20 1482/2
**$240,000 [2]** 1511/3 1511/4
**$2400 [1]** 1510/11
**$2800.71 [1]** 1445/17
**$3,000 [1]** 1480/21
**$3,090 [1]** 1446/7
**$3,220 [1]** 1442/6
**$300 [1]** 1447/24
**$360,000 [1]** 1510/15
**$437,614.06 [1]** 1482/10
**$5,200 [1]** 1444/6
**$50,000 [1]** 1449/20
**$500,000 [1]** 1477/6
**$5200 [1]** 1464/21
**$530,000 [1]** 1481/11
**$7,167 [2]** 1451/23 1488/19
**$70,000 [1]** 1456/13
**$9,000 [11]** 1450/23 1451/10 1451/13 1451/24 1470/2 1470/5 1470/10 1470/21 1470/23 1487/17 1488/2
**$9,999 [1]** 1507/14
**$900 [1]** 1444/18

---

**'**

**'2487 [9]** 1477/11 1477/13 1477/14 1477/15 1482/7 1482/10 1486/9 1486/11 1486/14
**'6401 [17]** 1474/10 1474/21 1474/23 1475/8 1477/11 1477/22 1484/8 1484/15 1485/3 1485/14 1485/18 1485/22 1486/1 1486/9 1486/12 1511/14 1511/15
**'6517 [2]** 1486/9 1488/3
**'95 [1]** 1397/2
**'95-'96 [1]** 1397/2
**'96 [1]** 1397/2

---

**/**

**/s/Francine [1]** 1514/23

**0**

**0:01 [1]** 1312/17

**1**

**1.4 [1]** 1476/7
**1.4 million [1]** 1475/13
**1.5 million [1]** 1476/7
**10 [7]** 1473/16 1473/18 1473/24 1473/25 1479/9 1506/20 1514/3
**10,000 [6]** 1448/21 1466/15 1479/9 1508/6 1508/7 1508/9
**10,952 [1]** 1507/10
**10-17-2019 [1]** 1514/23
**10/325 [1]** 1414/13
**100 [3]** 1385/22 1385/24 1425/23
**100 years [1]** 1335/18
**1006 [2]** 1367/6 1369/6
**10:18 [1]** 1323/9
**10:35 [1]** 1323/9
**10:45 [2]** 1297/24 1297/25

**10:50 [2]** 1325/16 1325/17
**10:56 [1]** 1326/17
**11 [9]** 1288/8 1325/15 1408/24 1408/25 1508/18 1509/4 1509/7 1509/10 1509/11
**11:21 [1]** 1299/5
**11:30 [2]** 1300/1 1300/3
**11:32 [1]** 1300/4
**12 [3]** 1413/19 1481/20 1481/21
**12-month [2]** 1510/3 1510/6
**120 [2]** 1415/9 1415/11
**1200 [1]** 1285/25
**1267 [1]** 1514/14
**1283 [1]** 1513/6
**1295 [1]** 1513/7
**12:03 [1]** 1377/2
**12B [1]** 1413/18
**12th [1]** 1417/8
**13 [7]** 1287/22 1348/23 1366/18 1366/20 1366/22 1366/25 1514/13
**1328 [2]** 1514/3 1514/3
**1341 [1]** 1513/7
**1345 [1]** 1513/8
**1346 [3]** 1513/8 1514/12 1514/12
**1348 [1]** 1513/10
**1357 [4]** 1514/12 1514/12 1514/12 1514/13
**1366 [2]** 1514/13 1514/13
**1380 [1]** 1513/10
**1382 [1]** 1513/10
**1387 [1]** 1514/11
**1391 [1]** 1513/11
**1393 [1]** 1513/12
**14 [6]** 1288/16 1357/7 1357/9 1357/10 1357/14 1514/12
**14 days [1]** 1365/21
**14-day [1]** 1365/22
**1400 [1]** 1281/7
**1407 [1]** 1514/11
**1418 [1]** 1513/13
**1424 [2]** 1514/10 1514/10
**1426 [1]** 1513/13
**1428 [1]** 1513/15
**1441 [3]** 1514/5 1514/5 1514/6
**1443 [3]** 1514/6 1514/6 1514/6
**1444 [1]** 1514/7
**1445 [1]** 1514/7
**1447 [1]** 1514/8
**1451 [1]** 1514/8
**1455 [1]** 1513/15
**1469 [1]** 1513/16
**1471 [1]** 1513/18
**1473 [1]** 1514/3
**1474 [1]** 1514/3
**1490 [1]** 1513/19
**1491 [3]** 1514/4 1514/4 1514/4
**1492 [1]** 1514/4
**1494 [2]** 1514/5 1514/5
**14:56 [1]** 1328/16
**14:58 [2]** 1328/12 1328/14
**15 [14]** 1357/16 1357/17 1357/18 1357/21 1362/22 1363/5 1364/3 1371/20 1453/2 1484/24 1486/22 1493/25 1494/3 1514/13

**1**

**15 minutes [2]** 1452/20 1453/5
**15's [1]** 1494/2
**15,833 [2]** 1466/18 1466/23
**15-minute [1]** 1452/17
**155 [1]** 1371/9
**15:39 [1]** 1327/5
**15:40 [1]** 1327/4
**15A [2]** 1359/3 1493/20
**15A2 [1]** 1362/21
**15A3 [1]** 1363/12
**15C-1 [1]** 1493/20
**15th [3]** 1416/24 1485/6 1486/3
**16 [12]** 1328/7 1328/9 1328/11
 1346/1 1407/21 1407/22 1407/25
 1408/5 1408/16 1487/16 1514/3
 1514/11
**164,000 [1]** 1446/12
**16th [2]** 1485/15 1487/16
**17 [5]** 1346/3 1346/5 1488/7 1488/17
 1514/12
**17-60301-CR-WPD [1]** 1280/4
**17B [1]** 1438/9
**17th [1]** 1487/16
**18 [3]** 1387/6 1387/7 1514/11
**180,000 [1]** 1489/22
**185 [4]** 1310/13 1310/14 1311/6
 1311/12
**18th [1]** 1416/9
**19 [6]** 1424/11 1424/13 1424/18
 1493/20 1494/5 1514/10
**1957 [1]** 1507/1
**1983 [1]** 1502/9
**1989 [1]** 1351/20
**1995 [1]** 1394/5
**19:24 [2]** 1333/1 1333/2
**19:35 [1]** 1333/15
**19th [1]** 1485/19
**1:30 [4]** 1373/15 1373/16 1373/23
 1376/24
**1:31 [1]** 1378/1
**1:35 [2]** 1319/4 1319/5
**1A [1]** 1482/19
**1B [1]** 1487/10
**1st [3]** 1288/3 1288/9 1487/14

**2**

**2,000 [2]** 1479/23 1481/1
**20 [10]** 1329/6 1335/20 1336/15
 1336/24 1395/16 1448/17 1448/24
 1448/25 1496/6 1508/6
**20 milligrams [1]** 1285/23
**20 years [6]** 1336/14 1336/17
 1336/22 1337/2 1337/2 1352/3
**20-milligram [1]** 1415/15
**20-year [1]** 1504/12
**200 [1]** 1281/11
**20005 [1]** 1281/8
**2005 [1]** 1348/22
**2007 [3]** 1363/5 1363/22 1364/3
**2012 [6]** 1357/9 1366/17 1366/21
 1369/11 1407/23 1408/4
**2014 [18]** 1369/14 1369/17 1373/3
 1374/24 1381/23 1381/25 1382/13

1408/19 1409/1 1409/13 1427/9
 1496/25 1498/1 1499/5 1499/8
 1500/12 1500/25 1501/11
**2015 [19]** 1362/20 1432/13 1439/22
 1439/24 1440/10 1440/11 1482/9
 1484/10 1484/24 1485/6 1485/15
 1487/14 1487/14 1487/23 1488/7
 1488/17 1511/6 1511/7 1511/10
**2016 [3]** 1485/19 1485/24 1486/3
**2017 [37]** 1283/18 1284/8 1286/4
 1288/1 1288/3 1288/9 1288/9
 1344/11 1357/9 1366/17 1366/21
 1369/11 1369/14 1369/17 1374/25
 1381/24 1382/1 1382/13 1407/24
 1408/4 1408/19 1414/10 1415/14
 1416/9 1416/24 1417/8 1427/9
 1432/6 1432/12 1432/22 1434/8
 1435/16 1435/18 1436/22 1436/23
 1437/17 1499/5
**2018 [21]** 1280/7 1282/1 1292/15
 1292/19 1292/24 1292/25 1293/6
 1294/11 1294/12 1343/13 1343/16
 1344/4 1346/20 1346/25 1378/1
 1409/2 1409/13 1417/15 1417/25
 1418/1 1418/10
**2019 [1]** 1514/23
**203 [1]** 1281/17
**204 [1]** 1504/16
**20th [1]** 1414/10
**22 [1]** 1287/6
**22 seconds [2]** 1290/1 1375/20
**22F [1]** 1287/5
**22nd [5]** 1288/1 1288/9 1311/14
 1311/22 1327/13
**23 [6]** 1491/22 1491/24 1492/6
 1492/9 1492/13 1514/4
**23:20 [2]** 1331/4 1331/5
**23rd [1]** 1482/15
**24 [4]** 1491/1 1491/4 1491/9 1514/4
**240 [2]** 1481/20 1510/15
**2400 [2]** 1285/22 1343/3
**24th [5]** 1283/18 1284/8 1291/13
 1299/20 1407/23
**25 [2]** 1371/22 1381/13
**25 minutes [1]** 1372/6
**25-minute [11]** 1372/18 1374/22
 1375/22 1376/14 1380/8 1380/15
 1380/23 1382/24 1382/25 1384/14
 1384/20
**25th [3]** 1299/23 1301/25 1362/20
**26 [4]** 1280/7 1282/1 1378/1 1415/14
**27 [1]** 1351/20
**2700 [1]** 1343/3
**28 [1]** 1514/20
**28 years [1]** 1351/20
**28th [1]** 1407/24
**29 [11]** 1494/21 1494/25 1495/5
 1496/5 1498/14 1500/23 1501/5
 1502/18 1504/13 1505/23 1506/19
**299 [1]** 1281/17
**29s [1]** 1512/20
**29th [2]** 1501/11 1502/21
**2:19 [1]** 1304/6
**2:40 [2]** 1320/14 1320/15

**2A [1]** 1484/5
**2B [1]** 1485/2
**2C [1]** 1485/11
**2D [1]** 1485/17
**2E [1]** 1485/21
**2F [1]** 1485/25
**2G [1]** 1488/10

**3**

**3,000 [1]** 1479/17
**30 [8]** 1415/9 1415/11 1494/7 1494/9
 1494/12 1494/14 1494/15 1514/5
**30 milligrams [5]** 1284/11 1285/21
 1413/2 1413/8 1417/19
**30 year [1]** 1428/23
**30's [1]** 1493/21
**300 [2]** 1281/4 1310/19
**30th [3]** 1482/9 1487/14 1487/23
**31st [4]** 1292/19 1409/1 1417/15
 1420/5
**32 years [1]** 1471/21
**320 [1]** 1442/5
**325 [1]** 1414/13
**33 [1]** 1494/7
**33128 [2]** 1281/11 1281/14
**33132 [1]** 1281/4
**33301 [1]** 1281/17
**3400 milligrams [1]** 1332/20
**350 [1]** 1310/21
**350 milligrams [1]** 1414/13
**3500 [1]** 1479/16
**36 [3]** 1352/20 1494/7 1494/11
**3600 [1]** 1286/3
**39's [1]** 1493/21
**3900 [1]** 1343/9
**3:26 [1]** 1453/9
**3:42 [1]** 1453/9
**3rd [2]** 1281/10 1281/13

**4**

**4-16 [1]** 1487/16
**40 [8]** 1281/10 1281/13 1441/12
 1441/14 1441/17 1441/19 1443/3
 1514/5
**40 seconds [1]** 1295/25
**401 [1]** 1473/22
**403 [2]** 1445/10 1473/22
**40B [5]** 1441/19 1441/20 1441/21
 1441/22 1514/6
**40C [4]** 1443/1 1443/2 1443/5 1514/6
**40D [3]** 1445/7 1445/8 1514/7
**40E [4]** 1444/5 1444/9 1464/12
 1514/7
**40F [4]** 1451/3 1451/4 1466/3 1514/8
**40G [3]** 1447/6 1447/7 1514/8
**41:55 [1]** 1331/16
**45 [7]** 1367/4 1367/8 1367/18
 1367/24 1369/18 1493/21 1514/14
**45 minutes [1]** 1392/9
**45 seconds [1]** 1302/1
**45,000 [1]** 1410/18
**46 [10]** 1292/18 1367/5 1367/8
 1367/24 1369/13 1369/17 1369/19
 1376/23 1493/21 1514/14

**4**

**47 [1]**  1493/21
**4750 [1]**  1482/15
**48 [1]**  1322/4
**49's [1]**  1493/21
**4:09 [2]**  1304/7 1304/9
**4:30 [2]**  1453/24 1454/21
**4th [1]**  1281/3

**5**

**50 [1]**  1330/24
**50 seconds [1]**  1324/10
**500,000 [2]**  1432/18 1477/2
**54 [3]**  1405/11 1409/16 1413/21
**540 [2]**  1481/19 1481/22
**55 [1]**  1345/2
**5686 [1]**  1281/18
**571 U.S. 204 [1]**  1504/16
**59 [1]**  1316/11
**5:26 [1]**  1513/2
**5:48 [1]**  1322/5
**5:51 [1]**  1324/12
**5th [2]**  1294/25 1295/4

**6**

**60 [3]**  1285/12 1285/23 1415/9
**60 percent [1]**  1463/3
**60 seconds [1]**  1345/3
**60,000 [1]**  1456/13
**65 [3]**  1353/23 1356/5 1404/22
**6:20 [2]**  1296/4 1296/5
**6:25 [1]**  1344/25
**6A [1]**  1473/21
**6C [1]**  1478/6
**6D [1]**  1478/8
**6E [1]**  1478/10
**6F [1]**  1478/13
**6G [1]**  1483/1
**6th [5]**  1295/7 1327/19 1420/10
  1420/14 1421/3

**7**

**702 [2]**  1353/14 1406/10
**7167 [2]**  1451/20 1451/22
**75 [2]**  1300/9 1345/5
**753 [1]**  1514/19
**769-5686 [1]**  1281/18
**78698 [1]**  1485/7
**78907 [1]**  1485/14
**79287 [1]**  1485/18
**79869 [1]**  1485/22
**7:31 [1]**  1307/1
**7:33 [1]**  1306/25
**7:56 [1]**  1297/23

**8**

**80 [7]**  1284/11 1284/12 1286/15
  1300/22 1301/3 1344/19 1344/24
**80 percent [2]**  1413/14 1413/17
**80,000 [1]**  1432/15
**80121 [1]**  1486/1
**85 [1]**  1321/5
**8:18 [1]**  1309/4
**8:20 [1]**  1309/3

**8:58 [2]**  1280/8 1282/1
**8A [1]**  1475/14
**8B [1]**  1475/19
**8C [1]**  1475/21
**8D [1]**  1475/24
**8E [1]**  1475/25
**8th [2]**  1281/7 1485/24

**9**

**9,000 [5]**  1450/8 1450/9 1450/12
  1466/13 1466/16
**90 [5]**  1285/3 1286/15 1321/5
  1324/19 1327/10
**90 percent [10]**  1374/23 1375/23
  1379/12 1382/6 1382/23 1384/24
  1392/11 1462/15 1463/2 1508/11
**900 [2]**  1479/23 1479/24
**954 [1]**  1281/18
**97 [1]**  1373/8
**99 [1]**  1281/3
**99211 [2]**  1371/12 1371/13
**99212 [2]**  1371/12 1371/19
**99213 [1]**  1371/12
**99214 [14]**  1371/12 1371/21 1372/6
  1372/18 1373/6 1374/22 1374/25
  1376/14 1380/8 1380/14 1381/3
  1381/18 1392/2 1392/12
**99215 [3]**  1371/12 1371/23 1392/8
**9:15 [6]**  1379/24 1493/7 1493/8
  1495/2 1508/23 1509/5
**9A [2]**  1473/22 1476/21
**9B [1]**  1478/16
**9C [1]**  1478/19

**:**

**:01 [1]**  1311/19
**:42 [1]**  1302/2

**A**

**a.m [4]**  1280/8 1282/1 1323/9 1323/9
**abide [2]**  1358/23 1360/19
**above [1]**  1514/22
**above-entitled [1]**  1514/22
**absolutely [4]**  1375/16 1437/13
  1449/3 1476/9
**absolve [2]**  1502/8 1509/2
**abuse [8]**  1386/4 1386/12 1386/17
  1387/25 1388/5 1388/7 1388/10
  1389/4
**abused [1]**  1288/20
**abusing [1]**  1402/21
**accept [2]**  1337/1 1383/19
**accepted [2]**  1359/17 1388/21
**accepting [1]**  1363/20
**access [2]**  1404/13 1441/6
**accompany [1]**  1293/7
**according [2]**  1286/19 1388/10
**account [45]**  1354/7 1451/12
  1451/14 1451/23 1466/20 1474/6
  1474/9 1474/13 1474/16 1474/18
  1474/19 1474/21 1477/10 1477/11
  1477/12 1477/16 1482/7 1482/22
  1482/25 1484/8 1484/14 1484/15
  1484/16 1485/3 1485/12 1485/14

  1485/18 1485/22 1486/1 1486/9
  1486/12 1487/2 1487/7 1487/8
  1487/8 1487/10 1487/20 1488/1
  1488/2 1488/11 1507/8 1507/18
  1510/19 1510/19 1511/19
**accountant [1]**  1458/2
**accounted [2]**  1410/21 1457/21
**accounting [3]**  1457/4 1457/24
  1461/3
**accounts [15]**  1450/24 1450/25
  1451/1 1481/16 1486/9 1486/19
  1486/19 1486/21 1486/22 1486/25
  1487/2 1487/3 1487/4 1487/7
  1507/20
**accurate [2]**  1332/21 1366/5
**accurately [1]**  1387/22
**acetaminophen [16]**  1406/25 1407/2
  1410/3 1410/24 1412/17 1412/19
  1412/21 1413/16 1414/13 1414/24
  1415/17 1415/20 1416/11 1416/25
  1417/10 1417/17
**acknowledges [1]**  1359/12
**acquittal [7]**  1495/9 1496/14 1501/12
  1505/19 1506/12 1506/21 1509/10
**act [1]**  1349/18
**acting [40]**  1331/19 1331/20 1331/2
  1331/25 1332/9 1332/10 1332/11
  1332/14 1332/14 1332/16 1332/17
  1342/13 1342/13 1342/14 1342/17
  1342/17 1342/18 1342/19 1342/20
  1342/22 1343/1 1343/5 1407/6
  1411/7 1411/7 1415/23 1415/23
  1416/2 1416/2 1416/4 1416/4
  1416/21 1417/3 1417/4 1417/6
  1417/6 1417/21 1417/21 1427/22
  1427/22
**activity [10]**  1507/1 1507/3 1507/6
  1510/2 1510/16 1510/17 1510/20
  1511/4 1511/9 1511/11
**acts [1]**  1507/2
**Adam [1]**  1281/5
**add [3]**  1302/16 1508/1 1508/10
**added [2]**  1302/19 1436/24
**Adderall [17]**  1312/22 1313/5
  1314/10 1314/25 1317/14 1317/19
  1318/4 1318/7 1318/22 1319/14
  1319/24 1320/3 1320/11 1326/25
  1327/2 1341/25 1342/3
**adding [2]**  1334/17 1437/9
**addition [7]**  1357/15 1402/25 1403/2
  1411/10 1431/21 1472/2 1481/2
**address [5]**  1292/17 1367/14 1368/6
  1414/14 1501/7
**addressed [1]**  1449/6
**administer [1]**  1404/9
**administered [1]**  1354/1
**administers [2]**  1357/1 1403/6
**Administration [1]**  1356/7
**administrative [4]**  1360/14 1398/23
  1462/9 1462/13
**admire [1]**  1293/10
**admission [1]**  1494/19
**admit [2]**  1328/6 1386/23
**admitted [16]**  1287/6 1328/11 1346/5

**A**

**admitted...** [13] 1357/14 1357/21 1366/25 1413/19 1424/18 1441/17 1441/22 1443/5 1473/25 1491/9 1492/9 1494/15 1495/14
**admonition** [8] 1283/2 1322/21 1324/4 1373/13 1379/20 1452/17 1454/16 1493/5
**Adult** [3] 1364/6 1429/6 1484/9
**adverse** [5] 1397/20 1397/25 1398/7 1399/25 1400/11
**advice** [2] 1320/10 1320/11
**advised** [3] 1288/18 1288/20 1334/4
**advisement** [1] 1347/13
**Aetna** [1] 1404/8
**affect** [3] 1370/23 1370/24 1394/16
**affected** [1] 1370/23
**afternoon** [10] 1380/3 1380/4 1382/18 1382/21 1393/16 1393/17 1418/24 1418/25 1455/3 1455/4
**age** [6] 1353/23 1353/25 1356/5 1356/6 1356/11 1428/21
**agencies** [3] 1349/14 1423/24 1423/25
**agency** [4] 1354/18 1356/25 1357/25 1472/21
**agent** [9] 1329/17 1330/1 1330/4 1330/13 1330/13 1331/9 1332/4 1333/4 1471/7
**Agent Amy** [1] 1471/7
**agent's** [1] 1333/21
**agents** [18] 1292/4 1292/12 1327/21 1328/19 1328/21 1329/11 1331/2 1331/19 1332/10 1333/24 1341/12 1369/16 1411/11 1416/5 1427/16 1464/5 1464/6 1468/20
**aggravating** [2] 1501/18 1506/6
**aggravation** [1] 1510/5
**AGI** [19] 1283/24 1295/6 1358/23 1364/7 1429/7 1430/3 1431/10 1431/15 1431/21 1432/20 1432/25 1439/16 1451/18 1451/20 1451/22 1451/23 1462/16 1474/7 1474/16
**agree** [14] 1308/24 1321/21 1344/15 1347/20 1359/19 1360/19 1385/3 1388/5 1406/3 1458/25 1481/12 1500/5 1503/14 1507/24
**agreement** [11] 1291/2 1291/5 1291/7 1328/6 1337/7 1337/13 1363/15 1476/23 1497/22 1497/22 1506/14
**agrees** [1] 1363/17
**air** [2] 1444/7 1464/22
**Albania** [3] 1428/23 1429/1 1429/2
**alert** [1] 1320/12
**allegations** [2] 1348/19 1373/9
**alleged** [1] 1509/15
**allow** [9] 1283/3 1322/22 1324/5 1373/14 1379/21 1382/2 1452/18 1454/17 1493/5
**allowance** [1] 1489/11
**allowed** [4] 1323/2 1356/8 1373/20 1452/24
**almost** [3] 1452/9 1458/13 1481/11

**alone** [1] 1364/18
**alprazolam** [5] 1407/11 1410/4 1410/24 1412/22 1427/18
**alteration** [1] 1360/12
**alternatively** [2] 1499/11 1499/14
**although** [4] 1282/10 1290/11 1345/22 1455/25
**Amanda** [2] 1498/7 1503/24
**ambulance** [1] 1354/21
**AMERICA** [1] 1280/6
**amongst** [1] 1493/1
**amount** [28] 1289/23 1290/22 1372/9 1432/17 1446/7 1446/16 1465/17 1467/17 1470/17 1470/19 1473/13 1480/25 1482/9 1482/23 1482/24 1483/8 1483/13 1484/1 1485/4 1485/9 1485/13 1485/16 1485/20 1485/23 1486/2 1487/17 1508/9 1510/2
**amounts** [5] 1465/20 1465/21 1466/7 1466/9 1466/12
**amphetamines** [1] 1411/1
**Amy** [9] 1413/24 1418/2 1419/6 1426/25 1427/11 1471/7 1471/9 1471/13 1513/17
**analgesic** [2] 1414/25 1415/4
**analysis** [3] 1378/20 1405/10 1405/21
**analysts** [2] 1405/10 1405/19
**analyze** [1] 1404/14
**analyzing** [1] 1349/20
**and Mr. Gilfarb** [1] 1408/11
**and/or** [5] 1360/16 1360/17 1473/3 1506/15 1507/22
**ANDRES** [10] 1280/9 1284/1 1287/24 1292/19 1362/9 1362/12 1363/7 1455/21 1456/16 1490/20
**announce** [1] 1493/15
**announced** [2] 1495/22 1496/3
**answer** [17] 1304/16 1334/12 1335/4 1339/4 1382/5 1382/11 1383/10 1390/15 1421/7 1421/9 1421/10 1421/18 1432/11 1446/15 1447/21 1457/23 1503/21
**answer's** [1] 1420/8
**answers** [2] 1344/1 1389/1
**antibiotics** [1] 1398/25
**anticipate** [1] 1454/2
**anticipates** [1] 1378/13
**antikickback** [1] 1361/2
**Antonio** [1] 1394/8
**anxiety** [1] 1407/12
**anymore** [1] 1400/6
**apologize** [2] 1426/14 1495/12
**APPEARANCES** [1] 1281/1
**applicable** [2] 1361/4 1412/15
**application** [8] 1358/19 1359/5 1360/8 1360/10 1360/13 1361/8 1361/25 1476/24
**applies** [2] 1358/23 1361/13
**apply** [3] 1352/10 1360/20 1365/15
**appointment** [2] 1298/8 1298/11
**appreciate** [3] 1293/11 1301/20 1508/24

**approach** [5] 1343/20 1347/14 1434/25 1476/15 1491/19
**approached** [1] 1435/3
**appropriately** [1] 1367/17 1368/12
**approximate** [7] 1475/11 1476/6 1479/9 1479/14 1480/22 1482/9 1483/13
**approximately** [29] 1288/13 1289/15 1289/25 1292/7 1292/24 1295/24 1345/2 1348/23 1351/18 1352/1 1352/16 1364/16 1365/1 1368/14 1373/5 1384/24 1397/13 1398/16 1413/11 1464/6 1471/21 1476/7 1479/15 1479/21 1480/20 1482/2 1486/20 1486/22 1489/21
**April** [8] 1418/10 1487/14 1487/14 1487/16 1487/23 1488/7 1488/17 1511/10
**April 16th** [1] 1487/16
**April 17** [2] 1488/7 1488/17
**April 1st** [1] 1487/14
**April 30th** [2] 1487/14 1487/23
**area** [4] 1310/6 1311/1 1352/23 1428/20
**areas** [2] 1353/14 1406/11
**aren't** [4] 1322/15 1347/20 1383/19 1423/16
**argue** [4] 1496/20 1499/11 1499/13 1502/13 1508/17
**argues** [1] 1496/8
**argument** [4] 1376/21 1499/25 1510/25 1511/18
**arguments** [9] 1378/11 1499/22 1500/2 1500/8 1504/22 1505/6 1505/22 1506/1 1508/22
**Army** [4] 1419/10 1427/5 1427/6 1427/25
**arrest** [5] 1292/13 1330/3 1341/12 1417/24 1439/24
**arrested** [6] 1327/19 1420/9 1420/14 1420/17 1421/3 1421/5
**arrests** [1] 1295/6
**ashamed** [1] 1301/21
**aspect** [1] 1506/6
**aspects** [2] 1349/3 1403/3
**assess** [1] 1397/21
**assessed** [1] 1397/23
**asset** [1] 1471/22
**assigned** [1] 1471/22
**assistant** [7] 1281/2 1289/12 1294/20 1346/19 1419/24 1430/11 1455/9
**assistants** [4] 1293/15 1294/7 1346/17 1498/4
**assisted** [1] 1456/19
**Assisting** [1] 1458/5
**associate** [1] 1396/12
**associated** [7] 1352/14 1365/12 1371/13 1371/19 1419/19 1460/1 1460/16
**associates** [2] 1420/16 1421/5
**association** [1] 1420/15
**assume** [4] 1362/18 1385/1 1421/6 1422/3

**A**

**Assuming [1]** 1386/1
**assumption [1]** 1366/4
**attach [1]** 1459/11
**attached [1]** 1446/24
**attachment [1]** 1447/4
**attempt [2]** 1332/11 1332/14
**attend [3]** 1393/21 1394/6 1435/16
**attesting [1]** 1361/7
**Attorney [1]** 1281/2
**Attorney's [2]** 1281/3 1349/16
**audio [2]** 1328/7 1341/11
**audits [3]** 1351/21 1351/22 1351/24
**August [12]** 1283/18 1284/8 1291/13
1342/10 1362/20 1363/5 1364/3
1417/8 1439/22 1485/24 1501/11
1502/21
**August 12th [1]** 1417/8
**August 15 [2]** 1363/5 1364/3
**August 2015 [1]** 1439/22
**August 24th [3]** 1283/18 1284/8
1291/13
**August 25th [1]** 1362/20
**August 29th [2]** 1501/11 1502/21
**August 8th [1]** 1485/24
**aunt [1]** 1429/11
**Austin [1]** 1394/8
**authentic [1]** 1408/3
**authenticity [2]** 1408/12 1473/21
**author [2]** 1405/24 1405/25
**authored [1]** 1405/22
**authorization [1]** 1358/21
**authorize [1]** 1362/6
**authorized [2]** 1356/19 1359/10
**automatically [1]** 1289/7
**avenue [3]** 1281/7 1403/17 1482/16
**average [3]** 1372/11 1381/13
1464/11
**avoid [3]** 1349/11 1504/19 1506/7
**awake [2]** 1319/25 1320/3
**awarded [1]** 1291/22
**aware [9]** 1329/16 1384/22 1420/9
1420/14 1421/3 1421/4 1440/2
1467/13 1482/8

**B**

**B-L-A-N-C-O [1]** 1490/13
**B-U-R-R-A-G-E [2]** 1501/15 1503/11
**babe [1]** 1449/1
**background [5]** 1315/2 1315/4
1315/7 1393/20 1422/5
**bag [5]** 1449/19 1449/21 1449/22
1449/23 1450/6
**balance [1]** 1489/12
**Baldwin [3]** 1498/7 1503/24 1505/2
**bank [30]** 1431/2 1436/19 1437/12
1440/16 1440/18 1440/24 1441/3
1441/10 1442/25 1442/25 1450/24
1450/25 1451/1 1451/12 1451/23
1472/7 1472/9 1472/11 1472/12
1472/13 1472/16 1483/3 1486/19
1486/19 1486/21 1486/22 1486/25
1487/5 1487/20 1507/18
**banking [3]** 1487/4 1487/5 1487/5

**banks [2]** 1474/23 1486/20
**baseline [1]** 1460/6
**basic [1]** 1479/2
**basis [3]** 1438/25 1463/21 1469/22
**batch [1]** 1504/10
**BB [22]** 1451/14 1466/18 1472/9
1474/9 1474/21 1477/10 1477/21
1484/15 1485/3 1485/14 1485/18
1485/22 1486/1 1486/9 1486/9
1487/4 1487/21 1487/21 1488/2
1488/10 1507/8 1511/14
**BBT [2]** 1451/13 1466/23
**Beach [3]** 1475/5 1479/11 1483/11
**beat [1]** 1320/18
**Beaton [29]** 1281/9 1300/17 1303/8
1312/19 1319/7 1321/1 1324/8
1342/8 1342/19 1369/8 1382/19
1418/23 1419/1 1423/6 1424/19
1454/22 1455/5 1494/12 1494/24
1495/13 1498/13 1501/1 1505/6
1507/24 1513/7 1513/8 1513/10
1513/13 1513/15
**beautiful [2]** 1444/24 1445/4
**becoming [1]** 1349/11
**bedroom [4]** 1491/13 1491/15
1492/14 1492/15
**begin [4]** 1294/8 1295/21 1302/1
1419/4
**beginning [4]** 1296/4 1371/13 1389/5
1430/21
**behavior [2]** 1328/1 1415/7
**behind [2]** 1419/25 1422/15
**believe [32]** 1283/19 1318/11 1328/6
1363/24 1371/22 1376/5 1382/21
1385/20 1397/1 1399/8 1420/10
1445/2 1446/25 1448/15 1453/19
1463/16 1473/7 1474/13 1477/12
1477/24 1479/9 1479/16 1482/17
1494/1 1497/21 1498/6 1498/8
1503/22 1504/22 1506/18 1509/19
1509/21
**believed [1]** 1294/4
**believes [1]** 1330/13
**belonging [2]** 1416/14 1490/19
**below [1]** 1362/8
**beneficiaries [2]** 1354/4 1410/6
**beneficiary [7]** 1355/6 1355/13
1356/4 1403/24 1463/4 1496/24
1497/2
**benefit [5]** 1399/13 1403/12 1403/14
1403/15 1404/9
**benefits [2]** 1356/8 1399/14
**Bentley [20]** 1446/1 1446/3 1446/4
1446/5 1446/12 1446/19 1447/1
1473/7 1476/23 1477/22 1477/22
1477/23 1478/15 1478/16 1478/19
1479/15 1488/22 1489/1 1489/14
1489/19
**Benz [6]** 1445/14 1445/21 1473/3
1473/6 1476/24 1476/25
**benzo [1]** 1410/7
**benzodiazepine [5]** 1407/10 1411/9
1414/21 1415/3 1415/25
**benzodiazepines [4]** 1400/20 1407/8

1411/8 1427/17
**besides [1]** 1410/9
**beyond [2]** 1343/21 1373/10
**bill [22]** 1307/9 1355/3 1355/4 1355/4
1355/9 1356/19 1358/21 1363/7
1367/17 1368/13 1371/17 1372/6
1381/15 1383/6 1390/11 1390/17
1432/12 1456/13 1459/3 1459/3
1459/23 1459/24
**billed [14]** 1356/1 1372/18 1373/6
1376/4 1376/14 1380/8 1380/14
1381/18 1385/2 1389/23 1390/3
1392/8 1459/18 1497/24
**billing [24]** 1350/16 1350/21 1351/7
1355/15 1359/20 1360/16 1365/15
1366/14 1366/16 1371/14 1371/19
1371/25 1375/22 1386/7 1389/16
1390/10 1391/11 1433/9 1435/19
1461/3 1462/8 1464/2 1497/18
1499/4
**bills [27]** 1347/19 1388/22 1431/15
1431/21 1436/4 1439/1 1439/2
1439/9 1445/21 1456/7 1456/8
1456/10 1456/11 1456/21 1458/16
1459/9 1459/11 1460/7 1460/14
1460/16 1462/8 1480/6 1480/7
1481/2 1498/17 1498/22 1498/24
**binder [1]** 1494/8
**binds [2]** 1359/11 1362/1
**Biology [1]** 1394/2
**birth [1]** 1287/18
**blame [2]** 1334/2 1334/4
**blaming [3]** 1318/15 1318/16
1333/25
**Blanco [5]** 1490/7 1490/9 1490/13
1490/16 1513/19
**blood [11]** 1298/16 1298/18 1298/23
1299/1 1299/2 1299/13 1370/22
1370/25 1398/5 1398/5 1504/3
**Blue [2]** 1350/1 1350/1
**Blvd [1]** 1281/17
**BM4911904 [1]** 1414/14
**BMW [1]** 1446/23
**boarded [1]** 1443/10
**body [5]** 1329/3 1370/20 1380/25
1394/16 1401/3
**bolded [1]** 1288/16
**Bond [1]** 1281/7
**bookkeeper [1]** 1438/23
**boost [3]** 1304/15 1304/25 1305/6
**bottles [2]** 1504/1 1504/2
**bottom [2]** 1284/15 1442/1
**bought [3]** 1399/11 1439/21 1502/1
**boy [3]** 1354/25 1366/9 1366/20
**Brad [34]** 1295/23 1296/20 1296/24
1297/22 1298/1 1299/4 1299/6
1299/20 1300/7 1300/13 1303/5
1304/7 1309/3 1309/23 1311/14
1312/16 1315/21 1316/11 1319/4
1320/14 1320/21 1322/4 1324/10
1324/13 1325/15 1326/16 1327/4
1328/12 1329/6 1329/9 1331/4
1331/13 1333/1 1333/14
**Bradley [1]** 1281/12

**B**

**brand [5]**  1406/25 1407/18 1407/19 1410/3 1412/22
**break [10]**  1322/18 1323/1 1324/15 1373/19 1452/23 1453/24 1454/20 1474/3 1478/25 1502/11
**breakthrough [1]**  1332/17
**breathe [1]**  1398/6
**brief [1]**  1493/1
**bro [4]**  1302/24 1302/24 1307/4 1309/7
**broader [2]**  1501/7 1501/7
**Broward [1]**  1281/17
**buddies [6]**  1316/16 1317/7 1317/13 1317/18 1317/21 1317/25
**buddy [2]**  1318/25 1319/2
**building [5]**  1281/7 1450/2 1451/18 1463/19 1467/2
**buildings [1]**  1451/17
**bulletproof [1]**  1422/14
**bumps [1]**  1510/4
**bunch [1]**  1505/15
**Burrage [7]**  1501/14 1503/9 1504/7 1504/16 1505/5 1505/10 1505/12
**business [20]**  1353/11 1423/12 1431/16 1438/24 1448/20 1448/21 1451/1 1456/24 1457/11 1457/14 1457/14 1458/3 1458/4 1458/5 1460/10 1461/17 1480/7 1480/17 1510/9 1510/23
**busy [2]**  1461/22 1461/23
**but-for [3]**  1502/11 1503/14 1503/15
**Buy [1]**  1446/11

**C**

**calculate [1]**  1319/23
**calculation [1]**  1285/20
**call [18]**  1309/7 1309/8 1309/18 1339/15 1340/21 1347/9 1389/15 1390/22 1392/19 1404/6 1411/25 1428/7 1462/4 1462/9 1471/6 1479/24 1490/6 1492/24
**called [15]**  1294/20 1332/17 1349/24 1354/6 1359/6 1363/15 1385/7 1399/11 1399/12 1399/21 1402/19 1406/25 1412/22 1422/25 1450/15
**calling [1]**  1421/11
**calls [6]**  1347/10 1392/20 1399/19 1428/8 1471/7 1490/7
**campus [1]**  1394/8
**cancer [3]**  1381/10 1381/11 1381/11
**capacities [1]**  1349/22
**capacity [2]**  1352/2 1402/8
**car [10]**  1447/3 1472/4 1488/21 1488/22 1488/25 1489/9 1489/11 1489/12 1489/13 1489/17
**card [6]**  1399/14 1399/15 1436/10 1436/10 1456/7 1456/13
**carisoprodol [10]**  1407/19 1410/4 1410/25 1414/12 1414/22 1415/3 1416/10 1416/25 1417/10 1417/17
**carried [1]**  1295/6
**carries [3]**  1329/19 1330/18 1510/1
**cars [1]**  1458/20

**cash [39]**  1289/16 1297/15 1404/23 1404/25 1410/19 1411/2 1435/22 1435/25 1436/9 1436/21 1437/15 1437/20 1438/20 1440/19 1441/3 1442/18 1442/20 1442/23 1442/24 1449/17 1459/14 1459/15 1459/21 1460/19 1462/18 1462/21 1462/24 1464/7 1465/17 1465/25 1466/9 1466/25 1467/25 1468/6 1468/9 1475/1 1484/16 1484/18 1488/2
**cash-paying [8]**  1435/22 1435/25 1442/20 1442/23 1442/24 1459/21 1462/18 1462/24
**cat [2]**  1294/1 1453/25
**CAT scans [1]**  1294/1
**categories [1]**  1368/24
**category [4]**  1395/17 1400/12 1400/24 1427/16
**cause [8]**  1361/15 1501/16 1502/8 1502/10 1502/11 1502/19 1503/15 1503/16
**caused [1]**  1504/23
**causes [1]**  1395/19
**ceiling [1]**  1300/10
**center [5]**  1283/24 1357/24 1394/7 1397/12 1397/17
**Centers [1]**  1403/10
**CEO [1]**  1362/15
**certification [10]**  1359/7 1359/12 1359/23 1360/1 1363/1 1363/3 1363/6 1363/10 1363/23 1365/9
**certifications [1]**  1363/9
**certify [2]**  1362/4 1514/19
**chain [1]**  1502/11
**characterization [1]**  1455/17
**characterize [2]**  1313/22 1321/22
**charge [7]**  1293/17 1336/21 1455/15 1456/11 1460/13 1460/14 1504/12
**charged [9]**  1290/17 1290/19 1331/1 1334/13 1336/8 1369/14 1376/20 1498/3 1499/15
**charges [4]**  1290/24 1334/17 1336/23 1501/10
**chart [5]**  1368/22 1369/6 1369/16 1416/23 1419/16
**charts [5]**  1367/5 1367/25 1368/4 1369/10 1369/13
**cheap [1]**  1447/24
**cheapest [1]**  1395/18
**check [15]**  1439/16 1439/17 1458/22 1458/24 1484/8 1484/23 1484/24 1485/3 1485/5 1485/7 1485/12 1485/14 1485/18 1485/22 1486/1
**checkbook [1]**  1431/8
**checked [1]**  1283/25
**checking [1]**  1431/1
**checkout [14]**  1297/3 1297/6 1297/9 1297/11 1297/12 1310/5 1310/7 1310/16 1310/25 1433/1 1433/6 1433/17 1434/24 1437/18
**checks [2]**  1459/9 1459/12
**chemistry [2]**  1394/2 1394/16
**chief [2]**  1370/9 1495/17
**chime [1]**  1408/14

**choose [1]**  1372/1
**chooses [1]**  1506/18
**chose [1]**  1374/25
**circuit [2]**  1378/14 1505/15
**circulatory [2]**  1370/24 1370/25
**circumstance [1]**  1501/18
**circumstantial [5]**  1498/20 1500/21 1504/6 1505/10 1505/16
**circumstantially [1]**  1504/4
**cite [2]**  1502/25 1503/12
**city [1]**  1439/10
**civil [2]**  1360/14 1360/17
**claim [34]**  1350/6 1350/7 1350/12 1350/19 1351/3 1352/8 1352/9 1352/10 1352/12 1352/14 1355/3 1355/9 1355/11 1355/23 1360/24 1360/24 1361/9 1361/16 1364/9 1364/21 1365/6 1365/13 1365/16 1365/21 1365/24 1368/13 1372/20 1374/6 1374/22 1375/22 1388/23 1477/6 1499/7 1499/16
**claiming [2]**  1365/11 1366/6
**claims [38]**  1348/13 1349/20 1350/3 1350/5 1350/9 1350/10 1350/18 1351/10 1352/18 1353/9 1353/15 1354/8 1355/8 1358/17 1361/13 1361/17 1363/17 1363/19 1364/12 1364/16 1365/1 1365/3 1365/6 1365/18 1365/23 1366/4 1374/3 1374/8 1374/11 1374/12 1374/13 1374/16 1375/6 1375/24 1389/1 1389/5 1496/1 1496/15
**clarify [4]**  1369/12 1381/25 1394/24 1418/4
**class [1]**  1401/2
**classes [2]**  1394/2 1394/13
**clear [8]**  1305/4 1427/1 1440/25 1456/23 1461/2 1484/20 1486/11 1503/14
**clerkships [1]**  1394/13
**clicked [1]**  1289/7
**client [1]**  1385/18
**clients [1]**  1385/14
**clinic [1]**  1358/22
**clinical [2]**  1398/22 1398/24
**clinicians [2]**  1349/5 1366/12
**close [3]**  1450/3 1469/18 1481/13
**closed [1]**  1483/7
**closer [4]**  1388/23 1388/24 1393/9 1393/11
**closet [1]**  1448/16
**closing [3]**  1482/17 1483/7 1483/9
**CMS [7]**  1357/17 1357/23 1403/7 1403/9 1404/7 1404/12 1404/14
**co [2]**  1437/20 1462/20
**co-payment [2]**  1437/20 1462/20
**coach [3]**  1313/4 1315/25 1319/16
**coaching [1]**  1320/19
**Coast [2]**  1349/25 1364/14
**coat [1]**  1312/1
**coconspirators [2]**  1498/4 1498/11
**code [40]**  1293/16 1293/16 1368/13 1368/25 1369/3 1370/16 1370/17 1371/8 1371/14 1371/17 1371/19

**C**

**code... [29]** 1374/25 1375/12 1375/17 1376/2 1376/4 1380/15 1382/24 1392/2 1392/3 1433/15 1433/18 1433/23 1434/5 1434/7 1434/14 1435/4 1435/14 1436/12 1443/9 1443/19 1443/21 1444/11 1444/12 1444/12 1465/5 1507/8 1507/22 1511/12 1514/20

**Code-G [16]** 1293/16 1375/12 1376/2 1376/4 1433/15 1433/18 1433/23 1434/7 1434/14 1435/4 1435/14 1436/12 1443/9 1443/19 1444/12 1507/8

**Code-GS [2]** 1444/11 1465/5

**codes [14]** 1294/16 1343/17 1350/15 1368/14 1368/21 1369/23 1370/2 1370/4 1370/14 1371/7 1371/11 1372/4 1372/4 1497/14

**coding [1]** 1390/8

**Cole [12]** 1479/8 1483/14 1483/16 1483/17 1483/23 1484/10 1484/13 1485/4 1485/15 1485/19 1485/23 1486/2

**collected [1]** 1434/5

**collection [1]** 1350/10

**College [2]** 1393/21 1394/4

**colloquy [1]** 1512/5

**column [6]** 1436/1 1436/24 1437/3 1437/9 1438/16 1438/17

**combination [5]** 1354/22 1395/20 1410/5 1415/1 1415/3

**combinations [1]** 1411/13

**combined [5]** 1335/5 1335/9 1335/18 1336/23 1417/11

**comfortable [1]** 1440/14

**commercial [11]** 1404/22 1410/17 1410/20 1410/23 1411/3 1411/6 1451/17 1470/13 1470/15 1480/12 1480/16

**commingled [2]** 1507/20 1508/16

**commit [3]** 1336/9 1376/17 1495/8

**committed [1]** 1502/15

**committee [4]** 1397/19 1397/21 1399/1 1399/2

**common [10]** 1400/25 1401/22 1406/23 1406/24 1407/15 1407/17 1407/19 1412/24 1422/17 1449/4

**commonly [2]** 1354/25 1395/1

**communicating [1]** 1309/13

**communication [1]** 1360/11

**Communications [1]** 1349/1

**community [3]** 1351/15 1396/12 1403/18

**companies [5]** 1348/15 1351/12 1459/18 1459/19 1464/3

**company [14]** 1348/12 1348/16 1349/23 1385/7 1391/4 1398/13 1422/25 1425/6 1426/6 1451/14 1451/16 1455/9 1459/24 1510/20

**company's [1]** 1391/25

**compare [6]** 1285/15 1286/22 1290/1 1355/3 1404/16 1477/6

**compared [1]** 1286/12

**compensated [1]** 1500/11

**compensation [1]** 1457/22

**complained [2]** 1380/19 1390/6

**complaint [7]** 1372/23 1380/25 1381/1 1381/8 1381/10 1383/7 1390/9

**complaints [2]** 1370/9 1370/10

**complete [2]** 1362/5 1381/14

**compliance [1]** 1361/3

**complicated [3]** 1385/4 1385/5 1392/7

**Complied [1]** 1298/3

**complies [1]** 1365/15

**complying [1]** 1360/25

**component [1]** 1370/10

**components [5]** 1355/11 1370/4 1370/5 1380/16 1381/15

**comport [1]** 1497/19

**comprehensive [1]** 1369/16

**comptroller [1]** 1455/9

**computer [2]** 1280/25 1433/2

**computerized [1]** 1396/25

**concede [4]** 1282/23 1323/25 1379/16 1454/12

**concentrate [2]** 1314/3 1314/13

**concentrated [1]** 1461/20

**concentrating [1]** 1315/8

**concentration [1]** 1320/1

**concerned [1]** 1375/10

**concluded [1]** 1513/2

**conclusions [4]** 1353/7 1406/4 1406/7 1406/8

**concur [1]** 1494/5

**concurs [1]** 1493/16

**condition [3]** 1350/16 1380/19 1394/21

**conditioned [1]** 1360/24

**conditions [2]** 1361/4 1385/5

**condo [1]** 1503/1

**conduct [4]** 1341/21 1351/18 1351/22 1490/23

**conducted [4]** 1351/24 1352/4 1370/8 1491/12

**conducts [1]** 1375/21

**confer [1]** 1301/13

**confidential [17]** 1308/18 1308/21 1308/25 1309/14 1310/2 1310/16 1312/21 1316/18 1317/16 1317/24 1319/8 1324/18 1325/23 1326/12 1326/20 1326/21 1327/9

**confirm [2]** 1408/11 1493/12

**confront [1]** 1441/5

**confused [2]** 1328/21 1343/3

**Connie [12]** 1479/8 1483/14 1483/16 1483/17 1483/23 1484/10 1484/13 1485/4 1485/15 1485/19 1485/23 1486/2

**Consecutively [1]** 1487/18

**consent [2]** 1293/21 1293/22

**consisted [1]** 1463/19

**consistency [2]** 1410/2 1410/9

**consistent [3]** 1382/24 1411/25 1413/4

**consistently [2]** 1321/21 1412/15

**conspiracy [8]** 1290/20 1336/9 1369/14 1376/16 1495/7 1499/15 1506/4 1506/10

**conspirators [1]** 1497/23

**conspire [1]** 1497/25

**constant [1]** 1456/15

**constituted [2]** 1507/2 1507/3

**constitutes [1]** 1373/9

**construction [9]** 1439/5 1439/7 1439/19 1439/25 1440/18 1440/23 1441/1 1441/2 1448/8

**consult [4]** 1305/24 1306/1 1306/4 1376/7

**consultant [4]** 1396/4 1396/7 1396/8 1396/14

**consulted [2]** 1305/22 1321/23

**consulting [1]** 1325/12

**contact [2]** 1330/10 1349/14

**contained [3]** 1360/10 1360/11 1362/4

**contents [3]** 1350/11 1361/25 1504/2

**context [3]** 1358/12 1386/7 1502/8

**continually [2]** 1373/9 1413/6

**continuance [1]** 1445/1

**continuation [1]** 1359/23

**CONTINUED [3]** 1283/9 1380/1 1513/6

**continuing [1]** 1504/14

**continuum [1]** 1389/1

**contractor [9]** 1350/7 1350/25 1360/23 1362/6 1364/21 1365/20 1403/13 1441/4 1447/17

**contractors [11]** 1348/16 1349/22 1351/4 1351/10 1351/11 1351/22 1358/4 1364/11 1364/13 1439/9 1439/12

**contracts [5]** 1348/12 1348/14 1358/4 1385/17 1423/24

**contribute [1]** 1461/9

**contributing [1]** 1370/20

**controlled [30]** 1288/19 1288/20 1289/6 1290/20 1339/19 1375/14 1376/12 1376/15 1400/16 1400/18 1401/8 1401/10 1401/17 1402/14 1402/17 1405/1 1406/12 1409/14 1409/17 1411/11 1414/3 1418/3 1427/7 1437/7 1437/12 1501/10 1502/12 1506/5 1506/11 1506/16

**controller [1]** 1438/24

**conversation [3]** 1302/5 1443/16 1447/22

**conversations [2]** 1325/22 1325/25

**convicted [1]** 1424/6

**conviction [2]** 1425/22 1508/5

**convinced [1]** 1441/9

**cooperate [1]** 1291/6 1334/22

**cooperating [1]** 1291/8

**cooperation [3]** 1291/18 1338/5 1338/8

**coordination [1]** 1349/1

**copay [3]** 1289/21 1289/22 1399/17

**copays [1]** 1289/19

**copy [1]** 1433/7

**corner [4]** 1287/23 1413/25 1424/22

**C**

**corner... [1]** 1450/3
**corresponding [2]** 1391/8 1391/11
**counsel [25]** 1282/5 1282/23 1295/9
1299/22 1311/16 1323/12 1323/25
1328/4 1331/15 1341/24 1367/7
1376/9 1378/5 1379/16 1386/20
1418/21 1424/9 1453/13 1454/12
1468/13 1476/18 1489/24 1493/1
1493/24 1506/24
**count [29]** 1330/16 1336/8 1336/14
1336/17 1352/2 1376/16 1385/22
1438/1 1442/12 1450/7 1450/10
1495/7 1496/12 1498/14 1499/15
1500/8 1501/9 1501/9 1506/4 1506/5
1506/10 1506/19 1506/21 1507/7
1508/17 1508/18 1509/4 1509/10
1509/10
**Count 1 [8]** 1336/8 1336/14 1336/17
1376/16 1495/7 1496/12 1498/14
1500/8
**Count 11 [3]** 1508/18 1509/4
1509/10
**Count 2 [3]** 1506/4 1506/10 1506/19
**Count 3 [2]** 1501/9 1506/5
**Count 4 [1]** 1507/7
**counter [3]** 1297/3 1297/6 1297/9
**country [2]** 1341/8 1468/15
**counts [6]** 1499/15 1506/3 1506/4
1506/20 1509/10 1512/21
**Counts 11 [1]** 1509/10
**Counts 4 [1]** 1506/20
**county [1]** 1483/25
**court [30]** 1280/1 1281/15 1281/16
1281/16 1282/6 1323/4 1323/15
1345/18 1347/13 1352/21 1373/8
1378/8 1421/20 1428/16 1429/22
1453/5 1453/14 1493/13 1493/16
1501/24 1501/24 1502/1 1502/3
1503/2 1503/8 1505/8 1505/19
1505/25 1512/10 1514/24
**Court's [2]** 1347/14 1504/20
**courtesy [1]** 1499/23
**courtroom [18]** 1282/2 1282/22
1322/25 1323/8 1323/10 1323/24
1339/2 1373/18 1373/25 1377/1
1378/2 1379/15 1452/22 1453/8
1453/10 1454/11 1493/10 1513/1
**courts [1]** 1502/7
**cover [9]** 1289/23 1354/11 1366/16
1395/17 1403/20 1404/24 1479/1
1510/9 1511/3
**coverage [7]** 1350/8 1353/14
1353/24 1355/21 1356/14 1366/10
1403/17
**covered [2]** 1289/23 1355/18
**covers [1]** 1427/7
**CPA [4]** 1458/2 1458/3 1458/4
1458/6
**CR [1]** 1280/4
**crack [2]** 1481/4 1482/2
**create [2]** 1367/21 1368/21
**created [3]** 1433/4 1433/5 1483/24
**credit [5]** 1333/21 1436/10 1456/7

**crime [3]** 1329/17 1329/19 1339/9
**criminal [3]** 1281/6 1360/13 1507/17
**criminally [5]** 1290/17 1507/10
1507/13 1507/14 1508/4
**Cristina [1]** 1281/9
**criteria [1]** 1355/21
**cross [18]** 1295/12 1295/15 1343/22
1350/1 1379/13 1382/10 1382/16
1412/9 1418/20 1418/22 1454/22
1455/1 1490/1 1492/18 1513/7
1513/10 1513/13 1513/15
**Cross-examination [9]** 1295/12
1295/15 1382/10 1382/16 1418/20
1418/22 1455/1 1490/1 1492/18
**cross-examine [3]** 1379/13 1412/9
1454/22
**Cross/Blue [1]** 1350/1
**CRR [2]** 1281/15 1514/24
**crudely [1]** 1477/9
**CS [22]** 1437/5 1437/6 1437/9
1437/10 1437/21 1437/23 1438/7
1438/16 1438/16 1438/20 1439/18
1440/12 1442/2 1442/10 1444/12
1444/15 1444/16 1459/14 1465/9
1465/12 1465/14 1507/22
**curative [2]** 1379/8 1379/10
**currency [1]** 1467/7
**customer [2]** 1351/11 1399/18
**customers [1]** 1385/15
**Customs [1]** 1471/20
**cut [2]** 1316/2 1316/5
**CVS [1]** 1403/24
**Cyclobenzaprine [1]** 1407/17

**D**

**dailies [1]** 1433/8
**daily [4]** 1433/9 1438/13 1463/21
1469/22
**damages [1]** 1360/17
**data [88]**
**date [20]** 1284/7 1287/18 1287/25
1288/2 1293/6 1362/19 1363/3
1364/2 1405/10 1484/21 1484/23
1484/24 1485/5 1485/13 1487/12
1487/22 1488/5 1488/8 1488/15
1514/24
**date-of-death [1]** 1405/10
**dated [4]** 1485/15 1485/19 1485/23
1486/2
**dates [2]** 1350/14 1431/1
**dating [2]** 1369/15 1397/1
**Daubert [2]** 1353/17 1392/24
**David [1]** 1405/18
**DC [1]** 1281/8
**DEA [1]** 1439/23
**dead [2]** 1320/18 1388/22
**dealership [1]** 1446/22
**death [6]** 1405/10 1497/9 1501/11
1501/16 1502/12 1502/19
**debit [1]** 1436/10
**decades [1]** 1352/19
**December [1]** 1397/1
**decide [5]** 1319/1 1340/16 1340/16

1395/17 1450/17
**decided [1]** 1294/6
**decides [1]** 1291/16
**decision [12]** 1319/24 1350/8
1352/10 1352/15 1370/11 1371/2
1371/4 1380/20 1381/2 1381/5
1395/15 1512/7
**decision-making [6]** 1370/11 1371/2
1380/20 1381/2 1381/5 1395/15
**decisions [4]** 1339/15 1380/21
1395/22 1397/20
**declared [2]** 1477/7 1477/8
**deeds [1]** 1472/4
**deeply [1]** 1315/4
**defendant [9]** 1280/1 1281/9
1284/23 1346/16 1353/10 1362/10
1495/8 1506/11 1512/5
**defendant's [11]** 1328/7 1328/9
1328/11 1346/3 1346/5 1353/11
1387/4 1387/7 1424/13 1424/18
1514/10
**defense [5]** 1282/9 1323/18 1341/24
1424/10 1511/24
**defer [2]** 1500/9 1510/7
**deficit [4]** 1314/10 1314/20 1314/23
1315/19
**definition [5]** 1386/17 1388/4 1388/5
1388/6 1388/10
**definitions [2]** 1386/11 1387/24
**degree [3]** 1393/25 1394/22 1395/1
**delegated [2]** 1458/13 1462/7
**deliberate [3]** 1360/8 1360/12
1361/18
**Delray [10]** 1472/25 1473/3 1475/5
1475/11 1475/18 1475/19 1475/21
1475/24 1479/11 1483/11
**demographic [1]** 1463/24
**demonstrate [1]** 1504/23
**demonstrated [3]** 1500/15 1500/16
1511/12
**demonstrating [1]** 1475/24
**demonstrative [3]** 1386/22 1387/6
1424/11
**Demonstrative 18 [1]** 1387/6
**denial [1]** 1360/15
**denied [3]** 1359/13 1382/15 1383/11
**Dental [1]** 1283/24
**deny [5]** 1350/8 1352/15 1501/5
1506/18 1512/19
**denying [2]** 1502/18 1504/13
**department [14]** 1281/6 1292/21
1349/16 1402/3 1405/16 1423/23
1433/10 1434/24 1435/19 1435/20
1461/3 1472/19 1477/4 1477/7
**depending [1]** 1512/6
**depends [1]** 1427/21
**deported [1]** 1341/7
**deposit [33]** 1431/3 1436/18 1437/11
1437/15 1440/15 1440/17 1440/24
1441/1 1441/6 1450/16 1450/17
1450/18 1450/20 1450/24 1450/24
1451/7 1464/6 1464/8 1465/17
1465/20 1465/20 1466/12 1466/14
1467/3 1467/4 1467/9 1470/12

## D

**deposit... [6]** 1487/24 1487/25 1488/2 1488/5 1488/13 1488/16
**deposited [5]** 1441/9 1442/25 1452/6 1466/4 1470/19
**depositing [1]** 1441/3
**deposits [12]** 1450/12 1452/2 1465/17 1470/3 1470/5 1470/10 1470/21 1470/22 1486/5 1487/16 1487/17 1487/18
**deprive [1]** 1497/23
**derived [5]** 1507/10 1507/13 1507/14 1507/21 1508/4
**describe [18]** 1287/9 1287/15 1289/21 1352/6 1354/13 1361/6 1363/12 1368/24 1395/13 1397/15 1398/1 1400/24 1402/8 1403/16 1404/5 1406/23 1435/4 1473/8
**description [1]** 1350/15
**designed [1]** 1332/24
**desk [10]** 1298/7 1298/12 1299/13 1310/3 1310/7 1310/25 1437/23 1443/9 1443/19 1450/7
**detail [2]** 1285/6 1482/21
**details [1]** 1350/13
**detect [1]** 1341/19
**determination [2]** 1291/21 1389/17
**determine [10]** 1399/2 1402/13 1402/17 1402/21 1474/23 1483/12 1483/16 1484/18 1486/15 1486/24
**determined [1]** 1350/18
**Dharma [22]** 1430/15 1430/24 1431/10 1431/11 1450/11 1450/23 1451/9 1455/11 1455/13 1455/15 1455/16 1456/11 1457/24 1458/1 1460/12 1460/13 1461/5 1461/6 1465/20 1465/22 1465/23 1467/9
**diabetes [2]** 1370/21 1370/21
**diagnosed [1]** 1314/19
**diagnosing [1]** 1341/22
**diagnosis [7]** 1287/19 1314/23 1315/18 1350/16 1370/12 1371/4 1380/21
**diagnostics [1]** 1460/4
**diagram [1]** 1477/9
**Diazepam [1]** 1407/13
**died [2]** 1500/12 1502/16
**difference [6]** 1286/13 1331/19 1375/13 1396/6 1407/4
**differentiate [1]** 1389/9
**difficult [4]** 1328/22 1341/18 1356/15 1375/4
**digits [1]** 1488/3
**Dilaudid [2]** 1407/1 1410/25
**diligence [2]** 1318/12 1422/4
**Dimitrouleas [3]** 1280/14 1335/12 1337/21
**direct [17]** 1283/9 1287/22 1348/5 1379/1 1380/1 1393/14 1428/17 1455/8 1455/13 1471/14 1490/14 1513/6 1513/10 1513/12 1513/15 1513/18 1513/19
**directing [1]** 1364/4
**directly [6]** 1309/13 1363/17 1363/19

1385/16 1386/12 1405/20
**director [3]** 1398/21 1398/22 1398/24
**dirty [4]** 1508/8 1508/8 1508/16 1511/18
**disability [3]** 1353/24 1356/10 1497/4
**disc [1]** 1499/4
**discuss [19]** 1283/3 1302/22 1303/3 1322/21 1323/2 1324/5 1327/13 1339/13 1340/5 1373/14 1373/20 1379/21 1409/7 1452/18 1452/24 1454/17 1493/1 1493/5 1495/12
**discussed [11]** 1283/3 1322/22 1324/5 1327/16 1373/14 1379/21 1406/22 1435/22 1452/18 1454/17 1493/5
**discussing [6]** 1341/12 1392/2 1438/17 1477/25 1478/15 1478/17
**discussion [20]** 1295/9 1299/22 1302/13 1311/16 1328/4 1331/15 1331/18 1347/15 1367/1 1376/9 1386/20 1418/21 1424/9 1435/21 1440/12 1468/13 1476/17 1489/24 1493/24 1506/24
**discussions [3]** 1399/23 1438/19 1440/7
**disease [1]** 1394/17
**disorder [3]** 1314/20 1314/23 1315/19
**dispense [3]** 1290/20 1506/5 1506/10
**dispensed [1]** 1415/11
**dispensing [5]** 1401/17 1501/10 1501/15 1502/12 1511/8
**dispute [1]** 1425/10
**disregard [1]** 1361/18
**distinction [2]** 1386/4 1391/5
**distribute [2]** 1290/20 1506/16
**DISTRICT [5]** 1280/1 1280/2 1280/15 1281/16 1353/1
**disturbed [1]** 1375/12
**division [3]** 1280/3 1281/6 1403/21
**Docket [1]** 1373/8
**doctor [52]**
**doctor's [4]** 1283/25 1355/1 1422/11 1477/1
**doctors [5]** 1341/21 1351/16 1366/11 1502/9 1504/9
**document [10]** 1287/7 1340/7 1345/22 1359/4 1362/23 1363/13 1363/23 1367/19 1367/21 1413/20
**documentation [3]** 1358/7 1358/10 1358/14
**documentations [1]** 1293/20
**documented [2]** 1355/24 1365/13
**documents [11]** 1356/21 1357/17 1358/17 1467/1 1472/25 1473/3 1473/5 1476/8 1476/12 1478/23 1494/19
**dollar [1]** 1307/9
**dollars [15]** 1307/12 1307/13 1340/4 1426/21 1426/23 1510/3 1510/5 1510/21 1510/22 1510/24 1511/6

1511/7 1511/10 1511/16 1511/20
**door [3]** 1433/19 1437/25 1447/20
**dosage [6]** 1284/9 1412/13 1412/16 1413/9 1413/15 1427/24
**dose [4]** 1412/23 1413/2 1413/5 1417/18
**doses [2]** 1412/15 1412/16
**dosing [1]** 1398/25
**doubt [1]** 1502/15
**download [1]** 1441/13
**downstairs [1]** 1469/22
**Dr. [279]**
**Dr. Andres [7]** 1284/1 1287/24 1292/19 1363/7 1455/21 1456/16 1490/20
**Dr. Mencia [223]**
**Dr. Mencia's [29]** 1298/18 1312/5 1323/12 1366/14 1374/23 1378/5 1379/12 1381/17 1382/23 1409/13 1409/14 1409/19 1414/18 1420/1 1427/8 1429/11 1430/3 1433/10 1437/2 1451/12 1453/13 1456/21 1463/6 1463/9 1473/1 1474/4 1491/2 1491/13 1498/16
**Dr. Rosemary [5]** 1429/17 1429/18 1431/20 1440/4 1457/18
**Dr. Sullivan [15]** 1393/16 1400/15 1405/6 1406/10 1406/22 1408/8 1408/17 1409/7 1417/23 1421/12 1421/16 1424/20 1426/14 1426/15 1426/25
**draw [1]** 1486/5
**drawn [9]** 1299/2 1477/9 1482/10 1482/25 1484/13 1485/14 1485/18 1485/22 1486/1
**dresser [2]** 1492/14 1492/15
**drink [1]** 1298/13
**drug [37]** 1284/9 1286/8 1314/10 1342/11 1342/15 1394/16 1394/20 1394/20 1395/8 1395/14 1395/14 1397/17 1397/20 1398/3 1398/3 1398/7 1399/14 1399/16 1399/25 1400/9 1400/11 1401/15 1401/16 1401/24 1403/14 1403/15 1406/11 1407/6 1410/6 1411/13 1412/16 1414/20 1415/7 1415/16 1416/18 1416/20 1416/21
**drug-seeking [2]** 1410/6 1415/7
**drugs [49]**
**duct [2]** 1444/7 1464/22
**duplication [2]** 1411/5 1427/23
**duplicative [8]** 1400/1 1400/7 1411/7 1411/8 1411/15 1416/2 1427/12 1427/14
**duration [1]** 1341/7
**duties [4]** 1430/3 1432/23 1462/9 1490/22

## E

**E-FORCSE [3]** 1401/22 1401/24 1413/25
**early [2]** 1454/20 1497/4
**easier [1]** 1493/14
**easy [2]** 1356/15 1356/16

**E**

**eat [1]** 1298/13
**educate [2]** 1387/19 1387/22
**educated [1]** 1288/19
**education [8]** 1349/3 1349/4 1349/8 1349/10 1349/17 1349/23 1351/16 1391/2
**Educational [1]** 1393/20
**effect [2]** 1307/24 1398/2
**effective [1]** 1395/19
**effects [12]** 1394/18 1395/20 1397/21 1398/4 1398/6 1399/25 1400/9 1400/10 1400/10 1400/11 1400/13 1400/13
**effort [4]** 1370/15 1371/3 1372/9 1500/11
**eight [2]** 1288/10 1352/17
**Eighteen [1]** 1387/5
**Eighty [2]** 1285/20 1344/18
**elderly [2]** 1400/3 1463/23
**electric [1]** 1480/6
**electricity [1]** 1459/3
**electronic [2]** 1287/20 1431/8
**electronically [2]** 1288/2 1288/4
**Eleven's [1]** 1409/4
**Eleventh [1]** 1505/15
**ELMO [3]** 1335/22 1345/20 1359/1
**EM [6]** 1367/15 1368/8 1368/10 1369/7 1369/23 1380/15
**email [3]** 1433/11 1503/2 1512/15
**employed [6]** 1348/9 1429/6 1471/17 1471/19 1471/20 1490/16
**employees [1]** 1461/14
**encounter [1]** 1370/13
**endocrine [1]** 1370/23
**enforce [1]** 1294/8
**enforcement [7]** 1292/12 1328/8 1349/14 1351/13 1387/17 1402/24 1403/4
**enhance [1]** 1511/21
**enroll [4]** 1356/4 1356/8 1356/10 1356/15
**enrolled [3]** 1355/16 1356/12 1404/18
**enrolling [1]** 1356/17
**enrollment [4]** 1358/17 1358/19 1359/5 1365/9
**ensure [2]** 1348/13 1426/22
**entails [1]** 1293/22
**enter [1]** 1447/6
**enters [1]** 1392/22
**entertain [2]** 1506/1 1506/2
**entirely [1]** 1458/14
**entitled [3]** 1356/7 1357/4 1514/22
**entity [1]** 1364/5
**entry [2]** 1359/13 1373/8
**Entry 97 [1]** 1373/8
**envelope [15]** 1433/23 1434/19 1434/21 1434/22 1436/13 1437/21 1437/22 1437/23 1438/5 1442/15 1442/16 1442/19 1443/9 1443/19 1443/21
**envelopes [6]** 1436/13 1436/16 1436/19 1436/20 1437/19 1442/22

**equal [1]** 1285/24
**equate [1]** 1505/19
**equated [1]** 1511/10
**equation [1]** 1508/1
**equipment [1]** 1354/21
**Erickson [2]** 1292/22 1374/5
**error [2]** 1320/8 1389/10
**errors [2]** 1389/4 1389/15
**Esq [3]** 1281/2 1281/9 1281/12
**essentially [5]** 1350/19 1355/4 1355/11 1363/16 1385/10
**establish [2]** 1506/23 1506/25
**established [5]** 1368/15 1369/24 1369/24 1370/2 1497/22
**estate [1]** 1451/16
**estimation [1]** 1462/15
**evade [3]** 1509/15 1509/21 1509/22
**evaluate [2]** 1395/15 1403/1
**evaluating [1]** 1395/21
**evaluation [2]** 1367/15 1380/17
**evaluations [1]** 1374/15
**evening [2]** 1493/4 1493/8
**events [1]** 1399/25
**everybody [4]** 1311/3 1311/11 1372/11 1404/20
**everyone [5]** 1283/2 1324/4 1379/20 1397/24 1454/16
**evidence [71]**
**Evidence 1006 [2]** 1367/6 1369/6
**exaggerated [1]** 1498/18
**exam [1]** 1397/2
**examination [40]** 1283/9 1290/1 1290/2 1295/12 1295/15 1318/13 1341/4 1343/10 1345/15 1346/23 1348/5 1370/8 1370/9 1370/18 1371/1 1375/21 1380/1 1380/18 1380/22 1380/24 1380/24 1381/14 1382/10 1382/16 1384/20 1390/9 1391/19 1393/14 1418/20 1418/22 1426/12 1428/17 1455/1 1455/8 1469/3 1469/11 1471/14 1490/1 1490/14 1492/18
**examinations [5]** 1287/19 1341/21 1372/16 1372/19 1497/14
**examine [8]** 1379/13 1383/7 1390/7 1412/9 1454/22 1471/24 1472/3 1472/7
**examined [1]** 1372/24
**examining [1]** 1472/2
**examples [2]** 1400/25 1407/15
**exception [2]** 1290/3 1504/8
**exceptions [1]** 1403/20
**excerpt [3]** 1362/25 1441/19 1441/24
**excess [1]** 1486/4
**exchange [2]** 1451/6 1488/22
**exchanging [1]** 1308/24
**exclude [4]** 1305/10 1378/22 1501/20 1502/6
**excluded [2]** 1378/11 1378/20
**excludes [1]** 1305/9
**excluding [1]** 1501/23
**exclusively [1]** 1369/17
**excuse [6]** 1335/3 1373/3 1374/9 1384/6 1398/9 1511/13

**excused [12]** 1345/10 1347/7 1347/8 1392/16 1392/18 1428/4 1428/6 1471/3 1471/5 1490/5 1492/21 1492/23
**exhibit [66]**
**Exhibit 11 [1]** 1408/25
**Exhibit 12 [1]** 1413/19
**Exhibit 12B [1]** 1413/18
**Exhibit 13 [1]** 1366/20
**Exhibit 14 [1]** 1357/9
**Exhibit 15 [1]** 1357/17 1362/22 1493/25
**Exhibit 15A [1]** 1359/3
**Exhibit 15A2 [1]** 1362/21
**Exhibit 15A3 [1]** 1363/12
**Exhibit 16 [1]** 1407/22
**Exhibit 1A [1]** 1482/19
**Exhibit 22 [1]** 1287/6
**Exhibit 22F [1]** 1287/5
**Exhibit 23 [2]** 1491/22 1492/13
**Exhibit 24 [1]** 1491/1
**Exhibit 2C [1]** 1485/11
**Exhibit 2G [1]** 1488/10
**Exhibit 40 [1]** 1441/12
**Exhibit 40E [2]** 1444/5 1464/12
**Exhibit 40F [1]** 1466/3
**Exhibit 45 [1]** 1367/18
**Exhibit 46 [1]** 1376/23
**Exhibit 8A [1]** 1475/14
**Exhibit 9A [1]** 1476/21
**Exhibit 9B [1]** 1478/16
**exhibits [8]** 1367/4 1367/8 1378/12 1378/13 1378/25 1514/1 1514/2 1514/10
**Exhibits 45 [1]** 1367/4
**exited [9]** 1322/25 1323/8 1373/18 1373/25 1377/1 1452/22 1453/8 1493/10 1513/1
**expect [2]** 1380/7 1380/14
**expected [2]** 1495/1 1497/18
**expenses [13]** 1354/11 1457/10 1479/2 1479/25 1480/4 1510/9 1510/11 1510/13 1510/15 1510/16 1510/18 1511/3 1511/15
**expensive [2]** 1444/23 1445/3
**experience [9]** 1353/4 1375/11 1380/6 1411/14 1412/11 1415/5 1415/21 1430/20 1468/17
**experienced [1]** 1341/16
**expert [11]** 1347/12 1352/21 1352/23 1353/13 1376/3 1381/21 1391/23 1401/5 1406/10 1406/19 1425/23
**explain [7]** 1335/6 1350/24 1367/14 1397/25 1427/14 1465/13 1489/5
**explained [1]** 1332/10
**explaining [1]** 1331/19
**explanatory [1]** 1361/20
**explore [1]** 1450/21
**exploring [1]** 1449/10
**Express [1]** 1399/11
**expresses [1]** 1316/1
**extended [11]** 1285/12 1285/17 1371/1 1380/23 1380/24 1381/7 1407/1 1407/6 1413/10 1415/18

**E**

**extended... [1]** 1416/19
**extension's [1]** 1444/19
**extensive [1]** 1370/16
**extensively [1]** 1402/5
**extent [1]** 1370/5 1503/24
**extrapolation [2]** 1375/5 1420/20
**extremely [1]** 1456/10
**eyesight [1]** 1370/24

**F**

**face [1]** 1470/7
**facility [3]** 1334/4 1354/16 1354/17
**facing [3]** 1334/17 1335/15 1335/17
**fact [15]** 1301/20 1320/11 1332/5
1336/13 1361/8 1375/5 1418/10
1441/5 1502/14 1504/7 1505/3
1505/20 1510/14 1510/22 1511/2
**facts [1]** 1331/11
**factual [2]** 1343/19 1345/17
**faculty [1]** 1397/10
**failed [3]** 1506/23 1506/25 1507/1
**failing [3]** 1386/14 1388/11 1388/12
**fall [2]** 1386/18 1389/17
**falls [2]** 1386/17 1400/4
**false [2]** 1361/16 1496/17
**falsification [2]** 1360/9 1361/10
**falsified [1]** 1390/1
**falsify [1]** 1361/8
**falsifying [2]** 1360/7 1389/20
**falsity [1]** 1361/19
**family [2]** 1381/10 1381/11
**Fargo [16]** 1451/10 1451/10 1451/24
1452/6 1466/14 1466/16 1472/7
1477/11 1482/10 1482/22 1482/25
1483/4 1486/8 1487/6 1487/10
1488/8
**fast [2]** 1297/24 1298/12
**father [1]** 1505/2
**favorable [8]** 1495/10 1496/13
1497/21 1501/13 1503/23 1506/13
1506/22 1509/13
**favorably [1]** 1338/23
**Faxed [1]** 1359/15
**FBI [1]** 1349/16
**fear [1]** 1316/1
**February [19]** 1292/15 1292/25
1293/6 1294/12 1295/4 1295/7
1327/19 1334/14 1343/13 1343/16
1344/4 1346/20 1346/25 1417/25
1418/1 1420/9 1420/14 1421/3
1485/19
**February 19th [1]** 1485/19
**February 5th [1]** 1295/4
**February 6th [3]** 1327/19 1420/14
1421/3
**federal [23]** 1292/12 1327/21
1329/16 1330/1 1348/10 1348/11
1348/13 1348/21 1349/21 1352/21
1353/13 1354/1 1355/19 1356/24
1356/25 1361/2 1367/5 1369/6
1471/20 1501/24 1502/3 1504/6
1505/19
**fee [1]** 1362/6

**fee-for-service [1]** 1362/6
**Ferrari [1]** 1446/22
**field [1]** 1398/14
**Fifteen [1]** 1357/20
**Fifty [1]** 1330/23
**file [7]** 1289/3 1291/24 1294/2 1294/3
1339/1 1442/19 1505/8
**filed [2]** 1345/18 1483/24
**files [2]** 1338/3 1338/14
**filing [3]** 1292/2 1353/15 1503/2
**fill [1]** 1414/10
**filled [8]** 1414/3 1467/7 1467/9
1488/16 1500/15 1500/16 1500/21
1500/25
**filling [2]** 1360/1 1418/7
**fills [1]** 1403/25
**final [2]** 1317/22 1341/24
**finally [1]** 1427/24
**finance [4]** 1430/9 1430/20 1474/4
1483/24
**financed [5]** 1483/8 1483/21 1483/22
1489/15 1489/18
**finances [5]** 1430/6 1455/16 1456/20
1457/21 1458/13 1459/6 1474/4
**financial [7]** 1355/25 1431/5 1431/6
1450/11 1471/24 1472/2 1472/18
**financially [2]** 1362/1 1467/21
**financing [1]** 1472/4
**fine [1]** 1494/13
**fines [1]** 1360/16
**finger [2]** 1464/15 1465/1
**finish [9]** 1296/20 1314/3 1314/16
1335/4 1378/10 1440/23 1441/1
1441/2 1508/22
**finished [2]** 1293/6 1297/18
**finishing [1]** 1315/14
**firm [2]** 1281/13 1421/24
**first-time [3]** 1290/3 1290/5 1290/6
**fit [1]** 1376/16
**five years [1]** 1511/21
**five-year [1]** 1510/1
**FL [1]** 1281/11
**flag [5]** 1284/17 1286/18 1288/19
1422/14 1422/23
**flags [3]** 1285/4 1422/11 1422/13
**flew [1]** 1396/24
**Flexeril [1]** 1407/18
**Flip [1]** 1414/6
**floor [6]** 1281/7 1450/3 1461/17
1463/22 1463/23 1469/12
**florida [37]** 1280/2 1280/7 1281/4
1281/14 1281/17 1292/20 1350/2
1351/15 1353/2 1364/6 1364/13
1364/17 1364/18 1393/19 1393/22
1395/25 1396/3 1396/9 1396/21
1397/6 1398/21 1401/16 1401/22
1402/1 1402/2 1402/16 1405/11
1405/15 1409/15 1414/1 1414/4
1429/2 1472/18 1472/21 1477/4
1477/7 1484/9
**focus [3]** 1386/23 1482/5 1483/11
**focused [2]** 1369/17 1420/17
**folder [4]** 1442/2 1442/11 1442/14
1442/17

**folks [1]** 1387/20
**FORCSE [3]** 1401/22 1401/24
1413/25
**foregoing [1]** 1514/20
**forfeiture [1]** 1471/22
**forget [1]** 1345/5
**forgive [13]** 1306/2 1310/5 1313/14
1317/23 1322/5 1322/5 1325/16
1334/5 1421/11 1458/5 1466/19
1505/10 1508/18
**forgot [1]** 1497/6
**form [17]** 1293/21 1293/22 1360/13
1361/10 1363/14 1401/18 1412/16
1415/18 1423/13 1462/16 1463/2
1467/7 1498/4 1512/14 1512/16
1512/17 1512/22
**form's [1]** 1512/18
**formulary [1]** 1397/19
**formulate [1]** 1395/22
**formulation [1]** 1407/7
**formulations [1]** 1427/21
**FORT [13]** 1280/3 1280/7 1281/17
1475/6 1476/3 1476/5 1476/11
1476/12 1477/25 1478/4 1479/12
1482/15 1490/19
**Fort Lauderdale [10]** 1475/6 1476/3
1476/5 1476/11 1476/12 1477/25
1478/4 1479/12 1482/15 1490/19
**Forty [3]** 1371/24 1392/6 1441/16
**Forty-five [2]** 1371/24 1392/6
**four-year [1]** 1374/24
**Fourteen [1]** 1357/13
**fourth [1]** 1381/4
**frame [4]** 1365/22 1397/2 1407/23
1409/1
**Fran [2]** 1335/22 1345/20
**Francine [3]** 1281/15 1514/23
1514/24
**fraud [26]** 1336/9 1336/9 1348/19
1349/5 1349/9 1349/12 1349/15
1358/5 1373/10 1376/17 1386/4
1386/9 1386/17 1387/24 1388/4
1388/15 1388/19 1388/21 1388/24
1389/9 1389/20 1403/13 1495/8
1495/8 1511/6 1511/12
**fraudulent [5]** 1361/16 1374/14
1374/16 1496/17 1498/18
**fraudulently [1]** 1498/23
**free [2]** 1408/14 1503/25
**front [18]** 1297/19 1298/7 1298/12
1299/13 1310/3 1310/6 1311/3
1311/11 1327/14 1327/16 1422/15
1437/24 1438/9 1476/8 1495/18
1495/20 1495/23 1496/10
**fun [1]** 1323/22
**fund [2]** 1354/6 1354/9
**funded [5]** 1354/2 1356/23 1356/24
1426/20 1426/21
**Funding [1]** 1472/23
**funds [5]** 1477/12 1482/21 1483/7
1483/9 1511/19
**funny [1]** 1425/5
**Fusion [3]** 1287/12 1287/15 1287/17
**FYI [2]** 1444/6 1464/21

**G**

**G-code [6]** 1293/16 1375/17 1434/5 1443/21 1507/22 1511/12
**G-codes [3]** 1294/16 1343/17 1497/14
**G-E-G-A [1]** 1428/15
**gain [1]** 1423/23
**garbage [2]** 1420/23 1420/24
**Garcia [14]** 1413/24 1414/10 1415/14 1416/9 1416/16 1416/24 1417/15 1418/2 1419/6 1419/13 1427/5 1427/6 1427/11 1427/25
**Garcia's [2]** 1419/10 1426/25
**Gega [15]** 1428/8 1428/11 1428/19 1428/22 1441/24 1452/23 1453/18 1454/5 1454/6 1455/3 1467/13 1468/15 1469/5 1509/17 1513/14
**Gega's [1]** 1441/13
**general [7]** 1348/16 1349/16 1363/9 1423/21 1430/4 1430/5 1468/22
**gentleman [3]** 1312/8 1330/11 1421/7
**gentlemen [1]** 1295/14
**geriatric [7]** 1364/6 1384/22 1384/25 1385/3 1392/7 1429/6 1484/9
**geriatrician [1]** 1463/8
**geriatrics' [1]** 1375/14
**German [2]** 1477/19 1477/20
**gets [2]** 1286/1 1484/16
**Ghana [1]** 1341/10
**gigantic [1]** 1499/4
**Gilfarb [25]** 1281/2 1408/11 1408/14 1432/10 1454/1 1471/15 1472/15 1474/2 1476/19 1482/1 1484/6 1490/15 1491/11 1491/21 1492/11 1496/22 1499/2 1507/4 1508/2 1508/15 1509/5 1513/15 1513/16 1513/18 1513/19
**girlfriend [2]** 1498/7 1500/20
**Glad [1]** 1323/22
**glass [1]** 1422/14
**gleaned [1]** 1370/7
**God [1]** 1293/11
**Gomez [13]** 1283/15 1284/3 1284/13 1286/1 1288/23 1289/1 1289/15 1290/9 1290/11 1343/7 1344/17 1374/21 1375/20
**gonna [58]**
**goods [1]** 1460/6
**gotten [4]** 1303/4 1422/2 1503/20 1504/25
**government [99]**
**government's [59]**
**Government's 2B [1]** 1485/2
**Government's 2D [1]** 1485/17
**Government's 40C [1]** 1443/1
**Government's 6G [1]** 1483/1
**Gracias [1]** 1445/23
**graduate [6]** 1394/3 1394/9 1394/10 1394/22 1395/6 1395/7
**graduating [1]** 1396/22
**Grant [2]** 1421/1 1506/15
**greater [3]** 1382/7 1400/14 1410/22
**gross [2]** 1476/13 1477/1

**grounds [4]** 1344/9 1381/19 1473/22 1473/22
**group [3]** 1396/1 1399/13 1471/23
**GS [3]** 1444/11 1465/5 1465/9
**Guarantee [1]** 1472/21
**guidance [1]** 1367/16
**guideline [1]** 1367/15
**guidelines [4]** 1368/8 1368/11 1369/7 1390/9
**guides [1]** 1368/12
**guilty [5]** 1293/25 1291/1 1334/22 1339/7 1426/3
**gypsies [4]** 1293/17 1294/15 1343/17 1375/16
**gypsy [1]** 1375/9

**H**

**habit [1]** 1305/13
**halfway [1]** 1299/7
**hallmark [1]** 1422/24
**hallmarks [2]** 1422/18 1422/19
**hand [15]** 1287/23 1297/15 1307/10 1347/24 1393/1 1413/25 1424/22 1428/10 1438/3 1438/4 1438/5 1450/6 1455/16 1471/8 1490/8
**handcuffs [1]** 1327/24
**handful [2]** 1353/10 1358/4
**handing [1]** 1307/8
**handle [1]** 1399/15
**handwriting [1]** 1287/1
**happy [3]** 1426/1 1448/10 1448/23
**harmful [1]** 1411/12
**haste [1]** 1495/12
**he'd [2]** 1487/7 1487/8
**head [3]** 1293/14 1397/8 1399/9
**health [13]** 1353/22 1353/22 1354/11 1354/17 1394/7 1395/15 1395/16 1395/25 1397/11 1398/20 1399/11 1402/3 1405/16
**Health's [1]** 1292/21
**healthcare [26]** 1336/9 1348/19 1349/5 1349/8 1349/9 1349/15 1350/6 1350/13 1351/15 1351/17 1354/20 1355/14 1355/16 1356/19 1358/5 1358/16 1358/18 1358/20 1359/6 1363/14 1363/17 1365/8 1370/7 1376/17 1387/15 1495/8
**hear [25]** 1284/25 1296/8 1298/6 1298/10 1298/11 1298/21 1298/22 1299/12 1300/9 1302/5 1302/23 1302/25 1303/11 1304/2 1304/12 1304/14 1307/6 1315/25 1329/14 1331/9 1331/18 1333/4 1333/24 1433/14 1508/15
**heard [15]** 1284/20 1285/2 1294/15 1297/11 1298/2 1399/12 1435/13 1444/3 1444/12 1444/12 1497/15 1497/15 1497/17 1498/7 1503/24
**hearing [2]** 1353/17 1392/24
**hearings [1]** 1508/21
**Hearsay [1]** 1435/9
**help [9]** 1293/12 1293/12 1316/22 1320/3 1332/24 1387/19 1397/19 1430/5 1467/20

**helpful [1]** 1512/17
**helping [8]** 1398/5 1430/9 1430/12 1430/13 1430/24 1431/2 1439/5 1439/6
**Here's [1]** 1504/15
**hereby [1]** 1514/19
**Hernandez [2]** 1376/11 1497/16
**hers [1]** 1419/17
**Hewett [14]** 1496/25 1497/2 1497/10 1498/1 1498/3 1498/5 1498/21 1498/25 1499/7 1499/17 1500/25 1501/12 1501/21 1507/9
**Hewett's [1]** 1500/11
**Hey [4]** 1302/9 1307/4 1307/15 1330/5
**hide [2]** 1422/15 1442/17
**high [7]** 1370/3 1370/25 1371/6 1371/7 1427/24 1456/10 1456/11
**higher [8]** 1299/8 1299/8 1370/16 1370/17 1381/2 1381/5 1417/18 1432/17
**highest [12]** 1371/10 1381/4 1412/16 1412/17 1412/19 1412/20 1412/23 1413/2 1413/5 1413/8 1413/13 1413/15
**highlight [1]** 1298/2
**highlighted [3]** 1359/8 1361/22 1374/11
**highlighter [1]** 1346/9
**highly [1]** 1372/7
**hire [1]** 1423/25
**hired [6]** 1289/4 1390/25 1391/4 1391/25 1430/2 1455/9
**histories [2]** 1381/10 1385/4
**history [6]** 1370/6 1370/16 1370/17 1380/18 1381/7 1409/18
**hit [1]** 1426/5
**HMO [1]** 1354/23
**HMS [4]** 1348/10 1348/11 1348/21 1349/21
**hold [4]** 1348/14 1484/11 1484/23 1500/6
**holding [4]** 1451/14 1466/18 1480/12 1501/14
**Holdings [6]** 1451/13 1451/15 1452/7 1466/23 1480/11 1480/20
**Holdings, [1]** 1488/4
**Holdings, LLC [1]** 1488/4
**home [13]** 1354/17 1396/11 1403/19 1430/20 1439/4 1448/21 1460/19 1477/25 1478/4 1482/13 1482/15 1490/19 1507/2
**Homeland [1]** 1471/19 1471/21 1490/17
**Homer [1]** 1498/5
**honest [2]** 1301/17 1330/4
**honestly [1]** 1453/19
**honor [104]**
**Honor's [1]** 1512/15
**honorable [2]** 1280/14 1340/16
**hook [2]** 1302/24 1304/1
**hooked [1]** 1309/7
**hookup [1]** 1303/14 1304/3
**hope [3]** 1334/18 1338/14 1509/6

**H**

**hopefully [3]** 1387/23 1500/1 1509/5
**hoping [2]** 1291/18 1340/11
**Horenstein [2]** 1281/12 1281/13
**horse [1]** 1320/18
**hospice [1]** 1354/18
**hospital [6]** 1354/17 1356/20
1396/10 1398/21 1399/4 1403/20
**hospitals [2]** 1351/16 1502/9
**hotel [2]** 1443/13 1443/24
**hours [1]** 1500/2
**house [14]** 1439/21 1440/3 1440/3
1445/5 1447/18 1447/18 1448/6
1448/16 1475/11 1475/12 1476/5
1476/6 1482/6 1490/22
**houses [6]** 1439/4 1440/2 1440/5
1440/8 1481/16 1482/5
**Huge [1]** 1473/10
**hum [9]** 1310/12 1310/12 1409/24
1419/17 1420/11 1421/17 1425/15
1448/6 1465/13
**Hum-hum [1]** 1310/12
**hundred [25]** 1307/9 1307/12
1307/13 1334/18 1335/5 1335/9
1340/4 1352/3 1364/20 1365/5
1365/6 1365/17 1365/22 1386/1
1425/22 1510/3 1510/5 1510/20
1510/22 1510/23 1511/6 1511/7
1511/10 1511/16 1511/20
**hydrocodone [1]** 1407/2
**hydromorphone [1]** 1407/2
**hypothesis [3]** 1501/20 1501/23
1505/18

**I**

**I'd [5]** 1378/10 1479/4 1499/23
1502/18 1506/2
**I'll [26]** 1302/24 1308/4 1308/15
1313/11 1318/14 1334/12 1345/25
1347/23 1352/7 1368/6 1369/18
1382/2 1389/15 1406/18 1434/2
1435/8 1479/5 1496/9 1500/9 1501/9
1502/25 1504/17 1504/20 1505/5
1508/15 1510/7
**I'm [109]**
**I've [12]** 1294/14 1294/21 1349/23
1351/4 1401/10 1401/10 1402/11
1428/25 1471/19 1501/2 1508/21
1509/7
**idea [2]** 1309/13 1437/1
**identification [21]** 1328/9 1346/3
1356/13 1357/10 1357/18 1366/22
1367/9 1387/7 1408/1 1424/14
1441/14 1441/20 1443/2 1444/9
1445/8 1447/7 1451/4 1473/19
1491/5 1491/25 1494/10
**identifier [1]** 1414/16
**identify [3]** 1348/18 1349/11 1358/5
**identity [5]** 1350/12 1350/12 1365/7
1365/8 1429/23
**IDR [2]** 1404/6 1405/19
**ignorance [1]** 1361/18
**II [1]** 1290/21
**illegal [8]** 1510/2 1510/16 1510/17

1510/19 1510/23 1511/4 1511/9
1511/11
**illegally [1]** 1503/20
**immediate [4]** 1285/16 1412/23
1413/1 1413/10
**immediate-release [1]** 1412/23
**immediately [2]** 1396/22 1452/9
**implement [1]** 1399/4
**imposition [1]** 1360/16
**impossibility [1]** 1364/25
**imprisonment [1]** 1360/17
**improperly [2]** 1379/11 1390/3
**in-office [1]** 1369/25
**inaccurately [5]** 1379/12 1382/25
1383/2 1383/3 1383/4
**inappropriate [1]** 1376/6
**inappropriately [4]** 1376/4 1498/21
1498/23 1511/8
**include [8]** 1285/13 1350/3 1369/2
1400/18 1427/20 1480/3 1480/6
1481/6
**included [2]** 1333/25 1512/15
**includes [1]** 1306/9
**including [6]** 1293/16 1349/19
1360/14 1361/1 1376/12 1462/7
**income [1]** 1476/13
**incorrect [1]** 1390/10
**increase [4]** 1321/10 1322/16 1325/3
1325/11
**increases [1]** 1423/17
**increasing [4]** 1326/1 1339/18
1343/10 1423/16
**increment [1]** 1306/17
**increments [1]** 1372/10
**INDEX [2]** 1513/4 1514/1
**indicate [2]** 1415/11 1477/1
**indicated [13]** 1314/13 1314/16
1431/14 1434/3 1436/11 1436/23
1442/14 1470/12 1475/3 1478/21
1483/12 1498/8 1511/14
**indicates [2]** 1444/18 1446/18
**indicating [1]** 1389/5
**indicative [4]** 1415/6 1415/7 1415/22
1416/12
**indictment [5]** 1334/13 1335/15
1336/3 1376/16 1376/21
**indirectly [2]** 1386/13 1472/3
**individual [10]** 1284/4 1287/23
1360/1 1371/17 1374/20 1403/23
1404/25 1409/18 1413/23 1415/24
**individual's [1]** 1355/1
**individualized [1]** 1410/16
**individuals [3]** 1357/4 1376/11
1376/13
**indulge [1]** 1499/21
**industry [1]** 1398/11
**infer [1]** 1509/24
**inform [1]** 1294/7
**informant [16]** 1308/18 1308/25
1309/14 1310/2 1310/16 1312/21
1316/18 1317/16 1317/24 1319/8
1324/18 1325/23 1326/13 1326/20
1326/21 1327/9
**informant's [1]** 1308/21

**information [15]** 1350/11 1351/16
1352/9 1358/15 1360/7 1360/10
1360/11 1361/9 1362/4 1362/7
1367/6 1395/8 1397/17 1420/23
1488/20
**inherited [2]** 1431/23 1432/2
**initial [1]** 1501/19
**initially [2]** 1293/2 1307/11
**initials [3]** 1403/8 1404/15 1498/6
**ink [1]** 1359/15
**Inna [5]** 1433/18 1433/22 1434/25
1443/8 1443/19
**innocence [1]** 1505/19
**insomnia [1]** 1411/11
**inspection [2]** 1439/10 1439/23
**inspector [2]** 1349/15 1439/11
**installation [1]** 1444/19
**instances [2]** 1320/1 1381/18
**Institute [3]** 1364/6 1429/7 1484/9
**institution [1]** 1403/22
**instructed [2]** 1293/14 1465/16
**instruction [3]** 1379/9 1379/10
1450/20
**instructions [12]** 1360/20 1360/22
1361/1 1362/3 1437/3 1437/8
1437/10 1437/17 1450/14 1450/18
1450/22 1512/14
**insufficient [1]** 1506/13
**insurance [14]** 1289/22 1289/22
1353/22 1353/22 1353/25 1404/22
1404/23 1410/17 1410/20 1410/20
1410/23 1462/16 1463/3 1464/2
**insured [4]** 1349/11 1355/7 1355/13
1463/3
**integrated [1]** 1404/6
**integrity [4]** 1348/13 1403/12
1426/17 1426/22
**intend [4]** 1398/3 1398/7 1493/11
1494/18
**intention [2]** 1378/24 1389/16
1389/17
**intentionally [2]** 1388/18 1388/20
**interest [1]** 1490/20
**interior [2]** 1475/21 1478/19
**interrupt [5]** 1313/15 1313/17
1367/23 1408/10 1495/11
**interrupting [1]** 1313/14
**interstate [2]** 1496/2 1496/9
**intervene [2]** 1399/21 1400/4
**intervening [3]** 1487/18 1502/8
1502/10
**interview [5]** 1429/14 1429/16
1430/2 1430/4 1430/5
**interviewed [4]** 1429/13 1455/20
1464/5 1468/20
**introduce [4]** 1345/25 1424/12
1428/19 1471/16
**introduced [3]** 1429/11 1501/4
1504/2
**introducing [3]** 1345/23 1367/4
1367/24
**investigate [3]** 1348/19 1358/5
1481/15
**investigation [3]** 1292/21 1372/14

**I**

**investigation... [1]** 1490/17
**investigations [6]** 1349/6 1351/21 1351/22 1351/24 1471/19 1471/21
**investigative [2]** 1419/12 1471/22
**investigators [2]** 1349/5 1351/12
**invoices [6]** 1430/10 1430/10 1431/15 1431/16 1431/16 1431/17
**invoicing [1]** 1430/25
**involvement [2]** 1290/15 1292/9
**issue [11]** 1303/4 1330/4 1334/11 1400/7 1456/15 1460/19 1460/22 1460/25 1496/5 1501/7 1501/8
**issued [1]** 1414/18 1419/25 1484/8
**issues [3]** 1339/13 1399/22 1399/24
**Italian [1]** 1445/25
**item [1]** 1491/16
**items [5]** 1355/5 1493/2 1493/15 1495/15 1510/12
**iteration [1]** 1498/18
**IV [1]** 1398/25
**IVs [1]** 1398/25

**J**

**J-O-H-A-N-N-A [1]** 1393/7
**jail [2]** 1329/25 1335/18
**James [2]** 1496/24 1501/12
**January [5]** 1292/19 1397/1 1409/1 1417/15 1420/5
**January 1 [1]** 1409/1
**January 31st [3]** 1292/19 1417/15 1420/5
**JM [1]** 1473/5
**JM Lexus [1]** 1473/5
**job [21]** 1348/18 1349/3 1350/7 1391/2 1398/11 1398/20 1404/3 1424/4 1426/2 1426/17 1429/9 1429/13 1429/14 1430/8 1430/8 1430/18 1430/19 1431/12 1431/14 1431/24 1455/16
**jobs [1]** 1402/12
**Jodi [1]** 1392/20
**JOHANNA [3]** 1393/2 1393/7 1513/12
**John [7]** 1293/9 1299/16 1340/23 1343/20 1421/8 1506/15 1513/6
**joking [1]** 1300/20
**Jr [1]** 1281/9
**Juan [1]** 1498/9
**judge [58]**
**Judge Dimitrouleas [1]** 1337/21
**judgment [11]** 1313/20 1317/20 1321/7 1321/11 1321/20 1495/9 1496/14 1501/12 1506/11 1506/21 1509/9
**judgments [1]** 1321/23
**July [8]** 1284/13 1299/23 1301/25 1344/11 1407/23 1407/24 1416/24 1482/9
**July 15th [1]** 1416/24
**July 24th [1]** 1407/23
**July 25th [2]** 1299/23 1301/25
**July 28th [1]** 1407/24
**July 30th [1]** 1482/9

**jump [2]** 1417/14 1433/12
**June [6]** 1280/7 1282/1 1378/1 1416/9 1484/10 1484/24
**June 15 [1]** 1484/24
**June 18th [1]** 1416/9
**jurors [4]** 1323/19 1378/15 1453/25 1454/8
**jury [66]**
**Justice [2]** 1281/6 1349/17

**K**

**K-H-A-N-A-L [1]** 1430/17
**K-L-A-U-D-I-A [1]** 1428/15
**keep [23]** 1297/22 1299/4 1300/13 1303/5 1303/9 1303/23 1304/5 1304/24 1309/23 1312/16 1313/14 1315/21 1316/22 1317/2 1319/25 1321/2 1326/16 1333/14 1391/10 1424/4 1432/23 1436/2 1462/9
**keeping [2]** 1316/24 1456/19
**Khanal [1]** 1430/15
**kids [1]** 1457/19
**killed [2]** 1502/2 1503/18
**KK [1]** 1448/1
**Klaudia [4]** 1428/8 1428/11 1428/22 1513/14
**knock [1]** 1501/17
**knowingly [2]** 1361/15 1386/9
**knowledge [7]** 1344/4 1362/16 1389/7 1389/7 1389/8 1442/18 1463/12
**knows [6]** 1294/8 1294/9 1307/22 1307/25 1316/8 1463/13

**L**

**lab [2]** 1354/21 1459/22
**labeled [4]** 1437/4 1437/5 1474/15 1487/1
**laboratory [1]** 1356/20
**lack [3]** 1463/11 1507/19 1508/13
**ladies [1]** 1295/14
**lady [3]** 1297/11 1297/13 1299/17
**land [2]** 1429/9 1472/4
**language [1]** 1288/16
**large [3]** 1395/15 1395/16 1399/10
**largely [1]** 1463/19
**lasting [1]** 1416/20
**lastly [1]** 1355/23 1371/2 1485/25
**Latom [1]** 1477/17
**LAUDERDALE [13]** 1280/3 1280/7 1281/17 1475/6 1476/3 1476/5 1476/11 1476/12 1477/25 1478/4 1479/12 1482/15 1490/19
**laugh [2]** 1306/9 1307/5
**laughing [2]** 1300/20 1304/12
**Laughter [3]** 1323/21 1423/19 1509/8
**laundered [1]** 1508/7
**laundering [8]** 1506/3 1506/21 1507/3 1507/5 1507/16 1507/17 1508/3 1511/18
**law [12]** 1292/12 1328/8 1337/21 1349/14 1351/13 1361/3 1387/17 1402/24 1403/3 1503/14 1504/6

1508/16
**laws [4]** 1360/19 1360/21 1360/25 1362/2
**lawyer [1]** 1331/10
**lawyers [1]** 1343/25
**laying [1]** 1439/7
**layman's [3]** 1350/5 1359/18 1361/6
**learned [1]** 1305/12
**learning [2]** 1430/18 1430/21
**lease [1]** 1458/21
**leave [4]** 1438/3 1443/9 1443/19 1450/17
**leaves [1]** 1300/12
**Lebrak [4]** 1284/3 1284/12 1374/20 1375/19
**left-hand [2]** 1413/25 1424/22
**legal [2]** 1362/1 1405/14
**legally [2]** 1338/6 1429/4
**legitimate [5]** 1329/1 1329/1 1507/15 1507/19 1508/12
**lengthy [1]** 1400/15
**lessors [2]** 1512/21 1512/21
**levels [4]** 1370/2 1370/15 1372/1 1381/3
**Lexus [3]** 1473/5 1479/20 1479/22
**liability [1]** 1502/10
**license [2]** 1396/8 1396/15
**licensed [6]** 1396/3 1396/16 1397/5 1401/12 1406/23 1412/6
**licenses [3]** 1396/2 1396/20 1397/3
**licensure [2]** 1365/9 1396/23
**lied [3]** 1329/11 1330/14 1330/16
**life [2]** 1313/12 1341/16
**light [9]** 1495/10 1496/13 1497/20 1497/21 1501/13 1501/14 1503/22 1506/12 1506/22
**liked [1]** 1342/8
**limit [1]** 1286/18
**limited [5]** 1354/9 1354/10 1360/15 1361/2 1427/6
**limits [2]** 1399/17 1402/10
**lines [2]** 1422/21 1480/23
**linked [2]** 1308/3 1308/14
**list [3]** 1368/8 1466/7 1466/9
**listen [4]** 1309/7 1500/9 1509/4 1509/6
**listened [1]** 1509/7
**literature [2]** 1395/15 1395/22
**LLC [1]** 1488/4
**loan [6]** 1472/23 1483/19 1489/12 1489/18 1489/19 1489/21
**loans [1]** 1480/9
**lobby [2]** 1463/18 1463/22
**lock [1]** 1402/15
**lock-in [1]** 1402/15
**log [1]** 1433/18
**logo [6]** 1385/12 1424/22 1424/25 1425/1 1425/13 1425/17
**long-acting [20]** 1331/19 1331/22 1332/9 1332/14 1332/17 1342/13 1342/17 1342/18 1342/20 1342/22 1407/6 1411/7 1415/23 1416/2 1416/4 1416/21 1417/4 1417/6 1417/21 1427/22

**L**

**Longo [4]** 1467/13 1467/17 1467/20 1468/6
**loop [1]** 1304/25
**Lorazepam [9]** 1414/12 1414/20 1414/21 1416/10 1416/25 1417/10 1417/19 1418/11 1427/18
**lose [3]** 1294/9 1294/10 1426/1
**loud [1]** 1421/18
**Louis [1]** 1281/10
**lower [5]** 1299/9 1299/9 1423/20 1446/19 1447/2
**lowering [2]** 1398/5 1398/5
**lowest [1]** 1371/9
**luck [1]** 1502/2
**lunch [2]** 1373/13 1373/16
**Luncheon [1]** 1377/2
**lunchtime [2]** 1448/7 1448/7
**lying [3]** 1329/16 1329/25 1331/1
**LYNN [3]** 1471/9 1471/13 1513/17

**M**

**magnify [1]** 1400/12
**main [5]** 1370/5 1380/16 1403/17 1486/12 1510/19
**mainly [1]** 1349/23
**maintain [1]** 1426/17
**maintained [1]** 1360/1
**majority [1]** 1463/6
**mall [2]** 1422/8 1422/12
**malls [1]** 1422/9
**man [2]** 1303/10 1307/5
**managed [1]** 1354/23
**management [2]** 1294/5 1367/15 1380/17
**manager [5]** 1349/1 1399/13 1430/9 1433/10 1433/18
**manages [1]** 1399/14
**manner [2]** 1374/19 1473/12
**March [1]** 1418/1
**Marcos [4]** 1281/9 1382/19 1419/1 1455/5
**mark [7]** 1346/10 1346/10 1386/21 1387/3 1424/10 1448/10 1494/2
**marked [23]** 1328/9 1346/3 1357/10 1357/18 1366/22 1367/8 1387/7 1407/25 1424/13 1441/14 1441/20 1443/2 1444/9 1445/8 1447/7 1451/4 1473/18 1491/4 1491/22 1491/24 1494/9 1514/2 1514/10
**marketing [2]** 1423/22 1423/23
**married [1]** 1455/25
**marshal [1]** 1282/10
**master [4]** 1491/13 1491/15 1492/14 1492/14
**materials [2]** 1353/7 1405/6
**math [7]** 1330/22 1332/2 1332/4 1332/20 1342/8 1510/8 1510/12
**matter [5]** 1337/21 1390/13 1493/1 1501/19 1514/22
**matters [2]** 1349/15 1349/19
**max [1]** 1504/12
**maximize [1]** 1394/19
**maximum [7]** 1290/22 1329/16

1334/19 1335/14 1337/2 1337/2 1510/2
**May 20th [1]** 1414/10
**May 24th [1]** 1299/20
**May 26 [1]** 1415/14
**May 31st [1]** 1409/1
**mean [62]**
**meaning [2]** 1318/20 1346/16
**means [13]** 1298/13 1306/23 1359/19 1361/6 1365/6 1366/4 1376/2 1395/13 1404/5 1427/16 1432/11 1483/23 1489/6
**meant [3]** 1303/2 1435/14 1509/4
**mechanical [1]** 1280/24
**med's [2]** 1288/19 1288/21
**Medco [2]** 1399/10 1399/11
**medic [2]** 1403/7 1403/11
**Medicaid [19]** 1348/20 1349/7 1356/22 1356/23 1357/1 1357/2 1357/5 1357/6 1357/9 1357/24 1358/1 1358/6 1374/3 1374/6 1376/19 1402/16 1403/10 1404/21 1498/24
**medical [52]**
**medically [6]** 1313/5 1365/13 1386/16 1388/13 1388/19 1412/2
**Medicare [191]**
**Medicare's [2]** 1353/22 1354/23
**medication [10]** 1284/18 1285/10 1285/11 1293/25 1316/2 1399/20 1399/20 1399/22 1399/24 1400/8
**medications [10]** 1285/3 1290/21 1293/16 1293/19 1293/23 1293/24 1332/22 1394/19 1400/1 1419/18
**meet [3]** 1372/3 1386/14 1388/12
**meeting [18]** 1292/15 1292/17 1292/24 1293/1 1293/2 1293/5 1294/5 1294/18 1296/4 1296/12 1343/13 1388/20 1435/16 1435/18 1435/21 1436/4 1437/17 1439/11
**meets [3]** 1355/19 1366/6 1372/5
**member [3]** 1395/24 1395/25 1397/11
**members [14]** 1322/20 1373/12 1428/19 1435/5 1452/16 1471/17 1476/21 1482/19 1484/4 1487/15 1488/15 1489/5 1492/12 1493/3
**memo [1]** 1484/10
**MENCIA [243]**
**Mencia's [29]** 1298/18 1312/5 1323/12 1366/14 1374/23 1378/5 1379/12 1381/17 1382/23 1409/13 1409/14 1409/19 1414/18 1420/1 1427/8 1429/11 1430/3 1433/10 1437/2 1451/12 1453/13 1456/21 1463/6 1463/9 1473/1 1474/4 1491/2 1491/13 1498/16
**Mensah [38]** 1282/12 1282/16 1283/11 1284/17 1289/11 1290/15 1295/17 1296/8 1298/9 1299/16 1302/7 1304/12 1309/16 1311/23 1313/7 1323/1 1323/13 1324/15 1327/12 1331/9 1331/18 1334/13 1336/3 1338/12 1339/5 1340/23

**Mensah's [2]** 1328/8 1376/5
**Mercedes [6]** 1445/21 1473/3 1473/6 1476/24 1476/25 1478/22
**Mercedes-Benz [5]** 1445/21 1473/3 1473/6 1476/24 1476/25
**Merck [1]** 1399/10
**Merck-Medco [1]** 1399/10
**mergers [1]** 1398/13
**mess [1]** 1334/10
**message [12]** 1433/16 1433/24 1434/1 1434/18 1435/7 1436/12 1444/2 1444/21 1445/13 1450/15 1451/6 1464/13
**messages [2]** 1441/25 1441/25
**methodology [3]** 1367/11 1406/14 1412/8
**Miami [4]** 1281/4 1281/11 1281/14 1471/23
**Michael [1]** 1281/2
**microphone [5]** 1346/7 1384/7 1393/10 1393/11 1471/11
**mid [1]** 1437/17
**mid-2017 [1]** 1437/17
**middle [2]** 1389/12 1469/20
**mill [5]** 1411/25 1413/5 1415/7 1421/22 1422/7
**milligram [2]** 1412/23 1415/15
**milligrams [16]** 1284/11 1285/21 1285/23 1286/2 1332/3 1332/20 1343/8 1412/18 1412/19 1413/2 1413/8 1414/12 1414/13 1417/19 1417/19 1418/14
**million [7]** 1364/20 1365/6 1365/17 1365/22 1459/5 1475/13 1476/7
**mills [5]** 1421/16 1422/3 1422/5 1422/19 1422/24
**mine [2]** 1287/2 1396/24
**mingled [1]** 1507/18
**minimum [1]** 1482/3
**minute [18]** 1290/1 1300/1 1322/21 1329/6 1372/18 1374/22 1375/22 1376/14 1380/8 1380/15 1380/23 1382/24 1382/25 1384/14 1384/20 1401/14 1452/17 1500/1
**minutes [23]** 1290/10 1295/25 1320/21 1322/23 1323/3 1323/5 1324/10 1325/15 1371/15 1371/17 1371/20 1371/22 1371/24 1372/5 1372/6 1373/1 1375/20 1381/13 1392/6 1392/9 1452/20 1453/2 1453/5
**misbehaving [1]** 1375/12
**misfiled [1]** 1476/4
**misleading [2]** 1343/18 1345/12
**misrepresentation [1]** 1360/9
**missing [2]** 1282/10 1282/14
**misstatement [1]** 1343/24
**misstatements [1]** 1389/15
**mistake [7]** 1301/18 1306/19 1313/20 1313/23 1340/1 1461/3 1461/6

**M**

**mistaken [2]**  1371/20 1448/9
**mistakes [6]**  1313/11 1321/23
1339/5 1339/9 1339/15 1389/14
**misunderstood [1]**  1505/14
**moment [10]**  1295/8 1311/18 1337/1
1433/13 1452/14 1468/12 1472/14
1474/4 1489/23 1493/23
**Monday [1]**  1294/25
**money [95]**
**monies [1]**  1457/25
**monitoring [5]**  1399/1 1401/15
1401/16 1401/24 1406/11
**monitors [1]**  1401/17
**month [18]**  1286/16 1294/14 1304/15
1305/6 1446/9 1449/18 1467/4
1479/9 1479/10 1479/14 1479/16
1480/1 1480/14 1482/2 1510/3
1510/6 1510/11 1510/15
**monthly [8]**  1354/3 1446/4 1458/23
1477/23 1479/2 1481/4 1483/25
1510/9
**months [5]**  1351/1 1356/6 1417/20
1449/18 1449/19
**moot [1]**  1496/5
**Morales [13]**  1283/15 1284/3
1284/13 1286/1 1288/23 1289/1
1289/15 1290/9 1290/11 1343/7
1344/17 1374/21 1375/20
**Morales-Gomez [5]**  1284/3 1284/13
1289/1 1374/21 1375/20
**morning [17]**  1283/11 1283/12
1283/13 1295/14 1295/17 1295/19
1348/7 1348/8 1422/21 1495/1
1496/5 1496/10 1499/12 1500/1
1500/10 1506/1 1509/5
**mortgage [2]**  1472/21 1483/24
**mostly [2]**  1430/10 1430/25
**motion [12]**  1291/24 1292/3 1337/17
1337/20 1338/3 1338/14 1339/1
1345/11 1382/2 1382/15 1505/24
1506/19
**move [26]**  1296/3 1306/21 1329/6
1357/8 1357/16 1359/22 1366/19
1369/5 1369/19 1373/10 1382/11
1383/10 1407/22 1408/25 1415/13
1416/7 1441/12 1441/18 1487/7
1487/7 1487/8 1491/1 1492/5 1494/6
1501/9 1501/12
**moved [1]**  1487/6
**moves [6]**  1473/16 1495/8 1496/14
1506/11 1506/21 1509/9
**moving [5]**  1378/23 1394/10 1443/1
1451/3 1487/3
**MR [48]**
**Mr. [114]**
**Mr. Beaton [12]**  1324/8 1342/8
1342/19 1369/8 1454/22 1494/12
1494/24 1495/13 1498/13 1501/1
1505/6 1507/24
**Mr. Gilfarb [8]**  1408/14 1454/1
1496/22 1499/2 1507/4 1508/2
1508/15 1509/5
**Mr. Hewett [11]**  1497/10 1498/1

1498/3 1498/5 1498/21 1498/25
1499/7 1499/17 1500/25 1501/21
1507/9
**Mr. Hewett's [1]**  1500/11
**Mr. Homer [1]**  1498/5
**Mr. Lebrak [2]**  1284/12 1374/20
**Mr. Mensah [31]**  1282/12 1282/16
1283/11 1284/17 1289/11 1290/15
1295/17 1296/8 1298/6 1302/7
1304/12 1309/16 1311/23 1313/7
1323/1 1323/13 1324/15 1327/12
1331/9 1331/18 1334/13 1336/3
1338/12 1339/5 1341/6 1343/20
1345/2 1345/17 1346/13 1374/18
1375/2
**Mr. Mensah's [1]**  1328/8
**Mr. Morales-Gomez [8]**  1283/15
1286/1 1288/23 1289/15 1290/9
1290/11 1343/7 1344/17
**Mr. Quindoza [25]**  1347/15 1348/7
1353/13 1353/21 1357/23 1362/21
1364/9 1366/8 1367/7 1367/14
1369/15 1369/23 1372/13 1373/2
1373/19 1374/14 1374/21 1376/19
1378/6 1380/3 1382/18 1387/9
1391/21 1406/16 1497/17
**Mr. Quindoza's [2]**  1375/3 1378/11
**Mr. Rodriguez [2]**  1375/8 1497/8
**Mr. Ventura [1]**  1497/1
**Mr. Ventura-Rodriguez [2]**  1375/18
1376/10
**Mr. Yoffie [6]**  1283/6 1330/21 1346/6
1346/22 1379/25 1408/10
**MRIs [1]**  1294/1
**Ms [1]**  1374/23
**Ms. [27]**  1414/10 1415/14 1416/9
1416/16 1416/24 1417/15 1418/24
1419/13 1421/11 1428/19 1441/13
1441/24 1452/23 1453/18 1454/5
1454/6 1455/3 1467/13 1467/17
1467/20 1468/15 1469/5 1471/16
1490/16 1505/2 1509/17 1511/14
**Ms. Baldwin [1]**  1505/2
**Ms. Blanco [1]**  1490/16
**Ms. Garcia [7]**  1414/10 1415/14
1416/9 1416/16 1416/24 1417/15
1419/13
**Ms. Gega [11]**  1428/19 1441/24
1452/23 1453/18 1454/5 1454/6
1455/3 1467/13 1468/15 1469/5
1509/17
**Ms. Gega's [1]**  1441/13
**Ms. Longo [2]**  1467/17 1467/20
**Ms. Parker [2]**  1471/16 1511/14
**Ms. Sullivan [2]**  1418/24 1421/11
**multiple [6]**  1370/20 1402/18
1402/19 1411/6 1413/6 1416/5
**multisystem [1]**  1370/19
**muscle [9]**  1400/22 1407/13 1407/15
1407/16 1410/7 1411/11 1414/23
1415/25 1418/17

**N**

**N.E [1]**  1281/3

**N.W [1]**  1281/7
**Nadira [5]**  1295/2 1299/17 1334/14
1421/1 1506/15
**name [50]**
**named [3]**  1419/6 1421/8 1467/13
**narrow [1]**  1402/22
**National [1]**  1403/12
**nature [3]**  1381/12 1449/11 1460/16
**NBI [2]**  1403/7 1403/11
**necessary [4]**  1306/1 1306/4
1365/14 1388/19
**necessity [3]**  1318/6 1318/11 1412/4
**negative [1]**  1400/13
**negotiate [3]**  1306/17 1321/9
1321/13
**negotiating [1]**  1321/5
**negotiation [3]**  1301/17 1339/23
1344/12
**nervous [2]**  1341/13 1341/15
**network [1]**  1354/23
**news [1]**  1454/4
**nice [3]**  1373/16 1385/24 1493/8
**nine [3]**  1508/21 1508/22 1512/10
**nine o'clock [1]**  1508/21
**Ninety [1]**  1343/2
**nobody [5]**  1335/8 1335/9 1335/10
1335/11 1340/8
**None [4]**  1391/9 1391/13 1391/16
1490/2
**nonprofit [6]**  1403/6 1423/2 1423/3
1423/9 1423/18 1426/15
**nonprofits [1]**  1423/20
**Nope [1]**  1321/3
**Norco [1]**  1407/3
**normal [1]**  1437/20
**normally [3]**  1443/20 1510/1 1512/4
**Northeast [1]**  1482/15
**Northwest [1]**  1281/10
**not-for-profit [2]**  1423/15 1423/17
**notate [1]**  1437/10
**notations [1]**  1433/6
**note [3]**  1345/21 1367/4 1376/10
**noted [1]**  1376/11
**notice [3]**  1409/25 1412/13 1503/2
**noticed [2]**  1410/1 1410/9
**notified [1]**  1356/6
**November [5]**  1288/3 1288/7 1288/9
1485/15 1486/3
**November 15th [1]**  1486/3
**November 16th [1]**  1485/15
**November 1st [1]**  1288/9
**nowadays [1]**  1422/17
**number [36]**  1284/11 1285/12
1285/21 1308/19 1308/22 1309/1
1309/11 1325/11 1328/7 1337/13
1356/13 1372/23 1385/24 1387/15
1407/25 1411/22 1416/14 1419/19
1424/11 1424/13 1424/18 1427/3
1466/19 1485/7 1485/13 1485/14
1485/18 1485/22 1486/1 1491/4
1491/9 1491/24 1492/9 1494/9
1494/15 1501/21
**Number 16 [1]**  1328/7
**Number 19 [1]**  1424/11

## N

**number 60 [1]** 1285/12
**Number 78698 [1]** 1485/7
**Number 78907 [1]** 1485/14
**Number 79287 [1]** 1485/18
**Number 79869 [1]** 1485/22
**Number 80121 [1]** 1486/1
**number one [2]** 1337/13 1501/21
**numbers [5]** 1308/25 1371/11 1415/9 1473/18 1473/25
**numerous [2]** 1285/2 1387/12
**nurse [1]** 1354/20
**nurses [1]** 1351/13
**nursing [3]** 1354/17 1396/11 1403/19
**nut [1]** 1481/3
**nutrition [1]** 1398/25
**NW [1]** 1281/13

## O

**o'clock [1]** 1508/21
**oath [4]** 1282/17 1323/13 1378/6 1454/6
**object [12]** 1284/21 1284/25 1343/18 1347/16 1347/19 1347/23 1392/25 1401/4 1408/4 1408/13 1411/19 1445/9
**objected [2]** 1408/21 1408/21
**objecting [2]** 1343/21 1343/23
**objection [38]** 1306/12 1335/23 1337/24 1338/6 1344/7 1345/22 1353/16 1357/12 1357/19 1366/23 1367/10 1367/11 1368/2 1369/9 1369/18 1373/7 1376/22 1380/10 1381/19 1386/25 1387/1 1392/23 1406/14 1406/15 1406/19 1408/16 1408/22 1409/3 1412/3 1424/15 1432/7 1435/9 1441/15 1449/7 1463/11 1491/6 1492/7 1494/13
**objectionable [1]** 1347/17
**objections [3]** 1347/18 1378/17 1473/21
**obligation [1]** 1291/4
**observed [3]** 1328/2 1427/1 1461/16
**obtain [3]** 1376/12 1405/18 1483/19
**obtained [1]** 1501/21
**occasion [1]** 1285/2
**occasions [2]** 1292/8 1387/12
**October [2]** 1288/6 1288/10
**offhand [3]** 1376/1 1479/3 1480/16
**office [39]** 1281/3 1289/8 1293/7 1293/8 1294/21 1305/16 1340/7 1349/15 1349/16 1355/1 1355/1 1368/16 1369/24 1369/25 1381/3 1422/12 1430/3 1436/5 1436/21 1439/23 1440/13 1440/15 1442/11 1442/12 1442/17 1449/16 1449/24 1449/25 1450/1 1450/2 1456/20 1469/9 1469/18 1469/18 1469/20 1480/19 1491/3 1491/3 1498/16
**officers [1]** 1502/10
**official [3]** 1281/16 1359/10 1514/24
**Oh [7]** 1306/9 1358/15 1374/7 1395/10 1446/23 1466/17 1503/9
**older [4]** 1353/23 1463/6 1463/10

**olderly [1]** 1463/23
**omission [1]** 1360/9
**one-third [1]** 1410/19
**one-year [1]** 1511/9
**ongoing [2]** 1363/9 1439/24
**open [1]** 1436/1
**operating [12]** 1462/1 1462/4 1474/5 1474/7 1474/8 1474/13 1474/16 1474/19 1480/17 1486/12 1487/2 1510/19
**opine [1]** 1408/17
**opinion [3]** 1383/21 1384/14 1456/16
**opioid [7]** 1331/20 1401/2 1402/15 1410/7 1414/25 1415/3 1415/23
**opioids [5]** 1400/18 1401/2 1406/23 1406/24 1411/7
**opportunity [8]** 1333/5 1396/25 1398/10 1477/3 1478/25 1481/15 1486/8 1490/18
**opposed [2]** 1502/21 1503/19
**option [2]** 1372/1 1372/3
**options [6]** 1349/25 1364/14 1368/22 1369/25 1370/12 1374/25
**order [3]** 1381/15 1383/6 1436/2
**ordered [1]** 1299/1
**orders [1]** 1298/18
**organization [2]** 1423/3 1423/10
**organizations [1]** 1395/24
**original [3]** 1335/15 1336/3 1359/15
**originally [1]** 1334/13 1428/22 1464/5
**Orlando [2]** 1433/21 1444/1
**Oscar [7]** 1295/2 1299/16 1334/15 1376/11 1420/12 1498/9 1506/14
**ounce [1]** 1330/10
**ours [1]** 1348/15
**outlined [1]** 1355/21 1359/19
**outlining [1]** 1368/22
**outpatient [3]** 1403/13 1403/15 1403/22
**outreach [1]** 1349/8
**overall [3]** 1428/1 1462/14 1462/19
**overdose [5]** 1502/16 1502/17 1502/20 1504/8 1504/24
**overdosing [1]** 1288/18
**overlapping [1]** 1389/2
**overrule [4]** 1344/9 1380/11 1408/21 1412/10
**Overruled [7]** 1306/13 1336/1 1353/18 1367/12 1432/9 1445/11 1473/23
**overseen [2]** 1353/25 1356/24
**oversight [2]** 1349/14 1357/25
**owe [1]** 1489/8
**owed [5]** 1489/4 1489/10 1489/11 1489/13 1489/16
**owned [2]** 1451/16 1477/16
**owner [2]** 1483/17 1483/23
**owners [1]** 1431/18
**ownership [1]** 1490/19
**oxy [3]** 1286/2 1343/7 1343/11
**oxycodone [60]**
**Oxycontin [23]** 1285/12 1285/13

1285/16 1285/23 1286/22 1286/25 1331/22 1331/24 1332/6 1342/16 1342/23 1407/1 1407/4 1407/5 1407/6 1410/25 1415/15 1415/16 1416/17 1416/18 1417/18 1418/15 1427/20

## P

**P-A-R-K-E-R [1]** 1471/13
**P.A [1]** 1281/10
**p.m [5]** 1377/2 1378/1 1453/9 1453/2 1513/2
**paced [1]** 1351/5
**PACER [1]** 1512/14
**pad [1]** 1491/2
**page [14]** 1287/22 1288/15 1288/16 1299/7 1359/22 1361/21 1373/8 1414/6 1424/12 1425/11 1425/14 1425/16 1425/17 1513/5
**page 13 [1]** 1287/22
**page 14 [1]** 1288/16
**page 2 [2]** 1424/12 1425/16
**page 8 [1]** 1373/8
**pain [11]** 1293/15 1328/22 1328/25 1332/18 1341/18 1341/18 1341/22 1372/24 1390/7 1390/8 1414/25
**paragraph [4]** 1361/7 1361/12 1361/14 1361/23
**paragraph 6 [1]** 1361/14
**paragraphs [1]** 1360/4
**paragraphs 2 [1]** 1360/4
**Parajon [1]** 1498/6
**Paralegal [1]** 1281/9
**Pardon [1]** 1313/16
**Parker [6]** 1471/7 1471/9 1471/13 1471/16 1511/14 1513/17
**part [83]**
**Part A [1]** 1354/16
**Part B [13]** 1354/19 1354/25 1363/20 1364/13 1365/19 1366/8 1366/9 1366/14 1366/20 1373/2 1373/5 1381/17 1405/9
**Part C [1]** 1354/22
**Part D [19]** 1354/24 1403/12 1403/13 1403/16 1404/1 1404/1 1404/2 1404/4 1404/7 1404/9 1404/16 1404/17 1404/18 1405/8 1405/18 1405/22 1406/11 1407/23 1408/9
**participate [1]** 1490/18
**participation [2]** 1361/4 1363/15
**parts [2]** 1295/21 1354/13
**party [1]** 1390/24
**Pass [1]** 1489/25
**passed [2]** 1346/16 1346/18
**passes [1]** 1295/11
**passing [1]** 1398/8
**patient [112]**
**patient's [10]** 1287/18 1316/2 1370/6 1370/9 1370/12 1372/23 1380/18 1380/20 1383/7 1390/9
**patient-specific [2]** 1402/11 1402/12
**patients [89]**
**Patricia [10]** 1299/7 1433/17 1433/21 1433/24 1434/23 1434/25 1435/2

**P**

**Patricia... [3]** 1435/3 1443/8 1443/18
**pattern [1]** 1420/5
**patterns [2]** 1413/4 1422/2
**Pause [3]** 1282/19 1495/6 1506/9
**pay [36]** 1289/17 1297/19 1311/5
1311/10 1347/19 1350/8 1352/10
1352/11 1352/15 1354/7 1354/25
1363/19 1369/2 1374/22 1399/16
1403/25 1423/10 1431/17 1439/14
1442/5 1447/19 1456/7 1456/13
1457/9 1458/10 1458/11 1458/16
1459/3 1459/5 1470/12 1470/19
1479/1 1489/14 1507/20 1511/2
1511/15
**payable [7]** 1482/11 1484/9 1485/3
1485/15 1485/19 1485/23 1486/2
**paycheck [6]** 1456/24 1457/1 1457/8
1457/12 1457/13 1457/16
**payer [1]** 1357/2
**payment [19]** 1297/12 1350/14
1355/5 1360/23 1361/16 1363/20
1365/2 1365/11 1366/6 1401/18
1411/2 1436/10 1436/10 1437/20
1446/4 1458/23 1462/20 1484/21
1499/14
**payments [24]** 1404/11 1431/24
1432/20 1433/3 1436/5 1446/19
1447/2 1457/25 1459/2 1461/4
1477/10 1477/22 1477/23 1478/21
1481/3 1481/16 1482/4 1482/6
1483/13 1483/25 1486/4 1507/2
1507/8 1510/21
**payroll [6]** 1432/19 1460/20 1461/10
1480/3 1481/2 1487/2
**PBM [2]** 1399/10 1399/13
**PDMP [26]** 1401/24 1402/2 1402/4
1402/9 1402/11 1402/25 1403/3
1404/16 1404/20 1405/1 1405/11
1405/13 1409/1 1409/7 1409/13
1409/15 1411/21 1411/22 1413/12
1414/1 1415/22 1418/4 1419/5
1427/2 1427/7 1500/15
**penalties [2]** 1360/6 1360/14
**penalty [2]** 1361/11 1511/21
**Penthouse [1]** 1281/14
**people [40]** 1311/1 1312/5 1314/13
1314/16 1314/19 1326/10 1339/2
1349/11 1353/23 1353/24 1366/11
1375/15 1376/5 1385/5 1387/15
1396/12 1398/14 1399/12 1399/15
1400/1 1403/1 1404/20 1404/21
1404/21 1404/23 1407/11 1409/18
1410/22 1422/23 1423/16 1441/4
1461/24 1462/1 1462/2 1462/4
1462/5 1462/7 1462/21 1463/18
1463/18
**perceived [1]** 1449/16
**percent [15]** 1365/3 1374/23 1375/23
1379/12 1382/6 1382/23 1384/24
1392/11 1413/14 1413/17 1425/22
1462/15 1463/2 1463/8 1508/11
**percentage [4]** 1365/1 1373/5
1381/18 1413/12

**Percocet [1]** 1410/3
**Percocets [1]** 1406/25
**perform [1]** 1384/19
**performed [1]** 1290/2
**performing [1]** 1386/15
**perhaps [2]** 1385/5 1389/9
**period [8]** 1374/24 1392/3 1392/5
1427/8 1500/3 1510/3 1510/6 1511/9
**periods [1]** 1413/7
**Permission [1]** 1491/19
**permits [1]** 1439/10
**permitted [1]** 1369/19
**person [30]** 1293/17 1294/4 1297/4
1298/6 1301/5 1304/14 1305/6
1307/8 1312/1 1315/8 1315/13
1315/13 1317/6 1321/14 1330/6
1332/3 1352/8 1355/7 1356/5
1356/10 1374/2 1430/13 1433/1
1433/6 1433/18 1434/24 1437/18
1450/11 1477/15 1479/7
**person's [4]** 1293/19 1297/9 1430/14
1455/11
**personal [12]** 1431/16 1431/17
1431/21 1432/13 1432/16 1438/25
1451/12 1456/21 1457/9 1457/21
1461/12 1463/12
**personally [4]** 1339/2 1344/5
1439/13 1457/16
**pertaining [2]** 1409/22 1477/4
**pertains [2]** 1408/18 1413/16
**Pfizer [1]** 1398/13
**pharmaceutical [1]** 1398/11
**Pharmacia [1]** 1398/12
**pharmacies [2]** 1402/19 1500/25
**pharmacist [20]** 1394/12 1396/1
1396/4 1396/4 1396/7 1396/7 1396/8
1396/15 1396/17 1396/18 1397/5
1399/18 1401/11 1401/13 1406/1
1406/2 1406/3 1406/5 1406/23
1412/6
**pharmacoeconomics [1]** 1395/8
**pharmacy [23]** 1393/25 1394/10
1394/23 1396/9 1396/10 1396/11
1396/12 1396/13 1397/23 1398/20
1398/22 1398/23 1399/13 1399/15
1401/12 1401/18 1402/19 1402/23
1403/19 1404/25 1405/20 1500/16
1500/21
**PharmD [2]** 1395/2 1395/3
**phone [1]** 1464/16
**phonetic [1]** 1477/17
**photocopied [1]** 1359/16
**photograph [1]** 1475/19
**photographic [1]** 1505/3
**photographs [1]** 1504/1
**phrase [1]** 1306/8
**physical [8]** 1287/18 1318/13
1341/21 1343/10 1364/25 1375/21
1419/22 1420/2
**physically [1]** 1396/23
**physician [2]** 1312/3 1312/14
**physicians [3]** 1399/2 1399/21
1400/2
**pick [1]** 1453/25

**picture [13]** 1425/20 1445/4 1446/21
1446/24 1447/3 1448/9 1448/12
1448/14 1448/22 1448/22 1467/25
1468/8 1475/17
**pictures [1]** 1445/5
**pile [1]** 1465/12
**pill [10]** 1411/25 1413/5 1415/7
1421/16 1421/22 1422/3 1422/5
1422/7 1422/19 1422/24
**pills [23]** 1284/12 1285/3 1285/20
1285/23 1286/15 1286/15 1286/16
1302/10 1302/10 1302/16 1302/19
1303/14 1306/17 1321/5 1321/9
1321/10 1321/14 1322/16 1325/11
1326/1 1342/25 1344/14 1344/17
**Pittsburgh [2]** 1397/10 1397/12
**place [2]** 1292/24 1353/11
**Plaintiff [1]** 1280/7
**plan [3]** 1287/19 1288/16 1289/6
**plans [4]** 1395/16 1402/16 1404/8
1404/13
**play [7]** 1295/22 1299/24 1309/3
1331/13 1344/21 1348/16 1349/13
**playing [45]** 1295/21 1296/2 1296/5
1296/20 1296/21 1297/22 1297/23
1297/25 1299/5 1300/4 1300/6
1300/13 1300/15 1302/2 1303/5
1303/6 1304/6 1304/9 1307/1 1309/4
1309/23 1309/24 1311/17 1311/19
1312/17 1315/21 1315/22 1316/12
1319/5 1320/15 1320/23 1322/6
1324/12 1325/17 1326/16 1326/17
1327/5 1328/16 1329/9 1331/5
1331/16 1333/2 1333/14 1333/15
1344/25
**plea [6]** 1291/1 1291/1 1291/4 1291/7
1337/7 1337/13
**plead [1]** 1290/24
**pleading [1]** 1334/22
**pled [1]** 1339/7
**PNC [2]** 1472/16 1487/5
**pocket [3]** 1307/11 1307/14 1340/6
**pocketing [1]** 1481/7
**point [19]** 1294/19 1299/1 1300/25
1333/23 1349/13 1353/12 1356/11
1367/3 1369/5 1369/20 1376/22
1406/9 1408/24 1458/8 1460/25
1500/23 1501/5 1504/13 1506/18
**police [1]** 1502/9
**policies [2]** 1349/6 1355/21
**polite [1]** 1303/13
**polling [4]** 1282/24 1324/1 1379/17
1454/13
**portion [7]** 1299/7 1324/16 1331/13
1359/8 1361/22 1462/25 1507/21
**portions [2]** 1299/24 1299/24
**portray [1]** 1332/22
**posed [2]** 1315/11 1390/14
**posing [14]** 1297/4 1298/6 1301/5
1304/14 1307/8 1312/21 1316/18
1317/17 1321/14 1324/18 1325/23
1326/13 1327/9 1332/2
**position [10]** 1351/14 1362/14
1375/1 1375/21 1399/7 1402/24

# P

**position... [4]** 1430/3 1494/12 1496/19 1496/22
**post [3]** 1394/9 1395/6 1395/7
**post-graduate [3]** 1394/9 1395/6 1395/7
**postulate [1]** 1374/15
**potential [1]** 1400/13
**potentially [1]** 1411/12
**practice [24]** 1283/23 1287/12 1287/15 1287/17 1327/21 1327/22 1328/2 1375/14 1384/22 1396/9 1419/13 1422/21 1455/23 1459/18 1459/23 1459/25 1460/5 1461/9 1461/22 1461/25 1462/9 1462/25 1507/15 1508/11
**practiced [1]** 1314/8
**practices [1]** 1406/12
**practitioner [1]** 1354/20
**practitioners [1]** 1367/16
**precisely [1]** 1389/1
**precision [1]** 1499/22
**preface [1]** 1315/16
**prefer [1]** 1285/2
**Prego [2]** 1445/24 1445/25
**preinstalled [1]** 1289/4
**premiums [1]** 1354/3
**prepare [1]** 1512/14
**prepared [2]** 1343/19 1345/17
**prescribe [9]** 1317/19 1318/4 1318/7 1318/22 1319/14 1319/24 1327/2 1342/3 1342/5
**prescribed [15]** 1293/24 1332/6 1332/9 1345/5 1410/7 1411/9 1411/16 1411/23 1412/14 1412/21 1412/25 1413/6 1413/12 1427/18 1427/22
**prescriber [6]** 1401/19 1402/22 1409/11 1416/14 1418/12 1419/19
**prescribers [2]** 1402/18 1405/12
**prescribing [17]** 1342/20 1406/12 1409/14 1410/2 1411/5 1411/25 1412/1 1413/5 1415/2 1415/6 1415/8 1416/2 1416/13 1417/13 1427/12 1427/15 1504/9
**prescription [45]** 1283/17 1283/21 1283/25 1284/2 1284/7 1284/9 1285/5 1285/7 1285/9 1286/4 1286/6 1286/8 1286/10 1286/12 1286/14 1286/20 1286/22 1286/25 1287/3 1301/3 1305/10 1305/20 1305/23 1313/5 1317/4 1317/14 1319/1 1319/3 1321/24 1322/1 1325/7 1342/23 1344/24 1345/4 1346/20 1354/24 1401/15 1401/16 1401/24 1403/25 1406/11 1417/7 1418/8 1420/5 1491/2
**prescriptions [29]** 1283/14 1285/18 1294/23 1295/1 1305/2 1305/3 1305/13 1305/16 1339/18 1342/5 1343/14 1344/5 1345/13 1346/16 1346/18 1347/1 1376/15 1403/22 1404/10 1409/17 1410/21 1411/23 1414/3 1414/18 1418/2 1419/22

**1419/25 1420/2 1427/8**
**presence [12]** 1282/23 1283/4 1322/22 1323/25 1324/6 1373/15 1379/16 1379/22 1452/19 1454/12 1454/18 1493/6
**present [10]** 1282/5 1282/5 1323/12 1323/12 1361/15 1378/5 1378/5 1385/4 1453/13 1453/13
**presentation [2]** 1378/14 1387/11
**presentations [2]** 1385/11 1387/14
**presented [3]** 1305/20 1361/16 1397/22
**presenting [1]** 1378/13
**President [2]** 1362/15 1364/1
**presigned [9]** 1294/23 1305/14 1343/14 1344/5 1345/13 1346/16 1346/18 1346/19 1347/1
**pressure [4]** 1330/3 1330/8 1370/25 1398/5
**prevent [1]** 1348/18
**preventing [1]** 1349/9
**price [1]** 1476/7
**Prieto [1]** 1281/9
**primarily [5]** 1353/4 1353/23 1394/2 1403/1 1411/6
**primary [2]** 1291/4 1405/25
**printed [1]** 1360/7
**prison [2]** 1290/22 1334/19
**private [4]** 1348/12 1358/4 1404/8 1404/22
**privilege [1]** 1292/2
**privileges [3]** 1355/15 1359/21 1360/16
**pro [1]** 1354/8
**problem [11]** 1370/19 1370/19 1370/20 1370/24 1406/16 1408/3 1448/19 1502/17 1504/4 1504/5 1504/13
**problems [4]** 1399/19 1400/4 1400/6 1411/15
**procedures [1]** 1386/16
**proceed [5]** 1315/17 1353/19 1379/25 1387/2 1406/20
**proceedings [4]** 1280/13 1280/24 1513/2 1514/21
**proceeds [1]** 1507/1 1507/10 1510/23
**process [3]** 1350/7 1351/2 1365/20
**processed [1]** 1297/12
**processes [1]** 1364/12
**processing [2]** 1350/18 1352/18
**processor [2]** 1350/3 1350/5
**processors [1]** 1351/10
**produced [1]** 1280/25
**product [1]** 1401/21
**products [1]** 1402/21
**professional [3]** 1354/20 1366/11 1395/24
**professionally [2]** 1386/15 1388/12
**proffer [2]** 1343/19 1345/17
**profiles [1]** 1402/13
**profit [3]** 1423/15 1423/17 1481/6
**program [36]** 1349/7 1349/18 1350/11 1351/2 1351/6 1351/17

**1352/19 1353/25 1355/15 1355/21 1356/9 1356/20 1357/1 1358/16 1358/21 1359/14 1360/20 1360/22 1361/1 1361/13 1362/2 1362/3 1366/7 1366/10 1391/21 1401/15 1401/16 1401/17 1401/25 1402/2 1402/15 1403/12 1406/12 1426/18 1426/20 1426/21**
**programs [1]** 1358/1
**progress [1]** 1497/9
**promise [2]** 1358/23 1398/18
**promises [1]** 1291/14
**prong [1]** 1507/1
**pronounce [1]** 1477/18
**proof [1]** 1510/21
**proper [1]** 1389/5
**properly [4]** 1355/24 1365/13 1457/4 1457/22
**properties [1]** 1480/17
**property [21]** 1470/13 1470/15 1470/16 1470/18 1472/4 1475/18 1475/19 1475/21 1475/24 1476/3 1476/11 1476/12 1479/11 1479/13 1480/12 1483/8 1483/17 1507/10 1507/13 1507/14 1508/4
**prosecuting [1]** 1338/16
**prosecution [4]** 1327/14 1337/7 1337/18 1337/20
**prosecutor [2]** 1332/2 1332/5
**prosecutors [2]** 1292/4 1338/25
**protocols [1]** 1399/3
**prove [5]** 1502/1 1502/19 1504/8 1507/10 1507/12
**provide [10]** 1294/1 1349/4 1349/8 1349/10 1367/16 1372/11 1404/10 1404/11 1407/10 1502/11
**provided [14]** 1288/22 1288/25 1347/20 1351/15 1355/5 1355/17 1355/19 1356/2 1365/10 1369/15 1371/5 1390/5 1405/13 1405/20
**provider [17]** 1350/6 1350/13 1355/14 1355/16 1356/17 1356/18 1356/19 1358/16 1358/19 1358/20 1358/23 1359/6 1363/15 1363/17 1365/8 1370/7 1418/8
**providers [5]** 1349/9 1351/17 1358/18 1387/16 1461/25
**provides [4]** 1353/23 1366/10 1388/18 1392/3
**providing [3]** 1358/13 1404/23 1497/24
**proximate [2]** 1501/15 1502/19
**public [1]** 1351/14
**Publix [4]** 1396/13 1403/24 1449/22 1449/23
**pull [2]** 1369/16 1508/19
**punished [1]** 1360/13
**punishment [5]** 1329/19 1329/21 1329/22 1330/19 1340/25
**purchase [6]** 1475/12 1476/7 1476/23 1476/23 1476/25 1482/13
**purchased [1]** 1488/25
**purporting [1]** 1412/6
**purposes [6]** 1348/15 1349/20

**P**

**purposes... [4]** 1470/24 1484/20 1509/18 1509/23
**pursuant [10]** 1357/7 1357/15 1357/16 1366/18 1367/5 1407/21 1408/24 1473/15 1490/25 1514/19

**Q**

**Q-L-A-R-A-N-T [2]** 1423/5 1425/5
**Q-U-I-N-D-O-Z-A [1]** 1348/4
**Qlarant [11]** 1403/6 1422/25 1423/7 1423/22 1424/2 1424/11 1424/20 1425/4 1425/17 1425/24 1426/15
**Qlarant's [1]** 1426/17
**qualified [1]** 1406/19
**qualify [1]** 1388/25
**quality [2]** 1338/4 1338/8
**quantity [7]** 1284/10 1284/11 1284/18 1285/3 1321/14 1411/24 1415/11
**question [41]** 1305/4 1307/23 1311/10 1313/22 1313/23 1315/11 1315/14 1317/15 1317/23 1318/18 1321/13 1321/16 1325/9 1330/12 1334/5 1340/22 1340/22 1343/18 1345/12 1380/12 1383/11 1383/24 1384/5 1384/9 1384/17 1411/18 1412/8 1420/6 1421/4 1421/6 1438/22 1442/9 1446/13 1448/10 1457/23 1469/7 1485/11 1502/14 1504/6 1504/24 1505/20
**questioning [3]** 1382/23 1386/24 1424/7
**questions [22]** 1295/10 1328/1 1341/2 1345/8 1345/12 1345/14 1347/5 1378/18 1379/2 1380/5 1382/9 1391/17 1392/14 1418/19 1426/10 1428/2 1469/6 1470/2 1471/1 1479/5 1490/2 1492/17
**quick [2]** 1285/20 1370/19
**QuickBooks [6]** 1431/3 1431/4 1431/7 1431/15 1431/23 1437/10
**quickly [1]** 1333/11
**quindoza [29]** 1347/10 1347/15 1347/25 1348/4 1348/7 1353/13 1353/21 1357/23 1362/21 1364/9 1366/8 1367/7 1367/14 1369/15 1369/23 1372/13 1373/2 1373/19 1374/14 1374/21 1376/19 1378/6 1380/3 1382/18 1387/9 1391/21 1406/16 1497/17 1513/9
**Quindoza's [2]** 1375/3 1378/11
**quote [7]** 1316/16 1317/6 1317/13 1317/18 1317/21 1317/25 1324/21
**quote/unquote [5]** 1316/16 1317/6 1317/18 1317/21 1317/25

**R**

**raise [6]** 1285/3 1347/24 1393/1 1428/10 1471/8 1490/8
**raised [1]** 1504/24
**ran [4]** 1384/22 1402/15 1405/10 1406/16
**ranging [2]** 1370/3 1371/9

**rate [2]** 1425/22 1481/11
**rays [2]** 1294/1 1354/21
**RE [2]** 1346/23 1513/8
**RE-REDIRECT [2]** 1346/23 1513/8
**reached [1]** 1406/7
**reaches [1]** 1356/5
**reaching [2]** 1353/7 1356/6
**reacted [1]** 1435/5
**reactions [2]** 1398/1 1398/7
**read [18]** 1288/16 1292/18 1310/9 1317/4 1322/1 1345/7 1359/8 1360/4 1360/6 1361/22 1361/25 1425/19 1485/12 1487/12 1487/24 1504/7 1504/17 1505/5
**readback [1]** 1384/13
**reading [2]** 1386/6 1388/8
**reads [1]** 1305/11
**ready [1]** 1283/7
**realtor [1]** 1429/11
**Realty [1]** 1482/11
**reasons [3]** 1338/9 1372/23 1406/17
**Recalculating [1]** 1510/8
**recall [33]** 1283/15 1288/22 1288/24 1288/25 1298/25 1308/23 1311/23 1324/15 1335/13 1341/19 1342/11 1342/20 1342/22 1342/25 1344/11 1419/5 1441/25 1444/25 1477/10 1477/17 1479/3 1479/23 1480/16 1481/1 1482/13 1486/17 1486/18 1488/20 1488/24 1488/24 1489/2 1489/21 1509/13
**receipt [1]** 1416/21
**receive [34]** 1289/9 1294/23 1334/23 1336/14 1336/17 1336/22 1343/14 1344/5 1344/17 1346/25 1347/3 1354/18 1356/12 1358/7 1358/10 1394/22 1396/20 1415/14 1416/9 1416/24 1417/9 1417/16 1418/2 1418/14 1418/16 1418/18 1432/12 1434/22 1456/23 1457/16 1459/23 1459/24 1464/9 1475/1
**received [33]** 1284/13 1285/18 1328/10 1346/4 1351/1 1351/4 1355/14 1357/13 1357/20 1366/24 1393/24 1395/3 1405/15 1408/6 1413/21 1414/12 1415/15 1416/10 1417/17 1418/11 1436/18 1441/16 1441/21 1443/4 1457/22 1460/7 1460/12 1473/24 1474/24 1491/8 1492/8 1514/2 1514/9
**receiving [15]** 1400/7 1415/23 1417/3 1417/18 1417/20 1418/7 1433/3 1434/13 1436/13 1436/16 1442/16 1464/13 1464/15 1464/16 1464/17
**recently [1]** 1425/7
**receptionists [1]** 1422/15
**receptors [1]** 1401/3
**recess [13]** 1322/21 1323/5 1323/9 1373/13 1376/24 1377/2 1452/17 1453/5 1453/9 1493/1 1493/4 1512/10 1512/24
**recipient [1]** 1284/2
**recipients [3]** 1349/10 1354/4

1387/16
**reckless [1]** 1361/18
**recognize [12]** 1283/21 1286/6 1286/20 1287/7 1362/23 1367/19 1387/9 1413/19 1424/20 1475/14 1478/2 1491/23
**recognized [3]** 1386/15 1388/12 1502/7
**recognizes [1]** 1424/16
**recollection [5]** 1295/5 1330/10 1347/14 1413/11 1417/24
**record [44]** 1282/4 1287/14 1287/20 1288/17 1292/18 1293/3 1295/9 1299/22 1311/16 1323/11 1328/4 1331/15 1348/2 1359/8 1360/4 1361/10 1367/1 1376/9 1378/4 1386/20 1393/6 1414/2 1418/21 1424/9 1428/14 1429/24 1453/12 1468/13 1471/12 1476/17 1482/21 1483/1 1484/20 1485/12 1487/13 1487/24 1489/24 1490/11 1493/24 1496/3 1503/13 1506/24 1508/10 1514/21
**record's [2]** 1484/20 1486/11
**recorded [2]** 1280/24 1353/11
**recording [5]** 1283/19 1296/8 1328/7 1341/25 1374/20
**recordings [5]** 1283/18 1284/5 1289/25 1372/13 1375/4
**records [30]** 1287/17 1292/20 1352/13 1355/25 1365/12 1369/10 1389/20 1390/1 1391/14 1405/8 1408/2 1410/18 1419/10 1432/24 1458/6 1471/24 1472/2 1472/3 1472/7 1472/18 1473/8 1473/10 1473/12 1476/12 1477/3 1488/21 1498/2 1498/5 1500/24 1501/3
**recover [2]** 1491/15 1491/16
**recovered [2]** 1492/2 1492/13
**recreation [1]** 1397/21
**RECROSS [2]** 1345/15 1513/8
**RECROSS-EXAMINATION [1]** 1345/15
**red [8]** 1284/17 1285/4 1286/18 1288/19 1422/11 1422/13 1422/14 1422/23
**redact [1]** 1495/15
**Redirect [14]** 1341/3 1341/4 1346/23 1391/18 1391/19 1426/11 1426/12 1469/2 1469/3 1513/7 1513/8 1513/11 1513/13 1513/16
**reduce [6]** 1332/14 1332/24 1337/17 1338/4 1338/9 1343/5
**reduced [2]** 1337/10 1416/20
**reducing [4]** 1332/11 1337/22 1342/19 1504/12
**reduction [4]** 1291/18 1291/22 1291/24 1417/1
**refer [5]** 1294/15 1358/14 1373/7 1403/11 1414/15
**reference [2]** 1448/4 1487/25
**referenced [1]** 1286/18
**referred [2]** 1383/24 1395/1
**referring [9]** 1317/9 1330/2 1332/5

# R

**referring... [6]** 1390/11 1391/10
1444/2 1446/3 1451/11 1466/3
**refers [3]** 1304/4 1318/3 1414/16
**reflect [2]** 1429/24 1476/13
**reflected [1]** 1483/3
**reflecting [1]** 1292/20
**refresh [1]** 1347/14
**refuses [1]** 1327/2
**regimens [3]** 1410/2 1410/10
1410/15
**register [1]** 1431/5
**registered [5]** 1396/4 1396/5 1396/6
1396/17 1396/18
**registering [1]** 1431/1
**regular [3]** 1293/17 1442/22 1442/24
**regulation [2]** 1349/18 1365/19
**regulations [11]** 1349/6 1352/15
1352/24 1355/20 1358/24 1360/20
1360/21 1361/1 1362/2 1366/7
1380/7
**reimburse [2]** 1375/24 1457/14
**reimbursed [1]** 1375/6
**reimbursement [2]** 1353/15 1391/3
**reimbursement's [1]** 1371/8
**relation [2]** 1355/20 1403/3
**relations [1]** 1351/14
**relationship [6]** 1316/22 1381/9
1449/2 1449/11 1449/12 1456/3
**relatively [1]** 1508/11
**relaxant [4]** 1410/7 1414/23 1415/25
1418/17
**relaxants [4]** 1400/22 1407/15
1407/16 1411/12
**release [11]** 1285/12 1285/16
1285/17 1407/1 1407/6 1412/23
1413/1 1413/10 1413/10 1415/18
1416/19
**relevance [6]** 1335/23 1380/10
1408/13 1432/8 1445/9 1449/7
**reliever [1]** 1414/25
**remainder [1]** 1296/4
**remaining [2]** 1380/5 1452/7
**remark [1]** 1376/1
**remember [32]** 1296/17 1297/8
1308/17 1322/21 1330/9 1342/1
1342/5 1373/13 1413/14 1420/6
1435/1 1436/14 1443/16 1445/2
1446/15 1447/16 1447/20 1447/21
1448/5 1448/10 1448/12 1450/22
1452/17 1459/2 1464/10 1468/4
1469/7 1476/6 1479/7 1480/15
1480/20 1493/4
**remind [1]** 1284/4
**Renate [1]** 1477/17
**rendered [6]** 1388/23 1389/23
1496/16 1497/19 1497/19 1498/17
**Rene [2]** 1477/17 1477/17
**renew [1]** 1347/18
**renewed [1]** 1367/11
**renovating [1]** 1439/3
**renovation [1]** 1445/6
**rent [4]** 1467/1 1470/13 1470/15
1470/18

**rentals [1]** 1472/4
**reopen [1]** 1496/9
**report [6]** 1405/22 1405/24 1405/25
1406/1 1406/2 1406/3
**reporter [4]** 1281/15 1281/16
1421/20 1514/24
**reporting [2]** 1457/6 1509/16
**reports [2]** 1419/12 1419/12
**repository [3]** 1404/7 1404/12
1405/20
**represent [7]** 1350/15 1351/12
1370/14 1382/19 1415/10 1419/1
1455/5
**representation [2]** 1383/19 1408/12
**representative [2]** 1290/12 1371/14
**representing [1]** 1371/7
**represents [1]** 1354/23 1381/13
**request [4]** 1353/16 1358/20 1392/23
1403/4
**requesting [1]** 1355/4
**required [4]** 1369/2 1396/8 1396/10
1396/10
**requirements [8]** 1350/22 1351/7
1359/11 1359/14 1359/25 1372/3
1457/6 1509/16
**research [3]** 1398/14 1398/15 1422/4
**reserving [1]** 1408/13
**residence [7]** 1472/25 1475/5 1475/6
1483/11 1491/13 1492/3 1492/13
**residences [1]** 1475/9
**residency [5]** 1394/9 1395/6 1395/7
1397/8 1397/18
**resign [1]** 1431/11
**resource [1]** 1349/19
**resources [1]** 1507/15
**respectfully [1]** 1499/9
**respond [1]** 1445/17
**responds [1]** 1443/12
**response [15]** 1301/6 1301/10
1303/19 1306/10 1308/1 1309/15
1309/20 1313/6 1318/8 1324/21
1329/13 1442/21 1476/14 1482/14
1489/7
**responsibilities [4]** 1397/15 1430/23
1432/2 1432/23
**responsibility [1]** 1431/23
**rest [9]** 1289/23 1313/12 1444/21
1453/21 1493/11 1494/19 1494/20
1495/20 1505/4
**Restoril [1]** 1407/12
**restricted [2]** 1418/4 1427/25
**rests [2]** 1341/1 1494/23
**result [6]** 1291/1 1357/3 1386/12
1388/11 1502/16 1508/5
**resulted [1]** 1501/11
**resume [3]** 1283/7 1398/18 1400/15
**retail [2]** 1396/12 1403/19
**return [2]** 1401/14 1433/13
**returning [1]** 1406/22
**Revenue [3]** 1472/19 1477/4 1477/7
**review [49]**
**reviewed [23]** 1285/7 1286/23
1353/9 1353/10 1363/1 1365/2
1367/6 1369/15 1372/19 1373/2

1405/8 1406/6 1406/6 1408/18
1409/11 1411/21 1419/8 1426/25
1473/9 1474/18 1475/5 1478/23
1488/21
**reviewing [4]** 1283/14 1349/20
1420/18 1459/9
**reviews [4]** 1352/4 1352/4 1352/16
1352/18
**revocation [1]** 1360/15
**revoked [1]** 1359/13
**right-hand [1]** 1287/23
**rise [11]** 1282/21 1322/24 1323/23
1373/17 1376/25 1379/14 1452/21
1453/7 1454/10 1493/9 1512/25
**risk [1]** 1288/20
**RMR [2]** 1281/15 1514/24
**RMR-CRR [1]** 1514/24
**Rodriguez [7]** 1299/17 1375/8
1375/18 1376/10 1420/12 1497/8
1506/15
**role [3]** 1348/16 1349/13 1349/17
**rolled [1]** 1489/19
**romantic [1]** 1449/2
**Ronald [1]** 1292/22
**roofer [1]** 1442/5
**room [24]** 1281/17 1296/18 1297/16
1298/22 1298/22 1300/12 1300/18
1311/5 1311/10 1312/6 1312/8
1312/10 1312/12 1322/23 1325/20
1326/2 1326/5 1326/10 1327/24
1375/11 1452/19 1469/21 1500/3
1506/7
**rooms [3]** 1448/15 1469/11 1469/14
**Rosemary [12]** 1429/17 1429/18
1431/20 1440/4 1455/20 1455/23
1456/1 1456/4 1456/8 1456/12
1456/16 1457/18
**round [1]** 1385/24
**routine [1]** 1411/23
**rule [18]** 1347/23 1367/5 1369/6
1406/10 1494/21 1494/25 1495/5
1496/5 1496/6 1498/14 1500/23
1501/5 1502/3 1502/18 1504/13
1505/23 1506/19 1512/20
**Rule 20 [1]** 1496/6
**Rule 29 [11]** 1494/21 1494/25 1495/5
1496/5 1498/14 1500/23 1501/5
1502/18 1504/13 1505/23 1506/19
**Rule 29s [1]** 1512/20
**Rule 702 [1]** 1406/10
**ruled [1]** 1381/20
**rules [14]** 1294/9 1349/6 1349/18
1351/2 1352/9 1352/14 1352/23
1358/24 1361/13 1365/15 1366/7
1367/16 1380/6 1380/23
**ruling [2]** 1408/15 1500/9
**runs [1]** 1402/2
**rushing [1]** 1435/8

# S

**S-U-L-L-I-V-A-N [1]** 1393/8
**SafeGuard [7]** 1358/3 1385/7 1385/8
1385/11 1385/12 1385/14 1385/18
**salaries [2]** 1423/13 1423/16

**S**

**salary [3]**  1391/1 1476/13 1477/1
**sale [2]**  1483/18 1483/20
**Salopek [3]**  1281/15 1514/23 1514/24
**Sampath [3]**  1299/17 1421/1 1506/15
**Sampath-Grant [2]**  1421/1 1506/15
**San [1]**  1394/8
**San Antonio [1]**  1394/8
**saved [1]**  1343/17
**saw [26]**  1284/4 1289/25 1296/14 1299/24 1318/17 1321/6 1321/9 1325/7 1327/12 1332/2 1339/20 1339/21 1339/23 1363/22 1375/19 1375/19 1390/10 1391/7 1420/5 1436/9 1458/9 1463/18 1463/19 1474/17 1480/3 1498/8
**scans [1]**  1294/1
**scared [1]**  1442/12
**scary [2]**  1468/17 1468/18
**scenario [1]**  1502/6
**schedule [2]**  1290/21 1439/10
**Schedule II [1]**  1290/21
**scheduled [2]**  1291/12 1439/22
**scheme [1]**  1497/8
**school [3]**  1394/6 1394/10 1394/22
**Science [2]**  1394/2 1394/7
**scientific [1]**  1398/2
**scoot [1]**  1393/11
**scope [1]**  1343/22
**screen [4]**  1310/10 1438/9 1470/3 1484/11
**screenshot [2]**  1447/15 1447/16
**Scripts [1]**  1399/12
**search [3]**  1490/18 1490/23 1491/12
**seat [2]**  1293/8 1293/9
**second [20]**  1290/9 1292/25 1296/11 1296/12 1301/25 1328/14 1335/3 1342/15 1357/6 1361/7 1367/23 1406/2 1450/3 1463/22 1464/25 1497/1 1497/7 1502/5 1508/19 1511/13
**second-to-last [1]**  1511/13
**secondary [2]**  1406/1 1406/5
**seconds [7]**  1290/1 1295/25 1302/1 1316/11 1324/10 1345/3 1375/20
**secret [5]**  1307/25 1316/23 1316/24 1317/2 1317/5
**section [3]**  1359/5 1359/20 1514/19
**section's [1]**  1359/6
**Security [4]**  1356/7 1471/19 1471/21 1490/17
**seek [3]**  1376/15 1386/23 1424/11
**seeking [5]**  1358/20 1375/15 1410/6 1415/7 1426/22
**seeks [5]**  1357/8 1357/16 1366/19 1407/22 1408/25
**segregated [1]**  1465/11
**seizures [1]**  1407/14
**select [2]**  1368/13 1372/4
**self [2]**  1351/5 1361/20
**self-explanatory [1]**  1361/20
**self-paced [1]**  1351/5
**seller [3]**  1483/8 1483/21 1483/22

**send [7]**  1433/25 1433/25 1435/7 1445/4 1445/5 1450/15 1464/18
**sending [3]**  1441/25 1445/13 1464/14
**sends [3]**  1446/21 1448/9 1465/7
**sense [1]**  1320/9
**sentence [7]**  1291/16 1335/24 1337/17 1337/22 1338/4 1340/11 1341/6
**sentenced [2]**  1291/10 1337/25
**sentencing [1]**  1291/12
**separated [2]**  1433/2 1459/15
**September [10]**  1286/4 1288/1 1288/6 1288/7 1288/9 1288/10 1311/14 1311/22 1327/13 1485/6
**September 15th [1]**  1485/6
**September 22nd [4]**  1288/9 1311/14 1311/22 1327/13
**serve [2]**  1290/22 1341/6
**served [1]**  1292/20
**service [18]**  1349/25 1351/11 1355/17 1355/20 1356/1 1356/1 1362/6 1364/14 1365/10 1365/11 1367/15 1368/8 1368/10 1372/12 1380/17 1388/18 1399/18 1497/14
**services [28]**  1347/20 1348/14 1350/13 1350/14 1350/15 1355/5 1357/25 1358/3 1366/11 1385/7 1385/8 1385/11 1385/12 1385/14 1385/18 1388/23 1389/23 1390/4 1390/4 1390/5 1403/10 1432/24 1459/18 1496/16 1497/18 1497/19 1497/24 1498/17
**session [1]**  1380/8
**sessions [1]**  1392/12
**setting [2]**  1293/20 1396/11
**settings [1]**  1396/9
**seven [1]**  1295/25
**Seventeen [1]**  1346/2 1346/4
**Seventy [1]**  1344/16
**Seventy-five [1]**  1344/16
**SGS [5]**  1357/17 1358/2 1358/8 1358/11 1358/13
**shareholders [1]**  1423/11
**Shield [1]**  1350/1
**shopping [1]**  1402/20
**short [24]**  1331/20 1331/25 1332/10 1332/11 1332/14 1332/16 1342/13 1342/14 1342/17 1342/19 1343/1 1343/5 1378/14 1411/7 1415/23 1416/2 1416/4 1416/20 1417/3 1417/6 1417/21 1427/22 1508/21 1512/3
**short-acting [20]**  1331/20 1331/25 1332/10 1332/11 1332/14 1332/16 1342/13 1342/14 1342/17 1342/19 1343/1 1343/5 1411/7 1415/23 1416/2 1416/4 1417/3 1417/6 1417/21 1427/22
**short-lasting [1]**  1416/20
**sic [38]**  1286/24 1288/21 1294/20 1303/4 1303/10 1305/11 1308/10 1330/6 1345/6 1346/19 1353/14 1362/1 1369/7 1371/9 1385/16

**1388/13 1412/25 1428/23 1429/8 1431/11 1434/5 1436/2 1446/11 1447/20 1447/20 1447/24 1448/3 1448/8 1448/17 1450/12 1452/11 1464/21 1472/11 1474/9 1484/9 1490/17 1496/6 1497/14
**side [10]**  1329/21 1389/18 1394/18 1395/19 1397/21 1398/2 1398/6 1399/25 1400/10 1400/12
**sidebar [2]**  1343/20 1347/14
**sign [15]**  1291/1 1293/20 1305/3 1305/3 1305/11 1317/3 1317/4 1319/1 1325/7 1340/8 1345/4 1345/7 1422/7 1458/24 1459/12
**signature [7]**  1284/15 1346/13 1346/15 1362/1 1362/4 1362/17 1363/22
**signatures [3]**  1359/10 1359/15 1359/16
**signed [16]**  1286/10 1287/3 1288/2 1288/5 1293/20 1305/13 1305/17 1305/19 1321/4 1337/7 1342/25 1343/20 1345/17 1362/19 1458/21 1491/2
**signs [1]**  1322/2
**silly [9]**  1301/18 1306/19 1313/11 1313/20 1313/23 1321/23 1339/9 1339/15 1340/1
**Silverman [1]**  1426/14
**similiar [1]**  1285/6
**simple [2]**  1318/18 1330/12
**Sinclair [1]**  1281/10
**single [3]**  1378/19 1378/21 1427/3
**situation [1]**  1330/8
**six days [1]**  1415/19
**six months [1]**  1417/20
**Sixteen [1]**  1328/10
**Sixty [1]**  1415/11
**skilled [1]**  1354/17
**sleep [1]**  1407/13
**sleepy [4]**  1319/19 1319/23 1320/2 1320/5
**slide [2]**  1387/9 1387/24
**slightly [1]**  1401/20
**slip [3]**  1487/24 1488/13 1488/16
**small [4]**  1354/3 1398/21 1462/18 1462/25
**smart [1]**  1333/11
**Social [1]**  1356/7
**Solutions [2]**  1348/10 1348/11 1348/21
**Soma [2]**  1407/19 1410/5
**somebody's [2]**  1323/22 1328/22
**sometime [1]**  1452/10
**soon [4]**  1439/21 1440/23 1440/25 1441/2
**sought [1]**  1410/6
**sounds [1]**  1480/22
**SOUTHERN [2]**  1280/2 1353/1
**spasms [1]**  1407/13
**specific [9]**  1334/11 1334/12 1356/13 1402/11 1402/12 1437/9 1468/8 1505/3 1507/2
**specified [1]**  1507/5

**S**

**specifies [1]** 1365/20
**specify [2]** 1436/8 1450/25
**Speculative [1]** 1463/11
**spell [7]** 1393/5 1395/9 1423/4
1425/8 1428/13 1430/16 1503/5
**spelled [1]** 1425/4
**spelling [4]** 1348/2 1425/5 1471/12
1490/11
**spells [1]** 1425/6
**spend [1]** 1500/2
**spends [1]** 1371/16
**spent [7]** 1372/25 1375/10 1456/16
1461/16 1463/9 1469/6 1469/22
**split [3]** 1450/12 1450/13 1450/23
**spoke [1]** 1415/1
**spoken [2]** 1292/4 1495/16
**spreadsheet [13]** 1433/2 1433/4
1433/5 1433/7 1433/7 1433/9 1436/1
1436/6 1436/8 1436/8 1436/24
1437/14 1438/13
**spreadsheets [1]** 1433/13
**spring [1]** 1348/22
**staff [6]** 1349/4 1351/11 1351/11
1387/16 1397/23 1397/23
**stage [1]** 1398/15
**stage 3 [1]** 1398/15
**stairs [1]** 1450/4
**stamped [1]** 1359/16
**stand [4]** 1282/13 1347/11 1392/21
1428/9
**standards [3]** 1386/15 1388/12
1388/21
**stands [2]** 1357/24 1358/3
**Stark [1]** 1361/3
**starting [1]** 1309/3
**starts [2]** 1443/7 1445/7
**state [24]** 1348/2 1351/15 1355/20
1356/24 1356/25 1357/1 1364/17
1380/12 1393/5 1396/3 1396/5
1396/9 1396/20 1397/6 1401/19
1402/16 1409/15 1414/1 1414/4
1428/13 1471/11 1490/11 1501/24
1501/25
**statement [12]** 1284/22 1315/16
1328/8 1359/7 1359/12 1359/23
1360/2 1363/1 1363/4 1483/3
1487/12 1487/22
**states [15]** 1280/1 1280/6 1280/15
1281/3 1281/16 1347/10 1385/19
1392/20 1394/18 1428/24 1428/25
1429/8 1429/10 1501/14 1514/20
**States vs [1]** 1501/14
**statistical [3]** 1378/20 1395/21
1422/2
**statute [1]** 1361/2
**stay [2]** 1320/3 1443/21
**staying [3]** 1440/3 1440/4 1442/10
**stemming [1]** 1283/14
**stenography [1]** 1280/24
**step [7]** 1345/9 1347/6 1392/15
1428/3 1471/2 1490/3 1492/20
**stephen [4]** 1347/10 1347/25 1348/4
1513/9

**steps [2]** 1355/9 1365/22
**Stipulate [1]** 1429/23
**stipulated [4]** 1408/2 1408/5 1473/20
1496/1
**stipulation [9]** 1292/18 1357/7
1357/16 1366/18 1407/21 1408/24
1473/16 1490/25 1494/6
**stipulation 11 [1]** 1408/24
**stipulation 13 [1]** 1366/18
**stipulation 14 [1]** 1357/7
**stipulation 15 [1]** 1357/16
**stipulation 16 [1]** 1407/21
**stipulation 46 [1]** 1292/18
**stipulations [5]** 1408/11 1408/12
1495/13 1495/13 1495/23
**stood [1]** 1437/6
**stop [30]** 1296/6 1296/24 1298/1
1299/6 1300/7 1300/16 1302/3
1303/7 1304/10 1307/2 1309/25
1311/20 1312/18 1315/23 1316/13
1319/6 1320/16 1320/24 1322/7
1324/13 1325/18 1326/18 1327/6
1328/17 1329/9 1329/9 1331/6
1331/6 1333/16 1410/14
**stopped [5]** 1295/24 1296/15 1461/4
1461/6 1461/8
**straight [3]** 1328/12 1429/1 1501/9
**streamline [1]** 1394/19
**street [9]** 1281/3 1281/10 1281/13
1293/25 1501/22 1502/2 1502/22
1503/20 1505/1
**strength [9]** 1412/17 1412/20
1412/20 1412/24 1413/2 1413/5
1413/13 1427/24 1427/24
**strengths [1]** 1412/14
**strictly [2]** 1369/13 1381/25
**strip [3]** 1422/8 1422/9 1422/12
**stroke [1]** 1398/8
**structure [1]** 1370/4
**structured [2]** 1509/14 1509/15
**structuring [2]** 1506/4 1508/17
**student [1]** 1401/12
**studies [2]** 1393/24 1395/22
**study [6]** 1393/23 1394/1 1394/11
1394/12 1394/14 1394/16
**studying [2]** 1395/14 1395/14
**stuff [1]** 1321/22
**subcontractor [2]** 1348/14 1385/8
**subject [2]** 1361/11 1382/2
**subjected [1]** 1298/16
**submission [2]** 1355/8 1365/21
**submit [6]** 1361/17 1363/17 1374/5
1374/8 1374/11 1498/17
**submits [1]** 1350/6
**submitted [25]** 1350/10 1352/9
1353/9 1355/12 1355/23 1358/18
1361/9 1363/14 1364/9 1364/16
1364/22 1366/5 1369/3 1374/2
1374/12 1374/17 1374/23 1375/23
1454/2 1496/1 1496/15 1498/22
1498/23 1498/24 1512/14
**submitting [2]** 1355/9 1459/9
**subpart [2]** 1287/6 1362/22
**subparts [4]** 1473/17 1484/3 1494/3

1494/4
**subpoenaed [1]** 1391/2
**subsequent [1]** 1286/5
**subsets [1]** 1478/1
**substance [10]** 1339/19 1375/15
1376/15 1405/1 1437/7 1437/12
1501/10 1502/12 1506/11 1506/16
**substance-seeking [1]** 1375/15
**substances [18]** 1289/6 1290/21
1376/13 1400/16 1400/18 1401/9
1401/10 1401/17 1402/14 1402/18
1406/13 1409/14 1409/17 1411/11
1414/3 1418/3 1427/7 1506/5
**substantially [3]** 1285/6 1374/19
1375/3
**substantive [1]** 1499/15
**success [1]** 1423/17
**sufficient [3]** 1502/7 1502/10
1506/17
**sugar [1]** 1398/5
**suggest [4]** 1382/25 1383/3 1383/4
1383/5
**suggested [1]** 1379/12
**suggesting [1]** 1384/17
**suicide [2]** 1502/7 1502/16
**Suite [2]** 1281/4 1281/11
**Sullivan [21]** 1392/20 1393/2 1393/7
1393/16 1400/15 1405/6 1406/10
1406/22 1408/8 1408/17 1409/7
1417/23 1418/24 1421/11 1421/12
1421/16 1424/20 1426/14 1426/15
1426/25 1513/12
**summarized [1]** 1397/24
**summary [4]** 1367/5 1367/25
1368/22 1369/6
**summer [5]** 1434/8 1435/16 1435/18
1436/22 1436/23
**sums [1]** 1467/23
**SunTrust [1]** 1473/3
**superbill [2]** 1287/10 1287/13
**superstar [1]** 1447/9
**supervisor [1]** 1455/13
**supplier [4]** 1359/11 1359/13
1360/21 1362/2
**supplier's [1]** 1361/3
**supplying [1]** 1360/11
**support [3]** 1313/5 1314/23 1315/18
**supported [1]** 1375/5
**Supreme [1]** 1503/8
**surprised [1]** 1435/6
**sustain [9]** 1338/1 1345/24 1369/18
1376/22 1401/6 1406/18 1408/15
1435/10 1449/9
**SWORN [5]** 1347/25 1393/2 1428/11
1471/9 1490/9
**Sylvia [2]** 1376/11 1497/15
**system [14]** 1289/4 1366/3 1370/23
1370/25 1386/13 1395/25 1397/11
1398/20 1430/21 1431/1 1431/5
1444/7 1464/22 1503/15
**systems [3]** 1370/20 1380/25
1395/16

**T**

**tablet [1]** 1417/2
**tablets [1]** 1415/15
**take [39]** 1282/12 1288/14 1292/24 1293/23 1293/25 1294/6 1298/23 1302/24 1322/11 1322/18 1322/20 1324/23 1325/10 1326/24 1340/3 1340/8 1365/21 1372/11 1381/14 1400/11 1403/8 1425/14 1425/24 1426/5 1431/12 1434/2 1435/8 1438/11 1439/10 1439/17 1442/2 1442/18 1452/17 1458/17 1463/17 1476/10 1500/1 1504/20 1504/20
**taken [11]** 1297/2 1323/9 1347/13 1359/21 1377/2 1392/8 1448/14 1448/15 1453/9 1457/1 1503/22
**takes [1]** 1372/10
**talk [18]** 1290/15 1301/12 1301/13 1308/10 1355/8 1356/17 1358/13 1393/20 1433/22 1434/17 1435/12 1455/19 1459/13 1470/22 1482/7 1509/3 1512/1 1512/5
**talked [5]** 1384/2 1399/20 1421/16 1460/18 1506/6
**talking [13]** 1297/11 1306/20 1318/10 1324/16 1381/23 1382/13 1388/5 1434/19 1438/14 1454/1 1477/21 1501/25 1502/4
**talks [1]** 1299/8
**Tam [9]** 1451/13 1451/14 1451/15 1452/7 1466/18 1466/23 1480/11 1480/20 1488/3
**Tam Holdings [1]** 1480/11
**Tampa [2]** 1393/19 1398/21
**tape [2]** 1376/19 1376/20
**tax [5]** 1432/12 1470/24 1481/3 1509/18 1509/23
**taxes [13]** 1354/3 1356/24 1431/25 1432/4 1432/6 1432/13 1432/17 1432/17 1432/19 1432/21 1457/1 1509/21 1509/23
**taxpayer [2]** 1426/21 1426/22
**TD [3]** 1472/12 1472/13 1487/5
**TD Bank [3]** 1472/12 1472/13 1487/5
**team [6]** 1327/14 1337/7 1337/18 1337/20 1405/14 1405/20
**technical [1]** 1389/4
**technically [1]** 1455/25
**technician [1]** 1401/12
**telephone [1]** 1441/13
**tell [53]**
**telling [10]** 1296/17 1303/25 1305/6 1317/2 1317/16 1318/16 1319/22 1435/8 1450/13 1471/17
**tells [8]** 1287/18 1307/15 1309/6 1317/17 1317/25 1326/20 1328/25 1330/13
**Temazepam [1]** 1407/12
**temporarily [1]** 1461/4
**ten milligrams [2]** 1412/18 1412/19
**ten years [3]** 1402/7 1510/4 1511/21
**ten-minute [1]** 1322/21
**tend [1]** 1423/20
**tender [2]** 1353/13 1452/15

**tendered [1]** 1401/5
**tenders [1]** 1406/10
**tense [1]** 1456/4
**Teresa [4]** 1467/13 1468/3 1468/4 1468/6
**term [7]** 1398/2 1420/22 1433/15 1433/15 1435/13 1435/14 1507/19
**terminology [1]** 1430/22
**terms [13]** 1318/13 1350/5 1355/24 1359/18 1359/19 1361/6 1399/15 1402/10 1411/13 1457/4 1457/21 1457/24 1458/22
**test [3]** 1298/16 1298/18 1298/23
**testified [10]** 1352/21 1374/18 1382/22 1384/12 1385/22 1386/2 1420/6 1455/8 1459/14 1497/11
**testifies [1]** 1392/25
**testify [11]** 1376/3 1390/23 1390/24 1391/1 1391/3 1405/7 1408/20 1412/4 1425/23 1512/5 1512/6
**testifying [1]** 1422/20
**testimony [41]** 1303/22 1303/24 1306/9 1308/17 1308/24 1321/2 1321/21 1321/25 1323/2 1323/2 1338/23 1347/19 1366/13 1373/20 1373/20 1374/1 1374/4 1375/2 1375/7 1375/13 1378/11 1379/9 1379/11 1384/14 1419/15 1452/24 1452/24 1465/16 1465/19 1466/11 1496/8 1496/15 1496/18 1496/23 1497/1 1497/7 1498/15 1500/20 1503/22 1509/14 1509/19
**tests [2]** 1354/21 1459/25
**Texas [6]** 1394/7 1395/5 1396/5 1396/22 1396/24 1397/8
**text [23]** 1360/12 1425/20 1433/16 1433/20 1433/22 1433/24 1433/25 1435/4 1435/7 1436/12 1441/24 1441/25 1444/2 1444/14 1447/4 1450/15 1451/6 1459/1 1464/13 1464/19 1464/25 1465/7 1466/2
**texts [2]** 1452/12 1458/9
**thank [32]** 1283/8 1283/13 1295/13 1307/5 1323/6 1323/7 1324/9 1345/9 1347/6 1373/24 1382/8 1392/15 1392/17 1393/3 1393/4 1393/13 1428/3 1428/5 1428/12 1445/23 1452/15 1453/6 1454/23 1468/24 1469/5 1471/2 1471/4 1490/3 1490/4 1492/20 1492/22 1508/25
**Thanks [1]** 1512/12
**therapeutic [1]** 1400/9
**therapeutics [1]** 1394/17
**therapy [2]** 1394/20 1400/5
**think [44]** 1282/10 1283/6 1288/11 1303/2 1303/15 1303/16 1317/20 1318/13 1347/16 1347/20 1361/20 1365/5 1370/21 1372/9 1376/18 1388/25 1390/18 1411/18 1413/14 1423/18 1423/21 1446/2 1457/20 1459/5 1469/22 1475/13 1476/3 1479/20 1481/1 1486/21 1489/22 1493/17 1494/17 1496/7 1498/20 1499/10 1501/2 1502/14 1506/17

1509/20 1510/4 1510/9 1511/20 1512/15
**thinking [7]** 1315/4 1316/24 1317/1 1330/9 1335/5 1340/23 1500/19
**thinks [2]** 1304/19 1308/11
**Thirteen [1]** 1366/24
**Thirty [1]** 1494/11
**Thirty-three [1]** 1494/11
**thought [15]** 1306/18 1313/8 1335/20 1335/24 1339/21 1339/24 1340/9 1340/10 1375/7 1375/12 1383/25 1384/9 1491/16 1498/8 1505/8
**thousand [11]** 1365/5 1510/3 1510/5 1510/20 1510/22 1510/24 1511/6 1511/7 1511/10 1511/16 1511/20
**thousands [3]** 1473/10 1473/10 1473/10
**three years [3]** 1394/13 1394/15 1398/17
**thrown [1]** 1404/15
**Thursday [2]** 1453/24 1454/20
**tickets [1]** 1467/9
**tie [1]** 1507/2
**tied [2]** 1382/3 1472/3
**tier [1]** 1399/16
**tiles [1]** 1439/7
**time [97]**
**times [17]** 1292/7 1302/23 1329/12 1330/14 1330/16 1330/22 1331/2 1385/6 1385/22 1386/1 1386/1 1440/21 1456/6 1468/6 1470/11 1481/20 1481/21
**tip [4]** 1302/21 1302/22 1303/4 1393/10
**tips [5]** 1318/21 1339/16 1340/4 1340/5 1340/8
**Titan [1]** 1472/23
**title [5]** 1348/25 1362/14 1363/25 1472/21 1514/20
**tonight [3]** 1503/3 1505/8 1512/2
**top [7]** 1283/23 1342/11 1364/4 1411/2 1424/22 1443/7 1445/7
**topic [1]** 1433/12
**total [3]** 1343/7 1352/18 1508/9
**totalled [1]** 1511/15
**touching [1]** 1484/11
**toward [1]** 1432/21
**towards [1]** 1432/6
**town [3]** 1428/20 1434/3 1434/12
**toxicology [1]** 1294/2
**track [2]** 1436/2 1456/19
**tracked [1]** 1436/5
**trade [7]** 1407/17 1446/18 1447/1 1488/24 1488/25 1489/3 1489/11
**trade-in [4]** 1488/24 1488/25 1489/3 1489/11
**traded [1]** 1489/10
**trading [3]** 1488/21 1488/22 1489/13
**trained [5]** 1314/6 1351/7 1351/9 1351/14 1397/18
**trainers [1]** 1289/5
**training [17]** 1289/5 1312/3 1319/22 1326/7 1326/12 1328/20 1349/4

**T**

**training... [10]** 1350/21 1350/24
1351/1 1351/5 1351/19 1352/18
1411/14 1412/10 1415/5 1415/21
**transacted [1]** 1488/6
**transaction [6]** 1360/25 1467/7
1488/23 1509/14 1509/15 1509/15
**transcript [6]** 1280/13 1280/24
1298/2 1298/10 1299/12 1514/21
**transcripts [1]** 1494/7
**transfer [4]** 1482/8 1482/10 1482/21
1507/7
**transferred [4]** 1477/12 1482/22
1483/10 1508/6
**transpired [3]** 1330/6 1339/20
1339/23
**transpiring [1]** 1334/3
**transportation [1]** 1354/21
**treat [2]** 1375/9 1394/21
**treated [10]** 1374/19 1375/2 1375/8
1376/2 1376/5 1376/6 1409/16
1410/11 1459/14 1498/21
**treatment [4]** 1370/12 1371/5
1380/21 1410/14
**treatments [1]** 1375/14
**trend [4]** 1416/1 1427/1 1427/11
1428/1
**trends [4]** 1408/18 1409/25 1410/1
1410/9
**trial [4]** 1280/13 1347/13 1425/24
1505/1
**trials [3]** 1390/21 1398/15 1425/23
**TriCenturion [1]** 1349/24
**trick [1]** 1318/20
**trinity [6]** 1410/6 1415/2 1415/6
1416/13 1417/13 1427/1
**trio [6]** 1410/5 1415/2 1416/13
1417/13 1427/1 1427/3
**trip [2]** 1443/11 1443/25
**trouble [3]** 1315/8 1315/13 1421/20
**true [5]** 1338/7 1338/9 1362/5
1512/23 1514/20
**trust [3]** 1354/6 1354/9 1366/2
**trust-based [1]** 1366/2
**truth [4]** 1291/6 1292/1 1333/22
1361/19
**truthful [2]** 1337/14 1366/6
**TUESDAY [2]** 1382/1 1378/1
**turning [1]** 1488/21
**Twenty [3]** 1335/16 1491/8 1492/8
**Twenty-four [1]** 1491/8
**Twenty-three [1]** 1492/8
**two milligram [1]** 1412/23
**two milligrams [3]** 1414/12 1417/19
1418/11
**two years [2]** 1397/14 1399/8
**Tylenol [1]** 1412/18
**typed [2]** 1388/2 1388/6
**typical [1]** 1415/24
**typically [2]** 1358/15 1403/22

**U**

**U.S [2]** 1281/2 1281/6
**U.S. [4]** 1349/16 1471/20 1504/16

1504/16
**U.S. Attorney's [1]** 1349/16
**U.S. Customs [1]** 1471/20
**U.S. vs [1]** 1504/16
**U.S.C. [1]** 1507/1
**U.S.C. 1957 [1]** 1507/1
**uhm [26]** 1293/10 1336/23 1382/6
1393/24 1394/12 1394/19 1398/8
1410/1 1411/17 1423/20 1424/22
1427/21 1429/11 1433/1 1439/22
1448/19 1457/12 1457/15 1458/13
1460/13 1470/16 1475/13 1483/14
1486/16 1500/6 1512/1
**ultimate [1]** 1341/1
**ultimately [8]** 1291/16 1291/21
1333/8 1339/7 1339/14 1345/18
1457/24 1458/1
**um [5]** 1409/24 1419/17 1420/11
1421/17 1425/15
**um-hum [5]** 1409/24 1419/17
1420/11 1421/17 1425/15
**uncharged [2]** 1498/3 1498/11
**unclear [2]** 1317/23 1334/6
**uncomfortable [4]** 1440/20 1468/19
1468/19 1468/22
**uncontroverted [1]** 1508/11
**undercover [1]** 1330/4
**undergraduate [2]** 1393/24 1394/1
**underlying [2]** 1360/25 1406/6
**understand [32]** 1282/16 1300/23
1306/2 1306/11 1313/13 1323/13
1333/5 1333/24 1334/9 1335/8
1335/14 1335/17 1338/16 1338/19
1360/6 1360/8 1360/23 1361/8
1362/10 1364/7 1373/21 1378/6
1384/5 1384/9 1426/6 1452/25
1454/6 1460/3 1467/17 1503/17
1510/14 1510/25
**understanding [11]** 1284/19 1335/7
1336/14 1336/16 1336/18 1336/21
1336/23 1338/12 1374/7 1384/11
1417/24
**understood [8]** 1318/19 1319/13
1333/8 1333/11 1333/18 1333/23
1335/21 1339/18
**unintentional [1]** 1502/17
**unique [1]** 1410/16
**united [15]** 1280/1 1280/6 1280/15
1281/3 1281/16 1347/10 1385/18
1392/20 1404/8 1428/24 1428/25
1429/8 1429/10 1501/14 1514/20
**university [6]** 1393/22 1394/7 1395/5
1397/10 1397/11 1398/9
**unlawful [4]** 1497/22 1507/1 1507/3
1507/5
**unless [1]** 1338/3
**unlike [1]** 1289/15
**unlikely [2]** 1372/7 1372/8
**unlimited [1]** 1354/9
**unnecessary [4]** 1386/13 1386/16
1388/11 1388/13
**unpaid [1]** 1432/13
**unquote [5]** 1316/16 1317/13
1317/18 1317/21 1317/25

**Upjohn [1]** 1398/12
**upper [2]** 1287/22 1413/25
**upside [2]** 1489/2 1489/6
**upstairs [4]** 1469/9 1469/19 1469/23
1470/1
**urinalysis [4]** 1459/22 1459/23
1460/1 1460/7
**urine [2]** 1294/2 1504/3
**us [10]** 1316/19 1324/11 1330/21
1429/12 1435/12 1447/2 1484/21
1493/14 1495/1 1512/13
**UT [1]** 1394/8
**utilization [1]** 1410/22
**utilize [1]** 1378/24

**V**

**vague [1]** 1411/18
**valid [2]** 1363/9 1365/25
**validate [1]** 1365/6
**Valium [1]** 1407/13
**value [3]** 1394/19 1475/12 1476/6
**Vanessa [4]** 1490/7 1490/9 1490/13
1513/19
**variety [1]** 1387/19
**vary [1]** 1412/19
**vast [1]** 1463/6
**vehicles [1]** 1479/19
**Ventura [5]** 1375/18 1376/10
1420/12 1497/1 1506/15
**Ventura-Rodriguez [2]** 1420/12
1506/15
**verdict [5]** 1512/14 1512/15 1512/17
1512/18 1512/22
**verify [4]** 1362/7 1365/7 1365/7
1365/10
**via [2]** 1482/10 1496/1
**Vicodin [2]** 1407/2 1407/3
**victims [1]** 1349/12
**video [29]** 1290/9 1295/21 1296/3
1296/11 1297/2 1298/24 1299/23
1300/14 1301/25 1312/20 1313/25
1324/16 1327/12 1327/13 1331/14
1341/11 1344/12 1344/14 1344/21
1372/13 1383/8 1383/13 1383/16
1383/24 1384/1 1384/10 1390/11
1391/11 1391/14
**videos [9]** 1339/6 1353/10 1383/21
1384/3 1384/15 1390/7 1391/7
1391/10 1497/13
**Videotape [36]** 1296/2 1296/5
1296/21 1297/23 1297/25 1299/5
1300/4 1300/6 1300/15 1302/2
1303/6 1304/6 1304/9 1307/1 1309/4
1309/24 1311/17 1311/19 1312/17
1315/22 1316/12 1319/5 1320/15
1320/23 1322/6 1324/12 1325/17
1326/17 1327/5 1328/16 1329/8
1331/5 1331/16 1333/2 1333/15
1344/25
**view [1]** 1338/22
**violation [1]** 1507/23
**visit [32]** 1284/13 1286/5 1289/23
1290/6 1290/6 1295/23 1297/18
1298/15 1299/20 1300/9 1311/7

**V**

**visit... [21]** 1311/8 1311/15 1311/23 1311/24 1326/4 1341/24 1341/25 1342/10 1342/22 1344/11 1355/1 1369/25 1370/3 1370/5 1370/11 1372/1 1372/18 1376/14 1380/17 1382/24 1383/6
**visits [15]** 1283/15 1289/13 1290/12 1367/17 1368/15 1368/19 1373/5 1381/3 1382/23 1382/25 1384/14 1384/18 1384/18 1384/19 1419/13
**volume [3]** 1280/17 1365/5 1473/8
**vouch [2]** 1425/3 1425/12

**W**

**wages [2]** 1476/13 1477/1
**wait [2]** 1484/11 1508/15
**waiting [5]** 1297/15 1375/11 1392/23 1469/21 1500/18
**waive [4]** 1282/24 1324/1 1379/17 1454/13
**Walgreens [1]** 1396/13
**walk [2]** 1302/13 1403/23
**walking [1]** 1463/19
**walks [2]** 1403/24 1404/25
**warehouse [1]** 1480/19
**warning [4]** 1288/18 1288/22 1288/25 1289/9
**Washington [1]** 1281/8
**waste [3]** 1311/22 1347/21 1347/22
**water [2]** 1459/3 1480/6
**Watermark [1]** 1482/11
**We'd [1]** 1493/12
**web [3]** 1425/11 1425/14 1425/17
**website [5]** 1424/11 1424/12 1424/21 1424/23 1426/8
**week [2]** 1429/8 1429/9
**weekend [3]** 1442/2 1444/23 1445/3
**weeks [5]** 1288/4 1288/8 1288/10 1288/11 1461/8
**weight [2]** 1317/21 1318/25
**welcome [2]** 1445/25 1469/1
**WellCare [1]** 1404/8
**Wells [16]** 1451/10 1451/10 1451/24 1452/6 1466/14 1466/16 1472/7 1477/11 1482/10 1482/22 1482/25 1483/4 1486/8 1487/6 1487/10 1488/8
**west [1]** 1479/11
**whatsoever [2]** 1302/14 1498/16
**whenever [1]** 1442/16
**where's [3]** 1303/14 1304/3 1341/9
**white [1]** 1312/1
**who's [3]** 1356/19 1403/24 1496/19
**wide [1]** 1387/19
**wife [2]** 1429/21 1438/25
**willfully [1]** 1386/9
**William [1]** 1280/14
**win [1]** 1338/19
**windows [2]** 1444/19 1445/4
**wire [6]** 1336/9 1482/10 1482/21 1483/9 1495/8 1496/2
**wires [1]** 1496/9
**wish [1]** 1503/6

**withdrawn [1]** 1482/22
**witness [39]** 1295/11 1306/17 1315/25 1335/24 1347/8 1347/9 1347/25 1353/4 1373/25 1378/23 1381/21 1386/24 1391/6 1392/18 1392/19 1392/22 1392/25 1393/2 1401/4 1401/5 1428/6 1428/7 1428/11 1452/15 1453/17 1471/5 1471/6 1471/9 1476/15 1476/17 1489/25 1490/5 1490/6 1490/9 1492/23 1492/24 1511/13 1511/14 1513/5
**witnessed [1]** 1301/16
**witnesses [3]** 1425/23 1493/12 1513/4
**woman [2]** 1419/6 1467/13
**word [3]** 1305/7 1498/19 1508/13
**words [14]** 1301/21 1314/22 1315/18 1387/19 1426/3 1457/13 1457/13 1458/5 1462/24 1465/14 1466/19 1482/24 1501/20 1507/6
**work [37]** 1293/10 1293/10 1294/6 1294/19 1299/2 1299/13 1314/3 1314/16 1315/14 1332/22 1348/10 1349/21 1350/3 1350/3 1372/9 1385/7 1385/10 1394/18 1400/16 1401/2 1401/8 1402/24 1403/5 1403/6 1404/13 1421/24 1421/24 1422/5 1422/25 1423/23 1425/6 1426/15 1430/18 1439/4 1462/13 1490/17 1501/24
**worked [21]** 1349/23 1349/24 1351/14 1395/14 1395/21 1397/11 1397/17 1397/19 1397/20 1398/11 1398/17 1399/1 1399/10 1401/10 1402/4 1402/9 1404/2 1407/8 1423/18 1431/14 1455/23
**working [12]** 1311/1 1350/25 1351/4 1352/19 1398/16 1402/10 1424/2 1433/14 1449/19 1461/25 1498/9 1503/1
**works [2]** 1404/7 1501/24
**worry [5]** 1307/21 1307/24 1316/9 1434/2 1435/8
**worth [1]** 1510/22
**WPD [1]** 1280/4
**write [5]** 1305/23 1406/2 1437/11 1437/12 1439/16
**writing [1]** 1459/8
**written [1]** 1344/24
**wrong [2]** 1340/3 1446/22
**wrongdoing [3]** 1389/7 1389/8 1389/8
**wrote [7]** 1286/8 1286/25 1301/3 1344/19 1458/22 1458/22 1458/24

**X**

**x-rays [2]** 1294/1 1354/21
**Xanax [3]** 1407/11 1410/4 1412/22

**Y**

**Yep [1]** 1425/21
**Yoffie [26]** 1281/5 1283/6 1330/21 1344/10 1346/6 1346/22 1359/2

1379/25 1393/15 1395/12 1401/7 1406/21 1408/7 1408/10 1409/6 1411/20 1412/12 1414/9 1426/13 1513/6 1513/7 1513/8 1513/10 1513/11 1513/12 1513/13
**York [1]** 1281/7
**you'd [1]** 1376/21
**young [1]** 1498/8
**younger [1]** 1385/5
**yours [1]** 1309/14

**Z**

**Zavertnik [1]** 1281/10
**zoom [2]** 1414/8 1416/8