```
                UNITED STATES DISTRICT COURT

              SOUTHERN DISTRICT OF FLORIDA

                FORT LAUDERDALE DIVISION

                CASE NO. 17-60301-CR-WPD


   UNITED STATES OF AMERICA,        .
                                    .
                Plaintiff,          . Fort Lauderdale, Florida
                                    . June 27, 2018
                v.                  . 9:06 a.m.
                                    .
   ANDRES MENCIA,                   .
                                    .
                Defendant.          .
   . . . . . . . . . . . . . . . .  .


                    -  -  -  -  -

            Transcript of Trial Proceedings had

       before the Honorable William P. Dimitrouleas,

        United States District Judge, and a Jury.

                    -  -  -  -  -

                      VOLUME 8

                    -  -  -  -  -
```

Proceedings recorded by mechanical stenography, transcript produced by computer.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

**APPEARANCES:**

For the Government:   Michael E. Gilfarb, Esq.
                             Evelyn B. Sheehan, Esq.
                             Assistant U.S. Attorneys
                             United States Attorney's Office
                             99 N.E. 4th Street
                             Suite 300
                             Miami, Florida  33132
                                 and
                             Adam G. Yoffie
                             U.S. Department of Justice
                             Criminal Division
                             Bond Building, 8th Floor
                             1400 New York Avenue, N.W.
                             Washington, DC  20005

For the Defendant:    Marcos Beaton, Jr., Esq.
                             Cristina Prieto, Paralegal
                             Sinclair, Louis & Zavertnik, P.A.
                             40 Northwest 3rd Street
                             Suite 200
                             Miami, FL 33128
                                 and
                             Bradley E. Horenstein, Esq.
                             The Horenstein Firm
                             40 NW 3rd Street
                             Penthouse 1
                             Miami, Florida  33128

Court Reporter:       Francine C. Salopek, RMR, CRR
                             Official Court Reporter
                             United States District Court
                             299 E. Broward Blvd., Room 203
                             Fort Lauderdale, Florida 33301
                             (954)769-5686

                                -  -  -  -  -

1   **WEDNESDAY, JUNE 27, 2018, 9:06 A.M.**

2   *(The judge is already on the bench)*

3   MR. BEATON:  Good morning.

4   THE COURT:  Good morning.

5   *(Pause)*

6   THE COURT:  All right.  We're back on the record.

7   Counsel are present.  Mr. Mencia's present.

8   I read Mr. Gilfarb's response on the issue of the

9   Medicare fraud.  I'm satisfied that there's enough evidence to

10   get by the Rule 29 motion at this point.

11   What's the government's position on money laundering

12   and structuring?

13   MR. YOFFIE:  Your Honor -- Adam Yoffie for the

14   government --

15   THE COURT REPORTER:  Excuse me, microphone.

16   MR. YOFFIE:  First, to address structuring, I believe

17   the issue was whether there was more than a hundred thousand

18   dollars in a 12-month period.  The government elicited

19   testimony from Klaudia Gega that there was $2,000 a day in

20   G-code money.  Six days a week at $12,000, four weeks in a

21   month at $48,000, times 12 months puts that at $576,000, which

22   more than -- is more than sufficient to cover the hundred

23   thousand dollars in a 12-month period.

24   THE COURT:  All right.  I forgot about Ms. Gega's

25   testimony about the G *(sic)* money.  So, I think that's enough

1    to get by the Rule 29.

2         How about the money laundering issue?

3         MR. YOFFIE:  In terms of money laundering, the

4    government would agree that if there were one dollar of SUA,

5    that would not be sufficient.  There must be $10,000 of illicit

6    proceeds in the account at the time that the transaction is

7    carried out.  That is -- we looked up *U.S. v. Adams*,

8    74 F.3d 1093, in the Eleventh Circuit.

9         The government maintains that based on the deposits

10   that are in evidence through the bank records introduced

11   through Amy Parker, there are sufficient deposits to indicate

12   that there was illicit proceeds in the account at the time the

13   checks or financial transactions were carried out.

14        In particular, for example, the government would point

15   to Count 6, September 15, 2015.  There are deposits in evidence

16   from BB&T of $13,720 deposit slips made prior to -- made in the

17   month of September and prior to September 15th, 2015, thereby

18   providing sufficient funds for the $10,000 950 -- sorry --

19   $10,952 check at issue in the count.  So, for an example like

20   that, the government believes there is in evidence sufficient

21   proceeds to allow the count to move forward.

22        THE COURT:  I'm not real excited about your money

23   laundering evidence, but I'll defer ruling on the Rule 29.  If

24   the jury comes back guilty on the money laundering evidence,

25   then Dr. Mencia can file a motion notwithstanding the verdict,

1    and I'll hear argument, and maybe we'll have transcripts to

2    make me more comfortable as to whether or not if there's a

3    conviction, it should stand.

4         MR. BEATON:  Your Honor, I have additional arguments,

5    and there's cases right on point on this exact issue.  I mean

6    this count should clearly be kicked at this point --

7         THE COURT:  Okay.  Give me the cases.

8         MR. BEATON:  So, the first one is *United States vs.*

9    *Rutgard*, 116 F.3d 1270, and it is a case where the government

10   failed to establish its burden demonstrating that the entire

11   practice of the ophthalmologist was a fraud.  Defendant's

12   partial transfer of funds from nonsegregated bank accounts into

13   which he had deposited proceeds of his criminal fraud did not

14   subject him to liability under federal statute prohibiting any

15   person from engaging in monetary transactions in property

16   derived from specified unlawful activity.  It is right on the

17   numbers, Judge.  It is as --

18        MR. YOFFIE:  Your Honor, I just ask for -- and I will

19   read the case for clarity -- was there sufficient illegal

20   proceeds in the account at the time the transaction was carried

21   out?  I mean, I don't know if defense counsel is suggesting

22   that it was a mixed account, and there simply was insufficient

23   illicit proceeds, or if even with sufficient illicit proceeds,

24   that would not be enough.

25        MR. BEATON:  I'm not sure that that really is the

1  standard by which -- I mean, if there's a dollar in illicit

2  proceeds, is the entire account tainted?  There's other cases

3  that I'm gonna cite the Court where the better practice is for

4  the government to establish that more illegal proceeds than not

5  are contained in the account, and that those proceeds were then

6  used in monetary transactions in satisfying 1957.

7          There's been no proof here of that.  And -- so, we're

8  not talking about four random transactions where -- really,

9  what's at issue is $900 and change, because that's what's over

10  the $10,000 threshold.  And so, you know, I'm not -- I went to

11  law school because I wasn't very good at math, but that's

12  really ten percent of the entire amount, and really only $900

13  over the $10,000 threshold.

14          The government has elicited no evidence, there's no

15  evidence in this record that any portion of those $10,000 and

16  change were from specified unlawful activity, much less the

17  entire amount of 10,900 and change, whatever it is.

18          MR. YOFFIE:  I think defense counsel is still

19  confusing the standard.  We are not proposing that if there's

20  $1 in a mixed account -- and there's not a standard that I'm

21  aware of that says it must simply be more than less.  My

22  question is, my understanding is, whether there is sufficient

23  illicit proceeds in the account at the time that the

24  transaction takes place.  And the government would argue,

25  based, again, on Ms. Gega's testimony, as well as bank records

1   introduced through Special Agent Parker, there are sufficient

2   cash transactions to equate to the transactions that were then

3   carried out.

4          THE COURT:  Well, how about Count 5 where the transfer

5   is $437,000?

6          MR. YOFFIE:  I think that would --

7          *(Discussion had off the record between counsel)*

8          MR. YOFFIE:  Right.  My understanding is that there

9   must just be $10,000 at the time the transaction is carried

10  out.  So, even with the 437,000, there must simply have been

11  over $10,000 of illicit proceeds in the account at the time

12  that transaction is carried out.  It cannot have, for example,

13  zeroed out, where there would be no illicit proceeds, and there

14  cannot be one dollar in there.  That would be insufficient.

15         MR. BEATON:  But what evidence is there in the record

16  from which a reasonable jury could infer -- what basis in fact

17  is there that a reasonable jury could infer that even a dollar

18  of that came from some specified unlawful activity?

19         MR. YOFFIE:  Sorry.  Excuse me.

20         MR. BEATON:  We've seen videos from 2017, we've seen,

21  you know, other evidence that don't correlate in any way,

22  shape, or form with this time frame, and there's been none.

23  And you invited the government to provide with you *(sic)*

24  transactions this morning that would support the Medicare --

25  and I understand that you've already ruled on that -- but would

```
 1   support any of these arguments.  And I'm hearing them.
 2          THE COURT:  Well, they came up with J.H.'s situation
 3   in 2014, and maybe there's circumstantial evidence that it
 4   continued through 2015, '16, '17, and '18.
 5          As I indicated, this is a troubling count, and at this
 6   point, I'm gonna deny the Rule 29 without prejudice to
 7   Dr. Mencia revisiting the issue should there be a conviction on
 8   the money laundering counts.
 9          MR. BEATON:  Yes, sir.
10          THE COURT:  Was there anything else the government
11   wanted to do before we brought the jury in and you rest?
12          MR. GILFARB:  Well --
13          MR. YOFFIE:  I don't believe we addressed Burrage for
14   dispensing a controlled substance.  Was that something you
15   would like to address?
16          THE COURT:  I think Burrage was distinguishable.  I
17   read it.
18          MR. YOFFIE:  Okay.
19          THE COURT:  I think it was distinguishable.
20          MR. GILFARB:  Your Honor, two things before the jury
21   comes in.  I -- the rule was previously invoked.  I spoke with
22   the defense in this matter.  There was a witness that was
23   previously excluded by the name of Carlos Suarez.  He was a
24   special agent.  Now that the case is over, and that his
25   testimony might only be for rebuttal purposes, I've spoken with
```

1   defense, they have no objection to having him in the courtroom

2   at this time.

3          MR. BEATON:  That's correct, your Honor.

4          THE COURT:  Okay.

5          MR. GILFARB:  The second thing, your Honor, is that

6   before I rest, since the stipulation document is not going into

7   evidence, there are some factual stipulations I wanted to

8   announce to the jury, and then we'll rest in front of the jury.

9          THE COURT:  Okay.

10         MR. BEATON:  And, also, I want to add a discussion

11  that Mr. Gilfarb and I had yesterday regarding the

12  stipulations.  For the sake of brevity and efficiency, we moved

13  exhibits into evidence such as the phone extraction in its

14  entirety to be able to rely on subparts of it.

15         Mr. Gilfarb and I have agreed that we will get

16  together, should the jury request to see any of that, and there

17  are portions that we both mutually agree are not appropriate to

18  go back to the jury.  So, we will segregate that on our own and

19  redact it as possible.  None of the objectionable material has

20  been published to the jury.  So --

21         THE COURT:  Okay.  Well, maybe you guys should be

22  working on that when the jury goes out in the event that they

23  make that type of a request so we don't have to --

24         MR. BEATON:  That's exactly what we're gonna do,

25  Judge.

1  THE COURT:  Okay.

2  So, the government's gonna come -- we're going to

3  bring the jury out, the government is going to announce the

4  stipulations, they're going to rest, and what's the defense

5  going to do?

6  MR. BEATON:  We're gonna rest.

7  THE COURT:  So, why don't we do the renewed Rule 29

8  motions at this point?

9  MR. BEATON:  As to Count 1, conspiracy to commit

10  healthcare fraud and wire fraud, Dr. Mencia moves for a renewed

11  Rule 29 judgment of acquittal for several reasons.

12  Number one, Judge, the -- there's so much vagueness in

13  the standard of care, as testified to by the experts that were

14  called in this case and the Florida statutes that are

15  applicable to Dr. Mencia, that no reasonable juror could find

16  that Dr. Mencia fell below the quagmire of rules, regulations,

17  and statutes that govern his practice of medicine.

18  Under the rule of lenity, a defendant is to be on

19  clear and unambiguous notice of what conduct -- or what

20  standard of conduct he or she must fall below before being held

21  criminally liable for anything.  And where the issue is a

22  question of professional judgment, I believe that that standard

23  is more accentuated.

24  So, to the extent -- and the government was the one

25  who opened the consideration of Florida statutes, which

1   Dr. Silverman testified must be followed, that we then got into

2   other Florida statutes, which the Court I hope will agree must

3   also be followed by a licensed physician in Florida, including

4   the Workers' Compensation statute.  And there was much made

5   about the fact that this was not a Workers' Compensation case.

6           However, as the Florida Patient Bill of Rights states,

7   a patient is entitled to the same level of care,

8   notwithstanding several factors, including race, religion, and

9   the method of payment.  It can't be legal for a doctor to treat

10  someone in one manner under the Workers' Compensation statute

11  simply because they have the privilege of working in a place

12  that carries Workers' Compensation insurance, and then be

13  punished for falling below that standard because the person

14  does not carry Workers' Compensation insurance.

15          And we submitted a proposed instruction to the Court,

16  which had a mistake, which says "in the Workers' Compensation

17  statute."  Our position is that a doctor cannot be held to one

18  standard of care based on form of payment in one context, and

19  then standard of care differently in another.

20          So that would be our motion as to Count 1.

21          THE COURT:  I think it's a question of fact for the

22  jury on Count 1.  I deny the Rule 29 motion.

23          MR. BEATON:  Count 2, Dr. Mencia moves for a judgment

24  of acquittal.  Taking the evidence in the light most favorable

25  to the government, the government has failed to establish that

1    a reasonable jury could convict Dr. Mencia of Count 2.

2            THE COURT:  All right.  I think it's a question of

3    fact for the jury.  I deny the Rule 29 motion as to Count 2.

4            MR. BEATON:  So, as to Count 3, the *Burrage* case uses

5    the language several times, and it's not dicta, that the

6    dispensed controlled substances were by the defendant and

7    needed to be by the defendant.

8            And I'll give you the example that I think most makes

9    my point.  And that is, if the decedent in *Burrage* had obtained

10   heroin, or there was some question that the defendant *(sic)* in

11   *Burrage* had obtained heroin from the defendant and possibly

12   from another person, that the but-for standard in *Burrage* would

13   not be satisfied.

14           In other words, *Burrage* does not stand for the

15   proposition that as long as the decedent died of a heroin

16   overdose, no matter who he got it from, that the defendant that

17   is charged is criminally liable.

18           I think *Burrage* made it very clear that --

19           THE COURT:  I think you can argue to the jury that if

20   the jury has a reasonable doubt as to whether or not the

21   oxycodone came from Dr. Mencia, and that if it came from

22   Dr. Mencia, it was the but-for cause of death, that they should

23   acquit him.  That if they think that he committed suicide, they

24   should acquit him.  If they think that he bought the oxycodone

25   off the street, they should acquit him.  I think you can argue

1    all those things.

2           MR. BEATON:  As a matter of sufficiency, though, your

3    Honor, I think it's incumbent on the government to present

4    evidence -- some evidence that the actual pills that the

5    decedent took --

6           THE COURT:  I think there's circumstantial evidence of

7    that.

8           MR. BEATON:  Okay.  So, I won't belabor that point.

9           THE COURT:  So, I'll deny the Rule 29 motion as to

10   Count 3.

11          MR. BEATON:  The money laundering counts, I have cited

12   to *Calvin*, that's a Fifth Circuit case, 39 F.3d 1299, where the

13   verdict of guilt was reversed based on the fact that the

14   government failed to establish -- although there were funds of

15   specified unlawful activity in the account that was used, did

16   not establish that the funds that were the subject of the

17   transaction were derived from specified unlawful activity.

18          And I've also cited 116 F.3d 1270, *Rutgard*, and that's

19   a Ninth Circuit case, where the government failed to establish

20   its burden of demonstrating that the doctor's practice --

21   entire practice was fraud.

22          And so, the elements under 1957, Judge --

23          THE COURT:  Well, they haven't proven that

24   Dr. Mencia's entire practice was fraud.  And if the jury comes

25   back guilty on any of the money laundering counts, then you're

1    going to be able to revisit those counts, and I'll have read

2    these two cases, and the government will have had an

3    opportunity to brief what facts they think the record shows,

4    and we can revisit it if there's a guilty verdict.  But at this

5    point, I'm going to deny the Rule 29 motion without prejudice

6    as to Counts 4 through 10.

7                MR. BEATON:  Gotcha.  I just want to add one other

8    point.  That it's not just the government's burden to prove

9    that the funds were derived from specified unlawful activity.

10   It's also the government's burden to prove that the defendant

11   knew at the time that the transaction was made that those funds

12   were derived from specified unlawful activity.

13               THE COURT:  And I think knowledge is normally a

14   question of fact for the jury.

15               MR. BEATON:  Understood.

16               As to Count 11, the structuring counts *(sic)*,

17   Dr. Mencia moves for a judgment of acquittal based on the fact

18   that the government did not establish that there was more than

19   $100,000 in a 12-month period, demonstrating a pattern of

20   illegal activity, and ask that the Court reduce it from the

21   ten-year count to the five-year count.

22               THE COURT:  Again, I think that's another close issue.

23   If the jury comes back guilty on the ten-year count, we can

24   revisit that.  So, I'll deny the Rule 29 as to Count 11 without

25   prejudice.

```
 1              MR. BEATON:  That completes my presentation on

 2     Rule 29, Judge.

 3              THE COURT:  Any objection to my having a colloquy with

 4     Dr. Mencia regarding his right to testify?

 5              MR. BEATON:  Absolutely not.

 6              THE COURT:  Dr. Mencia, you understand you have a

 7     constitutional right to testify?

 8              THE DEFENDANT:  Yes, sir.

 9              THE COURT:  You understand you have a constitutional

10     right not to testify?

11              THE DEFENDANT:  Yes, sir.

12              THE COURT:  Your lawyers have been to law school,

13     they've tried a lot of cases, they give you the benefit of

14     their legal advice, but it's your life; you don't have to

15     follow the advice.  Do you understand that?

16              THE DEFENDANT:  Yes, sir.

17              THE COURT:  And there may be strategy reasons for or

18     against your testifying.  Do you understand that?

19              THE DEFENDANT:  Yes, sir.

20              THE COURT:  Whatever decision you make in this case,

21     you're pretty much going to be stuck with that decision.  Do

22     you understand that?

23              THE DEFENDANT:  Yes, sir.

24              THE COURT:  For example, if you decide to testify, and

25     if you turn out to be a lousy witness and get convicted, you
```

1    can't complain about that later on, because you decided to

2    testify.  Do you understand that?

3              THE DEFENDANT:  Yes, sir.

4              THE COURT:  On the other hand, if you decide not to

5    testify, and if the jury comes back guilty, you can't come back

6    later on and say, "Oh, Judge, if the jury would have just heard

7    my side of the story, they would have let me go."  Do you

8    understand that?

9              THE DEFENDANT:  Yes, sir.

10             THE COURT:  And have you had enough time to think

11   about this and talk about it with your lawyers?

12             THE DEFENDANT:  Yes, sir, we have.

13             THE COURT:  Additionally, Mr. Beaton talked about

14   other witnesses that might be called to testify, the medical

15   examiner from --

16             MR. BEATON:  Miami-Dade.

17             THE COURT:  -- from Miami, maybe a bunch of

18   ex-patients.  I don't know.  There was a lot of witnesses that

19   were mentioned.  He's indicated now that you're going to rest

20   without calling witnesses.  Do you agree with that strategy?

21             THE DEFENDANT:  Yes, sir.

22             THE COURT:  And understanding all these things, is it

23   your decision that you do or do not want to testify?

24             THE DEFENDANT:  I do not want to testify.  I don't

25   think I need to.

```
 1        THE COURT:  And how about the lesser included offenses
 2   as to the Counts 3 and 11?  Are we gonna give the jury the
 3   option of all or nothing, or are we gonna give them the option
 4   of lesser included offenses?
 5        MR. BEATON:  Judge, can you give me just two minutes?
 6   I apologize.  I....
 7        THE COURT:  Well, we can go over that during the
 8   charge conference.
 9        MR. BEATON:  Thank you.  I think that would be
10   preferable.
11        THE COURT:  So, what we'll do is we'll bring out the
12   jury now -- do we have all the jurors?
13        COURTROOM SECURITY OFFICER:  Yes.
14        THE COURT:  We'll bring out the jury now, the
15   government can read their stipulations and rest, then I'll send
16   them out so we can do a charge conference.
17        All right.  Let's bring out the jury.
18        COURTROOM SECURITY OFFICER:  All rise.
19        (The jury entered the courtroom)
20        THE COURT:  Counsel concede the presence of the jury
21   and waive its polling?
22        MR. BEATON:  Yes, sir.
23        MR. GILFARB:  Yes.
24        THE COURT:  And did everyone follow my admonition not
25   to discuss the case or allow it to be discussed in your
```

1    presence?

2         THE JURORS:  Yes, your Honor.

3         THE COURT:  The government may proceed.

4         MR. GILFARB:  Thank you.

5         Members of the jury, the parties have reached some

6    stipulations that Dr. Mencia was a partner with ownership

7    interest in Adult & Geriatric Institute of Florida from at

8    least January 1st, 2014, through February 2018.

9         At all relevant times, Dr. Andres Mencia was a

10   licensed physician in the State of Florida, who was authorized

11   to prescribe Schedule II controlled substances.  Dr. Andres

12   Mencia is currently a licensed physician in Florida.

13        At all relevant times, Medicare and Medicaid billing

14   by Dr. Mencia and Adult & Geriatric Institute of Florida was

15   accomplished via interstate wire transfers.

16        Oxycodone is a Schedule II substance.

17        Percocet and Oxycontin pills contain Schedule II

18   substances.

19        THE COURT:  Anything further, Mr. Gilfarb?

20        MR. GILFARB:  No, your Honor.  That concludes our

21   presentation.  The government rests.

22        THE COURT:  Anything further, Mr. Beaton?

23        MR. BEATON:  No, your Honor.  The defense has decided

24   that no further presentation is required, and as a result, the

25   defense rests.

1559

```
 1        THE COURT:  All right, members of the jury, we're
 2   going to take a 30-minute recess.  Remember my admonition not
 3   to discuss the case or allow it to be discussed in your
 4   presence.  I have to go over the jury instructions with the
 5   lawyers.  So, we'll see you back in the jury room in about
 6   30 minutes.
 7        COURTROOM SECURITY OFFICER:  All rise.
 8        (The jury exited the courtroom)
 9        THE COURT:  So, let's go ahead and do a charge
10   conference.  Let me hand out a rough draft of some jury
11   instructions.  There's one for Fran, also.
12        And what I would propose doing is going through the
13   rough draft, see if there's objections, and then entertain any
14   additions that might be requested.
15        So, the first page is basic instruction number 1.
16   That looks okay to me.
17        The second page is a basic instruction also, but
18   because Dr. Mencia didn't testify, I don't think I give that
19   one.  I'll give the third page.  So, I'm gonna take the second
20   page out.  And the third one is the one that applies when a
21   defendant doesn't testify.
22        The next page is a standard instruction on burden of
23   proof.  It looks okay to me.
24        The next one is a standard instruction, basic
25   instruction 4.  Looks okay to me.
```

```
 1            The next one's credibility.  Looks okay to me.

 2            The next one is impeachment where a witness has been

 3    convicted of a felony.  Looks okay to me.

 4            The next one is accomplice testimony where a

 5    codefendant testifies.  Looks okay to me.

 6            The next one is where someone testifies when they were

 7    using addictive drugs at the time.  Any objection to that?

 8            MR. BEATON:  Not from the defense.

 9            MR. YOFFIE:  No objection, your Honor.

10            THE COURT:  So, I'll give that one.

11            The next one is expert testimony.  It looks okay to

12    me.

13            The next one is jury taking notes.  Looks okay to me.

14            The next one's the proposed instruction on

15    stipulation.  Any objection to that?

16            MR. BEATON:  No, your Honor.

17            MR. YOFFIE:  No, your Honor.

18            THE COURT:  I'll give that.

19            The next one is a proposed instruction on secondary

20    evidence, summaries admitted into evidence.  Any objection to

21    that?

22            MR. BEATON:  The only thing I would request, your

23    Honor, is that the Court add a cautionary instruction -- and I

24    can give the Court the Eleventh Circuit case that talks about

25    it -- which says that summary evidence is simply one party's
```

1  view of the evidence, and that ultimately the underlying

2  evidence is what governs.  And I'm paraphrasing.

3       THE COURT:  Or I could just take this thing out.

4       MR. YOFFIE:  Yeah, I don't believe any summary

5  ultimately charged were accepted *(sic)*.

6       THE COURT:  So, I'll just take it out.

7       The next one is the government's proposed introduction

8  to offense instructions.  Any objection to that?

9       MR. BEATON:  The only thing I would request, your

10 Honor, is that the Court instruct the jury that suicide -- that

11 there could be intervening cause -- causes that break the

12 but-for chain, including, but not limited to, suicide.  And if

13 the jury finds that there are any intervening causes, then

14 Dr. Mencia is not guilty of being the but-for cause of the

15 death.

16      THE COURT:  You could argue that.

17      So, I'll give the introduction to offense

18 instructions.

19      The next one is conspiracy to commit healthcare and

20 wire fraud.  Any objection to that?

21      MR. BEATON:  No.  It looks like the standard

22 instruction, Judge.

23      THE COURT:  The next one is conspiracy for drugs.  Any

24 objection to that?

25      MR. BEATON:  Yes.  I would ask that the instruction be

```
 1    modified as we have proposed in our proposed jury instruction,
 2    which we filed with the Court.
 3          THE COURT:  I didn't see that.  How did you propose
 4    that this one be modified?  I understand how the next count you
 5    asked to be modified, but I don't see this one being requested
 6    to be modified.
 7          MR. BEATON:  Well, because the controlled -- the
 8    dispensing of controlled substances is the underlying conduct
 9    about which there is an alleged conspiracy.
10          THE COURT:  And I'm gonna instruct them in the next
11    count regarding that.  So --
12          MR. BEATON:  Okay.  You know -- you're right.
13          THE COURT:  So, I'll give that.
14          The next one is Count 3.  And what I did was I cut and
15    pasted the defendant's elements, I guess based on the Fourth
16    Circuit case, into the government's proposed instruction.
17          MR. YOFFIE:  Is that -- excuse me, your Honor -- 1, 2,
18    3?
19          (No response)
20          MR. BEATON:  Judge, the only thing that we would
21    object to is that the portion that says -- and I don't know
22    what page it is, but it's on the back of the sheet that I have,
23    so we're going into the next page of the instruction -- that "a
24    controlled substance is prescribed by a physician in the usual
25    course of professional practice."  The paragraph begins that
```

1563

1    way, and then ends:

2          "In accordance with the standards of medical

3       practice generally recognized and accepted in the

4       United States."

5          So, our entire point is that there is no national

6    standard of practice.  The standard of practice is governed

7    state by state.  And the first party to elicit that testimony

8    and establish that fact was the government through their

9    expert --

10          THE COURT:  So, you want me just to scratch out

11    "United States" and put "Florida"?

12          MR. BEATON:  Yes.

13          THE COURT:  What's the government's position on that?

14          MR. YOFFIE:  The government's fine with that, your

15    Honor.

16          THE COURT:  Okay.  So, I'll scratch out "United

17    States," and I'll write in "Florida."

18          Any other objections?

19          MR. YOFFIE:  No, your Honor.

20          MR. BEATON:  Not... not from us, no.

21          THE COURT:  All right.  The next one is the money

22    laundering.  Any objection to that?

23          MR. BEATON:  I would only add that, as we discussed

24    earlier, and based on the cases that I read to the Court, the

25    government must trace the proceeds to the specified unlawful

1   activity.

2           THE COURT:  You can argue that.

3           MR. BEATON:  I'm sorry?

4           THE COURT:  You can argue that to the jury.

5           MR. BEATON:  Okay.

6           THE COURT:  So, I'll give this instruction.

7           The next one is the structuring.  Any objection to

8   that?

9           MR. BEATON:  It looks like the standard instruction,

10  your Honor.

11          THE COURT:  So, how about lesser included offenses

12  now?  Are we gonna go all or nothing, or are we gonna give the

13  jury the option of coming back with lessors on Counts 3 and 11?

14          (Discussion had off the record between counsel and

15  client)

16          MR. BEATON:  Judge, so when you were talking about a

17  lesser included offense as to Count 3, what I understand you to

18  be saying is that the jury receive sort of a special verdict

19  form that --

20          THE COURT:  Right.

21          MR. BEATON:  -- if they find Dr. Mencia guilty of

22  distributing a controlled substance in violation of the law,

23  they then have to find beyond a reasonable doubt -- their

24  second consideration is whether it was the proximate cause of

25  James Hewett's death.

```
 1          THE COURT:  Yeah.  The verdict form would read like
 2   this on Count 3:  "We, the jury, unanimously find the defendant
 3   as to Count 3 of the indictment, guilty or not guilty.  If you
 4   find the defendant guilty, answer this question.  We, the jury,
 5   unanimously find that the oxycodone prescribed by the defendant
 6   was the but-for cause of death of" -- that should be J.H.,
 7   right, not J.F?
 8          MR. BEATON:  That's acceptable to the defense, your
 9   Honor.
10          THE COURT:  Then how about Count 11?
11          MR. BEATON:  Right.  With regards to the ten versus
12   five, we would request that the Court instruct the jury --
13          THE COURT:  So, the way 11 would read is:
14          "We, the jury, unanimously find the defendant as
15       to Count 11 of the indictment, guilty or not guilty.
16       If you find the defendant guilty, answer the next
17       question.  We, the jury, unanimously find that the
18       currency transaction with the domestic financial
19       institutions furthered another federal crime as part
20       of a pattern of illegal activity involving more than
21       a hundred thousand dollars in a 12-month period, yes
22       or no."
23          MR. BEATON:  That's acceptable to the defense, your
24   Honor.
25          THE COURT:  So, Karen, if you could come back out.  We
```

```
 1   need to make some changes on the verdict form and also make
 2   copies for the lawyers.
 3          So, then I'll give the instruction on lesser included
 4   offenses, which is S10.1, which would be the same as -- I give
 5   it twice, once as to Count 3 and once as to Count 11.  And as
 6   to Count 3, the pertinent portion would read:
 7          "If you find the defendant not guilty of the
 8       crime charged in Count Number 3, you must determine
 9       whether the defendant is guilty of the lesser
10       included offense.  Proof of a lesser included offense
11       requires proof beyond a reasonable doubt of the facts
12       necessary to prove the crime charged in Count
13       Number 3, except the defendant's dispensing of
14       oxycodone was not the but-for cause of J.H.'s death."
15          MR. BEATON:  So, I'm uncomfortable with calling it a
16   lesser included, because what they really are doing is
17   answering a question as to the enhancement.
18          THE COURT:  So, maybe I shouldn't give this
19   instruction at all?
20          MR. BEATON:  I would just call it, "You must answer
21   the second" -- when you use the term "lesser included," I would
22   simply substitute, "You must answer the question posed to
23   you -- you must unanimously decide the question posed to you."
24          THE COURT:  I mean, if you want me to tell them about
25   lesser included offenses, I'm going to call it a lesser
```

1  included offense.  If you don't want me to, I can leave the

2  instruction out, and the verdict form can tell them what to do.

3          *(Discussion had off the record between counsel)*

4          MR. BEATON:  We would ask you to leave it out, then.

5          THE COURT:  The same thing on Count 11 then?

6          MR. BEATON:  Yes.

7          THE COURT:  All right.  The next instruction is on

8  aiders and abettors.  That looks okay to me.

9          The next one is the government's request on

10 civil/regulatory violations not being a crime.  Any objection

11 to that?

12         MR. GILFARB:  You mean the defense?  Which one?

13         THE COURT:  I thought it was the government's

14 requested instruction, civil/regulatory violations not a crime.

15         Oh, maybe this is the beginning of the defense

16 request.

17         MR. BEATON:  We would -- yeah, we would ask that you

18 leave that in, the civil/regulatory violations not a crime.

19         MR. GILFARB:  No objection from the government.

20         THE COURT:  All right.  So, I'll leave that in.

21         The next is a good faith defense requested by the

22 defense.  What's the government's position on that?

23         MR. GILFARB:  Let me -- your Honor, if I may, the

24 government does not object in general to the inclusion of a

25 good faith instruction.  We do object to a majority of this

1    language.  May I point the Court to what we object to

2    specifically?

3              THE COURT:  Okay.

4              MR. GILFARB:  So, we have no objection from the

5    first -- beginning of the paragraph, "The defendant asserts,"

6    all the way through "controlled substances -- when prescribing

7    controlled substances."  So, essentially, the first two

8    sentences.

9              We believe that everything down to "the government

10   proved beyond a reasonable doubt that the doctors" --

11   everything up between those two points is argument.  It's the

12   Court commenting on evidence and completely inappropriate.

13             For example, the Court would, if giving this

14   instruction, would be telling the members of the jury that

15   there's fluidity and flexibility in the boundaries of

16   acceptable medical practice.  We don't agree that that's true.

17   And the Court would be commenting on the evidence that it

18   heard.

19             We do not agree that the Court should say that there's

20   some latitude must be given to a doctor trying to determine the

21   current boundaries.  We don't find that there's a reasonable

22   basis in law to tell them that.  We think that's argument that

23   can be made.  But the Court should not be commenting upon that.

24             "Thus, even if a doctor's treatment and prescription

25   practice fall below what you determined to be the applicable

1    standard of care, the doctor should not be held criminally

2    liable if the doctor acted within -- with a reasonable

3    good-faith belief that his treatment and prescription of

4    controlled substance complied with the applicable standard of

5    care."

6          First of all, it's not an accurate statement of law

7    with regards to the standard of care.  You're not gonna be

8    instructing them on what malpractice is or anything like that,

9    or you're not gonna be commenting on the propriety of what

10   Dr. Carol Warfield testified, and that's what the Court would

11   be doing here about the standard of care.  If anything, it

12   should say, "Outside the scope of professional practice is what

13   you must determine based upon the evidence," and that's up to

14   them to decide.

15         Then it goes on to say:

16         "Even if you find the defendant acted below what

17      you determine to be the applicable standard of

18      care" -- that's confusing, because that is not what

19      they're being asked to do -- "in treating his

20      patients and prescribing them controlled substances,

21      you must find him not guilty of unlawful

22      dispensation."

23         And we just think that this is -- I mean basically is

24   having you instruct the jury on his closing argument.

25         We do feel that you should add:

1        "The government must prove beyond a reasonable

2     doubt that the doctor's prescription of controlled

3     substances was not undertaken with a reasonable

4     good-faith belief that he was acting with a

5     legitimate medical purpose and according to the

6     generally recognized and accepted standard of care,

7     that is, within the scope of professional practice."

8        THE COURT:  All right.  It seems to me that this is

9   the theory of defense, so I'm going to give it.

10       The next one is the defense requested on legitimate

11  medical purpose and usual course of medical practice.

12       MR. GILFARB:  Again, your Honor, we believe that

13  "beyond the bounds of medical purpose" is -- it's in quotes,

14  and it's not accurate, according to the charge or the case law.

15  It's outside the scope of professional practice.  And that we

16  should then include that where it says:

17       "This requires you to measure the defendant's

18     conduct against the prevailing scope of professional

19     practice."

20       THE COURT:  Okay.  I think it's the theory of defense.

21  I'm gonna give that.

22       The next one is standard of care:  Physician or drug

23  pusher.

24       MR. GILFARB:  Well, your Honor, we object to the

25  phrase "drug pusher."

1    THE COURT:  I mean that, to me, is the issue in the

2    case.  If they think Dr. Mencia is a drug pusher, they should

3    find him guilty.  And if they think he's a physician that made

4    mistakes, they should acquit him.

5         MR. GILFARB:  Well, I --

6         THE COURT:  To me, that's the issue in the case.

7         MR. GILFARB:  I understand that's the core issue in

8    the case, but phrasing it in this way, "drug pusher" or "drug

9    dealer," we certainly would not include that in any other kind

10   of instruction.  I just think that that carries --

11        THE COURT:  I wouldn't require it at the government's

12   request, but this is at the defendant's request.

13        MR. GILFARB:  I understand, your Honor.  But the term

14   "drug pusher" is subject to the interpretations of the jury

15   without any guidance.  We would just ask that it follow the

16   standard.  I understand this is the core issue, and this is the

17   theory of defense, but the Court, we believe, should still be

18   instructing them more significantly than he was a drug pusher,

19   and "pusher" in quotations, as opposed to, well, why doesn't it

20   say "drug dealer"?  Why doesn't it say "street thug"?  I mean

21   there could be a lot of things that it says.  Instead of "drug

22   pusher," we would ask that instead it say that "he left his

23   role as a medical doctor, and, instead, was acting outside the

24   scope of medical practice and not for a legitimate purpose."

25        THE COURT:  Okay.  So, I'm gonna give it the way it

1  was requested.

2         The next one is the Florida statutes, rules, and

3  guidelines.

4         MR. GILFARB:  Well, your Honor, you've already

5  indicated that you're going to instruct them that he's not

6  charged with violating any of these statutes, so we don't

7  believe that these statutes are pertinent.  They also did not

8  form the basis of any opinion by Dr. Warfield or Dr. Silverman.

9  The issues of palliative care, which are coming up in the next

10 one, the issues of Workers' Compensation, Patient's Bill of

11 Rights, the defense tried to make this an issue.  The testimony

12 is in evidence.  We don't think that the Court should be

13 instructing them with regards to those at the same time telling

14 them that they're not charged -- he's not charged with

15 criminally violating those statutes.

16        THE COURT:  Well, again, I think the whole statute

17 about palliative care, workmen's comp. is strained at best in

18 this case, but in an abundance of caution, I'm gonna give this

19 instruction.

20        The next one is civil rights, healthcare advance

21 directives, pain management, and palliative care.  Is it your

22 same objection on that?

23        MR. GILFARB:  Yes, your Honor.

24        THE COURT:  All right.  So, I'll give that over your

25 objection.

 1          The next one is Bill of Rights and Responsibilities.

 2   Same objection?

 3          MR. GILFARB:  Yes, your Honor.

 4          THE COURT:  So, I'll give that over your objection.

 5          The next is intractable pain, authorized treatment.  I

 6   assume your objection is the same?

 7          MR. GILFARB:  Yes.

 8          THE COURT:  So, I'll give that over your objection.

 9          The next one is workmen's comp.  Do you have the same

10   objection?

11          MR. GILFARB:  Yes, your Honor.

12          MR. BEATON:  Your Honor --

13          THE COURT:  I think your objections are not off base,

14   but I'm going to give it in an abundance of caution.

15          MR. BEATON:  Judge, the only thing that we would

16   modify -- and this was my mistake -- we would request that "in

17   the context of Workers' Compensation" be taken out.  It's our

18   position that, particularly in light of the fluidity

19   instruction, that there cannot be one standard of care as to

20   Workers' Comp. and then another as to something else.

21          THE COURT:  You could argue that to the jury.  We can

22   leave it in the way it is, or I could take it out.  It's up to

23   you.

24          MR. BEATON:  All right.  Leave it in the way it is.

25          THE COURT:  The next one is the Board of Medicine

1574

1    standards.  I assume the same objection, Mr. Gilfarb?

2            MR. GILFARB:  Yes, your Honor.

3            THE COURT:  All right.  I'll overrule the objection.

4    Give that.

5            And what's the government's position on their request

6    on entrapment?

7            MR. GILFARB:  Well, there's absolutely no evidence put

8    in with regards to entrapment, your Honor.  So, the defendant

9    didn't testify in this case.  There have been suggestions that

10   perhaps the source acted in a particular way, but we don't

11   believe there's sufficient evidence in the record to justify an

12   entrapment instruction.

13           THE COURT:  Well, I think normally a defendant has to

14   testify and say, "I committed the crime, but I was entrapped,"

15   before we can give the instruction.  But I think there is some

16   authority that entrapment can be developed on cross-examination

17   of government witnesses.  So, in an abundance of caution, I'll

18   give the entrapment defense.

19           The next one is a standard instruction on "knowingly

20   and willfully" and the date of the crime.  Any problems with

21   that?

22           MR. GILFARB:  No, your Honor.

23           MR. BEATON:  No, your Honor.

24           THE COURT:  The next one is a standard instruction.  I

25   think it's single defendant, multiple counts.  Any objection to

1  that?

2          MR. BEATON:  No, sir.

3          MR. GILFARB:  No, your Honor.

4          THE COURT:  The next one's the standard instruction

5  B11.  Any objection to that?

6          MR. BEATON:  Nope.

7          THE COURT:  And the last one's the standard

8  instruction B12.  Any objection to that?

9          MR. BEATON:  No, sir.

10          MR. GILFARB:  No, your Honor.

11          THE COURT:  And who's going to do the closing

12  arguments for the government?

13          MR. GILFARB:  I am, your Honor, but before we get into

14  that.  And I'm sorry, was there an instruction -- and I don't

15  know if the defense is waiving the instruction on it -- about

16  coconspirator statements viewed with great caution and whatnot?

17          MR. BEATON:  I thought I saw it in --

18          THE COURT:  Yeah, I think the accomplice testimony had

19  that.

20          MR. GILFARB:  All right.

21          So, your Honor, I'm doing the closing argument.

22          THE COURT:  Yeah, the accomplice testimony says:

23          "While a witness of that kind may be entirely

24       truthful when testifying, you should consider that

25       testimony with more caution than the testimony of

```
1        other witnesses."
2             And, Mr. Beaton, are you doing the closing for
3   Dr. Mencia?
4             MR. BEATON:  I am, your Honor.
5             THE COURT:  And how much time are you asking for in
6   your closing argument, Mr. Beaton?
7             MR. BEATON:  I don't expect to exceed 45 minutes, your
8   Honor.
9             THE COURT:  Forty-five minutes enough for you,
10  Mr. Gilfarb?
11            MR. GILFARB:  Yes, your Honor.
12            THE COURT:  And how do you want to split your
13  45 minutes?
14            MR. GILFARB:  Uhm, can I get a warning at 20 minutes?
15            THE COURT:  Well, I mean you got to use at least half
16  of it in the first part.
17            MR. GILFARB:  I wasn't clear, with 20 minutes
18  remaining?
19            THE COURT:  So, you want to have 25 minutes on the
20  first part, but a warning at that point, and then whatever you
21  go beyond that will be subtracted from the second part?
22            MR. GILFARB:  Yes, your Honor.
23            THE COURT:  Okay.  And on the second part, do you want
24  a warning on whatever is left of the 20 minutes?
25            MR. GILFARB:  No, your Honor.  I'll keep track of
```

1577

1    that.

2         THE COURT:  And a warning on your 45 minutes,

3    Mr. Beaton?

4         MR. BEATON:  Five minutes, Judge.

5         THE COURT:  You want a break, or are you guys ready to

6    go into closing?

7         MR. GILFARB:  We're ready to go.

8         MR. BEATON:  Dr. Mencia needs to use the restroom.

9         THE COURT:  All right.  Go ahead and go and come back.

10   We'll wait.

11        MR. BEATON:  And I'm gonna use it too, if I may?

12        THE COURT:  Okay.

13        *(Pause)*

14        THE COURT:  We're waiting for Mr. Yoffie?  Here he is.

15        MR. GILFARB:  We're more waiting for the computer to

16   work.  I have some PowerPoint slides --

17        THE COURT:  Okay.  We'll wait for it to boot up.

18        *(Discussion had off the record between court reporter*

19   *and Mr. Gilfarb)*

20        MR. GILFARB:  Okay.  Thank you.  I apologize for the

21   delay.

22        THE COURT:  All right.  We're back on the record.

23        Counsel are present.  Dr. Mencia's present.

24        Anything to come before the Court before we bring the

25   jury in?

CLOSING ARGUMENT - GILFARB

1        MR. GILFARB:  No, your Honor.

2        MR. BEATON:  No, your Honor.

3        THE COURT:  All right.  Let's bring in the jury.

4        COURTROOM SECURITY OFFICER:  All rise.

5        *(The jury entered the courtroom)*

6        THE COURT:  Counsel concede the presence of the jury

7   and waive its polling?

8        MR. GILFARB:  Yes, your Honor.

9        MR. BEATON:  Yes, sir.

10       THE COURT:  And did everyone follow my admonition not

11  to discuss the case or allow it to be discussed in your

12  presence?

13       THE JURORS:  Yes, sir.

14       THE COURT:  All right.  Both sides have now rested

15  their cases.  The attorneys now will present their closing

16  arguments.  What the attorneys say is not evidence, but their

17  arguments are intended to aid you in understanding the case.

18  Each side will have equal time, but Mr. Gilfarb is entitled to

19  divide that time between an opening argument and a rebuttal

20  argument after Mr. Beaton has spoken.

21       Mr. Gilfarb.

22       MR. GILFARB:  Thank you, your Honor.

23       Counsel, and members of the jury.

24       Can you hear me well?

25       THE COURT REPORTER:  No, you have to have it right in

1579

CLOSING ARGUMENT - GILFARB

1  front of you, Michael.

2          MR. GILFARB:  How about now?

3          THE COURT REPORTER:  Perfect.

4          MR. GILFARB:  Good morning.

5          Wow!  It has been a long, long trial.  You know, when

6  I went back to look in my notes, there were some things even I

7  didn't remember, stuff that happened last week.  And so, it's

8  hard to keep this straight, and as the trial moves on, we kind

9  of -- the issues narrow and focus a little bit more.  And so,

10 as the trial goes on, maybe some things speed up, because it's

11 not an issue, and maybe the lawyers spent a little bit more

12 time during the examinations on other things.  But that should

13 not deceive you into thinking that what you've heard in the

14 past isn't important.

15         Now, you're gonna get in this case a series of

16 instructions that are gonna tell you -- act as a guideline for

17 how you should decide this case.  The judge decides on the law.

18 And you're gonna hear about that today.  I just want to go

19 through some of the evidence that you heard, and why we believe

20 it fits within the parameters of the law that would justify, in

21 fact, call upon you to deliver guilty verdicts in this case.

22         So, first, we have the main issue in this case.  It

23 has always -- this case has always been about a doctor acting

24 outside the scope of professional practice and not for a

25 legitimate medical purpose when he provides medical assistants

1580

CLOSING ARGUMENT - GILFARB

1 with presigned prescriptions.  Everything above and beyond that

2 or anything else related to what the doctor did and didn't do,

3 we'll talk about in a moment.  But at its core, this case has

4 always been about this.

5          Now, what you heard from both experts that on this

6 matter, there is no dispute.  It is outside the scope of

7 professional practice and not for a legitimate purpose to hand

8 out presigned prescriptions for the medical assistants to fill

9 in if the doctor has never seen the patient.

10          There's no dispute about that.

11          To fill it in if the doctor approves the prescription

12 after it was issued, even if the doctor first saw the patient,

13 you can't do that either.  That's outside the scope of

14 professional practice.

15          And you can't do it -- you can't fill in a previous

16 presigned prescription, you can't fill in the information

17 without the doctor exercising some measure of medical judgment.

18          That's what this case has been about at its core.

19          Now, there was this whole other issue.  Does a doctor

20 act within the scope of professional practice and legitimate

21 medical purpose in prescribing oxycodone based upon what the

22 doctor is doing?  That's a whole different thing.

23          Now, the government's position is that you should look

24 at, what is the doctor doing?  And what is the doctor relying

25 upon?  And I use "he" here, I'm gonna get chastised by my

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

1581
CLOSING ARGUMENT - GILFARB

1 daughter, he/she, but the doctor here is a male, so we're just
2 gonna go with the male. What is he doing and what is he
3 relying upon? Is that being a doctor?
4       The defense would have you believe that this case is
5 about whether the person exercises any measure of medical
6 judgment. That's a doctor?
7       So, let's just think about that for a moment. Let me
8 explain to you why this is a complete fallacy.
9       You don't have to be a doctor to know that oxycodone
10 will treat your pain. It certainly will. Most everybody knows
11 that. But let's take the extreme example. And I want to show
12 the absurdity of this postulation -- "any measure of medical
13 judgment."
14       If you go to a doctor, and you say, "My hand hurts,"
15 the doctor can say, "Well, let's amputate it. That will solve
16 that problem. We'll amputate it, and after you recover, your
17 hand won't hurt. Now, you won't have a hand, but it won't
18 hurt."
19       Is the doctor exercising a degree of medical judgment
20 there? Sure. Would Dr. Warfield have you believe that that is
21 within the scope of professional practice? For her, yes. And
22 we'll get more into Dr. Warfield shortly. But that is the
23 difference between how the defense is phrasing this case for
24 you and how the government is phrasing this case.
25       Now, remember, this is only as to when we're judging

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

1582

CLOSING ARGUMENT - GILFARB

1  what the doctor does.  If you find that the doctor gave the

2  medical assistants presigned prescriptions, it's game over on

3  any level.  It is game over.

4       This is only if you have to start deciding whether

5  Dr. Mencia was acting like a doctor when he was doing those

6  examinations.

7       And the way that I like to view a case is, especially

8  when there has been such an attack by the defense on the

9  believability and credibility of some of the witnesses, I like

10  to start with -- start from what we know, and then we'll see

11  what's true.

12       Code-G or CSs, does that exist?  Of course.  The text

13  messages that we displayed by the defense were never

14  questioned, never touched.  There is no contradictory evidence

15  in the record about the existence of Code-G or CS.  We know

16  that from Sylvia Hernandez.  She was the one that sometimes

17  substituted as the checkout girl.  We know from Klaudia Gega,

18  the one who was the financial manager, who would get those

19  daily spreadsheets, and it would say "CS."  You heard -- you

20  saw the spreadsheets, and you saw the text messages.

21       So, we know that Code-G or CS exists.  No question.

22       Dr. Mencia knows about the Code-Gs or CSs.  How do we

23  know that?  The same people.

24       You heard about meetings that they had where they were

25  talking about Code-Gs, and now we're gonna call them CSs, and

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

1   we're gonna have a column in the spreadsheet.  You saw the text

2   messages.  As a matter of fact, you even heard about

3   conversations that they had with Dr. Mencia where he was using

4   those terms.  There's no question that Dr. Mencia knows what a

5   CS or a Code-G is.

6          Code-Gs or CSs' money is treated differently.  You,

7   again, heard this from Hernandez, Gega, the spreadsheet, and

8   the texts.

9          And you're talking about the two envelopes.  First,

10  it's the two envelopes.  He takes the envelope at the end of

11  the day, then it goes into the spreadsheet, the envelope gets

12  slipped under her door, Gega's door.  It never gets deposited.

13  Don't say that in QuickBooks.  Large sums of cash being plopped

14  on the desk in a Publix bag.

15         We know that that money is being treated differently.

16  And we know that that money is being treated differently in

17  these ways, and that he knows and is directing that that money

18  be treated differently.

19         Mencia's patients were pill seekers.  We know this

20  from Dr. Marrero.  Now, we're gonna talk about Warfield in a

21  moment.  But there could have been no greater contrast in how a

22  doctor should behave when seeing a Schedule II patient than

23  calling Dr. Marrero right after Dr. Warfield.

24         Dr. Marrero got up there, he had a little trouble with

25  his very thick accent, but "I see the patient, I touch the

CLOSING ARGUMENT - GILFARB

1  knee, I look at the medications, I see is there a urine."  In

2  other words, that's the doctor a person would want to go to,

3  not Dr. Warfield's doctor, "Hum, looks like you need

4  oxycodone."

5       You heard from Erickson.  He's a pill seeker.  That's

6  why he was going to Dr. Mencia.  And it was Dr. Mencia that he

7  saw.

8       And you heard from Amanda Baldwin, this was way back,

9  our first witness, the girlfriend of James Hewett, who would

10  talk to you about her fiancé pill seeker and drug addict going

11  to Dr. Mencia, and Dr. Mencia giving him what he wanted, not

12  what he needed, what he wanted.

13       And you heard Ronald Erickson say, "I just asked for

14  what I wanted."  And, of course, that's borne out by the

15  transcripts, patients, quote/unquote, were getting what they

16  wanted.

17       An expert review of the data would indicate that these

18  are pill seekers.  You heard this from Dr. Goldstein, Abby

19  Goldstein.  She was the pharmacist.  You heard this from

20  Dr. Sullivan.  She was the pharmacist who came in after her.

21  You heard this from Stephen Quindoza from Medicare, that

22  basically what all the data shows is the trends are that these

23  are pill seekers.  And they existed both in CS and G-code form

24  when they were cash payors, and they existed in that form when

25  they were Medicare patients.

CLOSING ARGUMENT - GILFARB

1    Not all of them.  He had a legitimate side to the

2    business, I guess.  But when he saw a Medicare patient who just

3    was acting like a Code-G or a CS, that's how he treated them.

4    That's what the evidence demonstrated from Mr. Rodriguez, one

5    of the medical assistants, from Mr. Mensah, one of the medical

6    assistants.  But the Medicare data doesn't reflect that, and

7    we'll get into that in a moment.

8    Even Dr. Silverman and Dr. Warfield agree.  And

9    Dr. Warfield basically says, "Even if they're pill seekers,

10   just give it to them."

11   What else do we know?  That there were presigned

12   prescriptions.  How do we know that?  Well, you saw the last

13   and final exhibits that were published for you, members of the

14   jury, a signed but blank -- otherwise blank prescription pad

15   recovered from his office, and a blank signed prescription

16   piece of paper from his master bedroom of his house.  Those are

17   facts.  Those are uncontested facts.  That exists.

18   And I just want to demonstrate for you for a moment

19   how else we know and why the videos can often be important.

20   This is a -- the recorded meeting on July 25th, 2017,

21   with Mr. Rodriguez.  He's writing the prescription.

22   *(Videotape playing at 10:58)*

23   MR. GILFARB:  He's filling it in.

24   *(Videotape playing)*

25   MR. GILFARB:  Members of the jury, if you look, you

CLOSING ARGUMENT - GILFARB

1   will see that the prescription is already filled in.  That is a

2   fact.

3          Now, now that we know the facts, now we can examine

4   whether the medical assistants were telling the truth.  Because

5   in the end, you're gonna have to decide whether they were

6   telling the truth.

7          And there were three of them -- Mr. Rodriguez,

8   Ms. Grant, and Mr. Mensah.

9          First, as what's common to all of them, this is all

10  out in the open.  It can't be a secret, because it's out in the

11  open.  It can't be that they're doing it and nobody knows that

12  they're running the medical practice without Dr. Mencia.  The

13  patients come in through the front door.  They leave a record

14  when they check in.  They go to an examination room, the door

15  of which is often kept open at some point during the

16  examination, in a busy practice with people passing back and

17  forth.  This is all in full view of people who are not in on

18  it.

19         They then take the prescriptions, they scan them into

20  the record for Dr. Mencia to see.  He signs the record.  The

21  record is there for eternity.  It doesn't get erased.  He then

22  has all the money.  The spreadsheet is there.  This idea of,

23  "Oh, I'm just a doctor, I just run around seeing patients,

24  taking their vitals and checking their breaths" is nonsense.

25  Because think of what they risk in getting caught.  At any

CLOSING ARGUMENT - GILFARB

1    moment, Dr. Mencia could walk by and go, "Who's that?  What are

2    you doing?"  Or any of those things.

3         Or, "Hey, you saw this patient?  I didn't authorize

4    that prescription.  What's happening here?"

5         That doesn't happen.

6         And how about the cost versus the benefit.  Now, you

7    saw the very, very modest conditions under which these medical

8    assistants lived.  And you saw the utter opulence in which he

9    lived, "he," Dr. Mencia.

10        What is their financial incentive?  That they made

11   some money on the side, some tips?  Mr. Rodriguez, his car was

12   so delapidated, he had to take Ubers to work.

13        So, let's talk about Oscar, Oscar Rodriguez.  In the

14   videos -- and there is a transcript, and you'll see it.  And we

15   kind of skimmed over it.  We don't have a lot of time to go

16   back over it, and I have less time now.  But there's a

17   transcript where the confidential source offers him and says,

18   "Oh, we're gonna pay you good, we're gonna give you a tip."

19        And he says, "You don't need to do that."

20        Now, he doesn't reject it.  He doesn't say, "No, no,

21   no, keep it."  But what he says is, "You don't need to do

22   that."  Now, this is -- he doesn't know he's being recorded.

23   And he says, "You don't need to do that."

24        If Oscar were lying, why talk about how he was

25   incrementally put in charge?  Right?  Remember, he testified

1588

CLOSING ARGUMENT - GILFARB

1  about all the different phases that this scheme went through.

2  First, Dr. Mencia would come in, he'd say, "Write up the

3  script," and then he would leave.  Then it got to the point

4  where he would just pop in his head, and then he would leave.

5  Then it got to the point where he would hand out the

6  prescription pads and say, "Come see me, and I'll sign it."

7  And then it just turned to, "Here's the prescription pads."

8       Why make all that up?  If you're lying, and you have

9  something to gain, and all you want to do is convict him, why

10  not just say, "From the very beginning, Dr. Mencia came out and

11  says, 'Here's what's happening.  I'm a drug dealer.  And we're

12  gonna push these drugs until people die.  And here are all

13  these scripts.'"  That would have been great testimony for the

14  government.  But it would have been false testimony.

15       And then I like to call this the big swing and the big

16  miss.  On cross-examination, the defense took a big swing at

17  Mr. Rodriguez.  The G-code money in his pocket.  "That's G-code

18  money.  That's G-code money."  Until you found out in redirect,

19  it can't be G-code money, because the place hadn't opened yet.

20  That's a big swing and a miss.

21       Another big swing and a miss was when they thought

22  they had caught him in some text messages of selling these

23  things on the street, and it turned out he was paying a hooker

24  on one occasion.

25       Who admits that?  That's got to be true.  Who does

CLOSING ARGUMENT - GILFARB

1    that with the wife sitting here in court?  What a thing to

2    admit.  And you saw -- as you're watching him on the stand, you

3    saw that he had to admit it, that he had been caught in that

4    cheating scandal, and he had to admit it.  He told the truth.

5    And then he told you about the Ubers.  A big swing and a miss.

6         There were other medical assistants that testified.

7    And I'll tell you, you know, as I went back through my notes --

8    and they're just my notes -- you have to rely on your own

9    recollection and your notes -- absolutely nothing got

10   accomplished during Nadira Sampath-Grant's examination that

11   would undermine her credibility.  It was just more of the same.

12   "You're facing 120 years, you don't want to go to jail, you

13   want to come out, this is what you told the agents, the agents

14   know about your son Kye."  And we'll get into that in a moment.

15        But, really, let's talk about John Mensah.  Because,

16   admittedly, it looked pretty bad when it was happening.  But

17   let's take a step back, and let's look at it.  Nothing happened

18   during that cross-examination that you don't already know.  Did

19   he get banged up a little bit?  Sure.  He was easy to

20   manipulate and push around.

21        But you saw John testify.  Does he strike you -- a

22   doctor in his own country, a gentleman in the way that he

23   testified, does that guy strike you as the guy that was lying

24   on the stand?  He answered the questions the best that he

25   could.  In the transcripts, you saw what you saw.  That is what

CLOSING ARGUMENT - GILFARB

1   it is.  And he was drug dealing.  And he explained why he was

2   drug dealing.  Because he's got a drug dealer boss, and he

3   thought it was okay.

4        And you know what?  The evidence was that John wasn't

5   really in on it until the very end.  And, sure, Oscar's making

6   some money, Nadira's making some money.  Who else is making --

7   the doctor is making tons of money.  He's sitting there

8   negotiating pills.  "I'll get in on the action too."  Watch the

9   videos.  You'll see how uncomfortable he is the first time it

10  happens, and he's taking the money.

11       This brings us to Dr. Carol Warfield.  We hired her,

12  and we consulted with her.  This is true.  But at the same

13  time, the same time, we hired Dr. Silverman.  You saw the

14  contract in evidence.  It was the same -- basically within a

15  day or two of each other.

16       We did not hide her testimony from you, because when

17  Dr. Silverman took the stand, I stood here at the ELMO, and I

18  showed you the claims that Dr. Warfield had made, and that we

19  had shared it with our doctor, and now he was testifying about

20  it.  By the way, some of which he agreed with.  Some of which

21  he thought was absurd.

22       So, nothing was hidden from you.

23       And you can imagine by now, having heard her testify,

24  why she wasn't called as a witness for the government.  Most

25  telling, even though she agrees that the medical assistants

CLOSING ARGUMENT - GILFARB

1    were being like doctors, she conveniently leaves out that fact

2    when asked in redirect, final question, "What's your opinion

3    about Dr. Mencia?"

4          "He's acting in the normal scope."

5          Hit play, rewind, record.  Over and over and over

6    again.  Does she stick in there?  Does she slide in there?

7    "But what bothers me is the medical assistants *(sic)*.  If he

8    was directing the medical assistants to do this, that I would

9    have a problem with."  No, she's on automatic.  She's a defense

10   expert.  She has presented to doctors' conferences about how to

11   dissect a government case on pill mills.  Warning them, "This

12   is how it works."  And her views are extreme.  You saw.  I took

13   out four massive binders of her testimony, and you saw how she

14   testified.

15         And I want to discuss that with you.

16         Can we switch to the ELMO for a moment?

17         You're gonna be given an instruction in this case

18   about how to evaluate the credibility of witnesses.  This is

19   not an exhaustive list.  These are some of the things that you

20   should consider.  There are a lot of other things.  Here are

21   some of the things you should consider.

22         And I want you to think about this, and I want you, as

23   we go through them, think about Dr. Warfield and then think

24   about Dr. Silverman, how he answered questions.  Sometimes he

25   was a little long-winded, but when he could, it was yes or no.

CLOSING ARGUMENT - GILFARB

1   When Dr. Marrero took the stand, when he could, it was yes or

2   no.

3       When all the government's witnesses took the stand,

4   and they could, it was yes or no.  There was only one witness

5   who could not find it within her soul to do it.  And that's

6   Dr. Warfield.  Everything came with a little microbomb, a

7   little explanation about why what I was saying is curved,

8   hemmed, playing the odds on it.

9       THE COURT:  Twenty-five minutes have elapsed,

10  Mr. Gilfarb.

11      MR. GILFARB:  Can we switch back to the ELMO, please?

12  I'm sorry, to the recording?

13      You heard about James Hewett.  There's no question

14  that he died because of the oxycodone in his system.  That was

15  the but-for cause of death.  There were lots of other things in

16  his system that did not result in his death, and that he would

17  have survived but for the oxycodone, the lethal dosage.

18      It was Dr. Mencia's oxycodone.  You saw that from

19  Amanda Baldwin, who was there, from Daniel Hewett, who said he

20  took his oxycodones with him to the Keys, and there -- for

21  goodness sakes, there's a photograph of the bottle --

22  prescription bottles in the premises.  And you heard that he

23  was getting them for free.  So, why get them anywhere else?

24      And he was getting them from Dr. Mencia without a

25  legitimate medical purpose and outside the scope.  You heard

CLOSING ARGUMENT - GILFARB

1  that from Dr. Silverman, who says, "I'm looking at the record

2  here.  I don't know why he's getting oxycodone."  Not all pain

3  is treated with oxycodone and still be within the scope of

4  professional practice.

5       And the last item I want to talk to you about is

6  Medicare fraud.  He was stealing from the government.

7       Dr. Mencia saw Medicare pill seekers.  You know that

8  because you heard the testimony that basically there were

9  Medicare patients that would come in, and they were basically

10 G-codes.  He saw them, he spent a little bit more time with

11 them, but basically the same kind of examination.

12      You saw that -- he saw them the way that he saw

13 G-codes.  You heard that from two witnesses.

14      Dr. Silverman and Dr. Sullivan and Quindoza tied up

15 the Medicare lack of medical purpose, the fact that he's

16 billing for 25-minute increments 90 percent of the time, even

17 when he's got G-code patients that he sees for six or seven or

18 ten minutes.  You heard that Medicare would not pay for that.

19 And you will see in the records that, in fact, Medicare was

20 billed for that.

21      Members of the jury, I want to just finish with an

22 important instruction that you're gonna hear.  They're all

23 important, but I want to just focus on one as I wrap this up,

24 the first part.

25      It's the reasonable doubt instruction.  You have to

CLOSING ARGUMENT - GILFARB

1   find what the judge tells you, you need to find beyond and to

2   the exclusion of every reasonable doubt.  And I'm a little

3   annoyed that my friend, Mr. Beaton here, stole my puzzle

4   example.  It's something I always say for closing, but he used

5   it during cross-examination.

6        I want you to imagine that you are in charge of making

7   this puzzle.  I don't know -- I don't care how many pieces.

8   But if you have kids like I do, you know there are gonna be

9   pieces missing, the puzzle pieces will be mixed together.  But

10  what you do is you have the puzzle top, and you have to put

11  that picture together.  A reasonable doubt is, how many pieces

12  can be missing from that puzzle piece before you cease to

13  recognize the picture?  That's what a reasonable doubt is.  And

14  so, there might be an examination about, look at this piece,

15  look at that piece, this is from a different puzzle, this one

16  doesn't fit exactly correct.

17       The question is for you to decide, based upon

18  everything that you've heard:  Do you recognize this for what

19  it is?  If you were to strip Dr. Mencia of the medical office

20  surrounding, of his fancy suits, of the titles, of the medical

21  examiner titles, and you were to just read those transcripts

22  and just hear what's going on, what you're hearing is a drug

23  deal.

24       Thank you.

25       THE COURT:  Mr. Beaton.

CLOSING ARGUMENT - BEATON

1    MR. BEATON:  Yes, sir.  Thank you.

2    May it please the Court, counsel.

3    Good morning, ladies and gentlemen.

4    THE COURT REPORTER:  Mr. Beaton, I'm sorry, just move

5    that microphone.

6    MR. BEATON:  Justice is not a team sport.  Team sports

7    are about winning.  They're about taking every advantage of the

8    other team, and they're about doing whatever it takes to win.

9    And that's why what happens in here is not a team sport.

10   Your job isn't to decide winners and losers.  Your job

11   is, to the extent possible, seek the truth and return a verdict

12   consistent with the law.

13   This is not a team sport.  But that's not how Team

14   America has viewed it from the beginning.  And you heard it,

15   you heard it in interrogation after interrogation.  You heard

16   it in the presentation of the evidence.  And time after time

17   after time, why was it me that had to bring to your attention

18   things that Team America did not?

19   Seek the truth.  Don't decide winners and losers.

20   Don't buy into that.

21   And so, in here, as with everything in life, there are

22   no absolute truths.  And that is not the measure by which you,

23   as a jury, judge a case.  Because we know in our personal lives

24   and through the combined experience of history and brilliant

25   men and women who have come before us, the truth or the

CLOSING ARGUMENT - BEATON

1  absolute truth is what you seek, but it is not how you measure.

2          We have a standard in this country called "reasonable

3  doubt."  And we go around the world talking about how proud we

4  are of the freedoms and the liberties that we have.  And what

5  we mean by that is that in this country, Team America has to

6  come in here and convince the 12 of you beyond and to the

7  exclusion of every reasonable doubt that Dr. Mencia left his

8  role as a medical professional and became a drug pusher.

9          Reasonable doubt is what we commend to the history

10  books.  Reasonable doubt is what we commend to our legacy.  And

11  what the government must do is exclude every reasonable doubt

12  that you all have.

13          And in the instruction that the judge will give you,

14  he'll define "reasonable doubt" as a decision that you make in

15  the most important of your affairs, without hesitation.  If you

16  have a hesitation, your verdict has to be not guilty as to

17  every single count.

18          And what reasonable doubt does is it protects us from

19  overreaching governments, like Team America.  Because Team

20  America has the manpower and the money to overreach.  And

21  there's no better example than what's happening in this

22  courtroom right now.

23          Look at Team America (indicating).  Look over

24  there (indicating).

25          That's why reasonable doubt stands in between the

CLOSING ARGUMENT - BEATON

1  government and a man's life.  That's why you stand in between

2  Team America and a man's life.

3       And when I talk about government overreach, it doesn't

4  just mean bad actors or people with bad intentions.  In fact,

5  history has taught us over and over and over again that the

6  most dangerous kind of government overreach comes from good men

7  and women who are convinced that they are doing the right

8  thing, who are so convinced that they are right that they

9  ignore things that don't support what they've already

10  concluded.  That they put to the side what doesn't fit into the

11  view they've taken.  That is the kind of government overreach

12  that is most dangerous.

13       There was never an investigation in this case, never.

14  It's always been a prosecution.  And you heard it from the

15  minute that the agents went in and started questioning people.

16  And when the answers weren't what they liked, they kept telling

17  people, "Just give us what we need.  Forget about the facts.

18  Tell us what we have to have."

19       And those were the only ones that we were able to

20  hear.  What happened in the ones that we weren't able to hear?

21  What happened in the interviews of the other witnesses that you

22  saw?  What kind of fear must they have come in here with?

23       But don't you forget about the facts.  And here are

24  the facts.  You want to talk about stark contrast, we got to

25  see what a drug deal looks like and what it doesn't look like.

CLOSING ARGUMENT - BEATON

1   Oscar, Nadira, and John, those are drug dealers.  They were

2   dealing drugs in that room behind Dr. Mencia's back with "do

3   not disturb" signs on the door.  And the government wants you

4   to believe that these people were dealing drugs for

5   Dr. Mencia's profit for $39,000 a year?

6         I mean, Oscar Ventura-Rodriguez is the hardest working

7   drug dealer in south Florida, and he's getting paid 39 grand?

8   He's making 12 or 1300 bucks every two weeks?  Are you kidding

9   me?  And even Team America picked up on it when they asked --

10  and some of you laughed -- they asked Oscar, "Hey, if I ask you

11  to rob a bank, are you gonna do it for free?"  Oscar laughed,

12  they laughed, and you laughed.  And you did it because it's

13  ridiculous.  And this guy, who's the hardest working drug

14  dealer in south Florida, at the behest of Dr. Mencia, is

15  carrying around in his wallet $2600 in cash?  Are you kidding

16  me?  We all know where that came from.

17        Nadira, drug dealer.  And she has a difficult decision

18  to make as a parent, despite the behavior.  And you saw it.

19  Oscar was the mastermind of all this.  He had perfected it.  He

20  would meet people upfront in the lobby.  Why get their personal

21  cell phone numbers?  Why escort them to the first room in the

22  practice?  We all know Dr. Mencia's office was upstairs, and he

23  was walking around.

24        You know what Dr. Mencia is guilty of?  He's guilty of

25  trusting people.  That's what he's guilty of.  He's simply

CLOSING ARGUMENT - BEATON

1   guilty of placing too much trust in the people around him.

2        When Nadira came up here, she told you.  And the

3   agents were very clever.  The first thing they told her, and

4   she broke down as a mother.  And those of us who have kids know

5   what that's like.  There's nothing we would not do for our

6   children.  And she is now confronted with the fact that because

7   of her behavior and because of the crimes she committed, she

8   has to make some difficult decisions, because she's gonna be

9   deported, and her baby boy, who is doing awesome in school and

10  has a future here in this country, is a United States citizen.

11  And she was unabashedly clear with you that she was doing this

12  for Kye.  What would she and what would she not say for Kye?

13        And then John Mensah.  The government calls him a

14  gentleman and a drug dealer in the same sentence.  Maybe

15  Mr. Gilfarb can answer this question when he comes up here, why

16  is it that I had to play the tape to you where John Mensah is

17  saying, "Keep us away from the doctor.  Don't tell the doctor.

18  He can't find out about you and me."  Really?

19        Why did I have to play that for you?  Why?  Because

20  Team America wants to win at all costs.  And that's what it's

21  been about from the beginning.  It's been about ignoring and

22  suppressing and hiding whatever does not support their theory.

23  And it's only a theory.

24        Dr. Warfield, the government -- it's remarkable.  I

25  didn't hire her.  I didn't pick her.  They did.  And then as

1600
CLOSING ARGUMENT - BEATON

1  with everything else in this case, when she didn't jump on Team
2  America, they put her to the side.  If I didn't call her, you
3  all would have never heard from her.  And those four binders
4  and all the questions, the government knew about all that when
5  they hired her.  But she just didn't jump on Team America.  She
6  didn't forget about the facts and just give them what they
7  want, which is what they were asking people to do.
8       And so, what the government wants you to believe is
9  that the Harvard professor that they hired, who is the head of
10 the pain management clinic that is named after her, who has
11 written the textbook on pain management that's been translated
12 into four languages and is used around the world, that you
13 shouldn't believe her.  The government wants you to believe
14 that Harvard Medical School is now putting out a bunch of
15 criminals.  Are you kidding me?  What happens if I don't call
16 her?  You never hear from her.  And it was because she wasn't
17 on Team America.
18      And then we saw the behavior of Dr. Mencia.  All of
19 these MAs testified Dr. Mencia would never see G-code patients.
20 And all of a sudden, we play a video where Dr. Mencia is doing
21 what?  Meeting with a patient, asking him questions, talking to
22 him, spending time with him, telling him, "Hey, you don't want
23 to take Xanax."
24      Even though John Mensah coaches him on Adderall, "You
25 don't need Adderall.  Here, take Ibuprofen while you're

CLOSING ARGUMENT - BEATON

1  driving.  Hey, do you have insurance?  I might be able to give

2  you something else."  But because it doesn't fit with Team

3  America's narrative, they just brush over that.  And so, drug

4  deal versus no drug deal.

5       Nadira, Oscar, John, they put money in their pockets.

6  They all admitted it, and we all saw it.

7       What does a visit with Dr. Mencia look like?  He walks

8  out of the room, and you can hear the confidential informant's

9  surprise.  He's like, "Okay, 185 bucks?"  He literally pays --

10 I mean he literally pays almost half of what Nadira and Oscar

11 are charging.  And Dr. Mencia is nowhere -- anywhere near that.

12 And he doesn't care.  And you heard no evidence that he later

13 came back and said, "No, no, no, no, I want my $300 in cash.

14 Make sure this doesn't happen again."

15      And so, what you learned about Dr. Mencia is that he

16 was so focused on his patients and so focused on being a doctor

17 that he put too much trust and too much confidence in the

18 people that he had hired.  And that included the drug dealers,

19 and that included the people in the front, who couldn't even

20 charge people the right price.

21      And then the government makes a big deal that now

22 there's a CS column.  So, they're accusing him of not doing

23 enough with controlled substance patients, but now when he

24 starts monitoring who is paying for controlled substances so

25 that he can keep the money aside in case he needs to build in a

CLOSING ARGUMENT - BEATON

1  cushion for something, now, no, no, no, that's evidence of a

2  crime.  So, he's damned if he does and he's damned if he

3  doesn't.  Team America will find a way to spin it.

4          Dr. Mencia is a doctor practicing in Florida.  The

5  judge is going to instruct you that the practice of medicine is

6  fluid, that latitude is given to doctors because of that

7  fluidity, that if you find Dr. Mencia fell below the standard

8  of care, if you find that he committed malpractice, if you're

9  not happy with some of the decisions that he made, it's not a

10  crime.

11         And we saw the rule in Florida on pre-signing

12  prescriptions.  Was that a mistake?  Absolutely.  But the

13  pre-signing of prescriptions -- and we showed it to you --

14  falls under a statute that says "disciplinary rules," and talks

15  about the Board of Medicine.  You all should not be called upon

16  to make this decision.  The government can't come in doctor by

17  doctor and try to regulate the practice of medicine through

18  fear and prosecution.  But doctors should be in front -- to the

19  extent you think he did anything wrong, or fell below the

20  standard of care, or made mistakes, he should be in front of

21  the Board of Medicine, in front of 12 doctors who will judge

22  whether he made a mistake and to what agree, if any, they will

23  discipline him.

24         And here's what we also know, is that the Board of

25  Medicine has the authority, if they believe that somebody's

CLOSING ARGUMENT - BEATON

1    overprescribing these controlled substances, to suspend their

2    license on an emergency basis.

3           And the stipulation that Mr. Gilfarb read as early as

4    this morning told you what?  That as of this morning,

5    Dr. Andres Mencia is a licensed physician in the State of

6    Florida.  What does that tell you?

7           You heard about drug seekers.  You heard that they're

8    manipulative, that they're really good actors.  You heard it

9    from Abby Goldstein.  Can you imagine what circus is going on

10   in her Publix pharmacy every day?  These people are good at

11   what they do.  And it's sad.  I'm not saying it's not sad.

12   It's sad.

13          But these people are professional actors,

14   manipulators, and liars.  And I don't say that in a derogatory

15   sense.  They do it out of desperation.  They brought in Ronald

16   Erickson to attempt to establish that he has no medical

17   necessity.  The guy walks in with two knee braces.  The guy

18   fell from a helicopter while serving our country, was told by

19   the U.S. Army, "Hey, that's gonna fix itself."  That turns out

20   not to be true.  And the Veterans Administration won't operate

21   on him until, by his own words, he's in excruciating pain.

22          And that's the kind of people that Mr. Gilfarb called

23   "junk" at the beginning of this case.  He's not junk.  He may

24   not have been telling the truth.  He may have come in here and

25   been less than honest, but he's not junk.  And he shouldn't be

1604
CLOSING ARGUMENT - BEATON

1   out there being left to float in the wind because the

2   government has instilled so much fear in doctors that none of

3   this is worth it.

4          And when you find a man who says, "You know what, I'm

5   gonna do what my oath requires me to do," this is what happens.

6   And it's amazing that you heard from Dr. Marrero.  And the

7   government held him up as that's how a doctor should look.  The

8   guy was literally shaking on the stand.  And that's what they

9   want.  They want people like Dr. Marrero, who are eventually

10  gonna say, "I'm not gonna treat anybody, and if I treat them,

11  you're gonna have to jump through a thousand hoops."

12         "Ronald Erickson, I don't care that you served our

13  country, I don't care that you fell out of a helicopter, I

14  don't care that the Veterans Administration is gonna let you

15  get to the point where you're screaming in pain before they

16  replace your knees.  I don't care.  Get out of here.  You're

17  junk."

18         That's not the country that we live in.  And that's

19  not what we expect of our doctors.

20         So, it's just a gotcha game.  It's a gotcha game.  We

21  have all these rules and regulations that tell doctors -- and

22  the Patient Bill of Rights, which said patients should be

23  treated with dignity, no matter how they pay.  And we have

24  Florida regulations that tell us what our discipline *(sic)*.

25  And, instead, it's all been translated into a criminal

CLOSING ARGUMENT - BEATON

1  prosecution.  It's a gotcha game.  It's like going to a golf

2  course where they show you a map of the course, and you go out

3  there, and the map shows the green over here, but it's really

4  over here *(indicating)*.

5          And I used to play a lot of golf when I was younger

6  before I had kids.  I have no time anymore.  But I do still,

7  from time to time, enjoy shooting something that's called

8  "sporting clays."  And I'll use my own experience in that.

9  Sporting clays is like basically golf with those little clay

10  pigeons.  And what you're allowed to do when you shoot sporting

11  clays is ask for what's called a "show pair."  And that means

12  when you get to a certain station, you can ask to see where the

13  clay pigeons are coming from.  And the analogy here is that the

14  Florida regulations, the opinion of Dr. Warfield have that show

15  pair coming from the left, but Dr. Mencia is being punished

16  because they ultimately came from the right, and he missed

17  them.

18          He's been told what to do and how to do it by the

19  Board of Medicine in Florida, and he did it to the best he

20  could.  And when the government disagrees, they get to come in

21  here one prosecution at a time and try to convince 12 of you to

22  put doctors in prison.

23          Let's talk about James Hewett.  A tragedy.  It's sad.

24  When you saw his dad come in, those of us who have kids, it's

25  heartbreaking.  But James Hewett had problems.  He was so

CLOSING ARGUMENT - BEATON

1    addicted and so manipulative and so good at getting "his

2    thing," as his ex-girlfriend called it, that she would go with

3    him to emergency rooms, and he would fool those doctors.  And

4    she would have to pull the doctors to the side and say,

5    "Listen, he's -- he doesn't need that.  Just give him a saline

6    shot and you'll see."

7            For you to hold Dr. Mencia responsible, you have to

8    find that Dr. Mencia fell so below the standard of care that he

9    became a drug pusher.  That's in the instructions.  He had to

10   have left the practice of medicine and become a drug pusher.

11           And the government has to exclude the three Ss.

12           The source.  Where did he get it?  And the guy himself

13   reported the medications that we know he got from Dr. Mencia

14   stolen.  I mean, the government's own witnesses give you

15   reasonable doubt.

16           Suicide.  The government has to exclude suicide.  Now,

17   remember I told you that reasonable doubt, in part, is to act

18   without hesitation in your most important affairs?  So, Team

19   America hadn't obviously provided Dr. Mallak with all the

20   information that he needed to testify here.  The nine suicide

21   attempts, the calls to 9-1-1, the Baker Acts for being a harm

22   to himself.

23           And so, when I asked Dr. Mallak about it -- and it was

24   unfair to him, because nobody prepared him, because it didn't

25   coincide with what Team America wanted to happen.  Maybe the

CLOSING ARGUMENT - BEATON

1    government can tell you why they hadn't brought those reports

2    to your attention before.

3         The last question I asked Dr. Mallak is:  "In light of

4    what we've just talked about, does that give you some pause

5    about the determination that you ultimately came to?"  And his

6    answer was:  "It might."  And so, if Dr. Mallak hesitated, how

7    can you not hesitate?

8         And so, another thing that Team America has done is

9    that they've put up pictures of Bentleys and big houses, and

10   then compared those to the houses of the drug dealers to try to

11   get some sort of class warfare reaction from you guys.  And I

12   don't know what the significance of any of that is.  Dr. Mencia

13   had a practice, you heard, with 15 employees, 12 to 16 doctors,

14   two stories, 90 percent geriatric.  You gonna punish him for

15   doing well for himself?  Really?  Is that what this case is

16   about?  It's not my fault or his fault that the drug dealers

17   spent their money poorly.  Maybe Oscar should have bought

18   himself a new car with the drug dealing money instead of going

19   out and finding hookers.  I don't know.  What's the

20   significance of any of that?

21        Why would John Mensah ask the confidential informant,

22   "Don't tell the doctor about this," if the doctor was this

23   mastermind drug dealer?  Why?

24        Why would Nadira -- when those two patients came in,

25   the woman and the man that she ultimately saw, why did she call

CLOSING ARGUMENT - BEATON

1    Oscar?  Why didn't she go see Dr. Mencia?  If Dr. Mencia was

2    the boss, if he was the head drug dealer?  Why?  Because the

3    head drug dealer was Oscar.  And what Nadira was trying to do,

4    although poorly, was get in on it.  And what John was trying to

5    do, even more poorly, was get in on it.  And so, they took

6    advantage of the doctor.

7         And so, if the doctor is guilty of anything, he's

8    guilty of trusting his employees too much by making the bad

9    decision to -- in an effort to move the practice along and keep

10   his waiting time down and do the right thing -- pre-signing

11   prescriptions.

12        It was a mistake.  It's a mistake that the Board of

13   Medicine should deal with.  Mr. Gilfarb said, "If you find he

14   pre-signed prescriptions, it's game over."  No, it's not.  The

15   Board of Medicine will deal with that.

16        You need to decide if he was a drug dealer.  I mean,

17   look, if you believe the government that Oscar, Nadira, and

18   John were the hardest working drug dealers in south Florida,

19   making 38, 39, $40,000 a year for the sole benefit of

20   Dr. Mencia, and at Dr. Mencia's direction that he said, "Hey,

21   go, uhm, go deal drugs here," if that's what you believe, he's

22   guilty.  I agree with that.  If you believe he told them to do

23   that?  Yeah, that's a crime.

24        But that's inconsistent with almost every piece of

25   evidence that you've heard, other than the testimony of these

CLOSING ARGUMENT - BEATON

1  people who sold drugs behind the doctor's back for money, put

2  these substances out on the street for money.  What do you

3  think they would do for their freedom?  I mean, if that's where

4  their moral compass is, if that's their baseline, if they did

5  that for money, what would they do for that -- from that

6  witness stand to get the keys to their own jail cell?

7       And you heard that the people that they have to

8  impress, the people that they have to convince to file motions

9  for reduction of their sentence, based on the quality of their

10 cooperation, is Team America.  The team that wants to win at

11 all costs.

12      What do you think happens to the quality and

13 significance of their cooperation if they come in here and say

14 things that lead you to find him not guilty?  What happens to

15 the quality and significance of their cooperation?  They sold

16 these drugs for money.  What would they do for their freedom?

17      Even if you find that Dr. Mencia fell below the

18 standard of care and did in good faith, your duty is to find

19 him not guilty.  The judge is gonna instruct you on that and

20 what "good faith" means.

21      The judge is also gonna instruct you that if you find

22 beyond a reasonable doubt that Dr. Mencia was a drug pusher --

23 and those are the words that are gonna be in the instruction --

24 that he left the medical practice and became a drug pusher, you

25 should convict him.  But unless you make that finding, your

CLOSING ARGUMENT - GILFARB

1    duty is to find Dr. Mencia not guilty.

2        And so, this is the time for me where I get scared,

3    because I wonder whether I've done everything that I can to

4    show you what happened here, to give you as many facts as

5    possible.  And I always wonder whether I did a good enough job.

6        And people often ask me, why criminal defense?  Why

7    did you pick criminal defense?  And the reason that I did is

8    because of people like Dr. Mencia.  He's not guilty.

9        THE COURT:  Mr. Gilfarb.

10       MR. GILFARB:  Your Honor, Mr. Yoffie was kind enough

11   to help me keep time.  Can I confirm that I have about

12   15 minutes?

13       THE COURT:  Fifteen minutes, correct.

14       MR. GILFARB:  Members of the jury, rebuttal argument,

15   which I'm doing now, is supposed to be my opportunity to

16   comment to you in rebuttal to some of the arguments made to you

17   by the defense.  But there's actually very little to rebut,

18   because he didn't talk about the evidence.  He talked about

19   policy.  He talked about Team America.

20       And I wonder what the word count, when this transcript

21   is typed up, will be when you hear Team America versus scope of

22   professional practice.  Because scope of professional practice

23   is what you're supposed to determine.  And you can hate Team

24   America all you want, but we're in court.  This is an island

25   unto itself, where no politics or policy decisions are supposed

1611

CLOSING ARGUMENT - GILFARB

1  to guide what you do.  And there is going to be a winner, and

2  there is going to be a loser.  That's the way court works.  We

3  go home at the end of the day -- win or lose.  It's not Team

4  America that wins or loses.  It's Dr. Mencia.

5       And you heard about the statements, and you got to

6  jump on Team America's bandwagon.  And I would suggest to you

7  that in the real world, members of the jury, confessions are

8  often not a pretty thing.  Oftentimes you don't sit down and

9  say, "Oh, tell me what happened," and you get a full

10 confession.  You get people who are scared, people who are

11 nervous, people who don't understand, and people who just don't

12 want to tell you.

13      Now, you may not like what you heard, but there's

14 nothing illegal about it.  There's no evidence that there's

15 anything illegal about it.  And maybe that doesn't make it

16 right.  But let's talk about whether it infects the evidence

17 that you heard.  They subsequently got a lawyer, admitted what

18 they did, and testified to it.  Their rights were protected,

19 just like Dr. Mencia's rights are protected.

20      And what do they get for their trouble?  What does

21 Team America do?  Show some mercy?  Mercy for Mr. Rodriguez?

22 Mercy for Ms. Grant?  Mercy for John?  In reducing the maximum

23 sentence that the judge could give them, because they're just

24 lieutenants in this drug organization.  There's the

25 captain *(indicating)*.

1612
CLOSING ARGUMENT - GILFARB

1       And now we're being skewered for the mercy?  And how

2   merciful was it that whenever they're done, they get deported

3   to Ghana?  That's mercy?  That Mr. Rodriguez, who told you he's

4   currently serving time -- I asked him, "How is it in there?"

5   He said, "Fatal."  Fatal.  That's mercy?  Separating a mother

6   from her son?  That's some mercy.

7       He asked you to think about reasonable doubt.  And

8   that if you hesitate even for a moment, you must find the

9   defendant not guilty.  That is not true.  Because if that were

10  true, you would go back into the jury room, raise your hands,

11  take a poll and say, "Oh, we can't decide, why deliberate?"

12  You have a duty to deliberate, to find out in this case, are

13  there reasonable doubts, doubts to which you can attach a

14  reason?

15      Dr. Warfield, that we picked her.  You saw that she's

16  not reasonable.  I would submit to you she's a little crazy.

17  And he's the one, the defense is the one that keeps saying,

18  "She wrote the book."  She did not go up to Sinai and talk to

19  the burning bush.  For her, she is the burning bush.  She wrote

20  the book.  She's judge and jury.  She's telling you he's

21  guilty.  She's telling you he's not guilty.  She's telling you

22  what a crime is.  She's telling you what a drug dealer looks

23  like.

24      Is this a person who presents as an expert?  She

25  doesn't even practice in Florida, doesn't have a license in

CLOSING ARGUMENT - GILFARB

1    Florida.  How is she gonna tell you what the standards are

2    here?

3         And you heard a lot about John Mensah -- oh, and I

4    just want to clear this up, because this I cannot let go.  I

5    thought that this was a bygone, but he brought it up again.

6         In opening statement, I talked about "getting rid of

7    the junk."  That was with regards to Dr. Marrero clearing his

8    caseload of Dr. Mencia's pill-seeking patients.  He was

9    clearing his caseload of junk.

10        These patients are not junk.  But when you're coming,

11   and you're not really a patient, and all you want are your

12   drugs?  Dr. Marrero will tell you, "That's a different doctor

13   you gotta go see."  A doctor like Dr. Mencia, who was not

14   acting like a doctor, taking your breath, "Oh, you need

15   oxycodone.  Let's chop off your hand while we're at it; that

16   will fix you.  Let's fix your back pain.  Let's just put you in

17   a wheelchair; that will fix you."  That's not acting like --

18   that's not being a doctor.

19        What did he do?  What did he do?  What did he rely

20   upon that makes him a doctor when he signed the Willy Wonka

21   golden ticket prescription?  Nothing.

22        John Mensah -- I'm sorry -- Dr. Mencia negotiating for

23   drugs.  That Mensah didn't go check with Dr. Mencia?  You saw

24   him leave the room.  Here's the transcript.  "I mean you ask...

25   let me speak to him."  It's right here.

1614

CLOSING ARGUMENT - GILFARB

1     So, don't be fooled.

2          That Mr. Hewett committed suicide?  That we have to

3     exclude that?  Well, that's debatable.

4          You heard that Dr. Mallak -- and I put it right up

5     here in two little yellow Post-its -- cause and manner.  Cause,

6     oxycodone; manner, accident.  At the end of the

7     cross-examination, he conceded that maybe, maybe the manner

8     would change to suicide.  Maybe.

9          But ask yourselves this question.  Who put the gun in

10    his hand?

11         And based upon what Amanda told you, these were all

12    threats as some sort of power ploy.  That the way you OD on

13    oxycodone is a mistake.  You take too many, and you forget what

14    you take.  And you take too many, and he was standing there

15    like a zombie with pills falling out of his mouth.  And you

16    heard what the medical examiner said, that eventually your

17    heart slows and your breathing slows, and you die.  There were

18    hamburgers sitting in front of him.  He was waiting to open his

19    eyes but never did.

20         So, what is it?  That Dr. Mencia didn't know what they

21    were doing?  Well, that means that he wasn't reviewing charts

22    that he signed.  Or is it, "Everything I did, I did right, but

23    everything they did, they did wrong"?

24         Well, if you're pre-signing scripts, it's not a

25    mistake; it's a crime if it results in a direction to fill it

CLOSING ARGUMENT - GILFARB

1   in with a controlled substance.  Nobody disagrees with that.

2           And I just want to end with two things.  Ronald

3   Erickson came in, and you are asked to believe that because he

4   came in with two knee braces, he needs oxycodone.  What greater

5   proof -- not oxycodone -- Dilaudid, another very strong drug,

6   basically heroin -- that because he came in with two knee

7   braces, that's what he needs.  Well, talk about drinking the

8   Kool-Aid.  Of course that's not what it means, because he's not

9   on that medication.  He doesn't need it.  There was no

10  legitimate medical reason to prescribe it other than he wanted

11  it.

12          And when you give somebody what they want in exchange

13  for cash, you are a drug dealer.  And I don't care how

14  expensive your suits are, or what kind of car you drive, or

15  where you live.

16          MR. BEATON:  I object to the prosecutor directing his

17  argument to the defendant.

18          THE COURT:  I allow wide latitude during closing

19  argument.

20          You may continue.

21          MR. GILFARB:  It makes no difference under the law.

22  What, that only street people can be drug dealers?  People of a

23  certain ethnicity or race or socioeconomic background?  That's

24  ludicrous.

25          What was happening here is a medically meaningless

1616

CLOSING ARGUMENT - GILFARB

1  consultation as a cover for what is essentially a drug deal.

2  That is acting outside the scope of professional practice and

3  issuing those prescriptions without a legitimate medical need.

4      The only evidence in this case that there's a

5  legitimate medical need and that it's within the scope is

6  Dr. Warfield.  Talk about getting a second opinion.  Well,

7  you're the patient.  You're gonna have to decide.  What is more

8  reasonable in this case about the practice of medicine here?

9      You heard about a good faith exception?  You would

10 have to find that he honestly believed that he was acting

11 within the scope of professional practice.  Well, then why all

12 the secrecy?  Why hide the money?  Why structure your deposits

13 to hide it from the IRS?  Why commingle it with legitimate

14 funds and buy your houses?  Why have your medical assistants

15 see them and you not see them?  Why even name them Code-Gs or

16 CSs?  He cannot reasonably argue in this case that there's a

17 legitimate, good-faith application here of his medical license.

18     And on that note, I just want to end on the following

19 statement.

20     Yes, you heard that the government has stipulated that

21 Dr. Mencia is currently a licensed physician.  But not for

22 long.  And, members of the jury, you heard the defense get up

23 here and say he lived by his oath.  His oath, what, to do no

24 harm?  As we indicated in opening statement, we're here about

25 the harm that he did.

```
1              The distribution of -- the conspiracy to distribute
2     drugs outside the course of professional conduct, that's a
3     harm; the harm that resulted in the death of James Hewett; the
4     harm to the government's system, a fund that he used as his own
5     slush fund, Medicare money; the harm that he did in hiding his
6     money from the government while he had a tax problem and was
7     living high on the hog.  That's the oath?
8              Members of the jury, for all the harms that he
9     committed, we ask you to find the defendant guilty.
10             THE COURT:  All right, members of the jury, we're
11    going to go ahead and recess for lunch.  Remember my admonition
12    not to discuss the case or allow it to be discussed in your
13    presence.  You haven't heard my instructions on the law yet.
14    And I'm gonna ask you to come back at 12:45.
15             So have a nice lunch.  We'll see you back at quarter
16    to one.
17             COURTROOM SECURITY OFFICER:  All rise.
18             (The jury exited the courtroom)
19             THE COURT:  And if you guys could go over all the
20    evidence and make sure everything's on the table that's
21    supposed to be there and nothing's there that's not supposed to
22    be there, so that when I give the instructions, we can send
23    back all the evidence.  And I guess if they want to hear tapes
24    or see videos, we'll have to bring them out and play them out
25    here.
```

1618

1    And if there's nothing else to come before the Court,

2  we'll be in recess until 12:45.

3         MR. BEATON:  Thank you, Judge.

4         MR. GILFARB:  Thank you, your Honor.

5         *(The Judge exited the courtroom)*

6         *(Luncheon recess taken at 11:32 a.m.)*

7                         -  -  -  -  -

1    **WEDNESDAY, JUNE 27, 2018, 12:48 P.M.**

2              *(The Judge entered the courtroom)*

3         THE COURT:  All right.  We're back on the record.

4         Counsel are present.  Dr. Mencia's present.

5         Anything to come before the Court before we bring the

6    jury in?

7         MR. GILFARB:  Yes, your Honor.  Can we verify with the

8    Court about two exhibits?

9         THE COURT:  Okay.

10        MR. GILFARB:  Government's Exhibit 16.

11        THE COURT:  Is not in.

12        MR. GILFARB:  And Government's 34?

13        THE COURT:  Is in.

14        MR. GILFARB:  Is.

15        THE COURT:  Right.

16        MR. GILFARB:  All right.

17        All right, your Honor, with that -- we've gone through

18   all the exhibits and taken out those items that are not in

19   evidence.

20        The only exception to that I would say, as we've

21   discussed, are these data downloads.  If the jury wants to

22   see -- the idea was that there's stuff on there that, you know,

23   if they want to see, is not relevant, but it's the entire

24   download.  I guess if they want to come out and see it, we can

25   do it that way.  Or I have a clean computer for them to use,

1   but then that would require us to then take the original and

2   extract all that data.  So, maybe just for those exhibit *(sic)*,

3   maybe we do that in public.

4        THE COURT:  So, that data, the videos, and the audios,

5   they would have to come out to hear.

6        MR. BEATON:  That's the protocol how we would propose.

7        THE COURT:  Okay.

8        MR. GILFARB:  Well, the videos, no, because they're

9   all in evidence.  They could see that at their leisure, pause

10  and stop as they like.  We have those.  It's the phone data

11  downloads that's really the issue, your Honor.

12       THE COURT:  Well, then for the audio and the videos,

13  we'd have to send back a computer.

14       MR. GILFARB:  Which I have here.

15       THE COURT:  Which Mr. Beaton's going to have to

16  approve.

17       MR. GILFARB:  Okay.  I guess we'll deal with that at

18  that time, your Honor.

19       THE COURT:  All right.  So, other than that, do we

20  have an agreement on all the evidence?  And is it on the table

21  so that the clerk can take it back?

22       MR. GILFARB:  It is all here, your Honor.

23       THE COURT:  Okay.

24       MR. BEATON:  Put it on the table.

25       MR. GILFARB:  Which table?  Up here?

JURY CHARGE

```
 1              THE COURT:  It doesn't matter, as long as we know
 2     where it is so that she can take it all in.
 3              Do we have all the jurors?
 4              Let's bring in the jury.
 5              COURTROOM SECURITY OFFICER:  All rise.
 6              (The jury entered the courtroom)
 7              THE COURT:  Counsel concede the presence of the jury
 8     and waive its polling?
 9              MR. GILFARB:  Yes, your Honor.
10              MR. BEATON:  Yes, sir.
11              THE COURT:  And did everyone follow my admonition not
12     to discuss the case or allow it to be discussed in your
13     presence?
14              THE JURORS:  Yes, your Honor.
15              THE COURT:  All right, members of the jury, it's my
16     duty to instruct you on the rules of law that you must use in
17     deciding this case.  After I've completed these instructions,
18     you will go to the jury room and begin your discussions -- what
19     we call your deliberations.
20              You must decide whether the government has proved the
21     specific facts necessary to find the defendant guilty beyond a
22     reasonable doubt.
23              Your decision must be based only on the evidence
24     presented during the trial.  You must not be influenced in any
25     way by either sympathy for or prejudice against the defendant
```

1622

JURY CHARGE

1   or the government.

2        You must follow the law as I explain it -- even if you

3   do not agree with the law -- and you must follow all of my

4   instructions as a whole.  You must not single out or disregard

5   any of the Court's instructions on the law.

6        The indictment or formal charge against a defendant

7   isn't evidence of guilt.  The law presumes every defendant is

8   innocent.  The defendant does not have to prove his innocence

9   or produce any evidence at all.  A defendant does not have to

10   testify, and if the defendant chose not to testify, you cannot

11   consider that in any way while making your decision.  The

12   government must prove guilt beyond a reasonable doubt.  If it

13   fails to do so, you must find the defendant not guilty.

14        The government's burden of proof is heavy, but it

15   doesn't have to prove a defendant's guilt beyond all possible

16   doubt.  The government's proof only has to exclude any

17   "reasonable doubt" concerning the defendant's guilt.

18        A "reasonable doubt" is a real doubt, based on your

19   reason and common sense after you've carefully and impartially

20   considered all the evidence in the case.

21        "Proof beyond a reasonable doubt" is proof so

22   convincing that you would be willing to rely and act on it

23   without hesitation in the most important of your own affairs.

24   If you are convinced that the defendant has been proved guilty

25   beyond a reasonable doubt, say so.  If you are not convinced,

JURY CHARGE

1  say so.

2          As I said before, you must consider only the evidence

3  that I have admitted in the case.  Evidence includes the

4  testimony of witnesses and the exhibits admitted.  But anything

5  the lawyers say is not evidence and isn't binding on you.

6          You shouldn't assume from anything I've said that I

7  have any opinion about any factual issue in this case.  Except

8  for my instructions to you on the law, you should disregard

9  anything I may have said during the trial in arriving at your

10  own decision about the facts.

11          Your own recollection and interpretation of the

12  evidence is what matters.

13          In considering the evidence, you may use reasoning and

14  common sense to make deductions and reach conclusions.  You

15  shouldn't be concerned about whether the evidence is direct or

16  circumstantial.

17          "Direct evidence" is the testimony of a person who

18  asserts that he or she has actual knowledge of a fact, such as

19  an eyewitness.  "Circumstantial evidence" is proof of a chain

20  of facts and circumstances that tend to prove or disprove a

21  fact.  There's no legal difference in the weight you may give

22  to either direct or circumstantial evidence.

23          When I say you must consider all the evidence, I don't

24  mean that you must accept all the evidence as true or accurate.

25  You should decide whether you believe what each witness had to

JURY CHARGE

```
 1    say, and how important that testimony was.  In making that
 2    decision, you may believe or disbelieve any witness, in whole
 3    or in part.  The number of witnesses testifying concerning a
 4    particular point doesn't necessarily matter.
 5              To decide whether you believe any witness, I suggest
 6    that you ask yourself a few questions:
 7              Did the witness impress you as one who was telling the
 8    truth?
 9              Did the witness have any particular reason not to tell
10    the truth?
11              Did the witness have a personal interest in the
12    outcome of the case?
13              Did the witness seem to have a good memory?
14              Did the witness have the opportunity and ability to
15    accurately observe the things he or she testified about?
16              Did the witness appear to understand the questions
17    clearly and answer them directly?
18              Did the witness's testimony differ from other
19    testimony or other evidence?
20              You should also ask yourself whether there was
21    evidence that a witness testified falsely about an important
22    fact.  And ask whether there was evidence that at some other
23    time a witness said or did something, or didn't say or do
24    something, that was different from the testimony the witness
25    gave during this trial.
```

JURY CHARGE

1     To decide whether you believe a witness, you may

2 consider the fact that the witness has been convicted of a

3 felony or a crime involving dishonesty or a false statement.

4     But keep in mind that a simple mistake doesn't mean a

5 witness wasn't telling the truth as he or she remembers it.

6 People naturally tend to forget some things or remember them

7 inaccurately.  So, if a witness misstated something, you must

8 decide whether it was because of an innocent lapse in memory or

9 an intentional deception.  The significance of your decision

10 may depend on whether the misstatement is about an important

11 fact or about a unimportant detail.

12     You must consider some witnesses's testimony with more

13 caution than others.

14     In this case, the government has made a plea agreement

15 with a codefendant in exchange for his or her testimony.  Such

16 "plea bargaining," as it's called, provides for the possibility

17 of a lesser sentence than the codefendant would normally face.

18 Plea bargaining is lawful and proper, and the rules of this

19 Court expressly provide for it.

20     But a witness who hopes to gain more favorable

21 treatment may have a reason to make a false statement in order

22 to strike a good bargain with the government.

23     So, while a witness of that kind may be entirely

24 truthful when testifying, you should consider that testimony

25 with more caution than the testimony of other witnesses.

1626

JURY CHARGE

1    And the fact that a witness has pleaded guilty to an
2    offense isn't evidence of the guilt of any other person.
3    Again, you must consider some witnesses's testimony
4    with more caution than others.
5    For example, a witness may testify about events that
6    occurred during a time when the witness was using addictive
7    drugs, and so the witness may have an impaired memory of those
8    events.  And a witness who has been promised immunity from
9    prosecution or witnesses who hope to gain more favorable
10   treatment in his or her own case may have a reason to make a
11   false statement in order to strike a good bargain with the
12   government.
13   So, while a witness of that kind may be entirely
14   truthful when testifying, you should consider that testimony
15   with more caution than the testimony of other witnesses.
16   When scientific, technical, or other specialized
17   knowledge might be helpful, a person who has special training
18   or experience in that field is allowed to state an opinion
19   about the matter.  But that doesn't mean that you must accept
20   the witness's opinion.  As with any other witness's testimony,
21   you must decide for yourself whether to rely upon the opinion.
22   You've been permitted to take notes during the trial.
23   Most of you -- perhaps all of you -- have taken advantage of
24   that opportunity.  You must use your notes only as a memory aid
25   during deliberations.  You must not give your notes priority

JURY CHARGE

1    over your independent recollection of the evidence.  And you

2    must not allow yourself to be unduly influenced by the notes of

3    other jurors.

4          I emphasize that notes are not entitled to any greater

5    weight than your memories or impression about the testimony.

6          The evidence in this case includes facts to which the

7    lawyers have agreed or stipulated.  A "stipulation" simply

8    means that the government and the defendant accept the truth of

9    a particular proposition or fact.  Since there is no

10   disagreement, there is no need for evidence apart from the

11   stipulation.  You must accept the stipulation as fact to be

12   given whatever weight you choose.

13         The indictment charges the defendant with 11 separate

14   crimes called "counts."  Each count has a number and refers to

15   a criminal charge against the defendant in this case.  You will

16   be given a copy of the indictment to refer to during your

17   deliberations.

18         Count 1 charges that the defendant knowingly and

19   willfully conspired to commit wire fraud and healthcare fraud.

20         Count 2 charges that the defendant knowingly and

21   willfully conspired to distribute and dispense a controlled

22   substance outside the scope of professional practice and not

23   for a legitimate medical purpose, namely, a mixture and

24   substance containing a detectable amount of oxycodone.

25         Count 3 charges the defendant knowingly and

1628

JURY CHARGE

1    intentionally distributed and dispensed a controlled substance

2    outside the scope of professional practice and not for a

3    legitimate medical purpose, namely, a mixture and substance

4    containing a detectable amount of oxycodone, and that the

5    oxycodone resulted in the death of the user, J.H.; that is,

6    that the oxycodone was a but-for cause of the death of J.H.

7         Counts 4 through 10 charge that the defendant

8    knowingly committed money laundering.

9         Count 11 charges that the defendant knowingly evaded a

10   currency transaction reporting requirement.

11        I will explain the law governing conspiracy and the

12   law governing the substantive offenses in a moment.

13        But first note that the defendant is not charged in

14   Count 1 and 2 with committing a substantive offense -- the

15   defendant is charged with conspiring to commit those offenses.

16        Count 1 charges that the defendant -- one more time --

17   Count 1 charges the defendant with conspiracy to commit wire

18   fraud and healthcare fraud.

19        It's a federal crime to knowingly and willfully

20   conspire or agree with someone else to do something that, if

21   actually carried out, would result in the crime of wire fraud

22   or healthcare fraud.

23        A "conspiracy" is an agreement by two or more persons

24   to commit an unlawful act.  In other words, it is a kind of

25   partnership for criminal purposes.  Every member of the

1   conspiracy becomes the agent or partner of every other member.

2          The government does not have to prove that all the

3   people named in the indictment were members of the plan, or

4   that those who were members made any kind of formal agreement.

5   The heart of a conspiracy is the making of the unlawful plan

6   itself, so the government does not have to prove that the

7   conspirators succeeded in carrying out the plan.

8          In addition, some of the people who may have been

9   involved in these events are not on trial.  This does not

10  matter.  There is no requirement that all members of a

11  conspiracy be charged and prosecuted, or that they all be tried

12  together in one proceeding.

13         A defendant can be found guilty of this conspiracy

14  offense only if all the following facts are proved beyond a

15  reasonable doubt:  One, two or more persons, in some way or

16  manner, agreed to try to accomplish a common and unlawful plan,

17  that is, to commit wire fraud or healthcare fraud as charged in

18  the indictment; and, two, the defendant knew the unlawful

19  purpose of the plan and willfully joined in it.

20         A person may be a conspirator even without knowing all

21  of the details of the unlawful plan or the names and identities

22  of all the other alleged conspirators.

23         If a defendant played only a minor part in the plan,

24  but had a general understanding of the unlawful purpose of the

25  plan -- and willfully joined in the plan on at least one

1  occasion -- that's sufficient for you to find a defendant

2  guilty.

3          But simply being present at the scene of an event or

4  merely associating with certain people and discussing common

5  goals and interests doesn't establish proof of a conspiracy.

6  Also, a person who doesn't know about a conspiracy but happens

7  to act in a way that advances some purpose of one doesn't

8  automatically become a conspirator.

9          Title 21, United States Code, Section 846 makes it a

10  separate federal crime for anyone to conspire or agree with

11  someone else to do something which, if actually carried out,

12  would be a violation of Title 21, United States Code,

13  Section 841(a)(1).  That section makes it a crime for anyone to

14  knowingly distribute or dispense oxycodone.

15          A "conspiracy" is an agreement by two or more persons

16  to commit an unlawful act.  In other words, it is a kind of

17  partnership for criminal purposes.  Every member of the

18  conspiracy becomes the agent or partner of every other member.

19          The government does not have to prove that all the

20  people named in the indictment were members of the plan, or

21  that those who were members made any kind of formal agreement.

22  The heart of a conspiracy is the making of the unlawful plan

23  itself, so the government does not have to prove that the

24  conspirators succeeded in carrying out the plan.

25          In addition, some of the people who may have been

JURY CHARGE

1    involved in these events are not on trial.  This does not

2    matter.  There is no requirement that all members of a

3    conspiracy be charged and prosecuted, or that they all be tried

4    together in one proceeding.

5         The defendant can be found guilty only if all the

6    following facts are proved beyond a reasonable doubt:  One, two

7    or more people in some way agreed to try to accomplish a shared

8    and unlawful plan to distribute or dispense a controlled

9    substance outside the scope of professional practice and not

10   for a legitimate medical purpose; two, the defendant knew the

11   unlawful purpose of the plan and willfully joined in it; and,

12   three, the object of the unlawful plan was to dispense or

13   distribute a controlled substance outside the scope of

14   professional practice and not for a legitimate medical purpose.

15        I will explain the law governing outside the scope of

16   professional practice and not for a legitimate medical purpose

17   in a moment.

18        But, first, a person may be a conspirator even without

19   knowing all the details of the unlawful plan or the names and

20   identities of all the other alleged conspirators.

21        If the defendant played only a minor part in the plan

22   but had a general understanding of the unlawful purpose of the

23   plan -- and willfully joined in the plan on at least one

24   occasion -- that's sufficient for you to find the defendant

25   guilty.

1    But simply being present at the scene of an event or

2 merely associating with certain people and discussing common

3 goals and interests doesn't establish proof of a conspiracy.

4 Also, a person who doesn't know about a conspiracy but happens

5 to act in a way that advances some purpose of one doesn't

6 automatically become a conspirator.

7    As it concerns Count 3 and the crimes underlying the

8 conspiracy charged in Count 2, Title 21, United States Code,

9 Section 841(a)(1), which is the Controlled Substances Act,

10 makes it a federal crime or offense for anyone to unlawfully

11 distribute or dispense, or possess with the intent to

12 distribute or dispense, a "controlled substance."  Oxycodone is

13 a controlled substance within the meaning of the law.

14    The defendant is charged with distributing or

15 dispensing, outside the scope of professional practice and not

16 for a legitimate medical purpose, a mixture and substance

17 containing a detectable amount of oxycodone which resulted in

18 the death of J.H.

19    The defendant can be found guilty of this crime only

20 if all the following facts are proved beyond a reasonable

21 doubt:  One, that the defendant dispensed or distributed a

22 controlled substance; two, that the defendant acted knowingly

23 and intentionally; three, that the defendant's actions were not

24 for a legitimate medical purpose in the usual course of his

25 professional medical practice or were beyond the bounds of

JURY CHARGE

1   medical practice; and, four, that the death of J.H. resulted

2   from that distributing or dispensing.

3         To "distribute" means to deliver a controlled

4   substance to another person, with or without any financial

5   interest in the transaction.

6         To "dispense" means to deliver a controlled substance

7   to an ultimate user or research subject by, or pursuant to a

8   lawful order of, a practitioner, including the prescribing and

9   administering of a controlled substance and the packaging,

10  labeling, or compounding necessary to prepare the substance for

11  delivery.  The term "dispenser" means a practitioner who

12  delivers a controlled substance to an ultimate user or research

13  subject.

14        The term "practitioner" means a physician, pharmacist,

15  or other person licensed, registered, or otherwise permitted by

16  the United States or the jurisdiction in which he or she

17  practices to distribute or dispense, or caused to be

18  distributed or dispensed, controlled substances in the course

19  of professional practice or research.

20        The law provides that persons registered by the

21  Attorney General under Title 21 to manufacture, distribute, or

22  dispense controlled substances are authorized to possess,

23  manufacture, distribute, or dispense such substances to the

24  extent authorized by their registration.  A medical doctor or

25  physician is exempted from the prohibitions of Section 841 when

JURY CHARGE

1  he issues a prescription for a legitimate medical purpose

2  within the usual course of professional practice.

3       A controlled substance is prescribed by a physician in

4  the usual course of professional practice and, therefore,

5  lawfully if the substance is prescribed by him as part of his

6  medical treatment for the patient in accordance with the

7  standards of medical practice generally recognized and accepted

8  in Florida.

9       Thus, a medical doctor has violated the Controlled

10 Substances Act when the government has proved, beyond a

11 reasonable doubt, that the doctor's actions were not for

12 legitimate medical purposes or were beyond the bounds of

13 professional medical practice.

14      The defendant is not on trial for medical malpractice

15 and is not charged with acting negligently with respect to the

16 care of his patients.  Again, he is charged with knowingly and

17 willfully prescribing controlled substances to his patients

18 outside the usual course of professional medical practice in

19 violation of the Controlled Substances Act.

20      To find the defendant guilty of distributing a

21 controlled substance or dispensing outside the course of

22 professional practice and without a legitimate medical purpose,

23 resulting in death, you must find that the controlled substance

24 was a but-for cause of J.H.'s death.

25      There is no requirement that the government prove that

1  the defendant knew he was distributing or dispensing outside

2  the course of professional practice and without a legitimate

3  medical purpose a particular kind of controlled substance.

4  Rather, the government must only prove that the defendant knew

5  he was distributing or dispensing outside the course of

6  professional practice and without a legitimate medical purpose

7  a controlled substance.

8          It's a federal crime for anyone to engage in certain

9  kinds of financial transactions, commonly known as "money

10  laundering."  The defendant is charged with this crime in

11  Counts 4 through 10.

12          A defendant can be found guilty of this offense only

13  if all the following facts are proved beyond a reasonable

14  doubt:  One, the defendant knowingly engaged or attempted to

15  engage in a monetary transaction; two, the defendant knew the

16  transaction involved property or funds that were proceeds of

17  some criminal activity; three, the property had a value of more

18  than $10,000; four, the property was, in fact, proceeds of a

19  conspiracy to commit healthcare fraud and wire fraud or a

20  conspiracy to distribute or dispense a controlled substance;

21  and, five, the transaction took place in the United States.

22          The term "monetary transaction" means the deposit,

23  withdrawal, transfer, or exchange of funds or a monetary

24  instrument by, through, or to a financial institution in a way

25  that affects interstate commerce.

1    A "financial institution" means an insured bank.

2    The term "proceeds" means any property derived from or

3 obtained or retained, directly or indirectly, through some form

4 of unlawful activity, including the gross receipts of the

5 activity.

6    In this case, the form of unlawful activity from which

7 the property was derived is alleged to be:  Conspiracy to

8 commit healthcare fraud and wire fraud and conspiracy to

9 dispense a controlled substance.  It doesn't matter whether the

10 defendant knew the precise nature of the crime or that the

11 property was obtained or derived from the crime.  But the

12 government must prove that the defendant knew that the property

13 involved in the monetary transaction was obtained or derived

14 from committing some crime.

15    Also, it doesn't matter whether all the property

16 involved was derived from a crime.  The government only has to

17 prove that $10,000 worth of the property was obtained or

18 derived from committing a crime.

19    It's a federal crime under certain circumstances for

20 anyone to knowingly evade a currency transaction reporting

21 requirement.

22    Domestic financial institutions and banks (with some

23 exceptions) must file currency transaction reports (or

24 Form 4789) with the government.  They must list all deposits,

25 withdrawals, transfers, or payments involving more than $10,000

JURY CHARGE

1    in cash or currency.

2          The defendant can be found guilty of this crime only

3    if all the following facts are proved beyond a reasonable

4    doubt:  One, the defendant knowingly structured or helped to

5    structure a currency transaction; two, the purpose of the

6    structured transaction was to evade the transaction reporting

7    requirements; three, the structured transaction involved one or

8    more domestic financial institutions; and, four, the currency

9    transaction with the domestic financial institution furthered

10   another federal crime as part of a pattern of illegal activity

11   involving more than $100,000 in a 12-month period.

12         To "structure" a transaction means to deposit,

13   withdraw, or otherwise participate in transferring a total of

14   more than $10,000 in cash or currency using a financial

15   institution or bank by intentionally setting up or arranging a

16   series of separate transactions, each one involving less than

17   $10,000, in order to evade the currency reporting requirement

18   that would have applied if fewer transactions has been made.

19         It's possible to prove the defendant guilty of a crime

20   even without evidence that the defendant personally performed

21   every act charged.

22         Ordinarily, any act a person can do may be done by

23   directing another person or "agent."  Or it may be done by

24   acting with or under the direction of others.

25         A defendant aids and abets a person if the defendant

1    intentionally joins with the person to commit a crime.

2         A defendant is criminally responsible for the acts of

3    another person if the defendant aids and abets the other

4    person.  A defendant is also responsible if the defendant

5    willfully directs or authorizes the acts of an agent, employee,

6    or other associate.

7         But finding that a defendant is criminally responsible

8    for the acts of another person requires proof that the

9    defendant intentionally associated with or participated in the

10   crime -- not just proof that the defendant was simply present

11   at the scene of a crime or knew about it.

12        In other words, you must find beyond a reasonable

13   doubt that the defendant was a willful participant and not

14   merely a knowing spectator.

15        During this trial, you have heard testimony regarding

16   Medicare's civil rules and regulations.  I caution you that a

17   violation of these civil statutes, rules, and regulations is

18   not a crime.  This is not a civil case.  The defendant is not

19   on trial for civil violations.  Even if you find the claims to

20   Medicare were not allowable under the applicable statutes,

21   rules, and regulations, a defendant cannot be convicted of a

22   crime merely for breaching civil statutes, rules and

23   regulations applicable to his conduct.  However, Medicare's

24   rules and regulations may be relevant in determining whether a

25   defendant acted with criminal intent, that is, knowingly,

1   willfully, and with the intent to defraud Medicare.  This is

2   how you may consider this evidence.

3          The defendant asserts that he acted in good faith in

4   attempting to treat his patients and prescribe controlled

5   substances.  A doctor's good faith is relevant to a

6   determination of whether the doctor acted outside the bounds of

7   medical practice or, instead, with a legitimate medical purpose

8   when prescribing controlled substances.  Because of the

9   fluidity or flexibility of the boundaries of acceptable medical

10  practice and the applicable standard of care, some latitude

11  must be given to a doctor trying to determine the current

12  boundaries of acceptable medical practice.

13         Thus, even if a doctor's treatment and prescription

14  practice fell below what you believe to be the applicable

15  standard of care, the doctor should not be held criminally

16  liable if the doctor acted with a reasonable good-faith belief

17  that his treatment and prescription of controlled substances

18  complied with the applicable standard of care.

19         Accordingly, even if you find that the defendant acted

20  below what you determine to be the applicable standard of care

21  in treating his patients and prescribing them controlled

22  substances, you must find him not guilty of unlawful

23  dispensation or distribution of controlled substances unless

24  you find that the government proved beyond a reasonable doubt

25  that the doctor's treatment and prescription of controlled

JURY CHARGE

1   substances were not undertaken with a reasonable good-faith

2   belief that he was acting with a legitimate medical purpose and

3   according to the generally recognized and accepted standard of

4   care.

5         To convict the defendant of unlawfully dispensing or

6   distributing controlled substances, the government must prove

7   beyond a reasonable doubt that the defendant was not acting

8   "for legitimate medical purposes in the usual course of his

9   professional medical practice" *(sic)* or "beyond the bounds of

10  medical purpose."  This requires you to measure the defendant's

11  conduct against the prevailing standard of care or practice

12  within the defendant's professional community.  Such a standard

13  of care is determined from the laws, rules, and guidelines

14  which govern the defendant's medical practice where he works.

15  There is no uniform national standard.  Accordingly, you should

16  look to the laws, rules, and guidelines that exist in Florida

17  where the defendant was licensed to, and did, practice

18  medicine.

19        In determining whether the government has proven

20  beyond a reasonable doubt that the defendant dispensed or

21  distributed controlled substances "outside the usual course of

22  professional medical practice and without a legitimate medical

23  purpose," you should consider whether, by failing to abide by

24  the applicable standard of care, he left the role of a medical

25  doctor and became a drug "pusher."  If you find beyond a

JURY CHARGE

1  reasonable doubt that the defendant failed to abide by the

2  applicable standard of care and, in effect, became a drug

3  "pusher," you should find him guilty of unlawfully dispensing

4  or distributing controlled substances as charged in Count 3.

5      The defendant was a medical physician licensed and

6  practicing in the state of Florida.  Accordingly, Florida

7  statutes, rules, and guidelines establish the standard of care

8  at, or above, which the defendant must practice medicine.  As

9  you recall, you may only find the defendant guilty of

10 unlawfully dispensing or distributing controlled substances if

11 the government proves beyond a reasonable doubt that he acted

12 below the applicable standard of care.

13      The following are some of the important laws, rules,

14 and guidelines that applied to the defendant as a Florida

15 physician and established the applicable standard of care.

16      In Florida, every competent adult has a fundamental

17 right to self-determination regarding decisions pertaining to

18 his or her own health, including the right to choose or refuse

19 medical treatment.  This right is subject to certain interests

20 of society, such as the protection of human life and the

21 preservation of ethical standards in medical profession.

22 Palliative care is the comprehensive management of the

23 physical, psychological, social, spiritual, and existential

24 needs of patients.  It includes an assurance that physical and

25 mental suffering will be carefully attended to.  Licensed

1642

JURY CHARGE

1    healthcare providers and practitioners must comply with a

2    request for pain management or palliative care from a patient

3    under their care.  A healthcare provider is not subject to

4    criminal prosecution or civil liability, and will not be deemed

5    to have engaged in unprofessional conduct, as a result of

6    carrying out a healthcare decision made in accordance with the

7    provisions.

8            Florida residents enjoy the certain rights to

9    healthcare to promote the interest and well-being of the

10   patients of healthcare -- let me start over.  Florida residents

11   enjoy the certain rights to healthcare to promote the interests

12   and well-being of the patients of healthcare providers and

13   healthcare facilities.  This includes the right to access any

14   mode of treatment that is, in his or her own judgment and the

15   judgment of his or her healthcare practitioner, in the best

16   interests of the patient.

17           Intractable pain means pain for which, in the

18   generally accepted course of medical practice, the cause cannot

19   be removed or otherwise treated.  Notwithstanding any other

20   provision of law, a physician may prescribe or administer any

21   controlled substances under Schedules II through V to a person

22   for the treatment of intractable pain, providing the physician

23   does so in accordance with the level of care, skill, and

24   treatment recognized by a reasonably prudent physician under

25   similar conditions and circumstances.

JURY CHARGE

1   Whenever a Florida physician provides care in the

2   context of workman's *(sic)* compensation, he shall provide such

3   care on the premise that returning to work is an integral part

4   of the treatment plan.  He shall provide any and all such

5   medically necessary service or treatment that is appropriate to

6   the patient's diagnosis and status of recovery, and is

7   consistent with the location of service, the level of care

8   provided, and the applicable practice parameters.  This service

9   must be widely accepted among practicing healthcare providers,

10   based on scientific criteria and determined to be reasonably

11   safe.  The care shall utilize a high-intensity, short-duration

12   treatment approach that focuses on early activation and

13   restoration of function whenever possible.

14   The Board of Medicine recognizes that principles of

15   quality medical practice dictate that the people of the state

16   of Florida have access to appropriate and effective pain

17   relief.

18   The Board encourages physicians to view effective pain

19   management as a part of quality medical practice for all

20   patients with pain, acute or chronic.  Fears of investigation

21   or sanction by federal, state, and local regulatory agencies

22   may also result in inappropriate or inadequate treatment of

23   chronic pain patients.  Physicians should not fear disciplinary

24   action from the Board or other state regulatory or enforcement

25   agencies for prescribing or dispensing or administering

JURY CHARGE

1    controlled substances, including opioid analgesics, for a

2    legitimate medical purpose and that is supported by appropriate

3    documentation establishing a valid medical need and treatment

4    plan.

5         The Board will consider prescribing, ordering,

6    administering, or dispensing controlled substances for pain to

7    be for a legitimate medical purpose if based on accepted

8    scientific knowledge of the treatment of pain or if based on

9    sound clinical grounds.  Each case of prescribing for pain will

10   be evaluated on an individual basis.  The Board will not take

11   disciplinary action against a physician for failing to adhere

12   strictly to the provisions of these standards, if good cause is

13   shown for such deviation.

14        "Entrapment" occurs when law enforcement officers or

15   others under their direction persuade a defendant to commit a

16   crime that the defendant had no previous intent to commit.  The

17   defendant has claimed to be a victim of entrapment regarding

18   the charged offenses.  The law forbids convicting an entrapped

19   defendant.  But there is no entrapment when a defendant is

20   willing to break the law and the government merely provides

21   what appears to be a favorable opportunity for the defendant to

22   commit a crime.  For example, it is not entrapment for a

23   government agent to pretend to be someone else and offer --

24   directly or through another person -- to engage in an unlawful

25   transaction.

JURY CHARGE

1   So, a defendant isn't a victim of entrapment if you

2   find beyond a reasonable doubt that the government only offered

3   the defendant an opportunity to commit a crime the defendant

4   was already willing to commit.  But if there's a reasonable

5   doubt about whether the defendant was willing to commit the

6   crime without the persuasion of a government officer or person

7   under the government's direction, then you must find the

8   defendant not guilty.

9   You'll see that the indictment charges that crimes

10  were committed "on or about" a certain date.  The government

11  doesn't have to prove that the crime occurred on an exact date.

12  The government only has to prove beyond a reasonable doubt that

13  the crime was committed on a date reasonably close to the date

14  alleged.

15  The word "knowingly" means that an act was done

16  voluntarily and intentionally and not because of a mistake or

17  by accident.

18  The word "willfully" means that the act was committed

19  voluntarily and purposely with the intent to do something the

20  law forbids; that is, with the bad purpose to disobey or

21  disregard the law.  While a person must have acted with the

22  intent to do something the law forbids before you can find that

23  the person acted "willfully," the person need not be aware of

24  the specific law or rule that his conduct may be violating.

25  Each count of the indictment charges a separate crime.

JURY CHARGE

1  You must consider each crime and the evidence relating to it

2  separately.  If you find the defendant guilty or not guilty of

3  one crime, that must not affect your verdict for any other

4  crime.

5        I caution you that the defendant is on trial only for

6  the specific crimes charged in the indictment.  You're here to

7  determine from the evidence in this case whether the defendant

8  is guilty or not guilty of those specific crimes.

9        You must never consider punishment in any way to

10  decide whether the defendant is guilty.  If you find the

11  defendant guilty, the punishment is for the judge alone to

12  decide later.

13        Your verdict, whether guilty or not guilty, must be

14  unanimous -- in other words, you must all agree.  Your

15  deliberations are secret.  You'll never have to explain your

16  verdict to anyone.

17        Each of you must decide the case for yourself, but

18  only after fully considering the evidence with the other

19  jurors.  So, you must discuss the case with one another and try

20  to reach an agreement.  While you're discussing the case, don't

21  hesitate to re-examine your own opinion and change your mind if

22  you become convinced that you were wrong.  But don't give up

23  your honest beliefs just because others think differently or

24  because you simply want to get the case over with.

25        Remember that, in a very real way, you're judges --

1647

JURY CHARGE

1 judges of the facts.  Your only interest is to seek the truth

2 from the evidence in the case.

3        When you go to the jury room, choose one of your

4 members to act as a foreperson.  The foreperson will direct

5 your deliberations and will speak for you here in court.

6        A verdict form has been prepared for you, and there

7 are 11 different counts, so there are 11 different

8 opportunities to come back with checking either "guilty" or

9 "not guilty."

10        As to two counts, Count 3 and Count 11, if you come

11 back with a guilty verdict, then there's another question for

12 you to answer.

13        Now, take the verdict form with you to the jury room.

14 When you've all agreed on the verdict, your foreperson must

15 fill in the form, sign it, date it, and carry it.  Then you'll

16 return it to the courtroom.

17        If you wish to communicate with me at any time, please

18 write down your message or question and give it to the marshal.

19 The marshal will bring it to me, and I'll respond as promptly

20 as possible -- either in writing or by talking to you in the

21 courtroom.  But I caution you not to tell me how many jurors

22 have voted one way or the other at that time.

23        Mrs. Moskaleva and Mrs. Ingber, did you leave anything

24 in the jury room, any property in the jury room?  If you can go

25 get that now and come on back out.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

1648

JURY CHARGE

1      And if the counsel would approach the bench sidebar.

2      (At the bench out of the hearing of the jury)

3      THE COURT:  Any exception or objection to the content

4  or manner in which the instructions were given?

5      MR. BEATON:  Not on behalf of the defendant.

6      MR. GILFARB:  No, your Honor.

7      THE COURT:  And can you check all the indictment, make

8  sure I've redacted it correctly to eliminate the forfeiture

9  count at this point so that we can send it back.

10      (Pause)

11      MR. GILFARB:  It appears so, yeah.

12      MR. BEATON:  I just --

13      THE COURT:  One other thing, the instructions don't

14  define "healthcare fraud" or "wire fraud" as it relates to the

15  conspiracy.  Should I be reading them the definitions of

16  healthcare fraud and wire fraud?

17      MR. GILFARB:  Yes.  I mean, I don't know how -- that's

18  a pretty big glaring mistake on both sides here.

19      MR. BEATON:  Uhm....

20      THE COURT:  So, could I just read them those two

21  instructions without typing them up and sending them back, or

22  do you want to have them typed up and sent back too?

23      MR. GILFARB:  Well, we think they should be part of

24  the instructions that you send back.  And we'll just tell them

25  that something got left out, and this is what got left out.

1649

JURY CHARGE

1    MR. BEATON:  Yeah, I need to take a look at the

2    instruction.  I agree.  But it does talk about manner and

3    means, does it not?  Or --

4    MR. GILFARB:  I think it just has the definitions.

5    THE COURT:  Here's wire fraud.

6    *(Pause)*

7    MR. BEATON:  As long as it's modified.  My only

8    request -- and I do this in other cases -- is -- my only

9    request is that it's modified to include what the government

10   has claimed to be the fraud.  In other words, that the fraud

11   was that patients were prescribed without medical necessity or

12   treated outside the standard or the scope of professional

13   practice.

14   THE COURT:  But there's no substantive count.

15   MR. GILFARB:  Right.  Your Honor, we just think that

16   you should give the standard jury instruction.  They have the

17   indictment.  The indictment indicates that, among others, these

18   are some of the manner and means.  They may be led to believe

19   this is what has to be proved.

20   THE COURT:  The government doesn't have to prove that

21   the wire fraud actually succeeded.  So, all they have to prove

22   is that there was a conspiracy to commit wire fraud.  And for

23   the jury to understand that, they have to understand what the

24   law is on wire fraud.

25   MR. BEATON:  Agreed.  I don't disagree with you at

JURY CHARGE

1  all.  My only request would be that the conduct -- and I'm

2  sure -- the only conduct that the government has alleged

3  constituted fraud, either healthcare or wire, was the purported

4  treatment of patients outside the scope of medical practice and

5  not for legitimate medical purposes.  That's been the only

6  evidence.  I'm not sure that there can be a quarrel as to that.

7          THE COURT:  Is there a standard instruction on

8  healthcare fraud?

9          MR. BEATON:  It's 1349.  Uhm, you know, I actually

10 don't think there is.

11         MR. GILFARB:  1349 is the general.  1347 is the --

12         THE COURT:  No, here it is.  This is the healthcare

13 fraud instruction.

14         MR. BEATON:  Yeah.

15         *(Pause)*

16         MR. BEATON:  I agree, with the same request.

17         THE COURT:  All right.  Well, I'm just going to give

18 it the way it is in the book.  I'll give the two instructions,

19 and we'll see if we can get it typed up and included into the

20 packet that's going to go back.

21         MR. BEATON:  Very well.

22         MR. GILFARB:  Thank you, your Honor.

23         *(The foregoing proceedings were had at sidebar)*

24         THE COURT:  Karen, can you ask Tammy to print out 051

25 and 053?

1651

JURY CHARGE

1    ROOM CLERK:  Yes.

2    THE COURT:  And you'll need to take the staple out of

3    this.

4    All right, members of the jury, I gave you the

5    instructions on conspiracy to commit healthcare fraud and wire

6    fraud.  But I didn't define healthcare fraud and wire fraud for

7    you, so I'm going to do that now.  And we're going to get a

8    copy of the written instructions so I can include it with the

9    packet that I'm going to send back.

10    All right.  So to understand conspiracy to commit wire

11    fraud and healthcare fraud, you have to know what the

12    definitions of wire fraud and healthcare fraud are.

13    It's a federal crime to use interstate wire, radio, or

14    television communications to carry out a scheme to defraud

15    someone else.

16    A defendant can be found guilty of this crime only if

17    all the following facts are proved beyond a reasonable doubt:

18    One, the defendant knowingly devised or participated in a

19    scheme to defraud or to obtain money or property by using false

20    pretenses, representations, or promises; two, the false

21    pretenses, representations, or promises were about a material

22    fact; three, the defendant acted with the intent to defraud;

23    and, four, the defendant transmitted or caused to be

24    transmitted by wire, radio, television some communication in

25    interstate commerce to help carry out the scheme to defraud.

1652

JURY CHARGE

1    The term "scheme to defraud" includes any plan or

2 course of action intended to deceive or cheat someone out of

3 money or property by using false or fraudulent pretenses,

4 representations, or promises.

5    A statement or representation is "false" or

6 "fraudulent" if it is about a material fact that the speaker

7 knows is untrue or makes with reckless indifference to the

8 truth and makes it with the intent to defraud.  A statement or

9 representation may be "false" or "fraudulent" when it is a

10 half-truth or effectively conceals a material fact and is made

11 with the intent to defraud.

12    A "material fact" is an important fact that a

13 reasonable person would use to decide whether to do or not do

14 something.  A fact is "material" if it has the capacity or

15 natural tendency to influence a person's decision.  It doesn't

16 matter whether the decision-maker actually relied on the

17 statement or knew or should have known that the statement was

18 false.

19    The "intent to defraud" is the specific intent to

20 deceive or cheat someone, usually for personal financial gain

21 or to cause financial loss to someone else.

22    The government does not have to prove all the details

23 alleged in the indictment about the precise nature and purpose

24 of the scheme.  It also doesn't have to prove that the material

25 transmitted by interstate wire, radio, or television was itself

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

JURY CHARGE

1  false or fraudulent, or that using the wire, radio, or

2  television was intended as a specific or exclusive means of

3  carrying out the alleged fraud, or that the defendant

4  personally made the transmission over the wire, radio,

5  television.  And it doesn't have to prove that the alleged

6  scheme actually succeeded in defrauding anyone.

7       To "use" interstate wire, radio, television

8  communications is to act so that something would normally be

9  sent through wire, radio, or television communications in the

10  normal course of business.

11       All right.  Let me give you the definition of

12  healthcare fraud.

13       It's a federal crime to knowingly and willfully

14  execute, or attempt to execute, a scheme or artifice to defraud

15  a healthcare benefit program, or to get any money or property

16  owned by, or under the custody or control of, a healthcare

17  benefit program by means of false or fraudulent pretenses,

18  representations, or promises.

19       A defendant can be found guilty of this offense only

20  if all the following facts are proved beyond a reasonable

21  doubt:  One, the defendant knowingly executed, or attempted to

22  execute, a scheme or artifice to defraud a healthcare benefit

23  program, or to obtain money or property owned by, or under the

24  custody or control of, a healthcare benefit program by means of

25  false or fraudulent pretenses, representations, or promises;

1654

JURY CHARGE

1  two, the healthcare benefit program affected interstate

2  commerce; three, the false or fraudulent pretenses,

3  representations, or promises related to a material fact; four,

4  the defendant acted willfully and intended to defraud; and,

5  five, the defendant did so in connection with the delivery of

6  or payment for healthcare benefits, items, or services.

7        "Healthcare benefit program" means any public or

8  private plan or contract affecting commerce under which any

9  medical benefit, item, or service is provided to any

10  individual, and includes any individual or entity who is

11  providing a medical benefit, item, or service for which payment

12  may be made under the plan or contract.

13        A healthcare program affects interstate commerce if

14  the healthcare program had any impact on the movement of any

15  money, goods, services, or persons from one state to another or

16  between another country and the United States.

17        The government need only prove that the healthcare

18  program itself engaged in interstate commerce or that its

19  activity affected interstate commerce to any degree.

20        The government need not prove that a defendant engaged

21  in interstate commerce or that the acts of the defendant

22  affected interstate commerce.

23        A "scheme to defraud" includes any plan or course of

24  action intended to deceive or cheat someone out of money or

25  property by using false or fraudulent pretenses,

JURY CHARGE

1   representations, or promises related to a material fact.

2          A statement or representation is "false" or

3   "fraudulent" if it is about a material fact that the speaker

4   knows is untrue or makes with reckless indifference as to the

5   truth and makes it with intent to defraud.  A statement or

6   representation may be "false" or "fraudulent" when it's a

7   half-truth or effectively conceals a material fact and is made

8   with the intent to defraud.

9          A "material fact" is an important fact that a

10  reasonable person would use to decide whether to do or not do

11  something.  A fact is material if it has the capacity or

12  natural tendency to influence a person's decision.  It doesn't

13  matter whether the decision-maker actually relied on the

14  statement or knew or should have known that the statement was

15  false.

16         To "act with intent to defraud" means to do something

17  with the specific intent to deceive or cheat someone, usually

18  for personal financial gain or to cause financial loss to

19  someone else.

20         The government doesn't have to prove all the details

21  alleged in the indictment about the precise nature and purpose

22  of the scheme.  The government also doesn't have to prove that

23  the alleged scheme actually succeeded in defrauding anyone.

24  What must be proved beyond a reasonable doubt is that a

25  defendant knowingly attempted or carried out a scheme

1  substantially similar to the one alleged in the indictment.

2        *(Discussion had off the record between the room clerk*

3  *and Court)*

4        THE COURT:  All right.  We're going to put the

5  instructions together and send them back in a moment.

6        All right.  I'm gonna ask Mrs. Moskaleva and

7  Ms. Ingber to remain in their seats, if they would.

8        We're going to get the evidence together, send the

9  evidence back.  We're going to put the jury instructions back

10  together again.  We're going to send that back.  We'll send

11  back a copy of the indictment.

12        We're also going to collect your cell phones, because

13  I don't allow the cell phones during your deliberations.

14        Also, during your deliberations, try to minimize any

15  interruptions in your deliberations.  If someone goes outside

16  to smoke a cigarette, someone goes to the bathroom, try to

17  minimize the number of interruptions and the duration of the

18  interruptions, because once someone leaves the jury

19  deliberation room, you have to cease your deliberations.  You

20  can only deliberate when all 12 people are in the room.  And

21  with that, I'll ask the 12 remaining jurors to retire and

22  consider your verdicts.

23        COURTROOM SECURITY OFFICER:  All rise.

24        *(The jury went to the jury room to deliberate upon a*

25  *verdict at 1:44 p.m.)*

1    THE COURT:  The instruction that my secretary printed

2  out for healthcare fraud has four elements and not five

3  elements.  And I think it's deleted that the healthcare benefit

4  program affected interstate commerce.

5    MR. GILFARB:  I think you did read that to them.

6    THE COURT:  Right.  I read 053 from the 2016 standard

7  jury instructions, but the 053 she printed out, maybe it's from

8  an earlier instruction.  So, I could write in the missing

9  element that the healthcare benefit program affected interstate

10  commerce, if you want me to do that.

11    MR. GILFARB:  We would prefer that, your Honor.

12    MR. BEATON:  That's fine, Judge.

13    THE COURT:  I think that's the only difference that I

14  see.  Well, no, there's another difference.

15    MR. GILFARB:  Oh, boy.

16    THE COURT:  The paragraph that talks about affecting

17  interstate commerce isn't in this instruction.  In other

18  words... so that element was left off.  And then the paragraph

19  that talks about the healthcare program affects interstate

20  commerce if the healthcare program had any impact on the

21  movement of any money.  But we had a stipulation that

22  interstate commerce was involved, right?

23    MR. GILFARB:  Through use of the wire transfer.

24    THE COURT:  I'm sorry?

25    MR. GILFARB:  Through the stipulation that it was done

1    through a wire transfer.

2              THE COURT:  Well, how about for the healthcare fraud?

3              MR. BEATON:  We had a stipulation as to wire, that it

4    was wired.

5              You have the stipulations, Mike.

6              THE COURT:  So, maybe we need to get the 053 from the

7    current instructions.  So, Karen, can you ask Tammy if she can

8    make sure that 053 is from the latest instructions?

9              And let me check 051 to see if that's the same.

10             Yeah, the wire fraud looks okay.  So, we'll get the

11   healthcare straightened up.  And I'll put these right after

12   Count 1.

13             There was one or two other little teeny changes that I

14   made as we went along.  Let's see if I can find them now.

15             On conspiracy to commit healthcare fraud and wire

16   fraud, 052, for the second element, instead of being "a

17   defendant," I changed "a" to "the."

18             MR. BEATON:  That's fine, Judge.

19             THE COURT:  That's maybe all -- but she needs to go on

20   the Eleventh Circuit pattern instructions for 2016.  Not the

21   O drive, but 2016, which you can get from the clerk's website,

22   I think has it.

23             And, again, we already talked about -- on the

24   controlled substances, 098, I wrote in the number 4 for the

25   fourth element regarding the death of J.H.  And on the next

1  page, we scratched out "United States" and put "Florida."

2       I think that's all the changes.

3       On civil/regulatory violations not a crime, there was

4  a footnote number there that I scratched out.

5       *(Pause)*

6       THE COURT:  Oh, I forgot about my alternates.

7       *(Laughter)*

8       THE COURT:  Let me take this opportunity to thank you

9  for being with us this last week and this week.  I think I

10  speak for all the Court personnel when I say we appreciate the

11  fact that you were here paying attention.  I know if someone

12  would have gotten sick, you would have been able to jump right

13  in there and perform your duty as a juror in this case.

14       As a small token of the Court's appreciation, I've had

15  prepared these certificates of appreciation.  I'll ask the

16  court security officer to give it to you at this time.

17       We are gonna need to get those juror badges back from

18  you at this time.  And I do need to ask you to leave through

19  the front doors.  You can't go back through the jury

20  deliberation area anymore.

21       You're welcome to stick around to see what the jury

22  comes up with as a verdict, or, if you want to, you can give my

23  office a call tomorrow and see if the jury's arrived at a

24  verdict, and we'll let you know what it was.

25       I am going to ask you, in an abundance of caution, not

```
 1    to discuss the case until you found out that the jury has
 2    reached a verdict, in the unlikely event that someone were to
 3    get sick, and I'd have to call you back and start the
 4    deliberations all over again.  In 20 years, it's never
 5    happened, but in that abundance of caution, I'll ask that you
 6    not discuss the case or allow it to be discussed in your
 7    presence, again, until you find out that the jury's reached a
 8    verdict, and then at that point, you're free to discuss the
 9    case or not discuss the case.
10           And if you don't have any questions, you're excused
11    with the Court's thanks.  Have a nice afternoon.
12           (The alternate jurors exited the courtroom)
13           MR. GILFARB:  Thank you for your time.
14           MR. BEATON:  Thank you.  Good-bye.
15           COURTROOM SECURITY OFFICER:  Should I take the stuff
16    back?
17           THE COURT:  What?
18           COURTROOM SECURITY OFFICER:  Judge, should I take the
19    stuff back?
20           THE COURT:  Yes, you can take that stuff back.
21           Let me see if I can find the instruction on the
22    Internet here.
23           (Pause)
24           THE COURT:  Also, I think we need to be preparing in
25    the eventuality that there's going to be a forfeiture
```

1  proceeding.  Does the government have proposed jury

2  instructions and a verdict form for the forfeiture?

3        MR. GILFARB:  Yes.  I'm told yes.

4        THE COURT:  Okay.  Can you email those to us?

5        MR. GILFARB:  Yes, your Honor.

6        THE COURT:  In a fashion that, you know, we can change

7  them around in Word or whatever?

8        And procedurally, what are we gonna do if they -- I

9  mean I would think that we only have a forfeiture proceeding if

10  there are convictions on some counts, right?

11        MR. GILFARB:  Yes, your Honor.

12        MR. BEATON:  I think so, yeah.

13        THE COURT:  So, it probably be Counts 1, 2, and 3?

14        *(Discussion had off the record between counsel)*

15        MR. BEATON:  I believe it's only 4 through 10, Judge.

16        THE COURT:  So, we are diametrically opposed to what

17  we think the forfeiture -- I'm looking at the indictment.  It

18  says "upon conviction of Count 1."  Then it says "upon

19  conviction of any violations alleged in Counts 2 through 10."

20  So, it looks like it's everything except for the structuring.

21        MR. BEATON:  Okay.  I may have been relying on my

22  memory of the first indictment.  I --

23        THE COURT:  Well, I may be looking at the first

24  indictment.  Because I....

25        MR. BEATON:  No, you've got the right one.  Its Docket

1   Entry 97.  Counts... it's all the counts.  The only thing that

2   it -- I just noticed is that it says "upon convictions of any

3   violations alleged in Counts 11 through 14."

4              MR. GILFARB:  Judge, can I just have some time, I

5   guess?  It's not ripe yet.  If I can just discuss this with an

6   asset forfeiture specialist.

7              THE COURT:  Okay.

8              MR. GILFARB:  Thank you.

9              THE COURT:  We still got to get the instruction on

10  053, though.

11             MR. GILFARB:  All right, your Honor.

12             *(Discussion had off the record between counsel)*

13             THE COURT:  I mean you guys have access to 053 that

14  you can email it to me?

15             MR. YOFFIE:  Yes, your Honor.  We can get that and

16  email it to you.  We just have to go up and send it to you.

17             THE COURT:  Okay.  I'll wait.

18             MR. YOFFIE:  Okay.

19             MR. GILFARB:  Your Honor, may I step outside to

20  address these asset forfeiture issues?

21             THE COURT:  Okay.

22             MR. GILFARB:  I'll be right back.  Thank you.

23             *(Mr. Gilfarb exited the courtroom)*

24             *(Pause)*

25             MR. BEATON:  Judge, 053 is which instruction again?

1    THE COURT:  Healthcare fraud.

2         I just pulled it up.  I just need to print it out.

3         All right.  It should be printing out in my office.

4    Let me go get it.

5         COURTROOM SECURITY OFFICER:  All rise.

6         *(The Judge exited the courtroom)*

7         ROOM CLERK:  All rise.

8         *(The Judge entered the courtroom)*

9         THE COURT:  All right.  So, I printed out 053.  It's

10   got the five elements on it.

11        MR. GILFARB:  Oh.

12        THE COURT:  Let me put it where it's supposed to be in

13   here and staple it back up, and then we'll send everything

14   back.

15        MR. GILFARB:  And I have an answer for you on the

16   forfeiture question, your Honor.

17        THE COURT:  Do you want healthcare fraud or wire fraud

18   first in the packet after conspiracy?  Does it matter?

19        MR. GILFARB:  The healthcare fraud and then the wire

20   fraud.

21        THE COURT:  Okay.

22        MR. HORENSTEIN:  That's right.

23        *(Mr. Beaton entered the courtroom)*

24        THE COURT:  Karen, could you staple this back?  Oh,

25   there it is, right in front of me.

1664

```
1          (Discussion had off the record between the Court and
2    room clerk)
3          THE COURT:  All right.  So, we're going to send back
4    the indictment, the verdict form, and the instructions.
5          Yeah, this was Fran's copy.
6          All right.  And what's the status on the forfeiture?
7          MR. GILFARB:  Your Honor, if -- we're gonna submit two
8    versions of instructions.  One if the money laundering -- if
9    there's a money laundering conviction, and if it survives a
10   judgment notwithstanding, we'll have a jury instruction dealing
11   with that.
12         We're also gonna submit a second one in case you -- in
13   case there is a conviction on that, and it's dismissed or the
14   jury finds him not guilty.  Because then the theory changes.
15   It's not as to -- we're not travelling under the money
16   laundering, if it gets kicked; it would be travelling under the
17   healthcare fraud and the dispensing.  And we would just have to
18   show to the jury that --
19         THE COURT:  We'll have both options available.  We'll
20   see what the jury's verdict is.  And there may be all
21   acquittals, and it will be moot.  But if it's some guilties and
22   some acquittals, then we'll react accordingly.
23         In the actual verdict form, I mean are we going to be
24   asking the jury to do what?  Are they going to be deciding, you
25   know, bank accounts, real property, the different things that
```

```
1   are in the indictment?

2            MR. GILFARB:  I think there should be some specific

3   findings as to the two properties and the two bank accounts

4   listed.  There was specific testimony about it.  It shouldn't

5   be an issue.

6            THE COURT:  Okay.

7            MR. GILFARB:  I mean, as far as whatever --

8            THE COURT:  What type of finding are we going to ask

9   them to make about the properties or -- you know, what if they

10  figure -- what if they feel that a residence is worth

11  1.4 million, but only $10,000 was laundered into that

12  residence, does that mean that --

13           MS. SHEEHAN:  Your Honor, under the forfeiture --

14  AUSA Evelyn Sheehan, your Honor, deputy chief of the asset

15  forfeiture division.  I'm stepping in for AUSA Karen Moore,

16  who's out of the district on -- also for work.

17           Under the forfeiture statutes, the only thing that

18  needs to be set forth is the nexus.  Is there a nexus between

19  the charge and the conviction and the assets that we're seeking

20  forfeiture?  Under the laundering theory, your Honor, if it was

21  involved in the money laundering transactions, we are allowed

22  to take the entire asset.  And it's not something that comes up

23  in front of the jury.

24           In terms of the proceeds theory, AUSA Gilfarb intends

25  to present and to remind the jury of what they heard during the
```

```
 1    course of the trial.  And the amount of proceeds that went into

 2    each asset, that asset also becomes forfeitable.

 3         Now, the commingled part that you seem to be worried

 4    about becomes moot in -- in my opinion, it becomes moot in

 5    practice, because there's a money judgment that's also coming,

 6    and we're allowed to take the rest of it under the money

 7    judgment in the event of forfeiture and conviction.

 8         THE COURT:  I guess it would be helpful to me to see

 9    the proposed instructions and the proposed verdict form.

10         MS. SHEEHAN:  Okay.

11         THE COURT:  If that can be emailed.

12         MS. SHEEHAN:  I will, your Honor.  Right now, I will

13    go back and revise -- given the alternative routes that we

14    have, I only have one route ready right now, I'll prepare the

15    other one, as well.  Okay?

16         THE COURT:  Okay.

17         The other thing is, uhm-- so, this really has to do

18    with the lawyers.  We're going to be in recess until we hear

19    further from the jury or five o'clock, whichever comes first.

20    If the jury doesn't reach a verdict by five o'clock, then I'll

21    bring them out and explain to them that they could continue to

22    deliberate as long as they'd like to, but that if one person is

23    tired or hungry and wants to go home, then we would recess the

24    deliberations until tomorrow morning.  If everybody wants to

25    continue, then I'll send them back to continue their
```

1  deliberations, but usually somebody wants to go home, and we

2  would recess the deliberations.

3       If you're gonna wander too far away from the

4  courtroom, please leave a number with the court clerk where you

5  can be reached so that if we have a question or a verdict, you

6  can get back in about ten minutes or so.

7       Anything else we need to discuss?

8       MR. GILFARB:  Not at this time, your Honor.  So, you

9  have whatever it is that Mr. Yoffie was gonna go print?  You

10 have that already?

11      THE COURT:  Yes.  And we've already sent it back.

12      MR. GILFARB:  All right.

13      MR. BEATON:  Not from the defense, your Honor.  Thank

14 you.

15      MR. GILFARB:  Thank you, your Honor.

16      MS. SHEEHAN:  Thank you.

17      THE COURT:  Okay.  We'll be in recess.

18      *(Recess taken at 2:07 p.m. until 2:39 p.m.)*

19      *(The Judge entered the courtroom)*

20      THE COURT:  All right.  We're back on the record.

21      Counsel are present.  Dr. Mencia's present.

22      I apologize for calling you back.  Right after I

23 started the change of plea, one of the jurors wanted to talk to

24 Karen and said she wasn't feeling well and wanted to talk to

25 me.  So, I asked you guys to come back.  While I was taking the

```
 1    change of plea, she asked Karen to come back, and she says

 2    she's now okay.  It was just anxiety.

 3            Anything further we need to do on that?

 4            MR. GILFARB:  Not on behalf of the government, your

 5    Honor.

 6            MR. BEATON:  Not on behalf of the defendant, your

 7    Honor.

 8            THE COURT:  All right.  So, hopefully she's all right,

 9    and it's just something new for her, and she'll be okay.

10            And if there's nothing else to come before the Court,

11    we'll be in recess until we hear further from the jury or

12    five o'clock, whatever comes first.

13            MR. BEATON:  Thank you.

14            MR. GILFARB:  Do you want us here at five if we don't

15    hear from you?

16            THE COURT:  Right.

17            MR. GILFARB:  Thank you, your Honor.

18            ROOM CLERK:  All rise.

19            (The Judge exited the courtroom)

20            (Recess taken at 2:40 p.m. until 4:20 p.m.)

21            (The Judge entered the courtroom)

22            THE COURT:  Please be seated.

23            All right.  We're back on the record.

24            Counsel are present.  Dr. Mencia's present.

25            We have a note from the jury.  If one of you guys want
```

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

```
 1   to come up, I'll give you a copy of the note.
 2            It says:  "Count 1, question on potential
 3        decision.  In judge's instructions in the title and
 4        first sentence of charge, it says both wire fraud and
 5        healthcare fraud, says in the indictment as well."
 6            "In paragraph 6, number 1, definition of guilty,
 7        it says wire fraud or healthcare fraud.  Do we need
 8        to find both and/or either or for a guilty verdict?"
 9            MR. GILFARB:  I think the legal construction, your
10   Honor, is that either.
11            THE COURT:  Fran, do you have a copy of the verdict
12   form I gave you?
13            THE COURT REPORTER:  Yep.
14            THE COURT:  I don't know what "paragraph 6, number 1"
15   means.
16            MR. GILFARB:  Well, your Honor, maybe -- I don't know
17   if it makes a difference to be more -- I guess it's never
18   harmful to be more specific.  Is the Court considering whether
19   to say:  "Check those that are applicable or check one or"....
20            I think the statutory construction is either one.
21   They just have to specify which one.  And they may be confused
22   in that they -- two things, either they think they have to find
23   both or that they have to render verdicts on both, independent
24   of each other.
25            THE COURT:  Does anybody know what "paragraph 6,
```

1    number 1" means?  I wonder if that is the --

2            MR. BEATON:  I'm looking now to see if that's the

3    indictment.

4            MR. GILFARB:  Count 1, paragraph 6?

5            MR. BEATON:  No, it's not the indictment.

6            MR. GILFARB:  It says, "In the judge's instruction,"

7    under wire fraud and healthcare fraud, in paragraph 6.  I guess

8    we have to count the paragraphs?

9            *(Discussion had off the record between counsel)*

10           MR. GILFARB:  Your Honor, do you have a copy of the

11   instructions that went back, the one that has the insert?  Wire

12   fraud -- it's a question about the one that was submitted and

13   slipped in, because it says both the wire fraud and healthcare

14   fraud instruction.

15           *(Pause)*

16           THE COURT:  Well, Count 1 is the conspiracy.  So, I

17   think they're talking about the instruction in the conspiracy

18   to commit healthcare fraud and wire fraud.  Do we have a copy

19   of the conspiracy instruction?

20           MR. GILFARB:  We don't have the instructions with us,

21   your Honor.

22           THE COURT:  All right.  So, the -- Count 1 --

23   "conspiracy to commit healthcare fraud and wire fraud" is the

24   title of the instruction on Count 1.

25           MR. BEATON:  And that's the way it's charged in the

```
 1   indictment.
 2              THE COURT:  And the first paragraph says:
 3              "Count 1 charges the defendant with conspiracy to
 4         commit wire fraud and healthcare fraud."
 5              So, I think that's what they're talking about in the
 6   first paragraph of the question.
 7              Paragraph 6, number 1, I don't know what that is.  I
 8   mean it would be nice to figure out what they're asking, but I
 9   think Mr. Gilfarb's right, they don't have to prove both.  They
10   only have to prove that there was a conspiracy to commit one or
11   the other, not both.
12              MR. BEATON:  But the indictment charges conspiracy to
13   commit healthcare fraud and wire fraud.
14              THE COURT:  Yeah, I mean that's -- there's plenty of
15   case law saying that they can choose "and" and prove "or."
16   They can charge in the conjunctive and prove in the
17   disjunctive.  I mean there's plenty of case law saying that.
18              MR. BEATON:  But the problem here, Judge, is that the
19   wire fraud is the healthcare fraud.  In other words, they're
20   the same -- the same facts make up both.
21              MR. GILFARB:  Well, that's often the case.  There's
22   nothing particular about this case that distinguishes it from
23   the typical case.
24              THE COURT:  Well, I mean --
25              MR. BEATON:  In other words -- and when I asked the
```

1    Court earlier, when we were debating it, to instruct the jury

2    that it's the government's -- it's been the government's

3    allegation, based on the indictment, that it was the lack of

4    medical necessity and outside the scope of medical practice

5    that formed the basis of the fraud.  And so, I get that they

6    can charge whatever they want in terms of fraud, but --

7            THE COURT:  Well, it may be that they are convinced

8    that, let's say, that there was healthcare fraud, but they're

9    not convinced that phones were used to do it.

10           I mean, for healthcare fraud, you don't have to use

11   wires.  It may be that they feel that there was one but not the

12   other.  And I don't -- again, I don't think the government has

13   to prove both of them.

14           So, over the defendant's objection, I'm just going to

15   write "or" on the bottom of the note, and sign and date it.

16           All right.  So, I've written "or" on the bottom,

17   signed and dated it, and we'll send the note back.

18           And if there's nothing else to come before the Court,

19   we'll be in recess until we hear further from the jury or

20   five o'clock, whichever comes first.

21           MR. BEATON:  Your Honor, the only thing I would add is

22   for --

23           THE COURT:  Hold on, Karen.

24           MR. BEATON:  -- for the government to prove wire

25   fraud, they would necessarily have to prove the elements of

1  healthcare fraud as alleged in this case.

2          THE COURT:  But they wouldn't necessarily have to

3  prove the elements of wire fraud to prove healthcare fraud.

4          MR. BEATON:  I agree with you there.

5          So -- but the obverse is the danger.

6          THE COURT:  I don't see it as a danger.  I think if

7  they find that either one is the object of the conspiracy, then

8  that's sufficient.

9          MR. BEATON:  Okay.  I just wanted to add that to the

10  record so that the Court had an opportunity to consider that

11  argument.

12          THE COURT:  Okay.  Karen, you can take it in.

13          I got the government's proposed instructions on

14  forfeiture and the proposed special verdict on forfeiture.  So,

15  if you haven't had a chance to look at them, Mr. Beaton, if you

16  could look at them, in the event that that becomes an

17  eventuality.

18          MR. BEATON:  Okay.

19          Did you email it to me?  You filed them?

20          MR. GILFARB:  Adam, was he included on the email?  Do

21  you remember?

22          MR. YOFFIE:  If not, we can forward it.  It was sent

23  by our asset forfeiture, so I'll check.

24          THE COURT:  All right.  We'll be in recess.

25          *(The Judge exited the courtroom)*

```
 1              (Recess taken at 4:30 p.m. until 4:40 p.m.)

 2              (The Judge entered the courtroom)

 3          THE COURT:  Please be seated.

 4          All right.  We're back on the record.

 5          Counsel are present.  Dr. Mencia's present.

 6          We have a two-sided note with four questions.

 7          The first question is:

 8          "Can we get a table of contents for the

 9      U.S. government's exhibits, please."

10          Second question:

11          "Is there physical evidence beyond testimony of

12      Medicare fraud?"

13          Third question is:

14          "Can we get transcript of testimony from, A,

15      Stephen Quindoza, B, Johanna Sullivan?"

16          I don't think we can send back the exhibit list,

17  because there's exhibits on it that weren't introduced.  If the

18  government wants to try to get a redacted list that deletes the

19  exhibits that weren't introduced, that would be a possibility.

20          MR. GILFARB:  Well, we can do that.  We'll just go

21  upstairs and do that.

22          THE COURT:  What's the defense's position on sending

23  back a redacted exhibit list only having the exhibits that were

24  introduced?

25          MR. BEATON:  We object.
```

1    THE COURT:  Well, the problem with sending it back is

2    there's descriptions of what the evidence is that could be

3    arguably prejudicial to the defense.

4    So, I'll sustain the objection.

5    Second question is:  "Is there physical evidence

6       beyond testimony of Medicare fraud?"

7    What I would tell them is that the evidence that's

8    been introduced is all they're gonna get, that they have to

9    rely on what the evidence was or wasn't, and that it would be

10   inappropriate to supplement any evidence at this point.

11   MR. GILFARB:  Judge, can -- I would just ask that --

12   that kind of makes it seem like there wasn't physical evidence.

13   I would ask the Court to instruct -- or to answer that all the

14   testimonial and physical evidence pertinent to this trial has

15   been received by them.

16   MR. BEATON:  I object.

17   THE COURT:  Well, what should I say, Mr. Beaton?

18   MR. BEATON:  "Rely on your own memory about the

19      evidence that either has been introduced or not

20      introduced."

21   I mean the honest answer to that question is, I think,

22   no.  But --

23   MR. GILFARB:  Well, that's not true.  That's the

24   problem, is that there's a whole couple discs on -- or a large

25   data drive of Medicare data.

```
1        THE COURT:  Well, why don't I just tell them that they

2   have to rely on whatever evidence has been introduced or not

3   introduced, and the evidence can't be supplemented at this

4   point?

5        MR. GILFARB:  Because, your Honor, that makes it sound

6   like that there was no physical evidence.  We just prefer a

7   more specific and complete instruction that all the -- without

8   saying that there is or isn't, just saying:

9        "All the physical and testimonial evidence that

10       was admitted in this case, you have it."

11       MR. BEATON:  That would be commenting on the evidence,

12   Judge.

13       THE COURT:  Well, Mr. Beaton, what's your position on

14   my saying to the jury:

15       "You have to rely on your view of the evidence or

16       lack of evidence.  The evidence cannot be

17       supplemented at this time."

18       MR. BEATON:  I don't think that -- I don't believe

19   that that last clause is necessary, that "it can't be

20   supplemented at this time."  I mean, I think the first part is

21   sufficient.  It suggests that there's possibly more evidence

22   out there that the government either forgot to introduce or --

23       THE COURT:  All right.  So, I'll tell them:

24       "You have to rely on your view of the evidence or

25       lack of evidence."
```

1    And as far as transcripts, I would tell them that

2  there aren't any transcripts, that it's not a situation where

3  the court reporter just pushes a button and out pops a

4  transcript, that it takes hours for her to prepare a

5  transcript, and that they should rely on their collective

6  recollection of what the testimony was.

7    MR. GILFARB:  No objection.

8    MR. BEATON:  I agree, your Honor.  And I want to --

9  now that we are with the Court, I was about to call chambers.

10 I would request that the Court submit to the jury a special

11 verdict form on whether they are unanimous on healthcare fraud

12 or wire fraud being the object of the conspiracy, because

13 ultimately -- and it's clear this is what's on their mind.

14    THE COURT:  So, why don't I tell them when they come

15 out -- I'll bring them out and answer these three questions and

16 tell them:

17    "As far as the first question goes, it's

18    either/or, but you have to be unanimous as to which

19    one you find."

20    MR. BEATON:  I think the -- I think we can begin

21 there.  And then tell them:

22    "And we will be submitting a form to you on that

23    issue."

24    THE COURT:  What's the government's position on that?

25    MR. GILFARB:  One moment, your Honor.

1    *(Discussion had off the record between counsel)*

2        MR. GILFARB:  Your Honor, in line with our philosophy

3    that more specificity is better, we don't have an objection.

4    You're gonna be instructing them that anyway.

5        THE COURT:  So, someone's going to get me another

6    verdict form that has that as an option as to Count 1?

7        MR. BEATON:  It sounds like I volunteered for that,

8    so, yeah.

9        MR. GILFARB:  Judge, perhaps before -- I'm sorry, your

10   Honor, are we done on that topic?  Because there was something

11   I needed to bring up with the Court.

12       THE COURT:  Okay.

13       MR. GILFARB:  Your Honor, it's ten to -- or nine to

14   five.

15       The government wanted to let the Court and defense

16   counsel know that four months ago a date was set for tomorrow

17   for a national healthcare takedown.  I'm sure the Court by now

18   is familiar with these.  By the time -- if the jury's coming

19   back and deliberating at nine, there probably won't be any news

20   about it, but we expect massive arrests around the country

21   related to healthcare fraud, including sober homes, Medicare

22   fraud, and doctors, nurses, therapists of all kinds.  So, to

23   the extent that the jurors may be exposed to that kind of

24   coverage, we just wanted the Court to know.

25       THE COURT:  Well, when I bring them out this time, I'm

1    gonna tell them that they can continue to deliberate as long as

2    they want to deliberate, but that if one person wants to go

3    home, we're going to recess for the evening.  If nobody wants

4    to go home, then they'll continue to deliberate.  If one person

5    wants to go home, then I'll recess the deliberations until

6    tomorrow, and tell them that once the 12th person is in the

7    room tomorrow at nine o'clock, they can resume their

8    deliberations without the necessity of our reconvening.

9         But I will tell them not to discuss the case or allow

10   it to be discussed in their presence and not to read any news

11   media about any events that are happening in the news, to stay

12   away from the newspaper.

13        MR. GILFARB:  Okay.

14        MR. BEATON:  I don't know that there's much more you

15   can do than that.  I'm trying to think it through, but I agree

16   right now.

17        THE COURT:  All right.  Let's bring out the jury.

18        COURTROOM SECURITY OFFICER:  All rise.

19        *(The jury entered the courtroom)*

20        THE COURT:  All right.  We have all the jury back.

21        I've got another note from you.  But before I answer

22   this note, I wanted to comment on the last note that you sent

23   out about Count 1, whether or not the government has to prove

24   both healthcare fraud and wire fraud before you could find a

25   verdict of guilty as to the conspiracy in Count 1.  And I told

1  you they have to prove one or the other, but you have to be

2  unanimous as to which one it is.  So, if you come back guilty

3  as to Count 1, you have to be unanimous it's either healthcare

4  fraud or unanimous it's wire fraud or unanimous that it's both.

5  If you're not, then you can't return a verdict of guilty as to

6  Count 1.  And we'll send in another verdict form that has that

7  option there for you to check, if you come back guilty, whether

8  you're unanimous as to the healthcare fraud, the wire fraud, or

9  both.

10      Now, the next question is:  "Can we get a table

11          of contents for the U.S. government exhibits,

12          please?"

13      And we can't do that.  Because, arguably, by

14  identifying the exhibits, that could be like testimony as to

15  what it was, so I can't send back a table of contents, even if

16  there was one that existed right now, and there isn't.

17      Second:  "Is there physical evidence beyond

18          testimony of Medicare fraud?"

19      You have to rely on your view of the evidence or the

20  lack of evidence.

21      Thirdly:  "Can we get transcript of testimony

22          from, A, Stephen Quindoza, B, Johanna Sullivan?"

23      It's not a situation where the court reporter can push

24  a button and out pops a transcript.  It takes hours for her to

25  go through her notes and prepare a transcript in a written

1681

```
 1   form.  So, at this point, I'm going to ask you to rely on your

 2   collective recollection of what the testimony was.

 3         Having said that, it's almost five o'clock.  You can

 4   continue to deliberate as long as you want.  If one person or

 5   more than one person is tired or hungry and wants to go home,

 6   we can recess the deliberations until tomorrow.  So, it's up to

 7   you whether you continue deliberations or whether we recess at

 8   this time.

 9         Is there anybody on the jury that wants to or has to

10   go home at this time?  If so, please raise your hand.

11         (All jurors raised their hand)

12         THE COURT:  All right.

13         (Laughter)

14         THE COURT:  So, we're going to go ahead and recess the

15   deliberations until tomorrow at nine o'clock.  As soon as the

16   12th person is in the room tomorrow, you can resume your

17   deliberations.  I'm not going to bring you out and ask you

18   whether you followed my admonition not to discuss the case or

19   allow it to be discussed in your presence.

20         Having said that, I'm telling you, don't discuss the

21   case, don't allow it to be discussed in your presence.  Even if

22   all 12 of you were to go to breakfast tomorrow, you can't talk

23   about the case until all 12 of you are back in the jury room.

24         Also, don't read any news accounts about this case or

25   any other type of case that may be going on in the news media.
```

1    Stay away from news accounts.

2           With that, have a nice evening.  We'll see you back

3    tomorrow at nine o'clock.

4           COURTROOM SECURITY OFFICER:  All rise.

5           *(The jury exited the courtroom)*

6           THE COURT:  And let's do this.  Tomorrow at nine, if

7    you have a substitute verdict form that everybody's in

8    agreement on, just give it to Karen, and she can take it back

9    in there.  If you're not in agreement on it, then I'll have to

10   referee it, but I may not be here right at nine o'clock

11   tomorrow.

12          MR. BEATON:  No problem, Judge.  I'll confer with

13   Mr. Gilfarb and see if we can reach some sort of agreement.

14          THE COURT:  I mean it's just basically adding some

15   verbiage under Count 1:

16          "If the verdict is guilty, do you find

17      unanimously that the object was healthcare fraud,

18      wire fraud, or both?"

19          And if there's nothing else to come before the Court,

20   we'll be in recess until sometime after nine o'clock tomorrow.

21          MR. GILFARB:  Thank you, your Honor.

22          MR. BEATON:  Thank you, your Honor.

23          MR. GILFARB:  Good afternoon, everyone.

24          *(The Judge exited the courtroom)*

25          *(Proceedings concluded at 4:55 p.m.)*

| 1 | **INDEX** | |
| 2 | **CLOSING ARGUMENT** | **PAGE** |
| 3 | By Mr. Gilfarb | 1578 |
| 4 | By Mr. Beaton | 1594 |
| 5 | By Mr. Gilfarb | 1610 |
| 6 | | |
| 7 | **JURY CHARGE** | 1621 |

8                      -   -   -   -   -

9

10

11

12

13

14

15

16

17

18                      **C E R T I F I C A T E**

19       I hereby certify that pursuant to Section 753,

20   Title 28, United States Code, the foregoing is a true and

21   correct transcript from the record of proceedings in the

22   above-entitled matter.

23
     _____/s/Francine C. Salopek _____      10-17-2019_____
24   Francine C. Salopek, RMR-CRR                      Date
     Official Court Reporter
25

**COURTROOM SECURITY OFFICER: [12]** 1557/12 1557/17 1559/6 1578/3 1617/16 1621/4 1656/22 1660/14 1660/17 1663/4 1679/17 1682/3
**MR. BEATON: [117]**
**MR. GILFARB: [112]**
**MR. HORENSTEIN: [1]** 1663/21
**MR. YOFFIE: [19]** 1543/12 1543/15 1544/2 1545/17 1546/17 1547/5 1547/7 1547/18 1548/12 1548/17 1560/8 1560/16 1561/3 1562/16 1563/13 1563/18 1662/14 1662/17 1673/21
**MS. SHEEHAN: [4]** 1665/12 1666/9 1666/11 1667/15
**ROOM CLERK: [3]** 1650/25 1663/6 1668/17
**THE COURT REPORTER: [5]** 1543/14 1578/24 1579/2 1595/3 1669/12
**THE COURT: [222]**
**THE DEFENDANT: [10]** 1555/7 1555/10 1555/15 1555/18 1555/22 1556/2 1556/8 1556/11 1556/20 1556/23
**THE JURORS: [3]** 1558/1 1578/12 1621/13

**$**
**$1 [1]** 1546/20
**$10,000 [13]** 1544/5 1544/18 1546/10 1546/13 1546/15 1547/9 1547/11 1635/18 1636/17 1636/25 1637/14 1637/17 1665/11
**$10,952 [1]** 1544/19
**$100,000 [2]** 1554/19 1637/11
**$12,000 [1]** 1543/20
**$13,720 [1]** 1544/16
**$2,000 [1]** 1543/19
**$2600 [1]** 1598/15
**$300 [1]** 1601/13
**$39,000 [1]** 1598/5
**$40,000 [1]** 1608/19
**$437,000 [1]** 1547/5
**$48,000 [1]** 1543/21
**$576,000 [1]** 1543/21
**$900 [2]** 1546/9 1546/12

**'**
**'16 [1]** 1548/4
**'17 [1]** 1548/4
**'18 [1]** 1548/4
**'Here's [1]** 1588/11

**/**
**/s/Francine [1]** 1683/23

**0**
**051 [2]** 1650/24 1658/9
**052 [1]** 1658/16
**053 [9]** 1650/25 1657/6 1657/7 1658/6 1658/8 1662/10 1662/13

**1662/25** 1663/9
**098 [1]** 1658/24

**1**
**1.4 million [1]** 1665/11
**10 [5]** 1554/6 1628/7 1635/11 1661/15 1661/19
**10,900 [1]** 1546/17
**10-17-2019 [1]** 1683/23
**1093 [1]** 1544/8
**10:58 [1]** 1585/22
**11 [15]** 1554/16 1554/24 1557/2 1564/13 1565/10 1565/13 1565/15 1566/5 1567/5 1627/13 1628/9 1647/7 1647/7 1647/10 1662/3
**116 F.3d 1270 [2]** 1545/9 1553/18
**11:32 [1]** 1618/6
**12 [9]** 1596/6 1598/8 1602/21 1605/21 1607/13 1656/20 1656/21 1681/22 1681/23
**12 months [1]** 1543/21
**12-month [5]** 1543/18 1543/23 1554/19 1565/21 1637/11
**120 years [1]** 1589/12
**1270 [2]** 1545/9 1553/18
**1299 [1]** 1553/12
**12:45 [2]** 1617/14 1618/2
**12:48 [1]** 1619/1
**12th [2]** 1679/6 1681/16
**1300 [1]** 1598/8
**1347 [1]** 1650/11
**1349 [2]** 1650/9 1650/11
**14 [1]** 1662/3
**1400 [1]** 1542/8
**15 [2]** 1544/15 1607/13
**15 minutes [1]** 1610/12
**1578 [1]** 1683/3
**1594 [1]** 1683/4
**15th [1]** 1544/17
**16 [2]** 1607/13 1619/10
**1610 [1]** 1683/5
**1621 [1]** 1683/7
**17-60301-CR-WPD [1]** 1541/4
**185 [1]** 1601/9
**1957 [2]** 1546/6 1553/22
**1:44 [1]** 1656/25
**1st [1]** 1558/8

**2**
**20 minutes [3]** 1576/14 1576/17 1576/24
**20 years [1]** 1660/4
**200 [1]** 1542/11
**20005 [1]** 1542/8
**2014 [2]** 1548/3 1558/8
**2015 [3]** 1544/15 1544/17 1548/4
**2016 [3]** 1657/6 1658/20 1658/21
**2017 [2]** 1547/20 1585/20
**2018 [4]** 1541/7 1543/1 1558/8 1619/1
**2019 [1]** 1683/23
**203 [1]** 1542/17
**21 [4]** 1630/9 1630/12 1632/8 1633/21

**25 minutes [1]** 1576/19
**25-minute [1]** 1593/16
**25th [1]** 1585/20
**27 [3]** 1541/7 1543/1 1619/1
**28 [1]** 1683/20
**29 [12]** 1543/10 1544/1 1544/23 1548/6 1550/7 1550/11 1551/22 1552/3 1553/9 1554/5 1554/24 1555/2
**299 [1]** 1542/17
**2:07 [1]** 1667/18
**2:39 [1]** 1667/18
**2:40 [1]** 1668/20

**3**
**30 minutes [1]** 1559/6
**30-minute [1]** 1559/2
**300 [1]** 1542/4
**33128 [2]** 1542/12 1542/15
**33132 [1]** 1542/5
**33301 [1]** 1542/18
**34 [1]** 1619/12
**38 [1]** 1608/19
**39 [2]** 1598/7 1608/19
**39 F.3d 1299 [1]** 1553/12
**3rd [2]** 1542/11 1542/14

**4**
**40 [2]** 1542/11 1542/14
**437,000 [1]** 1547/10
**45 minutes [3]** 1576/7 1576/13 1577/2
**4789 [1]** 1636/24
**4:20 [1]** 1668/20
**4:30 [1]** 1674/1
**4:40 [1]** 1674/1
**4:55 [1]** 1682/25
**4th [1]** 1542/4

**5**
**5686 [1]** 1542/18

**7**
**74 F.3d 1093 [1]** 1544/8
**753 [1]** 1683/19
**769-5686 [1]** 1542/18

**8**
**841 [3]** 1630/13 1632/9 1633/25
**846 [1]** 1630/9
**8th [1]** 1542/7

**9**
**9-1-1 [1]** 1606/21
**90 percent [2]** 1593/16 1607/14
**950 [1]** 1544/18
**954 [1]** 1542/18
**97 [1]** 1662/1
**99 [1]** 1542/4
**9:06 [2]** 1541/8 1543/1

**A**
**a.m [3]** 1541/8 1543/1 1618/6
**Abby [2]** 1584/18 1603/9
**abets [2]** 1637/25 1638/3

**A**

**abettors [1]** 1567/8
**abide [2]** 1640/23 1641/1
**ability [1]** 1624/14
**above [3]** 1580/1 1641/8 1683/22
**above-entitled [1]** 1683/22
**absolute [2]** 1595/22 1596/1
**absolutely [4]** 1555/5 1574/7 1589/9
  1602/12
**absurd [1]** 1590/21
**absurdity [1]** 1581/12
**abundance [5]** 1572/18 1573/14
  1574/17 1659/25 1660/5
**accent [1]** 1583/25
**accentuated [1]** 1550/23
**accept [2]** 1623/24 1626/19 1627/8
  1627/11
**acceptable [5]** 1565/8 1565/23
  1568/16 1639/9 1639/12
**accepted [8]** 1561/5 1563/3 1570/6
  1634/7 1640/3 1642/18 1643/9
  1644/7
**access [3]** 1642/13 1643/16 1662/13
**accident [2]** 1614/6 1645/17
**accomplice [3]** 1560/4 1575/18
  1575/22
**accomplish [2]** 1629/16 1631/7
**accomplished [2]** 1558/15 1589/10
**accordance [4]** 1563/2 1634/6
  1642/6 1642/23
**according [3]** 1570/5 1570/14 1640/3
**accordingly [4]** 1639/19 1640/15
  1641/6 1664/22
**account [10]** 1544/6 1544/12
  1545/20 1545/22 1546/2 1546/5
  1546/20 1546/23 1547/11 1553/15
**accounts [5]** 1545/12 1664/25
  1665/3 1681/24 1682/1
**accurate [3]** 1569/6 1570/14 1623/24
**accurately [1]** 1624/15
**accusing [1]** 1601/22
**acquit [4]** 1552/23 1552/24 1552/25
  1571/4
**acquittal [3]** 1550/11 1551/24
  1554/17
**acquittals [2]** 1664/21 1664/22
**act [18]** 1579/16 1580/20 1606/17
  1622/22 1628/24 1630/7 1630/16
  1632/5 1632/9 1634/10 1634/19
  1637/21 1637/22 1645/15 1645/18
  1647/4 1653/8 1655/16
**acted [14]** 1569/2 1569/16 1574/10
  1632/22 1638/25 1639/3 1639/6
  1639/16 1639/19 1641/11 1645/21
  1645/23 1651/22 1654/4
**acting [14]** 1570/4 1571/23 1579/23
  1582/5 1585/3 1591/4 1613/14
  1613/17 1616/2 1616/10 1634/15
  1637/24 1640/2 1640/7
**action [5]** 1590/8 1643/24 1644/11
  1652/2 1654/24
**actions [2]** 1632/23 1634/11
**activation [1]** 1643/12
**activity [16]** 1545/16 1546/16

  1547/18 1553/15 1553/17 1554/9
  1554/12 1554/20 1564/1 1565/20
  1635/17 1636/4 1636/5 1636/6
  1637/10 1654/19
**actors [3]** 1597/4 1603/8 1603/13
**acts [5]** 1606/21 1638/2 1638/5
  1638/8 1654/21
**acute [1]** 1643/20
**Adam [3]** 1542/6 1543/13 1673/20
**Adams [1]** 1544/7
**add [7]** 1549/10 1554/7 1560/23
  1563/23 1569/25 1672/21 1673/9
**Adderall [2]** 1600/24 1600/25
**addict [1]** 1584/10
**addicted [1]** 1606/1
**addictive [2]** 1560/7 1626/6
**adding [1]** 1682/14
**addition [2]** 1629/8 1630/25
**additions [1]** 1559/14
**address [3]** 1543/16 1548/15
  1662/20
**addressed [1]** 1548/13
**adhere [1]** 1644/11
**administer [1]** 1642/20
**administering [3]** 1633/9 1643/25
  1644/6
**Administration [2]** 1603/20 1604/14
**admit [3]** 1589/2 1589/3 1589/4
**admits [1]** 1588/25
**admitted [6]** 1560/20 1601/6 1611/17
  1623/3 1623/4 1676/10
**admittedly [1]** 1589/16
**admonition [6]** 1557/24 1559/2
  1578/10 1617/11 1621/11 1681/18
**adult [3]** 1558/7 1558/14 1641/16
**advance [1]** 1572/20
**advances [2]** 1630/7 1632/5
**advantage [3]** 1595/7 1608/6
  1626/23
**advice [2]** 1555/14 1555/15
**affairs [3]** 1596/15 1606/18 1622/23
**affect [1]** 1646/3
**affected [5]** 1654/1 1654/19 1654/22
  1657/4 1657/9
**affecting [2]** 1654/8 1657/16
**affects [3]** 1635/25 1654/13 1657/19
**afternoon [2]** 1660/11 1682/23
**agencies [2]** 1643/21 1643/25
**agent [7]** 1547/1 1548/24 1629/1
  1630/18 1637/23 1638/5 1644/23
**Agent Parker [1]** 1547/1
**agents [4]** 1589/13 1589/13 1597/15
  1599/3
**agree [18]** 1544/4 1549/17 1551/2
  1556/20 1568/16 1568/19 1585/8
  1602/22 1608/22 1622/3 1628/20
  1630/10 1646/14 1649/2 1650/16
  1673/4 1677/8 1679/15
**agreement [10]** 1620/20 1625/14
  1628/23 1629/4 1630/15 1630/21
  1646/20 1682/8 1682/9 1682/13
**agrees [1]** 1590/25
**aid [3]** 1578/17 1615/8 1626/24
**aiders [1]** 1567/8

**aids [2]** 1637/25 1638/3
**allegation [1]** 1672/3
**alleged [15]** 1562/9 1629/22 1631/20
  1636/7 1645/14 1650/2 1652/23
  1653/3 1653/5 1655/21 1655/23
  1656/1 1661/19 1662/3 1673/1
**allow [13]** 1544/21 1557/25 1559/3
  1578/11 1615/18 1617/12 1621/12
  1627/2 1656/13 1660/6 1679/9
  1681/19 1681/21
**allowable [1]** 1638/20
**allowed [4]** 1605/10 1626/18 1665/21
  1666/6
**almost [3]** 1601/10 1608/24 1681/3
**alone [1]** 1646/11
**alternate [1]** 1660/12
**alternates [1]** 1659/6
**alternative [1]** 1666/13
**although [2]** 1553/14 1608/4
**Amanda [3]** 1584/8 1592/19 1614/11
**amazing [1]** 1604/6
**AMERICA [23]** 1541/6 1595/14
  1595/18 1596/5 1596/19 1596/20
  1596/23 1597/2 1598/9 1599/20
  1600/2 1600/5 1600/17 1602/3
  1606/19 1606/25 1607/8 1609/10
  1610/19 1610/21 1610/24 1611/4
  1611/21
**America's [2]** 1601/3 1611/6
**amount [6]** 1546/12 1546/17 1627/24
  1628/4 1632/17 1666/1
**amputate [2]** 1581/15 1581/16
**Amy [1]** 1544/11
**analgesics [1]** 1644/1
**analogy [1]** 1605/13
**and/or [1]** 1669/8
**ANDRES [4]** 1541/9 1558/9 1558/11
  1603/5
**announce [2]** 1549/8 1550/3
**annoyed [1]** 1594/3
**answer [13]** 1565/4 1565/16 1566/20
  1566/22 1599/15 1607/6 1624/17
  1647/12 1663/15 1675/13 1675/21
  1677/15 1679/21
**answers [1]** 1597/16
**anxiety [1]** 1668/2
**anymore [2]** 1605/6 1659/20
**apologize [3]** 1557/6 1577/20
  1667/22
**APPEARANCES [1]** 1542/1
**applicable [16]** 1550/15 1568/25
  1569/4 1569/17 1638/20 1638/23
  1639/10 1639/14 1639/18 1639/20
  1640/24 1641/2 1641/12 1641/15
  1643/8 1669/19
**application [1]** 1616/17
**applied [2]** 1637/18 1641/14
**applies [1]** 1559/20
**appreciate [1]** 1659/10
**appreciation [2]** 1659/14 1659/15
**approach [2]** 1643/12 1648/1
**approve [1]** 1620/16
**approves [1]** 1580/11
**area [1]** 1659/20

**A**

**aren't [1]** 1677/2
**arguably [2]** 1675/3 1680/13
**argue [8]** 1546/24 1552/19 1552/25
1561/16 1564/2 1564/4 1573/21
1616/16
**argument [13]** 1545/1 1568/11
1568/22 1569/24 1575/21 1576/6
1578/19 1578/20 1610/14 1615/17
1615/19 1673/11 1683/2
**arguments [6]** 1545/4 1548/1
1575/12 1578/16 1578/17 1610/16
**Army [1]** 1603/19
**arranging [1]** 1637/15
**arrests [1]** 1678/20
**arrived [1]** 1659/23
**arriving [1]** 1623/9
**artifice [2]** 1653/14 1653/22
**asserts [3]** 1568/5 1623/18 1639/3
**asset [7]** 1662/6 1662/20 1665/14
1665/22 1666/2 1666/2 1673/23
**assets [1]** 1665/19
**Assistant [1]** 1542/3
**assistants [12]** 1579/25 1580/8
1582/2 1585/5 1585/6 1586/4 1587/8
1589/6 1590/25 1591/7 1591/8
1616/14
**associate [1]** 1638/6
**associated [1]** 1638/9
**associating [2]** 1630/4 1632/2
**assume [3]** 1573/6 1574/1 1623/6
**assurance [1]** 1641/24
**attach [1]** 1612/13
**attack [1]** 1582/8
**attempt [2]** 1603/16 1653/14
**attempted [3]** 1635/14 1653/21
1655/25
**attempting [1]** 1639/4
**attempts [1]** 1606/21
**attended [1]** 1641/25
**Attorney [1]** 1633/21
**Attorney's [1]** 1542/3
**attorneys [3]** 1542/3 1578/15
1578/16
**audio [1]** 1620/12
**audios [1]** 1620/4
**AUSA [3]** 1665/14 1665/15 1665/24
**AUSA Evelyn [1]** 1665/14
**AUSA Gilfarb [1]** 1665/24
**AUSA Karen [1]** 1665/15
**authority [2]** 1574/16 1602/25
**authorize [1]** 1587/3
**authorized [4]** 1558/10 1573/5
1633/22 1633/24
**authorizes [1]** 1638/5
**automatic [1]** 1591/9
**automatically [2]** 1630/8 1632/6
**Avenue [1]** 1542/8
**aware [2]** 1546/21 1645/23
**awesome [1]** 1599/9

**B**

**B11 [1]** 1575/5
**B12 [1]** 1575/8

**baby [1]** 1599/9
**background [1]** 1615/23
**badges [1]** 1659/17
**bag [1]** 1583/14
**Baker [1]** 1606/21
**Baldwin [2]** 1584/8 1592/19
**bandwagon [1]** 1611/6
**banged [1]** 1589/19
**bank [8]** 1544/10 1545/12 1546/25
1598/11 1636/1 1637/15 1664/25
1665/3
**banks [1]** 1636/22
**bargain [2]** 1625/22 1626/11
**bargaining [2]** 1625/16 1625/18
**base [1]** 1573/13
**baseline [1]** 1609/4
**basic [3]** 1559/15 1559/17 1559/24
**basis [6]** 1547/16 1568/22 1572/8
1603/2 1644/10 1672/5
**bathroom [1]** 1656/16
**BB [1]** 1544/16
**Beaton [15]** 1542/9 1556/13 1558/22
1576/2 1576/6 1577/3 1578/20
1594/3 1594/25 1595/4 1663/23
1673/15 1675/17 1676/13 1683/4
**Beaton's [1]** 1620/15
**becomes [6]** 1629/1 1630/18 1666/2
1666/4 1666/4 1673/16
**bedroom [1]** 1585/16
**begin [2]** 1621/18 1677/20
**beginning [6]** 1567/15 1568/5
1588/10 1595/14 1599/21 1603/23
**begins [1]** 1562/25
**behave [1]** 1583/22
**behavior [3]** 1598/18 1599/7 1600/18
**behest [1]** 1598/14
**behind [2]** 1598/2 1609/1
**belabor [1]** 1553/8
**belief [4]** 1569/3 1570/4 1639/16
1640/2
**beliefs [1]** 1646/23
**believability [1]** 1582/9
**believe [29]**
**believed [1]** 1616/10
**believes [1]** 1544/20
**below [12]** 1550/16 1550/20 1551/13
1568/25 1569/16 1602/7 1602/19
1606/8 1609/17 1639/14 1639/20
1641/12
**bench [2]** 1543/2 1648/1 1648/2
**benefit [13]** 1555/13 1587/6 1608/19
1653/15 1653/17 1653/22 1653/24
1654/1 1654/7 1654/9 1654/11
1657/3 1657/9
**benefits [1]** 1654/6
**Bentleys [1]** 1607/9
**beyond [38]**
**Bill [4]** 1551/6 1572/10 1573/1
1604/22
**billed [1]** 1593/20
**billing [2]** 1558/13 1593/16
**binders [2]** 1591/13 1600/3
**binding [1]** 1623/5
**blank [3]** 1585/14 1585/14 1585/15

**Blvd [1]** 1542/17
**Board [12]** 1573/25 1602/15 1602/21
1602/24 1605/19 1608/10 1608/15
1643/14 1643/18 1643/24 1644/5
1644/10
**Bond [1]** 1542/7
**book [3]** 1612/18 1612/20 1650/18
**books [1]** 1596/10
**boot [1]** 1577/17
**borne [1]** 1584/14
**boss [2]** 1590/2 1608/2
**bothers [1]** 1591/7
**bottle [1]** 1592/21
**bottles [1]** 1592/22
**bottom [2]** 1672/15 1672/16
**bought [2]** 1552/24 1607/17
**boundaries [4]** 1568/15 1568/21
1639/9 1639/12
**bounds [5]** 1570/13 1632/25 1634/12
1639/6 1640/9
**boy [2]** 1599/9 1657/15
**braces [3]** 1603/17 1615/4 1615/7
**Bradley [1]** 1542/13
**breaching [1]** 1638/22
**break [3]** 1561/11 1577/5 1644/20
**breakfast [1]** 1681/22
**breath [1]** 1613/14
**breathing [1]** 1614/17
**breaths [1]** 1586/24
**brevity [1]** 1549/12
**brief [1]** 1554/3
**brilliant [1]** 1595/24
**broke [1]** 1599/4
**Broward [1]** 1542/17
**brush [1]** 1601/3
**bucks [2]** 1598/8 1601/9
**build [1]** 1601/25
**Building [1]** 1542/7
**bunch [2]** 1556/17 1600/14
**burden [6]** 1545/10 1553/20 1554/8
1554/10 1559/22 1622/14
**burning [2]** 1612/19 1612/19
**Burrage [8]** 1548/13 1548/16 1552/4
1552/9 1552/11 1552/12 1552/14
1552/18
**bush [2]** 1612/19 1612/19
**business [2]** 1585/2 1653/10
**busy [1]** 1586/16
**but-for [9]** 1552/12 1552/22 1561/12
1561/14 1565/6 1566/14 1592/15
1628/6 1634/24
**button [2]** 1677/3 1680/24
**buy [2]** 1595/20 1616/14
**bye [1]** 1660/14
**bygone [1]** 1613/5

**C**

**call [12]** 1566/20 1566/25 1579/21
1582/25 1588/15 1600/2 1600/15
1607/25 1621/19 1659/23 1660/3
1677/9
**called [11]** 1550/14 1556/14 1590/24
1596/2 1602/15 1603/22 1605/7
1605/11 1606/2 1625/16 1627/14

**C**

**calling [4]**  1556/20 1566/15 1583/23
1667/22
**calls [2]**  1599/13 1606/21
**Calvin [1]**  1553/12
**capacity [2]**  1652/14 1655/11
**captain [1]**  1611/25
**car [3]**  1587/11 1607/18 1615/14
**carefully [2]**  1622/19 1641/25
**Carlos [1]**  1548/23
**Carol [2]**  1569/10 1590/11
**carried [9]**  1544/7 1544/13 1545/20
1547/3 1547/9 1547/12 1628/21
1630/11 1655/25
**carries [2]**  1551/12 1571/10
**carry [4]**  1551/14 1647/15 1651/14
1651/25
**carrying [5]**  1598/15 1629/7 1630/24
1642/6 1653/3
**caseload [2]**  1613/8 1613/9
**cash [8]**  1547/2 1583/13 1584/24
1598/15 1601/13 1615/13 1637/1
1637/14
**caught [3]**  1586/25 1588/22 1589/3
**cause [15]**  1552/22 1561/11 1561/14
1564/24 1565/6 1566/14 1592/15
1614/5 1614/6 1628/6 1634/24
1642/18 1644/12 1652/21 1655/18
**caused [2]**  1633/17 1651/23
**causes [2]**  1561/11 1561/13
**caution [14]**  1572/18 1573/14
1574/17 1575/16 1575/25 1625/13
1625/25 1626/4 1626/15 1638/16
1646/5 1647/21 1659/25 1660/5
**cautionary [1]**  1560/23
**cease [2]**  1594/12 1656/19
**cell [4]**  1598/21 1609/6 1656/12
1656/13
**certificates [1]**  1659/15
**certify [1]**  1683/19
**chain [2]**  1561/12 1623/19
**chambers [1]**  1677/9
**chance [1]**  1673/15
**charge [15]**  1557/8 1557/16 1559/9
1570/14 1587/25 1594/6 1601/20
1622/6 1627/15 1628/7 1665/19
1669/4 1671/16 1672/6 1683/7
**charged [22]**  1552/17 1561/5 1566/8
1566/12 1572/6 1572/14 1572/14
1628/13 1628/15 1629/11 1629/17
1631/3 1632/8 1632/14 1634/15
1634/16 1635/10 1637/21 1641/4
1644/18 1646/6 1670/25
**charges [11]**  1627/13 1627/18
1627/20 1627/25 1628/9 1628/16
1628/17 1645/9 1645/25 1671/3
1671/12
**charging [1]**  1601/11
**charts [1]**  1614/21
**chastised [1]**  1580/25
**cheat [4]**  1652/2 1652/20 1654/24
1655/17
**cheating [1]**  1589/4
**check [9]**  1544/19 1586/14 1613/23

1648/7 1658/9 1669/19 1669/19
1673/23 1680/7
**checking [2]**  1586/20 1647/8
**checkout [1]**  1582/17
**checks [1]**  1544/13
**chief [1]**  1665/14
**children [1]**  1599/6
**choose [4]**  1627/12 1641/18 1647/3
1671/15
**chop [1]**  1613/15
**chose [1]**  1622/10
**chronic [2]**  1643/20 1643/23
**cigarette [1]**  1656/16
**Circuit [6]**  1544/8 1553/12 1553/19
1560/24 1562/16 1658/20
**circumstances [3]**  1623/20 1636/19
1642/25
**circumstantial [5]**  1548/3 1553/6
1623/16 1623/19 1623/22
**circus [1]**  1603/9
**cite [1]**  1546/3
**cited [2]**  1553/11 1553/18
**citizen [1]**  1599/10
**civil [11]**  1567/10 1567/14 1567/18
1572/20 1638/16 1638/17 1638/18
1638/19 1638/22 1642/4 1659/3
**civil/regulatory [4]**  1567/10 1567/14
1567/18 1659/3
**claimed [2]**  1644/17 1649/10
**claims [2]**  1590/18 1638/19
**clarity [1]**  1545/19
**class [1]**  1607/11
**clause [1]**  1676/19
**clay [2]**  1605/9 1605/13
**clays [3]**  1605/8 1605/9 1605/11
**clean [1]**  1619/25
**clear [6]**  1550/19 1552/18 1576/17
1599/11 1613/4 1677/13
**clearing [2]**  1613/7 1613/9
**clerk [4]**  1620/21 1656/2 1664/2
1667/4
**clerk's [1]**  1658/21
**clever [1]**  1599/3
**client [1]**  1564/15
**clinic [1]**  1600/10
**clinical [1]**  1644/9
**close [2]**  1554/22 1645/13
**closing [10]**  1569/24 1575/11
1575/21 1576/2 1576/6 1577/6
1578/15 1594/4 1615/14 1683/2
**coaches [1]**  1600/24
**coconspirator [1]**  1575/16
**code [21]**  1543/20 1582/12 1582/15
1582/21 1582/22 1582/25 1583/5
1583/6 1584/23 1585/3 1588/17
1588/17 1588/18 1588/19 1593/17
1600/19 1616/15 1630/9 1630/12
1632/8 1683/20
**Code-G [5]**  1582/12 1582/15 1582/21
1583/5 1585/3
**Code-Gs [4]**  1582/22 1582/25 1583/6
1616/15
**codefendant [3]**  1560/5 1625/15
1625/17

**codes [2]**  1593/10 1593/13
**coincide [1]**  1606/25
**collect [1]**  1656/12
**collective [2]**  1677/5 1681/2
**colloquy [1]**  1555/3
**column [2]**  1583/1 1601/22
**combined [1]**  1595/24
**comfortable [1]**  1545/2
**commend [1]**  1596/9 1596/10
**comment [2]**  1610/16 1679/22
**commenting [5]**  1568/12 1568/17
1568/23 1569/9 1676/11
**commerce [14]**  1635/25 1651/25
1654/2 1654/8 1654/13 1654/18
1654/19 1654/21 1654/22 1657/4
1657/10 1657/17 1657/20 1657/22
**commingle [1]**  1616/13
**commingled [1]**  1666/3
**commit [26]**  1550/9 1561/19 1627/19
1628/15 1628/17 1628/24 1629/17
1630/16 1635/19 1636/8 1638/1
1644/15 1644/16 1644/22 1645/3
1645/4 1645/5 1649/22 1651/5
1651/10 1658/15 1670/18 1670/23
1671/4 1671/10 1671/13
**committed [10]**  1552/23 1574/14
1599/7 1602/8 1614/2 1617/9 1628/8
1645/10 1645/13 1645/18
**committing [3]**  1628/14 1636/14
1636/18
**common [6]**  1586/9 1622/19 1623/14
1629/16 1630/4 1632/2
**commonly [1]**  1635/9
**communicate [1]**  1647/17
**communication [1]**  1651/24
**communications [3]**  1651/14 1653/8
1653/9
**community [1]**  1640/12
**compared [1]**  1607/10
**compass [1]**  1609/4
**compensation [9]**  1551/4 1551/5
1551/10 1551/12 1551/14 1551/16
1572/10 1573/17 1643/2
**competent [1]**  1641/16
**complain [1]**  1556/1
**complete [2]**  1581/8 1676/7
**completed [1]**  1621/17
**completes [1]**  1555/1
**complied [2]**  1569/4 1639/18
**comply [1]**  1642/1
**compounding [1]**  1633/10
**comprehensive [1]**  1641/22
**computer [4]**  1541/25 1577/15
1619/25 1620/13
**conceals [1]**  1652/10 1655/7
**concede [3]**  1557/20 1578/6 1621/7
**conceded [1]**  1614/7
**concerned [1]**  1623/15
**concerning [2]**  1622/17 1624/3
**concerns [1]**  1632/7
**concluded [2]**  1597/10 1682/25
**concludes [1]**  1558/20
**conclusions [1]**  1623/14
**conditions [2]**  1587/7 1642/25

**C**

**conduct [11]** 1550/19 1550/20 1562/8 1570/18 1617/2 1638/23 1640/11 1642/5 1645/24 1650/1 1650/2
**confer [1]** 1682/12
**conference [3]** 1557/8 1557/16 1559/10
**conferences [1]** 1591/10
**confession [1]** 1611/10
**confessions [1]** 1611/7
**confidence [1]** 1601/17
**confidential [3]** 1587/17 1601/8 1607/21
**confirm [1]** 1610/11
**confronted [1]** 1599/6
**confused [1]** 1669/21
**confusing [2]** 1546/19 1569/18
**conjunctive [1]** 1671/16
**connection [1]** 1654/5
**consideration [2]** 1550/25 1564/24
**consistent [2]** 1595/12 1643/7
**conspiracy [41]**
**conspirator [2]** 1629/20 1630/8 1631/18 1632/6
**conspirators [4]** 1629/7 1629/22 1630/24 1631/20
**conspire [2]** 1628/20 1630/10
**conspired [2]** 1627/19 1627/21
**conspiring [1]** 1628/15
**constituted [1]** 1650/3
**constitutional [2]** 1555/7 1555/9
**construction [2]** 1669/9 1669/20
**consultation [1]** 1616/1
**consulted [1]** 1590/12
**contain [1]** 1558/17
**contained [1]** 1546/5
**containing [3]** 1627/24 1628/4 1632/17
**content [1]** 1648/3
**contents [3]** 1674/8 1680/11 1680/15
**context [3]** 1551/18 1573/17 1643/2
**continued [1]** 1548/4
**contract [3]** 1590/14 1654/8 1654/12
**contradictory [1]** 1582/14
**contrast [2]** 1583/21 1597/24
**control [2]** 1653/16 1653/24
**controlled [54]**
**conveniently [1]** 1591/1
**conversations [1]** 1583/3
**convict [4]** 1552/1 1588/9 1609/25 1640/5
**convicted [4]** 1555/25 1560/3 1625/2 1638/21
**convicting [1]** 1644/18
**conviction [8]** 1545/3 1548/7 1661/18 1661/19 1664/9 1664/13 1665/19 1666/7
**convictions [2]** 1661/10 1662/2
**convince [3]** 1596/6 1605/21 1609/8
**convinced [7]** 1597/7 1597/8 1622/24 1622/25 1646/22 1672/7 1672/9
**convincing [1]** 1622/22

**cooperation [3]** 1609/10 1609/13 1609/15
**copies [1]** 1566/2
**copy [8]** 1627/16 1651/8 1656/11 1664/5 1669/1 1669/11 1670/10 1670/18
**core [4]** 1571/7 1571/16 1580/3 1580/18
**correlate [1]** 1547/21
**counsel [22]** 1543/7 1545/21 1546/18 1547/7 1557/20 1564/14 1567/3 1577/23 1578/6 1578/23 1595/2 1619/4 1621/7 1648/1 1661/14 1662/12 1667/21 1668/24 1670/9 1674/5 1678/1 1678/16
**count [66]**
**Count 1 [21]** 1550/9 1551/20 1551/22 1627/18 1628/14 1628/16 1628/17 1658/12 1661/18 1669/2 1670/4 1670/16 1670/22 1670/24 1671/3 1678/16 1679/23 1679/25 1680/3 1680/6 1682/15
**Count 11 [8]** 1554/16 1554/24 1565/10 1565/15 1566/5 1567/5 1628/9 1647/10
**Count 2 [5]** 1551/23 1552/1 1552/3 1627/20 1632/8
**Count 3 [12]** 1552/4 1553/10 1562/14 1564/17 1565/2 1565/3 1566/5 1566/6 1627/25 1632/7 1641/4 1647/10
**Count 5 [1]** 1547/4
**Count 6 [1]** 1544/15
**country [9]** 1589/22 1596/2 1596/5 1599/10 1603/18 1604/13 1604/18 1654/16 1678/20
**counts [20]** 1548/8 1553/11 1553/25 1554/1 1554/6 1554/16 1557/2 1564/13 1574/25 1627/14 1628/7 1635/11 1647/7 1647/10 1661/10 1661/13 1661/19 1662/1 1662/1 1662/3
**Counts 1 [1]** 1661/13
**Counts 11 [1]** 1662/3
**Counts 2 [1]** 1661/19
**Counts 3 [2]** 1557/2 1564/13
**Counts 4 [3]** 1554/6 1628/7 1635/11
**court [55]**
**Court's [3]** 1622/5 1659/14 1660/11
**courtroom [25]** 1549/1 1557/19 1559/8 1578/5 1596/22 1617/18 1618/5 1619/2 1621/6 1647/16 1647/21 1660/12 1662/23 1663/6 1663/8 1663/23 1667/4 1667/19 1668/19 1668/21 1673/25 1674/2 1679/19 1682/5 1682/24
**cover [2]** 1543/22 1616/1
**coverage [1]** 1678/24
**CR [1]** 1541/4
**crazy [1]** 1612/16
**credibility [4]** 1560/1 1582/9 1589/11 1591/18
**crime [50]**
**crimes [6]** 1599/7 1627/14 1632/7

1645/9 1646/6 1646/8
**criminal [11]** 1542/7 1545/13 1604/25 1610/6 1610/7 1627/15 1628/25 1630/17 1635/17 1638/25 1642/4
**criminally [7]** 1550/21 1552/17 1569/1 1572/15 1638/2 1638/7 1639/15
**criminals [1]** 1600/15
**Cristina [1]** 1542/10
**criteria [1]** 1643/10
**cross [5]** 1574/16 1588/16 1589/18 1594/5 1614/7
**cross-examination [5]** 1574/16 1588/16 1589/18 1594/5 1614/7
**CRR [2]** 1542/16 1683/24
**CS [7]** 1582/15 1582/19 1582/21 1583/5 1584/23 1585/3 1601/22
**CSs [4]** 1582/12 1582/22 1582/25 1616/16
**CSs' [1]** 1583/6
**currency [9]** 1565/18 1628/10 1636/20 1636/23 1637/1 1637/5 1637/8 1637/14 1637/17
**curved [1]** 1592/7
**cushion [1]** 1602/1
**custody [2]** 1653/16 1653/24
**cut [1]** 1562/14

**D**

**dad [1]** 1605/24
**Dade [1]** 1556/16
**daily [1]** 1582/19
**damned [2]** 1602/2 1602/2
**danger [2]** 1673/5 1673/6
**dangerous [2]** 1597/6 1597/12
**Daniel [1]** 1592/19
**data [9]** 1584/17 1584/22 1585/6 1619/21 1620/2 1620/4 1620/10 1675/25 1675/25
**date [9]** 1574/20 1645/10 1645/11 1645/13 1645/13 1647/15 1672/15 1678/16 1683/24
**dated [1]** 1672/17
**daughter [1]** 1581/1
**DC [1]** 1542/8
**dealer [14]** 1571/9 1571/20 1588/11 1590/2 1598/7 1598/14 1598/17 1599/14 1607/23 1608/2 1608/3 1608/16 1612/22 1615/13
**dealers [6]** 1598/1 1601/18 1607/10 1607/16 1608/18 1615/22
**death [15]** 1552/22 1561/15 1564/25 1565/6 1566/14 1592/15 1592/16 1617/3 1628/5 1628/6 1632/18 1633/1 1634/23 1634/24 1658/25
**debatable [1]** 1614/3
**debating [1]** 1672/1
**decedent [3]** 1552/9 1552/15 1553/5
**deceive [5]** 1579/13 1652/2 1652/20 1654/24 1655/17
**deception [1]** 1625/9
**decide [23]** 1555/24 1556/4 1566/23 1569/14 1579/17 1586/5 1594/17

## D

decide... [16] 1595/10 1595/19 1608/16 1612/11 1616/7 1621/20 1623/25 1624/5 1625/1 1625/8 1626/21 1646/10 1646/12 1646/17 1652/13 1655/10
decided [2] 1556/1 1558/23
decides [1] 1579/17
decision [18] 1555/20 1555/21 1556/23 1596/14 1598/17 1602/16 1608/9 1621/23 1622/11 1623/10 1624/2 1625/9 1642/6 1652/15 1652/16 1655/12 1655/13 1669/3
decision-maker [2] 1652/16 1655/13
decisions [4] 1599/8 1602/9 1610/25 1641/17
deductions [1] 1623/14
deemed [1] 1642/4
defendant [128]
defendant's [12] 1545/11 1562/15 1566/13 1570/17 1571/12 1622/15 1622/17 1632/23 1640/10 1640/12 1640/14 1672/14
defense [35]
defense's [1] 1674/22
defer [1] 1544/23
definition [2] 1653/11 1669/6
definitions [3] 1648/15 1649/4 1651/12
defraud [16] 1639/1 1651/14 1651/19 1651/22 1651/25 1652/1 1652/8 1652/11 1652/19 1653/14 1653/22 1654/4 1654/23 1655/5 1655/8 1655/16
defrauding [2] 1653/6 1655/23
degree [2] 1581/19 1654/19
delapidated [1] 1587/12
delay [1] 1577/21
deleted [1] 1657/3
deletes [1] 1674/18
deliberate [9] 1612/11 1612/12 1656/20 1656/24 1666/22 1679/1 1679/2 1679/4 1681/4
deliberating [1] 1678/19
deliberation [2] 1656/19 1659/20
deliberations [19] 1621/19 1626/25 1627/17 1646/15 1647/5 1656/13 1656/14 1656/15 1656/19 1660/4 1666/24 1667/1 1667/2 1679/5 1679/8 1681/6 1681/7 1681/15 1681/17
deliver [3] 1579/21 1633/3 1633/6
delivers [1] 1633/12
delivery [2] 1633/11 1654/5
demonstrate [1] 1585/18
demonstrated [1] 1585/4
demonstrating [3] 1545/10 1553/20 1554/19
deny [6] 1548/6 1551/22 1552/3 1553/9 1554/5 1554/24
Department [1] 1542/6
depend [1] 1625/10
deported [2] 1599/9 1612/2
deposit [3] 1544/16 1635/22 1637/12

deposited [2] 1545/13 1583/12
deposits [5] 1544/9 1544/11 1544/15 1616/12 1636/24
deputy [1] 1665/14
derived [10] 1545/16 1553/17 1554/9 1554/12 1636/2 1636/7 1636/11 1636/13 1636/16 1636/18
derogatory [1] 1603/14
descriptions [1] 1675/2
desk [1] 1583/14
desperation [1] 1603/15
despite [1] 1598/18
detail [1] 1625/11
details [4] 1629/21 1631/19 1652/22 1655/20
detectable [3] 1627/24 1628/4 1632/17
determination [3] 1607/5 1639/6 1641/17
determine [8] 1566/8 1568/20 1569/13 1569/17 1610/23 1639/11 1639/20 1646/7
determined [3] 1568/25 1640/13 1643/10
determining [2] 1638/24 1640/19
developed [1] 1574/16
deviation [1] 1644/13
devised [1] 1651/18
diagnosis [1] 1643/6
diametrically [1] 1661/16
dicta [1] 1552/5
dictate [1] 1643/15
die [2] 1588/12 1614/17
died [2] 1552/15 1592/14
difference [6] 1581/23 1615/21 1623/21 1657/13 1657/14 1669/17
difficult [2] 1598/17 1599/8
dignity [1] 1604/23
Dilaudid [1] 1615/5
Dimitrouleas [1] 1541/14
direct [4] 1623/15 1623/17 1623/22 1647/4
directing [4] 1583/17 1591/8 1615/16 1637/23
direction [5] 1608/20 1614/25 1637/24 1644/15 1645/7
directives [1] 1572/21
directly [3] 1624/17 1636/3 1644/24
directs [1] 1638/5
disagree [1] 1649/25
disagreement [1] 1627/10
disagrees [2] 1605/20 1615/1
disbelieve [1] 1624/2
disciplinary [3] 1602/14 1643/23 1644/11
discipline [2] 1602/23 1604/24
discs [1] 1675/24
discuss [16] 1557/25 1559/3 1578/11 1591/15 1617/12 1621/12 1646/19 1660/1 1660/6 1660/8 1660/9 1662/5 1667/7 1679/9 1681/18 1681/20
discussed [11] 1557/25 1559/3 1563/23 1578/11 1617/12 1619/21

1621/12 1660/6 1679/10 1681/19 1681/21
discussing [3] 1630/4 1632/2 1646/20
discussion [11] 1547/7 1549/10 1564/14 1567/3 1577/18 1656/2 1661/14 1662/12 1664/1 1670/9 1678/1
discussions [1] 1621/18
dishonesty [1] 1625/3
disjunctive [1] 1671/17
dismissed [1] 1664/13
disobey [1] 1645/20
dispensation [2] 1569/22 1639/23
dispense [12] 1627/21 1630/14 1631/8 1631/12 1632/11 1632/12 1633/6 1633/17 1633/22 1633/23 1635/20 1636/9
dispensed [5] 1552/6 1628/1 1632/21 1633/18 1640/20
dispenser [1] 1633/11
dispensing [14] 1548/14 1562/8 1566/13 1632/15 1633/2 1634/21 1635/1 1635/5 1640/5 1641/3 1641/10 1643/25 1646/4 1664/17
displayed [1] 1582/13
disprove [1] 1623/20
dispute [2] 1580/6 1580/10
disregard [3] 1622/4 1623/8 1645/21
dissect [1] 1591/11
distinguishable [2] 1548/16 1548/19
distinguishes [1] 1671/22
distribute [12] 1617/1 1627/21 1630/14 1631/8 1631/13 1632/11 1632/12 1633/3 1633/17 1633/21 1633/23 1635/20
distributed [4] 1628/1 1632/21 1633/18 1640/21
distributing [9] 1564/22 1632/14 1633/2 1634/20 1635/1 1635/5 1640/6 1641/4 1641/10
distribution [2] 1617/1 1639/23
district [5] 1541/1 1541/2 1541/15 1542/17 1665/16
disturb [1] 1598/3
divide [1] 1578/19
division [3] 1541/3 1542/7 1665/15
Docket [1] 1661/25
doctor [56]
doctor's [8] 1553/20 1568/24 1570/2 1609/1 1634/11 1639/5 1639/13 1639/25
doctors [13] 1568/10 1591/1 1602/6 1602/18 1602/21 1604/2 1604/19 1604/21 1605/22 1606/3 1606/4 1607/13 1678/22
doctors' [1] 1591/10
document [1] 1549/6
documentation [1] 1644/3
dollar [4] 1544/4 1546/1 1547/14 1547/17
dollars [3] 1543/18 1543/23 1565/21
domestic [4] 1565/18 1636/22 1637/8 1637/9

**D**

**door [5]** 1583/12 1583/12 1586/13 1586/14 1598/3
**doors [1]** 1659/19
**dosage [1]** 1592/17
**doubt [47]**
**doubts [2]** 1612/13 1612/13
**download [1]** 1619/24
**downloads [2]** 1619/21 1620/11
**Dr. [123]**
**Dr. Andres [3]** 1558/9 1558/11 1603/5
**Dr. Carol [2]** 1569/10 1590/11
**Dr. Goldstein [1]** 1584/18
**Dr. Mallak [5]** 1606/19 1606/23 1607/3 1607/6 1614/4
**Dr. Marrero [8]** 1583/20 1583/23 1583/24 1592/1 1604/6 1604/9 1613/7 1613/12
**Dr. Mencia [67]**
**Dr. Mencia's [13]** 1553/24 1577/23 1592/18 1598/2 1598/5 1598/22 1608/20 1611/19 1613/8 1619/4 1667/21 1668/24 1674/5
**Dr. Silverman [8]** 1551/1 1572/8 1585/8 1590/13 1590/17 1591/24 1593/1 1593/14
**Dr. Sullivan [2]** 1584/20 1593/14
**Dr. Warfield [13]** 1572/8 1581/20 1581/22 1583/23 1585/8 1585/9 1590/18 1591/23 1592/6 1599/24 1605/14 1612/15 1616/6
**Dr. Warfield's [1]** 1584/3
**draft [2]** 1559/10 1559/13
**drinking [1]** 1615/7
**drive [3]** 1615/14 1658/21 1675/25
**driving [1]** 1601/1
**drug [46]**
**drugs [12]** 1560/7 1561/23 1588/12 1598/2 1598/4 1608/21 1609/1 1609/16 1613/12 1613/23 1617/2 1626/7
**duration [2]** 1643/11 1656/17
**duty [5]** 1609/18 1610/1 1612/12 1621/16 1659/13

**E**

**early [2]** 1603/3 1643/12
**easy [1]** 1589/19
**effect [1]** 1641/2
**effective [2]** 1643/16 1643/18
**effectively [2]** 1652/10 1655/7
**efficiency [1]** 1549/12
**effort [1]** 1608/9
**either/or [1]** 1677/18
**elapsed [1]** 1592/9
**element [4]** 1657/9 1657/18 1658/16 1658/25
**elements [7]** 1553/22 1562/15 1657/2 1657/3 1663/10 1672/25 1673/3
**Eleventh [3]** 1544/8 1560/24 1658/20
**elicit [1]** 1563/7
**elicited [2]** 1543/18 1546/14

**eliminate [1]** 1648/8
**ELMO [3]** 1590/17 1591/16 1592/11
**email [5]** 1661/4 1662/14 1662/16 1673/19 1673/20
**emailed [1]** 1666/11
**emergency [2]** 1603/2 1606/3
**emphasize [1]** 1627/4
**employee [1]** 1638/5
**employees [2]** 1607/13 1608/8
**encourages [1]** 1643/18
**enforcement [2]** 1643/24 1644/14
**engage [3]** 1635/8 1635/15 1644/24
**engaged [4]** 1635/14 1642/5 1654/18 1654/20
**engaging [1]** 1545/15
**enhancement [1]** 1566/17
**enjoy [3]** 1605/7 1642/8 1642/11
**entertain [1]** 1559/13
**entirely [3]** 1575/23 1625/23 1626/13
**entirety [1]** 1549/14
**entitled [4]** 1551/7 1578/18 1627/4 1683/22
**entity [1]** 1654/10
**entrapment [10]** 1574/6 1574/8 1574/12 1574/16 1574/18 1644/14 1644/17 1644/19 1644/22 1645/1
**entrapped [2]** 1574/14 1644/18
**Entry [1]** 1662/1
**Entry 97 [1]** 1662/1
**envelope [2]** 1583/10 1583/11
**envelopes [2]** 1583/9 1583/10
**equal [1]** 1578/18
**equate [1]** 1547/2
**erased [1]** 1586/21
**Erickson [5]** 1584/5 1584/13 1603/16 1604/12 1615/3
**escort [1]** 1598/21
**especially [1]** 1582/7
**Esq [4]** 1542/2 1542/2 1542/9 1542/13
**essentially [2]** 1568/7 1616/1
**establish [12]** 1545/10 1546/4 1551/25 1553/14 1553/16 1553/19 1554/18 1563/8 1603/16 1630/5 1632/3 1641/7
**established [1]** 1641/15
**establishing [1]** 1644/3
**eternity [1]** 1586/21
**ethical [1]** 1641/21
**ethnicity [1]** 1615/23
**evade [3]** 1636/20 1637/6 1637/17
**evaded [1]** 1628/9
**evaluate [1]** 1591/18
**evaluated [1]** 1644/10
**Evelyn [2]** 1542/2 1665/14
**evening [2]** 1679/3 1682/2
**event [6]** 1549/22 1630/3 1632/1 1660/2 1666/7 1673/16
**events [5]** 1626/5 1626/8 1629/9 1631/1 1679/11
**eventuality [2]** 1660/25 1673/17
**everybody [2]** 1581/10 1666/24
**everybody's [1]** 1682/7
**everyone [4]** 1557/24 1578/10

1621/11 1682/23
**everything's [1]** 1617/20
**evidence [101]**
**ex [2]** 1556/18 1606/2
**ex-girlfriend [1]** 1606/2
**ex-patients [1]** 1556/18
**examination [10]** 1574/16 1586/14 1586/16 1588/16 1589/10 1589/18 1593/11 1594/5 1594/14 1614/7
**examinations [2]** 1579/12 1582/6
**examine [2]** 1586/3 1646/21
**examiner [3]** 1556/15 1594/21 1614/16
**exceed [1]** 1576/7
**exception [3]** 1616/9 1619/20 1648/3
**exceptions [1]** 1636/23
**exchange [3]** 1615/12 1625/15 1635/23
**excited [1]** 1544/22
**exclude [5]** 1596/11 1606/11 1606/16 1614/3 1622/16
**excluded [1]** 1548/23
**exclusion [2]** 1594/2 1596/7
**exclusive [1]** 1653/2
**excruciating [1]** 1603/21
**excuse [3]** 1543/15 1547/19 1562/17
**excused [1]** 1660/10
**execute [3]** 1653/14 1653/14 1653/22
**executed [1]** 1653/21
**exempted [1]** 1633/25
**exercises [1]** 1581/5
**exercising [2]** 1580/17 1581/19
**exhaustive [1]** 1591/19
**exhibit [4]** 1619/10 1620/2 1674/16 1674/23
**Exhibit 16 [1]** 1619/10
**exhibits [11]** 1549/13 1585/13 1619/8 1619/18 1623/4 1674/9 1674/17 1674/19 1674/23 1680/11 1680/14
**exist [2]** 1582/12 1640/16
**existed [3]** 1584/23 1584/24 1680/16
**existence [1]** 1582/15
**existential [1]** 1641/23
**exists [2]** 1582/21 1585/17
**exited [10]** 1559/8 1617/18 1618/5 1660/12 1662/23 1663/6 1668/19 1673/25 1682/5 1682/24
**expect [3]** 1576/7 1604/19 1678/20
**expensive [1]** 1615/14
**experience [3]** 1595/24 1605/8 1626/18
**expert [5]** 1560/11 1563/9 1584/17 1591/10 1612/24
**experts [2]** 1550/13 1580/5
**explain [6]** 1581/8 1622/2 1628/11 1631/15 1646/15 1666/21
**explained [1]** 1590/1
**explanation [1]** 1592/7
**exposed [1]** 1678/23
**expressly [1]** 1625/19
**extent [5]** 1550/24 1595/11 1602/19 1633/24 1678/23

**E**

**extract [1]** 1620/2
**extraction [1]** 1549/13
**extreme [2]** 1581/11 1591/12
**eyes [1]** 1614/19
**eyewitness [1]** 1623/19

**F**

**F.3d [4]** 1544/8 1545/9 1553/12
  1553/18
**face [1]** 1625/17
**facilities [1]** 1642/13
**facing [1]** 1589/12
**fact [39]**
**factors [1]** 1551/8
**facts [23]** 1554/3 1566/11 1585/17
  1585/17 1586/3 1597/17 1597/23
  1597/24 1600/6 1610/4 1621/21
  1623/10 1623/20 1627/6 1629/14
  1631/6 1632/20 1635/13 1637/3
  1647/1 1651/17 1653/20 1671/20
**factual [2]** 1549/7 1623/7
**failed [5]** 1545/10 1551/25 1553/14
  1553/19 1641/1
**failing [2]** 1640/23 1644/11
**fails [1]** 1622/13
**faith [12]** 1567/21 1567/25 1569/3
  1570/4 1609/18 1609/20 1616/9
  1616/17 1639/3 1639/5 1639/16
  1640/1
**fall [2]** 1550/20 1568/25
**fallacy [1]** 1581/8
**falling [2]** 1551/13 1614/15
**falls [1]** 1602/14
**false [18]** 1588/14 1625/3 1625/21
  1626/11 1651/19 1651/20 1652/3
  1652/5 1652/9 1652/18 1653/1
  1653/17 1653/25 1654/2 1654/25
  1655/2 1655/6 1655/15
**falsely [1]** 1624/21
**fancy [1]** 1594/20
**fashion [1]** 1661/6
**Fatal [2]** 1612/5 1612/5
**fault [2]** 1607/16 1607/16
**favorable [4]** 1551/24 1625/20
  1626/9 1644/21
**fear [4]** 1597/22 1602/18 1604/2
  1643/23
**Fears [1]** 1643/20
**February [1]** 1558/8
**federal [11]** 1545/14 1565/19
  1628/19 1630/10 1632/10 1635/8
  1636/19 1637/10 1643/21 1651/13
  1653/13
**fell [8]** 1550/16 1602/7 1602/19
  1603/18 1604/13 1606/8 1609/17
  1639/14
**felony [2]** 1560/3 1625/3
**fewer [1]** 1637/18
**fiancé [1]** 1584/10
**field [1]** 1626/18
**Fifteen [1]** 1610/13
**Fifth [1]** 1553/12
**figure [2]** 1665/10 1671/8

**file [3]** 1544/25 1609/8 1636/23
**filed [2]** 1562/2 1673/19
**fill [6]** 1580/8 1580/11 1580/15
  1580/16 1614/25 1647/15
**filled [1]** 1586/1
**filling [1]** 1585/23
**final [2]** 1585/13 1591/2
**financial [16]** 1544/13 1565/18
  1582/18 1587/10 1633/4 1635/9
  1635/24 1636/1 1636/22 1637/8
  1637/9 1637/14 1652/20 1652/21
  1655/18 1655/18
**findings [1]** 1665/3
**fine [3]** 1563/14 1657/12 1658/18
**finish [1]** 1593/21
**Firm [1]** 1542/13
**fit [3]** 1594/16 1597/10 1601/2
**fits [1]** 1579/20
**Five minutes [1]** 1577/4
**five o'clock [5]** 1666/19 1666/20
  1668/12 1672/20 1681/3
**five-year [1]** 1554/21
**fix [4]** 1603/19 1613/16 1613/16
  1613/17
**FL [1]** 1542/12
**flexibility [1]** 1568/15 1639/9
**float [1]** 1604/1
**Floor [1]** 1542/7
**FLORIDA [39]**
**fluid [1]** 1602/6
**fluidity [4]** 1568/15 1573/18 1602/7
  1639/9
**focus [2]** 1579/9 1593/23
**focused [2]** 1601/16 1601/16
**focuses [1]** 1643/12
**fool [1]** 1606/3
**fooled [1]** 1614/1
**footnote [1]** 1659/4
**forbids [3]** 1644/18 1645/20 1645/22
**foregoing [2]** 1589/23 1683/20
**foreperson [3]** 1647/4 1647/4
  1647/14
**forfeitable [1]** 1666/2
**forfeiture [17]** 1648/8 1660/25
  1661/2 1661/9 1661/17 1662/6
  1662/20 1663/16 1664/6 1665/13
  1665/15 1665/17 1665/20 1666/7
  1673/14 1673/14 1673/23
**forget [5]** 1597/17 1597/23 1600/6
  1614/13 1625/6
**forgot [3]** 1543/24 1659/6 1676/22
**form [26]** 1547/22 1551/18 1564/19
  1565/1 1566/1 1567/2 1572/8
  1584/23 1584/24 1636/3 1636/6
  1636/24 1647/6 1647/13 1647/15
  1661/2 1664/4 1664/23 1666/9
  1669/12 1677/11 1677/22 1678/6
  1680/6 1681/1 1682/7
**Form 4789 [1]** 1636/24
**formal [3]** 1622/6 1629/4 1630/21
**FORT [3]** 1541/3 1541/7 1542/18
**Forty [1]** 1576/9
**Forty-five [1]** 1576/9
**four months [1]** 1678/16

**four weeks [1]** 1543/20
**fourth [2]** 1562/15 1658/25
**frame [1]** 1547/22
**Fran [2]** 1559/11 1669/11
**Fran's [1]** 1664/5
**Francine [3]** 1542/16 1683/23
  1683/24
**fraud [97]**
**fraudulent [10]** 1652/3 1652/6
  1652/9 1653/1 1653/17 1653/25
  1654/2 1654/25 1655/3 1655/6
**free [3]** 1592/23 1598/11 1660/8
**freedom [2]** 1609/3 1609/16
**freedoms [1]** 1596/4
**friend [1]** 1594/3
**front [11]** 1549/8 1579/1 1586/13
  1601/19 1602/18 1602/20 1602/21
  1614/18 1659/19 1663/25 1665/23
**function [1]** 1643/13
**fund [2]** 1617/4 1617/5
**fundamental [1]** 1641/16
**funds [9]** 1544/18 1545/12 1553/14
  1553/16 1554/9 1554/11 1616/14
  1635/16 1635/23
**furthered [2]** 1565/19 1637/9

**G**

**G-code [8]** 1543/20 1584/23 1588/17
  1588/17 1588/18 1588/19 1593/17
  1600/19
**G-codes [2]** 1593/10 1593/13
**gain [5]** 1588/9 1625/20 1626/9
  1652/20 1655/18
**game [6]** 1582/2 1582/3 1604/20
  1604/20 1605/1 1608/14
**Gega [3]** 1543/19 1582/17 1583/7
**Gega's [3]** 1543/24 1546/25 1583/12
**general [3]** 1567/24 1629/24 1631/22
  1633/21 1650/11
**gentleman [2]** 1589/22 1599/14
**gentlemen [1]** 1595/3
**geriatric [3]** 1558/7 1558/14 1607/14
**gets [3]** 1583/11 1583/12 1664/16
**Ghana [1]** 1612/3
**Gilfarb [20]** 1542/2 1549/11 1549/15
  1558/19 1574/1 1576/10 1577/19
  1578/18 1578/21 1592/10 1599/15
  1603/3 1603/22 1608/13 1610/9
  1662/23 1665/24 1682/13 1683/3
  1683/5
**Gilfarb's [2]** 1543/8 1671/9
**girl [1]** 1582/17
**girlfriend [2]** 1584/9 1606/2
**glaring [1]** 1648/18
**goals [2]** 1630/5 1632/3
**golden [1]** 1613/21
**Goldstein [3]** 1584/18 1584/19
  1603/9
**golf [3]** 1605/1 1605/5 1605/9
**gonna [57]**
**Good-bye [1]** 1660/14
**good-faith [5]** 1569/3 1570/4
  1616/17 1639/16 1640/1
**goodness [1]** 1592/21

1692

**G**

**goods [1]** 1654/15
**gotcha [4]** 1554/7 1604/20 1604/20 1605/1
**gotta [1]** 1613/13
**gotten [1]** 1659/12
**govern [2]** 1550/17 1640/14
**governed [1]** 1563/6
**governing [3]** 1628/11 1628/12 1631/15
**government [104]**
**government's [27]** 1543/11 1550/2 1554/8 1554/10 1561/7 1562/16 1563/13 1563/14 1567/9 1567/13 1567/22 1571/11 1574/5 1580/23 1592/3 1606/14 1617/4 1619/10 1619/12 1622/14 1622/16 1645/7 1672/2 1672/2 1673/13 1674/9 1677/24
**Government's 34 [1]** 1619/12
**governments [1]** 1596/19
**governs [1]** 1561/2
**grand [1]** 1598/7
**Grant [2]** 1586/8 1611/22
**Grant's [1]** 1589/10
**great [2]** 1575/16 1588/13
**greater [3]** 1583/21 1615/4 1627/4
**green [1]** 1605/3
**gross [1]** 1636/4
**grounds [1]** 1644/9
**Gs [4]** 1582/22 1582/25 1583/6 1616/15
**guidance [1]** 1571/15
**guide [1]** 1611/1
**guideline [1]** 1579/16
**guidelines [5]** 1572/3 1640/13 1640/16 1641/7 1641/14
**guilt [6]** 1553/13 1622/7 1622/12 1622/15 1622/17 1626/2
**guilties [1]** 1664/21
**guilty [72]**
**gun [1]** 1614/9

**H**

**half [4]** 1576/15 1601/10 1652/10 1655/7
**half-truth [2]** 1652/10 1655/7
**hamburgers [1]** 1614/18
**hand [11]** 1556/4 1559/10 1580/7 1581/14 1581/17 1581/17 1588/5 1613/15 1614/10 1681/10 1681/11
**hands [1]** 1612/10
**happy [1]** 1602/9
**hardest [3]** 1598/6 1598/13 1608/18
**harm [7]** 1606/21 1616/24 1616/25 1617/3 1617/3 1617/4 1617/5
**harmful [1]** 1669/18
**harms [1]** 1617/8
**Harvard [2]** 1600/9 1600/14
**hate [1]** 1610/23
**he'd [1]** 1588/2
**he'll [1]** 1596/14
**he/she [1]** 1581/1
**head [4]** 1588/4 1600/9 1608/2

1608/3
**health [1]** 1641/18
**healthcare [71]**
**hear [16]** 1545/1 1578/24 1579/18 1593/22 1594/22 1597/20 1597/20 1600/16 1601/8 1610/21 1617/23 1620/5 1666/18 1668/11 1668/15 1672/19
**heard [48]**
**hearing [3]** 1548/1 1594/22 1648/2
**heart [3]** 1614/17 1629/5 1630/22
**heartbreaking [1]** 1605/25
**heavy [1]** 1622/14
**helicopter [2]** 1603/18 1604/13
**help [2]** 1610/11 1651/25
**helped [1]** 1637/4
**helpful [2]** 1626/17 1666/8
**hemmed [1]** 1592/8
**here's [4]** 1588/7 1602/24 1613/24 1649/5
**hereby [1]** 1683/19
**Hernandez [2]** 1582/16 1583/7
**heroin [4]** 1552/10 1552/11 1552/15 1615/6
**hesitate [3]** 1607/7 1612/8 1646/21
**hesitated [1]** 1607/6
**hesitation [4]** 1596/15 1596/16 1606/18 1622/23
**Hewett [7]** 1584/9 1592/13 1592/19 1605/23 1605/25 1614/2 1617/3
**Hewett's [1]** 1564/25
**Hey [6]** 1587/3 1598/10 1600/22 1601/1 1603/19 1608/20
**hidden [1]** 1590/22
**hide [3]** 1590/16 1616/12 1616/13
**hiding [2]** 1599/22 1617/5
**high [2]** 1617/7 1643/11
**high-intensity [1]** 1643/11
**hire [1]** 1599/25
**hired [5]** 1590/11 1590/13 1600/5 1600/9 1601/18
**history [3]** 1595/24 1596/9 1597/5
**Hit [1]** 1591/5
**hog [1]** 1617/7
**hold [2]** 1606/7 1672/23
**home [8]** 1611/3 1666/23 1667/1 1679/3 1679/4 1679/5 1681/5 1681/10
**homes [1]** 1678/21
**honest [3]** 1603/25 1646/23 1675/21
**honestly [1]** 1616/10
**Honor [90]**
**Honorable [1]** 1541/14
**hooker [1]** 1588/23
**hookers [1]** 1607/19
**hoops [1]** 1604/11
**hope [2]** 1551/2 1626/9
**hopefully [1]** 1668/8
**hopes [1]** 1625/20
**Horenstein [2]** 1542/13 1542/13
**hours [2]** 1677/4 1680/24
**house [1]** 1585/16
**houses [3]** 1607/9 1607/10 1616/14
**Hum [1]** 1584/3

**human [1]** 1641/20
**hundred [3]** 1543/17 1543/22 1565/21
**hungry [2]** 1666/23 1681/5
**hurt [2]** 1581/17 1581/18
**hurts [1]** 1581/14

**I**

**I'd [1]** 1660/3
**I'll [47]**
**I'm [55]**
**I've [9]** 1548/25 1553/18 1610/3 1621/17 1623/6 1648/8 1659/14 1672/16 1679/21
**Ibuprofen [1]** 1600/25
**idea [2]** 1586/22 1619/22
**identifying [1]** 1680/14
**identities [2]** 1629/21 1631/20
**ignore [1]** 1597/9
**ignoring [1]** 1599/21
**II [5]** 1558/11 1558/16 1558/17 1583/22 1642/21
**illegal [7]** 1545/19 1546/4 1554/20 1565/20 1611/14 1611/15 1637/10
**illicit [8]** 1544/5 1544/12 1545/23 1545/23 1546/1 1546/23 1547/11 1547/13
**imagine [3]** 1590/23 1594/6 1603/9
**immunity [1]** 1626/8
**impact [2]** 1654/14 1657/20
**impaired [1]** 1626/7
**impartially [1]** 1622/19
**impeachment [1]** 1560/2
**impress [2]** 1609/8 1624/7
**impression [1]** 1627/5
**inaccurately [1]** 1625/7
**inadequate [1]** 1643/22
**inappropriate [3]** 1568/12 1643/22 1675/10
**incentive [1]** 1587/10
**include [4]** 1570/16 1571/9 1649/9 1651/8
**included [15]** 1557/1 1557/4 1564/11 1564/17 1566/3 1566/10 1566/10 1566/16 1566/21 1566/25 1567/1 1601/18 1601/19 1650/19 1673/20
**includes [7]** 1623/3 1627/6 1641/24 1642/13 1652/1 1654/10 1654/23
**including [8]** 1551/3 1551/8 1561/12 1633/8 1636/4 1641/18 1644/1 1678/21
**inclusion [1]** 1567/24
**inconsistent [1]** 1608/24
**incrementally [1]** 1587/25
**increments [1]** 1593/16
**incumbent [1]** 1553/3
**independent [2]** 1627/1 1669/23
**INDEX [1]** 1683/1
**indicate [2]** 1544/11 1584/17
**indicated [4]** 1548/5 1556/19 1572/5 1616/24
**indicates [1]** 1649/17
**indicating [4]** 1596/23 1596/24 1605/4 1611/25

## I

**indictment [29]**
**indifference [2]** 1652/7 1655/4
**indirectly [1]** 1636/3
**individual [3]** 1644/10 1654/10 1654/10
**infects [1]** 1611/16
**infer [2]** 1547/16 1547/17
**influence [2]** 1652/15 1655/12
**influenced [2]** 1621/24 1627/2
**informant [1]** 1607/21
**informant's [1]** 1601/8
**information [2]** 1580/16 1606/20
**Ingber [2]** 1647/23 1656/7
**innocence [1]** 1622/8
**innocent [2]** 1622/8 1625/8
**insert [1]** 1670/11
**instead [7]** 1571/21 1571/22 1571/23 1604/25 1607/18 1639/7 1658/16
**instilled [1]** 1604/2
**Institute [2]** 1558/7 1558/14
**institution [4]** 1635/24 1636/1 1637/9 1637/15
**institutions [3]** 1565/19 1636/22 1637/8
**instruct [11]** 1561/10 1562/10 1565/12 1569/24 1572/5 1602/5 1609/19 1609/21 1621/16 1672/1 1675/13
**instructing [4]** 1569/8 1571/18 1572/13 1678/4
**instruction [56]**
**instruction 4 [1]** 1559/25
**instructions [33]**
**instrument [1]** 1635/24
**insufficient [2]** 1545/22 1547/14
**insurance [3]** 1551/12 1551/14 1601/1
**insured [1]** 1636/1
**integral [1]** 1643/3
**intended [5]** 1578/17 1652/2 1653/2 1654/4 1654/24
**intends [1]** 1665/24
**intensity [1]** 1643/11
**intent [15]** 1632/11 1638/25 1639/1 1644/16 1645/19 1645/22 1651/22 1652/8 1652/11 1652/19 1652/19 1655/5 1655/8 1655/16 1655/17
**intentional [1]** 1625/9
**intentionally [6]** 1628/1 1632/23 1637/15 1638/1 1638/9 1645/16
**intentions [1]** 1597/4
**interest [5]** 1558/7 1624/11 1633/5 1642/9 1647/1
**interests [5]** 1630/5 1632/3 1641/19 1642/11 1642/16
**Internet [1]** 1660/22
**interpretation [1]** 1623/11
**interpretations [1]** 1571/14
**interrogation [2]** 1595/15 1595/15
**interruptions [3]** 1656/15 1656/17 1656/18
**interstate [17]** 1558/15 1635/25 1651/13 1651/25 1652/25 1653/7

1654/1 1654/13 1654/18 1654/19 1654/21 1654/22 1657/4 1657/9 1657/17 1657/19 1657/22
**intervening [2]** 1561/11 1561/13
**interviews [1]** 1597/21
**intractable [3]** 1573/5 1642/17 1642/22
**introduce [1]** 1676/22
**introduced [10]** 1544/10 1547/1 1674/17 1674/19 1674/24 1675/8 1675/19 1675/20 1676/2 1676/3
**introduction [2]** 1561/7 1561/17
**investigation [2]** 1597/13 1643/20
**invited [1]** 1547/23
**invoked [1]** 1548/21
**IRS [1]** 1616/13
**island [1]** 1610/24
**issue [21]** 1543/8 1543/17 1544/2 1544/19 1545/5 1546/9 1548/7 1550/21 1554/22 1571/1 1571/6 1571/7 1571/16 1572/11 1579/11 1579/22 1580/19 1620/11 1623/7 1665/5 1677/23
**issued [1]** 1580/12
**issues [5]** 1572/9 1572/10 1579/9 1634/1 1662/20
**issuing [1]** 1616/3
**item [2]** 1593/5 1654/9 1654/11
**items [2]** 1619/18 1654/6

## J

**J.F [1]** 1565/7
**J.H [6]** 1565/6 1628/5 1628/6 1632/18 1633/1 1658/25
**J.H.'s [3]** 1548/2 1566/14 1634/24
**jail [2]** 1589/12 1609/6
**James [6]** 1564/25 1584/9 1592/13 1605/23 1605/25 1617/3
**January [1]** 1558/8
**January 1st [1]** 1558/8
**job [3]** 1595/10 1595/10 1610/5
**Johanna [2]** 1674/15 1680/22
**John [14]** 1589/15 1589/21 1590/4 1598/1 1599/13 1599/16 1600/24 1601/5 1607/21 1608/4 1608/18 1611/22 1613/3 1613/22
**joined [4]** 1629/19 1629/25 1631/11 1631/23
**joins [1]** 1638/1
**Jr [1]** 1542/9
**judge [47]**
**judge's [2]** 1669/3 1670/6
**judges [2]** 1646/25 1647/1
**judging [1]** 1581/25
**judgment [13]** 1550/11 1550/22 1551/23 1554/17 1580/17 1581/6 1581/13 1581/19 1642/14 1642/15 1664/10 1666/5 1666/7
**July [1]** 1585/20
**July 25th [1]** 1585/20
**jump [5]** 1600/1 1600/5 1604/11 1611/6 1659/12
**June [3]** 1541/7 1543/1 1619/1
**junk [7]** 1603/23 1603/23 1603/25

1604/17 1613/7 1613/9 1613/10
**jurisdiction [1]** 1633/16
**juror [3]** 1550/15 1559/13 1659/17
**jurors [10]** 1557/12 1621/3 1627/3 1646/19 1647/21 1656/21 1660/12 1667/23 1678/23 1681/11
**jury [113]**
**jury's [4]** 1659/23 1660/7 1664/20 1678/18
**Justice [2]** 1542/6 1595/6
**justify [2]** 1574/11 1579/20

## K

**Karen [10]** 1565/25 1650/24 1658/7 1663/24 1665/15 1667/24 1668/1 1672/23 1673/12 1682/8
**keep [8]** 1576/25 1579/8 1587/21 1599/17 1601/25 1608/9 1610/11 1625/4
**keeps [1]** 1612/17
**keys [2]** 1592/20 1609/6
**kicked [2]** 1545/6 1664/16
**kidding [3]** 1598/8 1598/15 1600/15
**kids [4]** 1594/8 1599/4 1605/6 1605/24
**kinds [2]** 1635/9 1678/22
**Klaudia [2]** 1543/19 1582/17
**knee [4]** 1584/1 1603/17 1615/4 1615/6
**knees [1]** 1604/16
**knowing [3]** 1629/20 1631/19 1638/14
**knowingly [19]** 1574/19 1627/18 1627/20 1627/25 1628/8 1628/9 1628/19 1630/14 1632/22 1634/16 1635/14 1636/20 1637/4 1638/25 1645/15 1651/18 1653/13 1653/21 1655/25
**knowledge [4]** 1554/13 1623/18 1626/17 1644/8
**knows [7]** 1581/10 1582/22 1583/4 1583/17 1586/11 1652/7 1655/4
**Kool [1]** 1615/8
**Kool-Aid [1]** 1615/8
**Kye [3]** 1589/14 1599/12 1599/12

## L

**labeling [1]** 1633/10
**lack [5]** 1593/15 1672/3 1676/16 1676/25 1680/20
**ladies [1]** 1595/3
**language [2]** 1552/5 1568/1
**languages [1]** 1600/12
**lapse [1]** 1625/8
**large [2]** 1583/13 1675/24
**latest [1]** 1658/8
**latitude [4]** 1568/20 1602/6 1615/18 1639/10
**LAUDERDALE [3]** 1541/3 1541/7 1542/18
**laughed [4]** 1598/10 1598/11 1598/12 1598/12
**Laughter [2]** 1659/7 1681/13
**laundered [1]** 1665/11

**L**

**laundering [16]** 1543/11 1544/2
1544/3 1544/23 1544/24 1548/8
1553/11 1553/25 1563/22 1628/8
1635/10 1664/8 1664/9 1664/16
1665/20 1665/21
**law [33]**
**lawful [2]** 1625/18 1633/8
**lawfully [1]** 1634/5
**laws [3]** 1640/13 1640/16 1641/13
**lawyer [1]** 1611/17
**lawyers [8]** 1555/12 1556/11 1559/5
1566/2 1579/11 1623/5 1627/7
1666/18
**lead [1]** 1609/14
**learned [1]** 1601/15
**leave [13]** 1567/1 1567/4 1567/18
1567/20 1573/22 1573/24 1586/13
1588/3 1588/4 1613/24 1647/23
1659/18 1667/4
**leaves [2]** 1591/1 1656/18
**led [1]** 1649/18
**legacy [1]** 1596/10
**legal [4]** 1551/9 1555/14 1623/21
1669/9
**legitimate [32]**
**leisure [1]** 1620/9
**lenity [1]** 1550/18
**lesser [12]** 1557/1 1557/4 1564/11
1564/17 1566/3 1566/9 1566/10
1566/16 1566/21 1566/25 1566/25
1625/17
**lessors [1]** 1564/13
**lethal [1]** 1592/17
**liability [2]** 1545/14 1642/4
**liable [4]** 1550/21 1552/17 1569/2
1639/16
**liars [1]** 1603/14
**liberties [1]** 1596/4
**license [3]** 1603/2 1612/25 1616/17
**licensed [9]** 1551/3 1558/10 1558/12
1603/5 1616/21 1633/15 1640/17
1641/5 1546/15
**lieutenants [1]** 1611/24
**life [5]** 1555/14 1595/21 1597/1
1597/2 1641/20
**light [3]** 1551/24 1573/18 1607/3
**liked [1]** 1597/16
**limited [1]** 1561/12
**list [5]** 1591/19 1636/24 1674/16
1674/18 1674/23
**Listen [1]** 1606/5
**literally [3]** 1601/9 1601/10 1604/8
**lobby [1]** 1598/20
**local [1]** 1643/21
**location [1]** 1643/7
**long-winded [1]** 1591/25
**lose [1]** 1611/3
**loser [1]** 1611/2
**losers [2]** 1595/10 1595/19
**loses [1]** 1611/4
**loss [2]** 1652/21 1655/18
**Louis [1]** 1542/10
**lousy [1]** 1555/25

**ludicrous [1]** 1615/24
**lunch [2]** 1617/11 1617/15
**Luncheon [1]** 1618/6
**lying [3]** 1587/24 1588/8 1589/23

**M**

**main [1]** 1579/22
**maintains [1]** 1544/9
**majority [1]** 1567/25
**maker [2]** 1652/16 1655/13
**male [2]** 1581/1 1581/2
**Mallak [5]** 1606/19 1606/23 1607/3
1607/6 1614/4
**malpractice [3]** 1569/8 1602/8
1634/14
**man [2]** 1604/4 1607/25
**man's [2]** 1597/1 1597/2
**management [2]** 1572/21 1600/10
1600/11 1641/22 1642/2 1643/19
**manager [1]** 1582/18
**manipulate [1]** 1589/20
**manipulative [2]** 1603/8 1606/1
**manipulators [1]** 1603/14
**manner [8]** 1551/10 1614/5 1614/6
1614/7 1629/16 1648/4 1649/2
1649/18
**manpower [1]** 1596/20
**manufacture [2]** 1633/21 1633/23
**map [2]** 1605/2 1605/3
**Marcos [1]** 1542/9
**Marrero [8]** 1583/20 1583/23
1583/24 1592/1 1604/6 1604/9
1613/7 1613/12
**marshal [2]** 1647/18 1647/19
**MAs [1]** 1600/19
**massive [2]** 1591/13 1678/20
**master [1]** 1585/16
**mastermind [2]** 1598/19 1607/23
**material [13]** 1549/19 1651/21
1652/6 1652/10 1652/12 1652/14
1652/24 1654/3 1655/1 1655/3
1655/7 1655/9 1655/11
**math [1]** 1546/11
**matter [17]** 1548/22 1552/16 1553/2
1580/6 1583/2 1604/23 1621/1
1624/4 1626/19 1629/10 1631/2
1636/9 1636/15 1652/16 1655/13
1663/18 1683/22
**matters [1]** 1623/12
**maximum [1]** 1611/22
**mean [34]**
**meaning [1]** 1632/13
**meaningless [1]** 1615/25
**means [25]** 1605/11 1609/20
1614/21 1615/8 1627/8 1633/3
1633/6 1633/11 1633/14 1635/22
1636/1 1636/2 1637/12 1642/17
1645/15 1645/18 1649/3 1649/18
1653/2 1653/17 1653/24 1654/7
1655/16 1655/15 1670/1
**measure [7]** 1570/17 1580/17 1581/5
1581/12 1595/22 1596/1 1640/10
**mechanical [1]** 1541/24
**media [2]** 1679/11 1681/25

**Medicaid [1]** 1558/13
**medical [90]**
**medically [1]** 1615/25 1643/5
**Medicare [21]** 1543/9 1547/24
1558/13 1584/21 1584/25 1585/2
1585/6 1593/6 1593/7 1593/9
1593/15 1593/18 1593/19 1617/5
1638/20 1639/1 1674/12 1675/6
1675/25 1678/21 1680/18
**Medicare's [2]** 1638/16 1638/23
**medication [1]** 1615/9
**medications [2]** 1584/1 1606/13
**medicine [15]** 1550/17 1573/25
1602/5 1602/15 1602/17 1602/21
1602/25 1605/19 1606/10 1608/13
1608/15 1616/8 1640/18 1641/8
1643/14
**meet [1]** 1598/20
**meeting [2]** 1585/20 1600/21
**meetings [1]** 1582/24
**member [4]** 1628/25 1629/1 1630/17
1630/18
**members [21]** 1558/5 1559/1
1568/14 1578/23 1585/13 1585/25
1593/21 1610/14 1611/7 1616/22
1617/8 1617/10 1621/15 1629/3
1629/4 1629/10 1630/20 1630/21
1631/2 1647/4 1651/4
**memories [1]** 1627/5
**memory [6]** 1624/13 1625/8 1626/7
1626/24 1661/22 1675/18
**men [2]** 1595/25 1597/6
**MENCIA [71]**
**Mencia's [15]** 1543/7 1553/24
1577/23 1583/19 1592/18 1598/2
1598/5 1598/22 1608/20 1611/19
1613/8 1619/4 1667/21 1668/24
1674/5
**Mensah [10]** 1585/5 1586/8 1589/15
1599/13 1599/16 1600/24 1607/21
1613/3 1613/22 1613/23
**mental [1]** 1641/25
**merciful [1]** 1612/2
**mercy [8]** 1611/21 1611/21 1611/22
1611/22 1612/1 1612/3 1612/5
1612/6
**merely [5]** 1630/4 1632/2 1638/14
1638/22 1644/20
**message [1]** 1647/18
**messages [4]** 1582/13 1582/20
1583/2 1588/22
**method [1]** 1551/9
**Miami [5]** 1542/5 1542/12 1542/15
1556/16 1556/17
**Miami-Dade [1]** 1556/16
**Michael [2]** 1542/2 1579/1
**microbomb [1]** 1592/6
**microphone [2]** 1543/15 1595/5
**Mike [1]** 1658/5
**million [1]** 1665/11
**mills [1]** 1591/11
**minimize [2]** 1656/14 1656/17
**minor [2]** 1629/23 1631/21
**minute [3]** 1559/2 1593/16 1597/15

## M

**minutes [16]** 1557/5 1559/6 1576/7 1576/9 1576/13 1576/14 1576/17 1576/19 1576/24 1577/2 1577/4 1592/9 1593/18 1610/12 1610/13 1667/6
**miss [4]** 1588/16 1588/20 1588/21 1589/5
**missed [1]** 1605/16
**missing [3]** 1594/9 1594/12 1657/8
**misstated [1]** 1625/7
**misstatement [1]** 1625/10
**mistake [11]** 1551/16 1573/16 1602/12 1602/22 1608/12 1608/12 1614/13 1614/25 1625/4 1645/16 1648/18
**mistakes [2]** 1571/4 1602/20
**mixed [3]** 1545/22 1546/20 1594/9
**mixture [3]** 1627/23 1628/3 1632/16
**mode [1]** 1642/14
**modest [1]** 1587/7
**modified [6]** 1562/1 1562/4 1562/5 1562/6 1649/7 1649/9
**modify [1]** 1573/16
**moment [13]** 1580/3 1581/7 1583/21 1585/7 1585/18 1587/1 1589/14 1591/16 1612/8 1628/12 1631/17 1656/5 1677/25
**monetary [6]** 1545/15 1546/6 1635/15 1635/22 1635/23 1636/13
**money [52]**
**monitoring [1]** 1601/24
**month [7]** 1543/18 1543/21 1543/23 1544/17 1554/19 1565/21 1637/11
**months [2]** 1543/21 1678/16
**Moore [1]** 1665/15
**moot [3]** 1664/21 1666/4 1666/4
**moral [1]** 1609/4
**morning [8]** 1543/3 1543/4 1547/24 1579/4 1595/3 1603/4 1603/4 1666/24
**Moskaleva [2]** 1647/23 1656/6
**mother [2]** 1599/4 1612/5
**motion [7]** 1543/10 1544/25 1551/20 1551/22 1552/3 1553/9 1554/5
**motions [2]** 1550/8 1609/8
**mouth [1]** 1614/15
**move [3]** 1544/21 1595/4 1608/9
**moved [1]** 1549/12
**movement [2]** 1654/14 1657/21
**moves [4]** 1550/10 1551/23 1554/17 1579/8
**Mr [3]** 1683/3 1683/4 1683/5
**Mr. [46]**
**Mr. Beaton [13]** 1556/13 1558/22 1576/2 1576/6 1577/3 1578/20 1594/3 1594/25 1595/4 1663/23 1673/15 1675/17 1676/13
**Mr. Beaton's [1]** 1620/15
**Mr. Gilfarb [16]** 1549/11 1549/15 1558/19 1574/1 1576/10 1577/19 1578/18 1578/21 1592/10 1599/15 1603/3 1603/22 1608/13 1610/9 1662/23 1682/13

**Mr. Gilfarb's [2]** 1543/8 1671/9
**Mr. Hewett [1]** 1614/2
**Mr. Mencia's [1]** 1543/7
**Mr. Mensah [2]** 1585/5 1586/8
**Mr. Rodriguez [7]** 1585/4 1585/21 1586/7 1587/11 1588/17 1611/21 1612/3
**Mr. Yoffie [3]** 1577/14 1610/10 1667/9
**Mrs. [3]** 1647/23 1647/23 1656/6
**Mrs. Ingber [1]** 1647/23
**Mrs. Moskaleva [2]** 1647/23 1656/6
**Ms. [5]** 1543/24 1546/25 1586/8 1611/22 1656/7
**Ms. Gega's [2]** 1543/24 1546/25
**Ms. Grant [2]** 1586/8 1611/22
**Ms. Ingber [1]** 1656/7
**multiple [1]** 1574/25
**mutually [1]** 1549/17

## N

**N.E [1]** 1542/4
**N.W [1]** 1542/8
**Nadira [9]** 1589/10 1598/1 1598/17 1599/2 1601/5 1601/10 1607/24 1608/3 1608/17
**Nadira's [1]** 1590/6
**name [2]** 1548/23 1616/15
**named [3]** 1600/10 1629/3 1630/20
**namely [2]** 1627/23 1628/3
**names [2]** 1629/21 1631/19
**narrative [1]** 1601/3
**narrow [1]** 1579/9
**national [3]** 1563/5 1640/15 1678/17
**natural [2]** 1652/15 1655/12
**nature [3]** 1636/10 1652/23 1655/21
**near [1]** 1601/11
**necessary [5]** 1566/12 1621/21 1633/10 1643/5 1676/19
**necessity [4]** 1603/17 1649/11 1672/4 1679/8
**negligently [1]** 1634/15
**negotiating [2]** 1590/8 1613/22
**nervous [1]** 1611/11
**news [6]** 1678/19 1679/10 1679/11 1681/24 1681/25 1682/1
**newspaper [1]** 1679/12
**nexus [2]** 1665/18 1665/18
**nice [4]** 1617/15 1660/11 1671/8 1682/2
**nine [9]** 1606/20 1678/13 1678/19 1679/7 1681/15 1682/3 1682/6 1682/10 1682/20
**nine o'clock [5]** 1679/7 1681/15 1682/3 1682/10 1682/20
**Ninth [1]** 1553/19
**nobody [4]** 1586/11 1606/24 1615/1 1679/3
**none [3]** 1547/22 1549/19 1604/2
**nonsegregated [1]** 1545/12
**nonsense [1]** 1586/24
**Nope [1]** 1575/6
**normal [1]** 1591/4 1653/10
**normally [4]** 1554/13 1574/13

1625/17 1653/8
**Northwest [1]** 1542/11
**note [10]** 1616/18 1628/13 1668/25 1669/1 1672/15 1672/17 1674/6 1679/21 1679/22 1679/22
**notes [11]** 1560/13 1579/6 1589/7 1589/8 1589/9 1626/22 1626/24 1626/25 1627/2 1627/4 1680/25
**nothing's [1]** 1617/21
**notice [1]** 1550/19
**noticed [1]** 1662/2
**notwithstanding [4]** 1544/25 1551/8 1642/19 1664/10
**nowhere [1]** 1601/11
**number [14]** 1550/12 1559/15 1566/8 1566/13 1624/3 1627/14 1656/17 1658/24 1659/4 1667/4 1669/6 1669/14 1670/1 1671/7
**number 1 [5]** 1559/15 1669/6 1669/14 1670/1 1671/7
**Number 3 [2]** 1566/8 1566/13
**number 4 [1]** 1658/24
**Number one [1]** 1550/12
**numbers [2]** 1545/17 1598/21
**nurses [1]** 1678/22
**NW [1]** 1542/14

## O

**O drive [1]** 1658/21
**o'clock [10]** 1666/19 1666/20 1668/12 1672/20 1679/7 1681/3 1681/15 1682/3 1682/10 1682/20
**oath [4]** 1604/5 1616/23 1616/23 1617/7
**object [12]** 1562/21 1567/24 1567/25 1568/1 1570/24 1615/16 1631/12 1673/7 1674/25 1675/16 1677/12 1682/17
**objection [31]**
**objectionable [1]** 1549/19
**objections [3]** 1559/13 1563/18 1573/13
**observe [1]** 1624/15
**obtain [2]** 1651/19 1653/23
**obtained [6]** 1552/9 1552/11 1636/3 1636/11 1636/13 1636/17
**obverse [1]** 1673/5
**occasion [3]** 1588/24 1630/1 1631/24
**OD [1]** 1614/12
**odds [1]** 1592/8
**offense [12]** 1561/8 1561/17 1564/17 1566/10 1566/10 1567/1 1626/2 1628/14 1629/14 1632/10 1635/12 1653/19
**offenses [8]** 1557/1 1557/4 1564/11 1566/4 1566/25 1628/12 1628/15 1644/18
**offer [1]** 1644/23
**offers [1]** 1587/17
**office [6]** 1542/3 1585/15 1594/19 1598/22 1659/23 1663/3
**officer [2]** 1645/6 1659/16
**officers [1]** 1644/14

**O**

**Official [2]** 1542/16 1683/24
**Oftentimes [1]** 1611/8
**oh [12]** 1556/6 1567/15 1586/23
1587/18 1611/9 1612/11 1613/3
1613/14 1657/15 1659/6 1663/11
1663/24
**one's [4]** 1560/1 1560/14 1575/4
1575/7
**open [4]** 1586/10 1586/11 1586/15
1614/18
**opening [3]** 1578/19 1613/6 1616/24
**operate [1]** 1603/20
**ophthalmologist [1]** 1545/11
**opinion [10]** 1572/8 1591/2 1605/14
1616/6 1623/7 1626/18 1626/20
1626/21 1646/21 1666/4
**opioid [1]** 1644/1
**opportunities [1]** 1647/8
**opportunity [8]** 1554/3 1610/15
1624/14 1626/24 1644/21 1645/3
1659/8 1673/10
**opposed [2]** 1571/19 1661/16
**option [5]** 1557/3 1557/3 1564/13
1678/6 1680/7
**options [1]** 1664/19
**opulence [1]** 1587/8
**order [4]** 1625/21 1626/11 1633/8
1637/17
**ordering [1]** 1644/5
**Ordinarily [1]** 1637/22
**organization [1]** 1611/24
**original [1]** 1620/1
**Oscar [14]** 1587/13 1587/13 1587/24
1598/1 1598/6 1598/10 1598/11
1598/19 1601/5 1601/10 1607/17
1608/1 1608/3 1608/17
**Oscar's [1]** 1590/5
**outcome [1]** 1624/12
**overdose [1]** 1552/16
**overprescribing [1]** 1603/1
**overreach [4]** 1596/20 1597/3 1597/6
1597/11
**overreaching [1]** 1596/19
**overrule [1]** 1574/3
**owned [2]** 1653/16 1653/23
**ownership [1]** 1558/6
**oxycodone [25]** 1552/21 1552/24
1558/16 1565/5 1566/14 1580/21
1581/9 1584/4 1592/14 1592/17
1592/18 1593/2 1593/3 1613/15
1614/6 1614/13 1615/4 1615/5
1627/24 1628/4 1628/5 1628/6
1630/14 1632/12 1632/17
**oxycodones [1]** 1592/20
**Oxycontin [1]** 1558/17

**P**

**P.A [1]** 1542/10
**p.m [9]** 1619/1 1656/25 1667/18
1667/18 1668/20 1668/20 1674/1
1674/1 1682/25
**packaging [1]** 1633/9
**packet [3]** 1650/20 1651/9 1663/18

**pad [1]** 1585/14
**pads [2]** 1588/6 1588/7
**page [9]** 1559/15 1559/17 1559/19
1559/20 1559/22 1562/22 1562/23
1659/1 1683/2
**pain [20]** 1572/21 1573/5 1581/10
1593/2 1600/10 1600/11 1603/21
1604/15 1613/16 1642/2 1642/17
1642/17 1642/22 1643/16 1643/18
1643/20 1643/23 1644/6 1644/8
1644/9
**pair [2]** 1605/11 1605/15
**palliative [5]** 1572/9 1572/17 1572/21
1641/22 1642/2
**paper [1]** 1585/16
**paragraph [12]** 1562/25 1568/5
1657/16 1657/18 1669/6 1669/14
1669/25 1670/4 1670/7 1671/2
1671/6 1671/7
**paragraph 6 [6]** 1669/6 1669/14
1669/25 1670/4 1670/7 1671/7
**paragraphs [1]** 1670/8
**Paralegal [1]** 1542/10
**parameters [2]** 1579/20 1643/8
**paraphrasing [1]** 1561/2
**parent [1]** 1598/18
**Parker [2]** 1544/11 1547/1
**part [17]** 1565/19 1576/16 1576/20
1576/21 1576/23 1593/24 1606/17
1624/3 1629/23 1631/21 1634/5
1637/10 1643/3 1643/19 1648/23
1666/3 1676/20
**partial [1]** 1545/12
**participant [1]** 1638/13
**participate [1]** 1637/13
**participated [2]** 1638/9 1651/18
**parties [1]** 1558/5
**partner [3]** 1558/6 1629/1 1630/18
**partnership [2]** 1628/25 1630/17
**party [1]** 1563/7
**party's [1]** 1560/25
**passing [1]** 1586/16
**pasted [1]** 1562/15
**patient [15]** 1551/6 1551/7 1580/9
1580/12 1583/22 1583/25 1585/2
1587/3 1600/21 1604/22 1613/11
1616/7 1634/6 1642/2 1642/16
**patient's [1]** 1572/10 1643/6
**patients [27]** 1556/18 1569/20
1583/19 1584/15 1584/25 1586/13
1586/23 1593/9 1593/17 1600/19
1601/16 1601/23 1604/22 1607/24
1613/8 1613/10 1634/16 1634/17
1639/4 1639/21 1641/24 1642/10
1642/12 1643/20 1643/23 1649/11
1650/4
**pattern [4]** 1554/19 1565/20 1637/10
1658/20
**pause [11]** 1543/5 1577/13 1607/4
1620/9 1648/10 1649/6 1650/15
1659/5 1660/23 1662/24 1670/15
**pay [3]** 1587/18 1593/18 1604/23
**payment [4]** 1551/9 1551/18 1654/6
1654/11

**payments [1]** 1636/25
**payors [1]** 1584/24
**Penthouse [1]** 1542/14
**people [40]**
**percent [3]** 1546/12 1593/16 1607/14
**Percocet [1]** 1558/17
**Perfect [1]** 1579/3
**perfected [1]** 1598/19
**perform [1]** 1659/13
**performed [1]** 1637/20
**perhaps [3]** 1574/10 1626/23 1678/9
**period [5]** 1543/18 1543/23 1554/19
1565/21 1637/11
**permitted [1]** 1626/22 1633/15
**person [37]**
**person's [2]** 1652/15 1655/12
**personal [5]** 1595/23 1598/20
1624/11 1652/20 1655/18
**personally [2]** 1637/20 1653/4
**personnel [1]** 1659/10
**persons [5]** 1628/23 1629/15
1630/15 1633/20 1654/15
**persuade [1]** 1644/15
**persuasion [1]** 1645/6
**pertaining [1]** 1641/17
**pertinent [3]** 1566/6 1572/7 1675/14
**pharmacist [3]** 1584/19 1584/20
1633/14
**pharmacy [1]** 1603/10
**phases [1]** 1588/1
**philosophy [1]** 1678/2
**phone [3]** 1549/13 1598/21 1620/10
**phones [3]** 1656/12 1656/13 1672/9
**photograph [1]** 1592/21
**phrase [1]** 1570/25
**phrasing [3]** 1571/8 1581/23 1581/24
**physical [9]** 1641/23 1641/24
1674/11 1675/5 1675/12 1675/14
1676/6 1676/9 1680/17
**physician [18]** 1551/3 1558/10
1558/12 1562/24 1570/22 1571/3
1603/5 1616/21 1633/14 1633/25
1634/3 1641/5 1641/15 1642/22
1642/22 1642/24 1643/1 1644/11
**physicians [2]** 1643/18 1643/23
**pick [2]** 1599/25 1610/7
**picked [2]** 1598/9 1612/15
**picture [2]** 1594/11 1594/13
**pictures [1]** 1607/9
**piece [5]** 1585/16 1594/12 1594/14
1594/15 1608/24
**pieces [4]** 1594/7 1594/9 1594/9
1594/11
**pigeons [2]** 1605/10 1605/13
**pill [9]** 1583/19 1584/5 1584/10
1584/18 1584/23 1585/9 1591/11
1593/7 1613/8
**pill-seeking [1]** 1613/8
**pills [4]** 1553/4 1558/17 1590/8
1614/15
**place [4]** 1546/24 1551/11 1588/19
1635/21
**Plaintiff [1]** 1541/7
**plan [25]** 1629/3 1629/5 1629/7

**P**

**plan... [22]** 1629/16 1629/19 1629/21 1629/23 1629/25 1629/25 1630/20 1630/22 1630/24 1631/8 1631/11 1631/12 1631/19 1631/21 1631/23 1631/23 1643/4 1644/4 1652/1 1654/8 1654/12 1654/23
**play [6]** 1591/5 1599/16 1599/19 1600/20 1605/5 1617/24
**played [2]** 1629/23 1631/21
**playing [3]** 1585/22 1585/24 1592/8
**plea [5]** 1625/14 1625/16 1625/18 1667/23 1668/1
**pleaded [1]** 1626/1
**plenty [2]** 1671/14 1671/17
**plopped [1]** 1583/13
**ploy [1]** 1614/12
**pocket [1]** 1588/17
**pockets [1]** 1601/5
**point [23]** 1543/10 1544/14 1545/5 1545/6 1548/6 1550/8 1552/9 1553/8 1554/5 1554/8 1563/5 1568/1 1576/20 1586/15 1588/3 1588/5 1604/15 1624/4 1648/9 1660/8 1675/10 1676/4 1681/1
**points [1]** 1568/11
**policy [2]** 1610/19 1610/25
**politics [1]** 1610/25
**poll [1]** 1612/11
**polling [3]** 1557/21 1578/7 1621/8
**poorly [3]** 1607/17 1608/4 1608/5
**pop [1]** 1588/4
**pops [2]** 1677/3 1680/24
**portion [3]** 1546/15 1562/21 1566/6
**portions [1]** 1549/17
**posed [2]** 1566/22 1566/23
**position [10]** 1543/11 1551/17 1563/13 1567/22 1573/18 1574/5 1580/23 1674/22 1676/13 1677/24
**possess [2]** 1632/11 1633/22
**possibility [2]** 1625/16 1674/19
**Post [1]** 1614/5
**Post-its [1]** 1614/5
**postulation [1]** 1581/12
**potential [1]** 1669/2
**power [1]** 1614/12
**PowerPoint [1]** 1577/16
**practice [74]**
**practices [1]** 1633/17
**practicing [3]** 1602/4 1641/6 1643/9
**practitioner [4]** 1633/8 1633/11 1633/14 1642/15
**practitioners [1]** 1642/1
**pre [5]** 1602/11 1602/13 1608/10 1608/14 1614/24
**pre-signed [1]** 1608/14
**pre-signing [4]** 1602/11 1602/13 1608/10 1614/24
**precise [3]** 1636/10 1652/23 1655/21
**prefer [2]** 1657/11 1676/6
**preferable [1]** 1557/10
**prejudice [4]** 1548/6 1554/5 1554/25 1621/25
**prejudicial [1]** 1675/3

**premise [1]** 1643/3
**premises [1]** 1592/22
**prepare [4]** 1633/10 1666/14 1677/4 1680/25
**prepared [3]** 1606/24 1647/6 1659/15
**preparing [1]** 1660/24
**prescribe [4]** 1558/11 1615/10 1639/4 1642/20
**prescribed [5]** 1562/24 1565/5 1634/3 1634/5 1649/11
**prescribing [10]** 1568/6 1569/20 1580/21 1633/8 1634/17 1639/8 1639/21 1643/25 1644/5 1644/9
**prescription [18]** 1568/24 1569/3 1570/2 1580/11 1580/16 1585/14 1585/15 1585/21 1586/1 1587/4 1588/6 1588/7 1592/22 1613/21 1634/1 1639/13 1639/17 1639/25
**prescriptions [10]** 1580/1 1580/8 1582/2 1585/12 1586/19 1602/12 1602/13 1608/11 1608/14 1616/3
**presence [12]** 1557/20 1558/1 1559/4 1578/6 1578/12 1617/13 1621/7 1621/13 1660/7 1679/10 1681/19 1681/21
**present [18]** 1543/7 1543/7 1553/3 1577/23 1577/23 1578/15 1619/4 1619/4 1630/3 1632/1 1638/10 1665/25 1667/21 1667/21 1668/24 1668/24 1674/5 1674/5
**presentation [4]** 1555/1 1558/21 1558/24 1595/16
**presented [1]** 1591/10 1621/24
**presents [1]** 1612/24
**preservation [1]** 1641/21
**presigned [5]** 1580/1 1580/8 1580/16 1582/2 1585/11
**presumes [1]** 1622/7
**pretend [1]** 1644/23
**pretenses [7]** 1651/20 1651/21 1652/3 1653/17 1653/25 1654/2 1654/25
**prevailing [2]** 1570/18 1640/11
**price [1]** 1601/20
**Prieto [1]** 1542/10
**principles [1]** 1643/14
**print [3]** 1650/24 1663/2 1667/9
**printed [3]** 1657/1 1657/7 1663/9
**printing [1]** 1663/3
**priority [1]** 1626/25
**prison [1]** 1605/22
**private [1]** 1654/8
**privilege [1]** 1551/11
**problem [7]** 1581/16 1591/9 1617/6 1671/18 1675/1 1675/24 1682/12
**problems [2]** 1574/20 1605/25
**procedurally [1]** 1661/8
**proceed [1]** 1558/3
**proceeding [4]** 1629/12 1631/4 1661/1 1661/9
**proceedings [5]** 1541/13 1541/24 1650/23 1682/25 1683/21
**proceeds [19]** 1544/6 1544/12

1544/21 1545/13 1545/20 1545/23 1545/23 1546/2 1546/4 1546/5 1546/23 1547/11 1547/13 1563/25 1635/16 1635/18 1636/2 1665/24 1666/1
**produce [1]** 1622/9
**produced [1]** 1541/25
**profession [1]** 1641/21
**professional [38]**
**professor [1]** 1600/9
**profit [1]** 1598/5
**program [13]** 1653/15 1653/17 1653/23 1653/24 1654/1 1654/7 1654/13 1654/14 1654/18 1657/4 1657/9 1657/19 1657/20
**prohibiting [1]** 1545/14
**prohibitions [1]** 1633/25
**promised [1]** 1626/8
**promises [7]** 1651/20 1651/21 1652/4 1653/18 1653/25 1654/3 1655/1
**promote [2]** 1642/9 1642/11
**promptly [1]** 1647/19
**proof [14]** 1546/7 1559/23 1566/10 1566/11 1615/5 1622/14 1622/16 1622/21 1622/21 1623/19 1630/5 1632/3 1638/8 1638/10
**proper [1]** 1625/18
**properties [2]** 1665/3 1665/9
**property [17]** 1545/15 1635/16 1635/17 1635/18 1636/2 1636/7 1636/11 1636/12 1636/15 1636/17 1647/24 1651/19 1652/3 1653/15 1653/23 1654/25 1664/25
**propose [3]** 1559/12 1562/3 1620/6
**proposed [12]** 1551/15 1560/14 1560/19 1561/7 1562/1 1562/1 1562/16 1661/1 1666/9 1666/9 1673/13 1673/14
**proposing [1]** 1546/19
**proposition [2]** 1552/15 1627/9
**propriety [1]** 1569/9
**prosecuted [2]** 1629/11 1631/3
**prosecution [6]** 1597/14 1602/18 1605/1 1605/21 1626/9 1642/4
**prosecutor [1]** 1615/16
**protected [2]** 1611/18 1611/19
**protection [1]** 1641/20
**protects [1]** 1596/18
**protocol [1]** 1620/6
**proud [1]** 1596/3
**prove [40]**
**proved [14]** 1568/10 1621/20 1622/24 1629/14 1631/6 1632/20 1634/10 1635/13 1637/3 1639/24 1649/19 1651/17 1653/20 1655/24
**proven [2]** 1553/23 1640/19
**proves [1]** 1641/11
**provide [4]** 1547/23 1625/19 1643/2 1643/4
**provided [3]** 1606/19 1643/8 1654/9
**provider [1]** 1642/3
**providers [3]** 1642/1 1642/12 1643/9
**provides [5]** 1579/25 1625/16

**P**

**provides... [3]** 1633/20 1643/1 1644/20
**providing [3]** 1544/18 1642/22 1654/11
**provision [1]** 1642/20
**provisions [2]** 1642/7 1644/12
**proximate [1]** 1564/24
**prudent [1]** 1642/24
**psychological [1]** 1641/23
**public [2]** 1620/3 1654/7
**published [2]** 1549/20 1585/13
**Publix [2]** 1583/14 1603/10
**pull [1]** 1606/4
**pulled [1]** 1663/2
**punish [1]** 1607/14
**punished [2]** 1551/13 1605/15
**punishment [2]** 1646/9 1646/11
**purported [1]** 1650/3
**purposely [1]** 1645/19
**purposes [6]** 1548/25 1628/25 1630/17 1634/12 1640/8 1650/5
**pursuant [2]** 1633/7 1683/19
**push [3]** 1588/12 1589/20 1680/23
**pusher [15]** 1570/23 1570/25 1571/2 1571/8 1571/14 1571/18 1571/19 1571/22 1596/8 1606/9 1606/10 1609/22 1609/24 1640/25 1641/3
**pushes [1]** 1677/3
**puts [1]** 1543/21
**puzzle [6]** 1594/3 1594/7 1594/9 1594/10 1594/12 1594/15

**Q**

**quagmire [1]** 1550/16
**quality [5]** 1609/9 1609/12 1609/15 1643/15 1643/19
**quarrel [1]** 1650/6
**quarter [1]** 1617/15
**question [33]**
**questioned [1]** 1582/14
**questioning [1]** 1597/15
**questions [9]** 1589/24 1591/24 1600/4 1600/21 1624/6 1624/16 1660/10 1674/6 1677/15
**QuickBooks [1]** 1583/13
**Quindoza [4]** 1584/21 1593/14 1674/15 1680/22
**quotations [1]** 1571/19
**quote [1]** 1584/15
**quote/unquote [1]** 1584/15
**quotes [1]** 1570/13

**R**

**race [2]** 1551/8 1615/23
**radio [7]** 1651/13 1651/24 1652/25 1653/1 1653/4 1653/7 1653/9
**raise [2]** 1612/10 1681/10
**raised [1]** 1681/11
**random [1]** 1546/8
**re [1]** 1646/21
**re-examine [1]** 1646/21
**reach [4]** 1623/14 1646/20 1666/20 1682/13

**reached [4]** 1558/5 1660/2 1660/7 1667/5
**react [1]** 1664/22
**reaction [1]** 1607/11
**read [16]** 1543/8 1545/19 1548/17 1554/1 1557/15 1563/24 1565/1 1565/13 1566/6 1594/21 1603/3 1648/20 1657/5 1657/6 1679/10 1681/24
**reading [1]** 1648/15
**ready [3]** 1577/5 1577/7 1666/14
**reasoning [1]** 1623/13
**reasons [2]** 1550/11 1555/17
**rebut [1]** 1610/17
**rebuttal [4]** 1548/25 1578/19 1610/14 1610/16
**recall [1]** 1641/9
**receipts [1]** 1636/4
**receive [1]** 1564/18
**received [1]** 1575/15
**recess [20]** 1559/2 1617/11 1618/2 1618/6 1666/18 1666/23 1667/2 1667/17 1667/18 1668/11 1668/20 1672/19 1673/24 1674/1 1679/3 1679/5 1681/6 1681/7 1681/14 1682/20
**reckless [2]** 1652/7 1655/4
**recognize [2]** 1594/13 1594/18
**recognized [5]** 1563/3 1570/6 1634/7 1640/3 1642/24
**recognizes [1]** 1643/14
**recollection [5]** 1589/9 1623/11 1627/1 1677/6 1681/2
**reconvening [1]** 1679/8
**record [29]**
**recorded [3]** 1541/24 1585/20 1587/22
**recording [1]** 1592/12
**records [3]** 1544/10 1546/25 1593/19
**recover [1]** 1581/16
**recovered [1]** 1585/15
**recovery [1]** 1643/6
**redact [1]** 1549/19
**redacted [3]** 1648/8 1674/18 1674/23
**redirect [2]** 1588/18 1591/2
**reduce [1]** 1554/20
**reducing [1]** 1611/22
**reduction [1]** 1609/9
**refer [1]** 1627/16
**referee [1]** 1682/10
**refers [1]** 1627/14
**reflect [1]** 1585/6
**refuse [1]** 1641/18
**registered [2]** 1633/15 1633/20
**registration [1]** 1633/24
**regulate [1]** 1602/17
**regulations [9]** 1550/16 1604/21 1604/24 1605/14 1638/16 1638/17 1638/21 1638/23 1638/24
**regulatory [1]** 1567/10 1567/14 1567/18 1643/21 1643/24 1659/3
**reject [1]** 1587/20
**relevant [5]** 1558/9 1558/13 1619/23 1638/24 1639/5

**relied [2]** 1652/16 1655/13
**relief [1]** 1643/17
**religion [1]** 1551/8
**rely [13]** 1549/14 1589/8 1613/19 1622/22 1626/21 1675/9 1675/18 1676/2 1676/15 1676/24 1677/5 1680/19 1681/1
**relying [3]** 1580/24 1581/3 1661/21
**remain [1]** 1656/7
**remaining [2]** 1576/18 1656/21
**remarkable [1]** 1599/24
**remember [9]** 1559/2 1579/7 1581/25 1587/25 1606/17 1617/11 1625/6 1646/25 1673/21
**remembers [1]** 1625/5
**remind [1]** 1665/25
**removed [1]** 1642/19
**render [1]** 1669/23
**renewed [2]** 1550/7 1550/10
**replace [1]** 1604/16
**reporter [6]** 1542/16 1542/16 1577/18 1677/3 1680/23 1683/24
**reporting [4]** 1628/10 1636/20 1637/6 1637/17
**reports [2]** 1607/1 1636/23
**representation [4]** 1652/5 1652/9 1655/2 1655/6
**representations [7]** 1651/20 1651/21 1652/4 1653/18 1653/25 1654/3 1655/1
**request [17]** 1549/16 1549/23 1560/22 1561/9 1565/12 1567/9 1567/16 1571/12 1571/12 1573/16 1574/5 1642/2 1649/8 1649/9 1650/1 1650/16 1677/10
**requested [6]** 1559/14 1562/5 1567/14 1567/21 1570/10 1572/1
**required [1]** 1558/24
**requirement [6]** 1628/10 1629/10 1631/2 1634/25 1636/21 1637/17
**requirements [1]** 1637/7
**research [3]** 1633/7 1633/12 1633/19
**residence [2]** 1665/10 1665/12
**residents [2]** 1642/8 1642/10
**respond [1]** 1647/19
**response [2]** 1543/8 1562/19
**Responsibilities [1]** 1573/1
**rest [8]** 1548/11 1549/6 1549/8 1550/4 1550/6 1556/19 1557/15 1666/6
**rested [1]** 1578/14
**restoration [1]** 1643/13
**restroom [1]** 1577/8
**rests [2]** 1558/21 1558/25
**result [5]** 1558/24 1592/16 1628/21 1642/5 1643/22
**resulted [4]** 1617/3 1628/5 1632/17 1633/1
**resulting [1]** 1634/23
**results [1]** 1614/25
**resume [2]** 1679/7 1681/16
**retained [1]** 1636/3
**retire [1]** 1656/21
**return [3]** 1595/11 1647/16 1680/5

**R**

**returning [1]** 1643/3
**reversed [1]** 1553/13
**review [1]** 1584/17
**reviewing [1]** 1614/21
**revise [1]** 1666/13
**revisit [3]** 1554/1 1554/4 1554/24
**revisiting [1]** 1548/7
**rewind [1]** 1591/5
**rid [1]** 1613/6
**ridiculous [1]** 1598/13
**rights [9]** 1551/6 1572/11 1572/20
  1573/1 1604/22 1611/18 1611/19
  1642/8 1642/11
**ripe [1]** 1662/5
**rise [11]** 1557/18 1559/7 1578/4
  1617/17 1621/5 1656/23 1663/5
  1663/7 1668/18 1679/18 1682/4
**risk [1]** 1586/25
**RMR [2]** 1542/16 1683/24
**RMR-CRR [1]** 1683/24
**rob [1]** 1598/11
**Rodriguez [9]** 1585/4 1585/21
  1586/7 1587/11 1587/13 1588/17
  1598/6 1611/21 1612/3
**role [3]** 1571/23 1596/8 1640/24
**Ronald [4]** 1584/13 1603/15 1604/12
  1615/2
**room [21]** 1542/17 1559/5 1586/14
  1598/2 1598/21 1601/8 1612/10
  1613/24 1621/18 1647/3 1647/13
  1647/24 1647/24 1656/2 1656/19
  1656/20 1656/24 1664/2 1679/7
  1681/16 1681/23
**rooms [1]** 1606/3
**rough [2]** 1559/10 1559/13
**route [1]** 1666/14
**routes [1]** 1666/13
**rule [16]** 1543/10 1544/1 1544/23
  1548/6 1548/21 1550/7 1550/11
  1550/18 1551/22 1552/3 1553/9
  1554/5 1554/24 1555/2 1602/11
  1645/24
**Rule 29 [12]** 1543/10 1544/1 1544/23
  1548/6 1550/7 1550/11 1551/22
  1552/3 1553/9 1554/5 1554/24
  1555/2
**ruled [1]** 1547/25
**rules [15]** 1550/16 1572/2 1602/14
  1604/21 1621/16 1625/18 1638/16
  1638/17 1638/21 1638/22 1638/24
  1640/13 1640/16 1641/7 1641/13
**ruling [1]** 1544/23
**Rutgard [2]** 1545/9 1553/18

**S**

**S10.1 [1]** 1566/4
**sad [4]** 1603/11 1603/11 1603/12
  1605/23
**safe [1]** 1643/11
**sake [1]** 1549/12
**sakes [1]** 1592/21
**saline [1]** 1606/5
**Salopek [3]** 1542/16 1683/23

1683/24
**Sampath [1]** 1589/10
**Sampath-Grant's [1]** 1589/10
**sanction [1]** 1643/21
**satisfied [2]** 1543/9 1552/13
**satisfying [1]** 1546/6
**saw [34]**
**scan [1]** 1586/19
**scandal [1]** 1589/4
**scared [2]** 1610/2 1611/10
**scene [3]** 1630/3 1632/1 1638/11
**Schedule [4]** 1558/11 1558/16
  1558/17 1583/22
**Schedule II [4]** 1558/11 1558/16
  1558/17 1583/22
**Schedules [1]** 1642/21
**Schedules II [1]** 1642/21
**scheme [13]** 1588/1 1651/14
  1651/19 1651/25 1652/1 1652/24
  1653/6 1653/14 1653/22 1654/23
  1655/22 1655/23 1655/25
**school [4]** 1546/11 1555/12 1599/9
  1600/14
**scientific [3]** 1626/16 1643/10
  1644/8
**scope [27]** 1569/12 1570/7 1570/15
  1570/18 1571/24 1579/24 1580/6
  1580/13 1580/20 1581/21 1591/4
  1592/25 1593/3 1610/21 1610/22
  1616/2 1616/5 1616/11 1627/22
  1628/2 1631/9 1631/13 1631/15
  1632/15 1649/12 1650/4 1672/4
**scratch [2]** 1563/10 1563/16
**scratched [2]** 1659/1 1659/4
**screaming [1]** 1604/15
**script [1]** 1588/3
**scripts [1]** 1614/24
**scripts.' [1]** 1588/13
**seats [1]** 1656/7
**second [13]** 1549/5 1559/17 1559/19
  1564/24 1566/21 1576/21 1576/23
  1616/6 1658/16 1664/12 1674/10
  1675/5 1680/17
**secondary [1]** 1560/19
**secrecy [1]** 1616/12
**secret [2]** 1586/10 1646/15
**secretary [1]** 1657/1
**section [6]** 1630/9 1630/13 1630/13
  1632/9 1633/25 1683/19
**Section 841 [3]** 1630/13 1632/9
  1633/25
**Section 846 [1]** 1630/9
**security [1]** 1659/16
**seek [4]** 1595/11 1595/19 1596/1
  1647/1
**seeker [2]** 1584/5 1584/10
**seekers [6]** 1583/19 1584/18
  1584/23 1585/9 1593/7 1603/7
**seeking [2]** 1613/8 1665/19
**sees [1]** 1593/17
**segregate [1]** 1549/18
**self [1]** 1641/17
**self-determination [1]** 1641/17
**selling [1]** 1588/22

**send [18]** 1557/15 1617/22 1620/13
  1648/9 1648/24 1651/9 1656/5
  1656/8 1656/10 1656/10 1662/16
  1663/13 1664/3 1666/25 1672/17
  1674/16 1680/6 1680/15
**sending [3]** 1648/21 1674/22 1675/1
**sense [1]** 1603/15 1622/19 1623/14
**sentence [5]** 1599/14 1609/9
  1611/23 1625/17 1669/4
**sentences [1]** 1568/8
**September [3]** 1544/15 1544/17
  1544/17
**September 15 [1]** 1544/15
**September 15th [1]** 1544/17
**series [2]** 1579/15 1637/16
**served [1]** 1604/12
**service [5]** 1643/5 1643/7 1643/8
  1654/9 1654/11
**services [2]** 1654/6 1654/15
**serving [2]** 1603/18 1612/4
**setting [1]** 1637/15
**seven [1]** 1593/17
**shaking [1]** 1604/8
**shall [3]** 1643/2 1643/4 1643/11
**shape [1]** 1547/22
**shared [2]** 1590/19 1631/7
**she'll [1]** 1668/9
**Sheehan [2]** 1542/2 1665/14
**sheet [1]** 1562/22
**shoot [1]** 1605/10
**shooting [1]** 1605/7
**short [1]** 1643/11
**short-duration [1]** 1643/11
**shot [1]** 1606/6
**shown [1]** 1644/13
**sic [10]** 1543/25 1547/23 1552/10
  1554/16 1561/5 1591/7 1604/24
  1620/2 1640/9 1643/2
**sick [2]** 1659/12 1660/3
**side [7]** 1556/7 1578/18 1585/1
  1587/11 1597/10 1600/2 1606/4
**sidebar [2]** 1648/1 1650/23
**sides [2]** 1578/14 1648/18
**sign [3]** 1588/6 1647/15 1672/15
**signed [6]** 1585/14 1585/15 1608/14
  1613/20 1614/22 1672/17
**significance [5]** 1607/12 1607/20
  1609/13 1609/15 1625/9
**signs [2]** 1586/20 1598/3
**Silverman [8]** 1551/1 1572/8 1585/8
  1590/13 1590/17 1591/24 1593/1
  1593/14
**simple [1]** 1625/4
**Sinai [1]** 1612/18
**Sinclair [1]** 1542/10
**single [3]** 1574/25 1596/17 1622/4
**situation [3]** 1548/2 1677/2 1680/23
**Six days [1]** 1543/20
**skewered [1]** 1612/1
**skill [1]** 1642/23
**skimmed [1]** 1587/15
**slide [1]** 1591/6
**slides [1]** 1577/16
**slipped [2]** 1583/12 1670/13

**S**

**slips** [1]  1544/16
**slows** [2]  1614/17 1614/17
**slush** [1]  1617/5
**small** [1]  1659/14
**smoke** [1]  1656/16
**sober** [1]  1678/21
**social** [1]  1641/23
**society** [1]  1641/20
**socioeconomic** [1]  1615/23
**sole** [1]  1608/19
**solve** [1]  1581/15
**somebody's** [1]  1602/25
**someone's** [1]  1678/5
**sometime** [1]  1682/20
**son** [2]  1589/14 1612/6
**soon** [1]  1681/15
**soul** [1]  1592/5
**sound** [2]  1644/9 1676/5
**sounds** [1]  1678/7
**source** [3]  1574/10 1587/17 1606/12
**south** [3]  1598/7 1598/14 1608/18
**SOUTHERN** [1]  1541/2
**speaker** [2]  1652/6 1655/3
**special** [6]  1547/1 1548/24 1564/18
 1626/17 1673/14 1677/10
**specialist** [1]  1662/6
**specialized** [1]  1626/16
**specific** [11]  1621/21 1645/24
 1646/6 1646/8 1652/19 1653/2
 1655/17 1665/2 1665/4 1669/18
 1676/7
**specificity** [1]  1678/3
**specified** [8]  1545/16 1546/16
 1547/18 1553/15 1553/17 1554/9
 1554/12 1563/25
**specify** [1]  1669/21
**spectator** [1]  1638/14
**speed** [1]  1579/10
**spending** [1]  1600/22
**spent** [3]  1579/11 1593/10 1607/17
**spin** [1]  1602/3
**spiritual** [1]  1641/23
**split** [1]  1576/12
**spoke** [1]  1548/21
**spoken** [2]  1548/25 1578/20
**sport** [3]  1595/6 1595/9 1595/13
**sporting** [3]  1605/8 1605/9 1605/10
**sports** [1]  1595/6
**spreadsheet** [4]  1583/1 1583/7
 1583/11 1586/22
**spreadsheets** [2]  1582/19 1582/20
**Ss** [1]  1606/11
**stand** [10]  1545/3 1552/14 1589/2
 1589/24 1590/17 1592/1 1592/3
 1597/1 1604/8 1609/6
**standard** [51]
**standards** [6]  1563/2 1574/1 1613/1
 1634/7 1641/21 1644/12
**standing** [1]  1614/14
**stands** [1]  1596/25
**staple** [3]  1651/2 1663/13 1663/24
**stark** [1]  1597/24
**starts** [1]  1601/24

**state** [10]  1558/10 1563/7 1563/7
 1603/5 1626/18 1641/6 1643/15
 1643/21 1643/24 1654/15
**statement** [15]  1569/6 1613/6
 1616/19 1616/24 1625/3 1625/21
 1626/11 1652/5 1652/8 1652/17
 1652/17 1652/5 1655/5 1655/14
 1655/14
**statements** [2]  1575/16 1611/5
**states** [19]  1541/1 1541/6 1541/15
 1542/3 1542/17 1545/8 1551/6
 1563/4 1563/11 1563/17 1599/10
 1630/9 1630/12 1632/8 1633/16
 1635/21 1654/16 1659/1 1683/20
**States vs** [1]  1545/8
**station** [1]  1605/12
**status** [1]  1643/6 1664/6
**statute** [6]  1545/14 1551/4 1551/10
 1551/17 1572/16 1602/14
**statutes** [13]  1550/14 1550/17
 1550/25 1551/2 1572/2 1572/6
 1572/7 1572/15 1638/17 1638/20
 1638/22 1641/7 1665/17
**statutory** [1]  1669/20
**stay** [2]  1679/11 1682/1
**stealing** [1]  1593/6
**stenography** [1]  1541/24
**step** [2]  1589/17 1662/19
**Stephen** [3]  1584/21 1674/15
 1680/22
**stepping** [1]  1665/15
**stick** [2]  1591/6 1659/21
**stipulated** [2]  1616/20 1627/7
**stipulation** [9]  1549/6 1560/15
 1603/3 1627/7 1627/11 1627/11
 1657/21 1657/25 1658/3
**stipulations** [6]  1549/7 1549/12
 1550/4 1557/15 1558/6 1658/5
**stole** [1]  1594/3
**stolen** [1]  1606/14
**stood** [1]  1590/17
**stop** [1]  1620/10
**stories** [1]  1607/14
**story** [1]  1556/7
**straight** [1]  1579/8
**straightened** [1]  1658/11
**strained** [1]  1572/17
**strategy** [2]  1557/15 1556/20
**street** [8]  1542/4 1542/11 1542/14
 1552/25 1571/20 1588/23 1609/2
 1615/22
**strictly** [1]  1644/12
**strip** [1]  1594/19
**strong** [1]  1615/5
**structure** [3]  1616/12 1637/5
 1637/12
**structured** [3]  1637/4 1637/6 1637/7
**structuring** [5]  1543/12 1543/16
 1554/16 1564/7 1661/20
**stuck** [1]  1555/21
**stuff** [5]  1579/7 1619/22 1660/15
 1660/19 1660/20
**SUA** [1]  1544/4
**Suarez** [1]  1548/23

**subject** [7]  1545/14 1553/16 1571/14
 1633/7 1633/13 1641/19 1642/3
**submit** [4]  1612/16 1664/7 1664/12
 1677/10
**submitted** [2]  1551/15 1670/12
**submitting** [1]  1677/22
**subparts** [1]  1549/14
**substance** [30]
**substances** [32]
**substantially** [1]  1656/1
**substantive** [3]  1628/12 1628/14
 1649/14
**substitute** [2]  1566/22 1682/7
**substituted** [1]  1582/17
**subtracted** [1]  1576/21
**succeeded** [5]  1629/7 1630/24
 1649/21 1653/6 1655/23
**sudden** [1]  1600/20
**suffering** [1]  1641/25
**sufficiency** [1]  1553/2
**sufficient** [14]  1543/22 1544/5
 1544/11 1544/18 1544/20 1545/19
 1545/23 1546/22 1547/1 1574/11
 1630/1 1631/24 1673/8 1676/21
**suggest** [2]  1611/6 1624/5
**suggesting** [1]  1545/21
**suggestions** [1]  1574/9
**suggests** [1]  1676/21
**suicide** [8]  1552/23 1561/10 1561/12
 1606/16 1606/16 1606/20 1614/2
 1614/8
**Suite** [2]  1542/4 1542/11
**suits** [2]  1594/20 1615/14
**Sullivan** [4]  1584/20 1593/14
 1674/15 1680/22
**summaries** [1]  1560/20
**summary** [2]  1560/25 1561/4
**sums** [1]  1583/13
**supplement** [1]  1675/10
**supplemented** [3]  1676/3 1676/17
 1676/20
**support** [4]  1547/24 1548/1 1597/9
 1599/22
**supported** [1]  1644/2
**suppressing** [1]  1599/22
**surprise** [1]  1601/9
**surrounding** [1]  1594/20
**survived** [1]  1592/17
**survives** [1]  1664/9
**suspend** [1]  1603/1
**sustain** [1]  1675/4
**swing** [5]  1588/15 1588/16 1588/20
 1588/21 1589/5
**switch** [2]  1591/16 1592/11
**Sylvia** [1]  1582/16
**sympathy** [1]  1621/25
**system** [3]  1592/14 1592/16 1617/4

**T**

**table** [7]  1617/20 1620/20 1620/24
 1620/25 1674/8 1680/10 1680/15
**tainted** [1]  1546/2
**take** [31]
**takedown** [1]  1678/17

**T**

**taken [8]** 1573/17 1597/11 1618/6 1619/18 1626/23 1667/18 1668/20 1674/1
**takes [5]** 1546/24 1583/10 1595/8 1677/4 1680/24
**talk [20]** 1556/11 1580/3 1583/20 1584/10 1587/13 1587/24 1589/15 1593/5 1597/3 1597/24 1605/23 1610/18 1611/16 1612/18 1615/7 1616/6 1649/2 1667/23 1667/24 1681/22
**talked [6]** 1556/13 1607/4 1610/18 1610/19 1613/6 1658/23
**talking [9]** 1546/8 1564/16 1582/25 1583/9 1596/3 1600/21 1647/20 1670/17 1671/5
**talks [4]** 1560/24 1602/14 1657/16 1657/19
**Tammy [2]** 1650/24 1658/7
**tape [1]** 1599/16
**tapes [1]** 1617/23
**taught [1]** 1597/5
**tax [1]** 1617/6
**team [30]**
**technical [1]** 1626/16
**teeny [1]** 1658/13
**television [7]** 1651/14 1651/24 1652/25 1653/2 1653/5 1653/7 1653/9
**tell [29]**
**telling [15]** 1568/14 1572/13 1586/4 1586/6 1590/25 1597/16 1600/22 1603/24 1612/10 1612/21 1612/21 1612/22 1624/7 1625/5 1681/20
**tells [1]** 1594/1
**ten minutes [2]** 1593/18 1667/6
**ten percent [1]** 1546/12
**ten-year [2]** 1554/21 1554/23
**tend [2]** 1623/20 1625/6
**tendency [2]** 1652/15 1655/12
**term [7]** 1566/21 1571/13 1633/11 1633/14 1635/22 1636/2 1652/1
**terms [4]** 1544/3 1583/4 1665/24 1672/6
**testified [11]** 1550/13 1551/1 1569/10 1587/25 1589/6 1589/23 1591/14 1600/19 1611/18 1624/15 1624/21
**testifies [2]** 1560/5 1560/6
**testify [19]** 1555/4 1555/7 1555/10 1555/24 1556/2 1556/5 1556/14 1556/23 1556/24 1559/18 1559/21 1574/9 1574/14 1589/21 1590/23 1606/20 1622/10 1622/10 1626/5
**testifying [6]** 1555/18 1575/24 1590/19 1624/3 1625/24 1626/14
**testimonial [2]** 1675/14 1676/9
**testimony [43]**
**text [4]** 1582/12 1582/20 1583/1 1588/22
**textbook [1]** 1600/11
**texts [1]** 1583/8
**thank [21]** 1557/9 1558/4 1577/20

1578/22 1594/24 1595/1 1618/3 1618/4 1650/22 1659/8 1660/13 1660/14 1662/8 1662/22 1667/13 1667/15 1667/16 1668/13 1668/17 1682/21 1682/22
**thanks [1]** 1660/11
**theory [8]** 1570/9 1570/20 1571/17 1599/22 1599/23 1664/14 1665/20 1665/24
**therapists [1]** 1678/22
**thereby [1]** 1544/17
**they'd [1]** 1666/22
**thick [1]** 1583/25
**think [75]**
**thinking [1]** 1579/13
**Thirdly [1]** 1680/21
**thought [6]** 1567/13 1575/17 1588/21 1590/3 1590/21 1613/5
**thousand [4]** 1543/17 1543/23 1565/21 1604/11
**threats [1]** 1614/12
**threshold [2]** 1546/10 1546/13
**thug [1]** 1571/20
**Thus [3]** 1568/24 1634/9 1639/13
**ticket [1]** 1613/21
**tied [1]** 1593/14
**time [52]**
**times [4]** 1543/21 1552/5 1558/9 1558/13
**tip [1]** 1587/18
**tips [1]** 1587/11
**tired [2]** 1666/23 1681/5
**title [7]** 1630/9 1630/12 1632/8 1633/21 1669/3 1670/24 1683/20
**Title 21 [4]** 1630/9 1630/12 1632/8 1633/21
**titles [2]** 1594/20 1594/21
**token [1]** 1659/14
**tons [1]** 1590/7
**top [1]** 1594/10
**topic [1]** 1678/10
**total [1]** 1637/13
**touch [1]** 1583/25
**touched [1]** 1582/14
**trace [1]** 1563/25
**track [1]** 1576/25
**tragedy [1]** 1605/23
**training [1]** 1626/17
**transaction [24]** 1544/6 1545/20 1546/24 1547/9 1547/12 1553/17 1554/11 1565/18 1628/10 1633/5 1635/15 1635/16 1635/21 1635/22 1636/13 1636/20 1636/23 1637/5 1637/6 1637/6 1637/7 1637/9 1637/12 1644/25
**transactions [11]** 1544/13 1545/15 1546/6 1546/8 1547/2 1547/2 1547/24 1635/9 1637/16 1637/18 1665/21
**transcript [13]** 1541/13 1541/24 1587/14 1587/17 1610/20 1613/24 1674/14 1677/4 1677/5 1680/21 1680/24 1680/25 1683/21
**transcripts [6]** 1545/1 1584/15

1589/25 1594/21 1677/1 1677/2
**transfer [5]** 1545/12 1547/4 1635/23 1657/23 1658/1
**transferring [1]** 1637/13
**transfers [2]** 1558/15 1636/25
**translated [2]** 1600/11 1604/25
**transmission [1]** 1653/4
**transmitted [3]** 1651/23 1651/24 1652/25
**travelling [2]** 1664/15 1664/16
**treat [5]** 1551/9 1581/10 1604/10 1604/10 1639/4
**treated [9]** 1583/6 1583/15 1583/16 1583/18 1585/3 1593/3 1604/23 1642/19 1649/12
**treating [2]** 1569/19 1639/21
**treatment [20]** 1568/24 1569/3 1573/5 1625/21 1626/10 1634/6 1639/13 1639/17 1639/25 1641/19 1642/14 1642/22 1642/24 1643/4 1643/5 1643/12 1643/22 1644/3 1644/8 1650/4
**trends [1]** 1584/22
**trial [16]** 1541/13 1579/5 1579/8 1579/10 1621/24 1623/9 1624/25 1626/22 1629/9 1631/1 1634/14 1638/15 1638/19 1646/5 1666/1 1675/14
**trouble [2]** 1583/24 1611/20
**troubling [1]** 1548/5
**true [10]** 1568/16 1582/11 1588/25 1590/12 1603/20 1612/9 1612/10 1623/24 1675/23 1683/20
**trust [2]** 1599/1 1601/17
**trusting [2]** 1598/25 1608/8
**truth [17]** 1586/4 1586/6 1589/4 1595/11 1595/19 1595/25 1596/1 1603/24 1624/8 1624/10 1625/5 1627/8 1647/1 1652/8 1652/10 1655/5 1655/7
**truthful [3]** 1575/24 1625/24 1626/14
**truths [1]** 1595/22
**Twenty [1]** 1592/9
**Twenty-five [1]** 1592/9
**twice [1]** 1566/5
**two minutes [1]** 1557/5
**two weeks [1]** 1598/8
**two-sided [1]** 1674/6
**typed [3]** 1610/21 1648/22 1650/19
**typical [1]** 1671/23

**U**

**U.S [2]** 1542/3 1542/6
**U.S. [4]** 1544/7 1603/19 1674/9 1680/11
**U.S. Army [1]** 1603/19
**U.S. government [1]** 1680/11
**U.S. government's [1]** 1674/9
**U.S. v. Adams [1]** 1544/7
**Ubers [2]** 1587/12 1589/5
**uhm [5]** 1576/14 1608/21 1648/19 1650/9 1666/17
**ultimate [2]** 1633/7 1633/12
**ultimately [6]** 1561/1 1561/5 1605/16

**U**

**ultimately... [3]** 1607/5 1607/25 1677/13
**unabashedly [1]** 1599/11
**unambiguous [1]** 1550/19
**unanimous [8]** 1646/14 1677/11 1677/18 1680/2 1680/3 1680/4 1680/8
**unanimously [6]** 1565/2 1565/5 1565/14 1565/17 1566/23 1682/17
**uncomfortable [2]** 1566/15 1590/9
**uncontested [1]** 1585/17
**underlying [3]** 1561/1 1562/8 1632/7
**undermine [1]** 1589/11
**understand [18]** 1547/25 1555/6 1555/9 1555/15 1555/18 1555/22 1556/2 1556/8 1562/4 1564/17 1571/7 1571/13 1571/16 1611/11 1624/16 1649/23 1649/23 1651/10
**understanding [6]** 1546/22 1547/8 1556/22 1578/17 1629/24 1631/22
**Understood [1]** 1554/15
**undertaken [2]** 1570/3 1640/1
**unduly [1]** 1627/2
**unfair [1]** 1606/24
**uniform [1]** 1640/15
**unimportant [1]** 1625/11
**UNITED [18]** 1541/1 1541/6 1541/15 1542/3 1542/17 1545/8 1563/4 1563/11 1563/16 1599/10 1630/9 1630/12 1632/8 1633/16 1635/21 1654/16 1659/1 1683/20
**unlawful [26]** 1545/16 1546/16 1547/18 1553/15 1553/17 1554/9 1554/12 1563/25 1569/21 1628/24 1629/5 1629/16 1629/18 1629/21 1629/24 1630/16 1630/22 1631/8 1631/11 1631/12 1631/19 1631/22 1636/4 1636/6 1639/22 1644/24
**unlawfully [4]** 1632/10 1640/5 1641/3 1641/10
**unless [2]** 1609/25 1639/23
**unlikely [1]** 1660/2
**unprofessional [1]** 1642/5
**unquote [1]** 1584/15
**unto [1]** 1610/25
**untrue [2]** 1652/7 1655/4
**upfront [1]** 1598/20
**upstairs [2]** 1598/22 1674/21
**urine [1]** 1584/1
**us [16]** 1563/20 1590/11 1595/25 1596/18 1597/5 1597/17 1597/18 1599/4 1599/17 1604/24 1605/24 1620/1 1659/19 1661/4 1668/14 1670/20
**user [3]** 1628/5 1633/7 1633/12
**usual [8]** 1562/24 1570/11 1632/24 1634/2 1634/4 1634/18 1640/8 1640/21
**utilize [1]** 1643/11
**utter [1]** 1587/8

**V**

**v. [1]** 1544/7

**vagueness [1]** 1550/12
**valid [1]** 1644/3
**value [1]** 1635/17
**Ventura [1]** 1598/6
**Ventura-Rodriguez [1]** 1598/6
**verbiage [1]** 1682/15
**verdict [38]**
**verdicts [3]** 1579/21 1656/22 1669/23
**verify [1]** 1619/7
**versions [1]** 1664/8
**versus [4]** 1565/11 1587/6 1601/4 1610/21
**Veterans [2]** 1603/20 1604/14
**via [1]** 1558/15
**victim [2]** 1644/17 1645/1
**video [1]** 1600/20
**videos [8]** 1547/20 1585/19 1587/14 1590/9 1617/24 1620/4 1620/8 1620/12
**Videotape [2]** 1585/22 1585/24
**view [8]** 1561/1 1582/7 1586/17 1597/11 1643/18 1676/15 1676/24 1680/19
**viewed [1]** 1575/16 1595/14
**views [1]** 1591/12
**violated [1]** 1634/9
**violating [3]** 1572/6 1572/15 1645/24
**violation [4]** 1564/22 1630/12 1634/19 1638/17
**violations [7]** 1567/10 1567/14 1567/18 1638/19 1659/3 1661/19 1662/3
**visit [1]** 1601/7
**vitals [1]** 1586/24
**VOLUME [1]** 1541/17
**voluntarily [2]** 1645/16 1645/19
**volunteered [1]** 1678/7
**voted [1]** 1647/22

**W**

**wait [3]** 1577/10 1577/17 1662/17
**waiting [4]** 1577/14 1577/15 1608/10 1614/18
**waive [3]** 1557/21 1578/7 1621/8
**waiving [1]** 1575/15
**walk [1]** 1587/1
**walking [1]** 1598/23
**walks [2]** 1601/7 1603/17
**wallet [1]** 1598/15
**wander [1]** 1667/3
**warfare [1]** 1607/11
**Warfield [16]** 1569/10 1572/8 1581/20 1581/22 1583/20 1583/23 1585/8 1585/9 1590/11 1590/18 1591/23 1592/6 1599/24 1605/14 1612/15 1616/6
**Warfield's [1]** 1584/3
**warning [5]** 1576/14 1576/20 1576/24 1577/2 1591/11
**Washington [1]** 1542/8
**Watch [1]** 1590/8
**watching [1]** 1589/2
**we'd [1]** 1620/13

**website [1]** 1658/21
**WEDNESDAY [2]** 1543/1 1619/1
**week [3]** 1543/20 1579/7 1659/9 1659/9
**weeks [2]** 1543/20 1598/8
**weight [3]** 1623/21 1627/5 1627/12
**welcome [1]** 1659/21
**well-being [2]** 1642/9 1642/12
**wheelchair [1]** 1613/17
**whenever [3]** 1612/2 1643/1 1643/13
**whichever [2]** 1666/19 1672/20
**who's [4]** 1575/11 1587/1 1598/13 1665/16
**wide [1]** 1615/18
**widely [1]** 1643/9
**wife [1]** 1589/1
**willful [1]** 1638/13
**willfully [15]** 1574/20 1627/19 1627/21 1628/19 1629/19 1629/25 1631/11 1631/23 1634/17 1638/5 1639/1 1645/18 1645/23 1653/13 1654/4
**William [1]** 1541/14
**willing [4]** 1622/22 1644/20 1645/4 1645/5
**Willy [1]** 1613/20
**win [4]** 1595/8 1599/20 1609/10 1611/3
**wind [1]** 1604/1
**winded [1]** 1591/25
**winner [1]** 1611/1
**winners [2]** 1595/10 1595/19
**winning [1]** 1595/7
**wins [1]** 1611/4
**wire [51]**
**wired [1]** 1658/4
**wires [1]** 1672/11
**wish [1]** 1647/17
**withdraw [1]** 1637/13
**withdrawal [1]** 1635/23
**withdrawals [1]** 1636/25
**witness [32]**
**witness's [3]** 1624/18 1626/20 1626/20
**witnesses [16]** 1556/14 1556/18 1556/20 1574/17 1576/1 1582/9 1591/18 1592/3 1593/13 1597/21 1606/14 1623/4 1624/3 1625/25 1626/9 1626/15
**witnesses's [2]** 1625/12 1626/3
**woman [1]** 1607/25
**women [2]** 1595/25 1597/7
**wonder [4]** 1610/3 1610/5 1610/20 1670/1
**Wonka [1]** 1613/20
**word [4]** 1610/20 1645/15 1645/18 1661/7
**words [12]** 1552/14 1584/2 1603/21 1609/23 1628/24 1630/16 1638/12 1646/14 1649/10 1657/18 1671/19 1671/25
**work [4]** 1577/16 1587/12 1643/3 1665/16
**Workers' [9]** 1551/4 1551/5 1551/10

**W**

**Workers'... [6]**  1551/12 1551/14
 1551/16 1572/10 1573/17 1573/20
**working [5]**  1549/22 1551/11 1598/6
 1598/13 1608/18
**workman's [1]**  1643/2
**workmen's [2]**  1572/17 1573/9
**works [3]**  1591/12 1611/2 1640/14
**world [3]**  1596/3 1600/12 1611/7
**worried [1]**  1666/3
**worth [3]**  1604/3 1636/17 1665/10
**WPD [1]**  1541/4
**wrap [1]**  1593/23
**write [5]**  1563/17 1588/2 1647/18
 1657/8 1672/15
**writing [2]**  1585/21 1647/20
**written [4]**  1600/11 1651/8 1672/16
 1680/25
**wrong [3]**  1602/19 1614/23 1646/22
**wrote [3]**  1612/18 1612/19 1658/24

**X**

**Xanax [1]**  1600/23

**Y**

**yellow [1]**  1614/5
**Yep [1]**  1669/13
**Yoffie [5]**  1542/6 1543/13 1577/14
 1610/10 1667/9
**York [1]**  1542/8
**younger [1]**  1605/5

**Z**

**Zavertnik [1]**  1542/10
**zeroed [1]**  1547/13
**zombie [1]**  1614/15